IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
Southern Division

BRIAN J. MARTIN and YAHMI NUNDLEY,
individually and on behalf of all others
similarly situated,

v.

TROTT LAW P.C. (f/k/a TROTT & TROTT,
P.C.), DAVID A. TROTT, JANE DOE, AND
JOHN DOE.

Defendants.
_____/

Case No.

Hon.

Mag. Judge

CLASS ACTION

Andrew J. McGuinness (P42074)
ANDREW J. MCGUINNESS, ESQ.
122 S. Main St., Suite 118
P. O. Box 7711
Ann Arbor, MI  48107
Phone: (734) 274-9374
drewmcg@topclasslaw.com

Paul F. Novak (P39524)
Diana Gjonaj (P74637)
MILBERG LLP
One Kennedy Square
777 Woodward Avenue, Suite 890
Detroit, Michigan  48226
Phone: (313) 309-1760
pnovak@milberg.com
dgjonaj@milberg.com

Daniel R. Karon
Beau Hollowell
KARON LLC
700 W. St. Clair Avenue, Suite 200
Cleveland, Ohio 44113
Telephone: (216) 622-1851
dkaron@karonllc.com
bhollowell@karonllc.com

*Counsel for Plaintiffs and the Proposed Class*
_____/

COMPLAINT

**Introduction**

1.      Effective March 1978 the United States Congress enacted the Fair Debt Collection Practices Act ("FDCPA"). 15 U.S.C. § 1692, *et seq.* In so doing Congress stated its "findings and declaration of purpose" as follows:

> It is the purpose of this subchapter to eliminate abuse debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged*, and to promote consistent State action to protect consumers against debt collection abuses*.

15 U.S.C. § 1692(e) (emphasis added).

2.      Following Congress' express invitation, in 1980 and in 1981 the Michigan Legislature enacted the Michigan Occupational Code ("MOC"), M.C.L. § 339.901, *et seq.*, and the Regulation of Collection Practices Act ("RCPA"), M.C.L. § 445.251, *et seq.,* regulating the debt collection practices of collection agencies and "regulated persons" respectively (collectively, "Michigan collection practices statutes"). Like the FDCPA, 15 U.S.C. §1692e, these Michigan collection practices statutes prohibit "misleading" communications in connection with the collection of debts. M.C.L. §§ 339.915(e), 445.252(e). More specifically, the FDCPA and the Michigan collection practices statutes each expressly prohibit communications purporting to be from an attorney that are not actually communications from an attorney. 15 U.S.C. § 1692(e)(3); M.C.L. §§ 339.915(a), 445.252(a).

3.      Two years after enactment of the RCPA, in 1983, the professional corporation named for many years named Trott & Trott, P.C., was incorporated.

4.      This action concerns a particular misleading communication:  a form letter sent by defendant Trott Law, P.C. (f/k/a Trott & Trott, P.C.) ("Trott PC"), Michigan's dominant foreclosure firm, to hundreds of thousands of Michigan homeowners over the past several years.

5.      Under both the FDCPA and the Michigan collection practices statutes courts apply an objective "least sophisticated consumer" standard to determine whether communications are misleading.

6.      This case falls within a category of debt collection cases referred to as "attorney letterhead" cases. The form letters from Trott PC that are the subject of this Complaint are misleading in violation of both federal and state law because they suggest to consumers that they were authored by an attorney, when in fact they were not. Instead, these letters were generated and sent by non-attorney personnel without direct attorney involvement.

7.      A second category of claims relates to defendants' failure to comply with the statutory requirements for a "notice of debt" by omitting amounts claimed to be owed for attorneys' fees, rendering Trott PC's initial letter misleading under federal and state law for this additional reason.

8.      Finally, the reference to a looming sheriff's sale in a large subgroup of the form letters at issue, containing a solicitation of a request for a reinstatement quote, "overshadow" the notice-of-dispute rights of the debtor under the FDCPA, thereby violating the Michigan collection practices statutes as well.

**Jurisdiction and Venue**

9.      This Court has jurisdiction of both the FDCPA and the Michigan collection practices statutory claims under the Class Action Fairness Act, 28 U.S.C. §§ 1332(d), 1453, and 1711–1715, in that (i) the putative class contains more than 100 members; (ii) the claims total more than $5 million; and (iii) there is minimal diversity because a number of the more than 200,000 estimated class members who were Michigan residents when Trott PC sent them the Trott PC Foreclosure Letter (defined below) up to six or more years ago have since moved their domiciles outside of Michigan.

10.     This Court also has jurisdiction of the FDCPA claims under 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 15 U.S.C. § 1692k(d); and supplemental jurisdiction of the Michigan collection practices claims under 28 U.S.C. § 1367.

11.     Venue is proper in this district because all defendants reside here, all defendants conduct business here, all plaintiffs reside here, and the conduct complained of occurred here.

### Parties & Affiliates

12.     Plaintiff Brian J. Martin ("Martin") is an individual residing in Trenton, Michigan.

13.     Plaintiff Yahmi Nundley is an individual residing in Inkster, Michigan.

14.     Trott & Trott, P.C., filed with the Michigan Department of Licensing and Regulatory Affairs Corporations Bureau on December 1, 2014, a certificate changing its name to "Trott Law, P.C." On that same date the firm filed an assumed name certificate for "Trott & Trott, P.C." Effective January 2, 2015, the firm filed a certificate cancelling the assumed name certificate. The firm now goes publically by the name "Trott Law, P.C."  For purposes of this Complaint the term "Trott PC" refers both to Trott & Trott, P.C., and Trott Law, P.C., which are in fact and in law the same entity.

15.     Trott PC is a professional corporation organized under Michigan law.

16.     Trott PC holds itself out as a law firm.

17.     David A. Trott ("David Trott") is an attorney licensed to practice law in Michigan, and, on information and belief, a resident of Oakland County, Michigan. He was recently elected to Congress.

18.     For most of the Class Period (defined below), David Trott was the majority shareholder/owner of Trott PC and President and/or Managing Partner of that firm.

19.     In late 2014, after his election to Congress, on information and belief David Trott sold his interest in Trott PC. He is no longer employed by the firm.

4

20.     "Jane Doe" and "John Doe" are placeholders for an indeterminate number of partners or shareholders of Trott PC that may bear individual culpability for the claims stated in this Complaint, and may be separately liable therefore.

### Trott PC's Dominance of the Michigan Foreclosure Industry And The Nature Of Its Business

21.     David Trott appeared on the public television series "Due Process" produced by Henry Baskin, Esq., which originally aired in or about September 2007. On that program, David Trott stated that:

   a.  Trott PC started in 1992 "with 12 employees,"

   b.  That Trott PC had "grown to nearly 500 employees,"

   c.  That Trott PC had about 70 lawyers; and

   d.  That foreclosures are "what we do."

22.     Trott PC's LinkedIn "home" page (accessed May 19, 2014) stated that the firm:

[S]pecializes in all facets of real estate finance default legal work [and that] the firm represents mortgage bankers, banks, credit unions, mortgage servicers, regional property owners, investor groups and individual entrepreneurs in the state of Michigan.

23.     As of April 16, 2015, the firm's LinkedIn home page stated, in part, that the firm:

[S]pecializes in all facets of real estate finance legal work, including default servicing, bankruptcy, eviction and litigation [and that] the firm represents mortgage servicers, banks, credit unions, investor groups, commercial and multi-family property owners, and individual entrepreneurs.

24.     David Trott was interviewed for a feature story on "power lawyers" published on December 7, 2008, by Crain's Detroit Business magazine. The article identifies David Trott as President and Managing Partner of Trott PC.  According to Crain's, Trott PC:

   a.  "has had the narrow niche of foreclosure work since its inception in 1976";

   b.  is "one of the three largest foreclosure law firms in the country, based on business volume and employees";

      c.    may have handled some 40,000 "work-outs" in 2008 alone;

      d.    "offers technological services for the foreclosure process," and

      e.    "[t]he company now has more than 1,000 employees nationally."

25.      On information and belief, Trott PC employed less than 80 attorneys in 2008.

26.      In a 2014 article on "Leading Detroit Law Firms," Crain's Detroit Business reported that Trott PC had 73 attorneys combined in the following counties:  Wayne, Oakland, Macomb, Livingston, and Washtenaw.  This article ranks Trott PC as the 11th largest law firm in Southeastern Michigan.

27.      On May 18, 2014, the Detroit Free Press published an article recounting a "wide-ranging interview" with David Trott, in which he "talked about his late parents and their once-small law office, and how . . . he built it into a multi-company empire, at one point employing 1,800 people."

28.      On information and belief, other large law firms in Michigan have substantially fewer staff in relation to attorneys than Trott PC. For example, if Trott PC currently has 500 employees, of which 61 are attorneys[1], then some 12% of its employees are attorneys (less than one in eight). If it currently employs 1,000 people, including 61 attorneys, then only some 6% of its employees are attorneys (less than one in 16).

29.      In 2012, The Managing Partner Forum, working with ALM Legal Intelligence and The National Law Journal, conducted a comprehensive survey of mid-size US law firms. (ALM Survey.) Some 196 firms, with nearly 10,000 lawyers, participated.

---

[1] A search of the member directory of the Michigan Bar Association at www.michbar.org on April 15, 2015, revealed 61 attorneys listed with Trott PC.

30.     The ALM Survey found that in 2012 law firms averaged 83 support staff per 100 lawyers (ratio of .83 staff to one lawyer). If Trott PC has a total of 61 lawyers, and had an average ratio of support staff to lawyers, it would have approximately 51 support staff for a total of 112 employees (rather than 500 or more).

31.     Alternatively, if Trott PC has 1,000 employees and had an average ratio of support staff to attorneys among mid-sized American law firms it would employ approximately 546 attorneys rather than 61.

32.     American Processing Company, LLC (APC), is a Michigan corporation incorporated in June 2005.

33.     APC provides processing services for law firms engaged in the foreclosure services industry.

34.     APC, at the time of its incorporation, was owned by Trott PC, David Trott, and/or certain family members of David Trott.

35.     In October 2009, APC filed assumed name registrations with the State of Michigan for the names "National Default Exchange" and "NDeX."

36.     In this Complaint, the acronym "APC" refers to APC, National Default Exchange, and NDeX, or any of them.

37.     In or about March 2006, APC signed an exclusive services contract with Trott PC for a 15-year term, expiring in or about March 2021. On information and belief, among the principal terms of the APC/Trott PC exclusive services agreement are those whereby:

    a.     Trott PC agrees to use exclusively the services of APC for foreclosure services processing, unless a Trott PC client specifies that Trott PC use another provider; and

    b.     Trott PC agrees to pay APC a pre-negotiated fixed fee for each file it refers to APC for processing.

38.     On March 14, 2006, Trott PC and David Trott sold an 81% interest in APC to Dolan Media Group, k/k/a The Dolan Company (collectively, Dolan), for approximately $40 million. After this transaction, Trott PC and/or David Trott and/or his immediate family members, directly or through an entity they or he created identified as APC Investments, LLC, retained approximately an 18% interest in APC.

39.     In the fourth quarter of 2007, Dolan paid Trott PC $12.5 million for approximately a 9.1% interest in APC.

40.     On December 31, 2009, Dolan acquired approximately 5.2% of the equity interest in APC from David Trott and certain other partners of Trott PC for an aggregate purchase price of $8 million plus additional consideration of Dolan stock.

41.     On January 4, 2010, Dolan acquired 2.4 % of APC owned by David Trott or his affiliates for $5 million.

42.     As of December 31, 2007, 348 of APC's 505 employees worked at Trott PC's headquarters, located at 31440 Northwestern Highway, Farmington Hills, Michigan. This office building is owned by NW13, LLC (NW13).

43.     David Trott owned a 75% interest in NW13 from at least 2008 into 2012.

44.     In 2012, Trott PC leased 25,000 square feet of its headquarters to APC for $565,909. As of May 2014, David Trott continued to own 60% of NW13.

45.     According to State of Michigan records, until September 19, 2011, David Trott was the resident agent for APC and the registered office for APC was 31440 Northwestern Hwy, Ste 300, Farmington Hills, Michigan  48334.  As indicated on Exhibits A and B, attached, this address is in the same office building as Trott PC.

46.     According to Trott PC's 2014 Annual Report filed with the State of Michigan in May 2014, David Trott was Trott PC's resident agent, and the firm's registered office was at the same building address as that of APC, with a suite number 200 (Trott PC) instead of 300 (APC).

47.     David Trott was Chairman of APC prior to February 2, 2013.

48.     Dolan and/or APC have had one or more employment agreement(s) with David Trott in one or more executive officer position(s) since 2007, and have paid him compensation pursuant to such employment agreement(s).

49.     In 2007 and 2008, David Trott served as President of APC, and "led its sales and marketing efforts."

50.     David Trott was an executive officer of Dolan until May 17, 2012.

51.     According to a report published in the Detroit Free Press on May 18, 2014, David Trott was paid some $264,000 per year through February 2013 for his services at APC and/or Dolan, not counting stock options and other forms of compensation.

52.     During the Class Period (defined below), APC paid Net Director, LLC, and American Servicing Corporation for services provided to APC. David Trott has, over the Class Period, directly or indirectly held ownership interests in these two companies, including a 50% ownership interest in American Servicing Corporation until June 1, 2010.

53.     On information and belief, on or about August 31, 2013, Dolan sold that portion of APC covering its Michigan services, referred to as "NDeX Michigan," back to David Trott, individually or through his family members, and/or to Trott PC. The sale price has not been publically disclosed. On information and belief, Trott PC and David Trott owned, as recently as June 2014, directly or indirectly a majority interest in NDeX Michigan.

54.     According to Dolan's 2007 Form 10-K filed with the SEC, Trott PC handled 64% of all foreclosures in Michigan in calendar 2007.

55.     According to an article published by the Detroit Free Press on May 18, 2014, after interviewing David Trott ("U.S. House candidate David Trott made millions in mortgage crisis"), Trott PC handled "as many as 80,00 [foreclosures] in Michigan in a single year, by his own count." The Detroit Free Press identifies the single year as 2009.

56.     According to Dolan's SEC filings, Dolan through APC and/or other affiliates received the following sums for "mortgage default process services" provided to Trott PC in the following years, and recorded the following accounts receivables due from Trott PC for such services at year end:

| Year | Payments | Year-end A/R |
|------|----------|--------------|
| 2008 | $41,266,000 | $4,052,000 |
| 2009 | $43,534,000 | $4,380,000 |
| 2010 | $43,162,000 | $3,327,000 |
| 2011 | $33,451,000 | $4,450,000 |
| 2012 | $25,249,000 | $3,212,000 |

57.     On information and belief, the level of payments made by Trott PC to APC over the period 2008-2012 reflect the relative volume of Trott PC's handling of foreclosure-by-advertisement proceedings in Michigan over those years.

58.     By comparing Dolan/APC's income from Trott PC in 2009 with the 80,000 foreclosure proceedings David Trott says Trott PC handled that year, Trott PC's foreclosure volume for 2008, 2010, 2011, and 2012 can be estimated from Dolan's SEC filings data. (This calculation, while believed reliable, is only an estimate.  For example, the per-file processing charge paid by Trott PC to APC may have changed over the time period. Moreover, some clients may have required Trott PC to use a mortgage default process servicer other than APC to varying degrees over this time period.) Public data is not known to be available for 2013 or 2014.

59.     Based on this calculation[2], plaintiffs are able to estimate that following foreclosure volumes in Michigan by Trott PC for the following calendar years:

| 2008: | 76,297 |
|-------|--------|
| 2009: | 79,999 |
| 2010: | 76,802 |
| 2011: | 63,059 |
| 2012: | 43,793 |
| Total | 339,950 |

60.     Based on the foregoing calculations, on information and belief it is estimated that Trott PC has handled over 200,000 foreclosure-by-advertisement proceedings (non-judicial foreclosures) in Michigan over the Class Period (defined below).

61.     On information and belief, in each foreclosure-by-advertisement proceeding in Michigan handled by Trott PC in the past six years, Trott PC has sent a letter to the debtor/mortgagor in substantial conformity with Exhibits A and B to this Complaint, in that each such letter:

    a.  Was on firm letterhead;

    b.  Displayed David Trott's surname;

    c.  Identified Trott PC's client as the creditor or servicing agent;

    d.  Stated that Trott PC was retained by its client to foreclose the debtor's mortgage;

    e.  Purports to state a "total" amount due;

    f.  Did not disclaim that it was from an attorney;

---

[2] The calculation is as follows:  (i) per/year APC fees received from Trott PC derived from SEC form 10-K data, by taking year-end accounts receivables, adding calendar year payments, and subtracting previous year-end accounts receivable to get net dollar volume per calendar year; (ii) divide 2009 net dollar volume by the 80,000 foreclosures David Trott says Trott PC processed that year to yield a per-foreclosure fee of $548.28; and (iii) dividing the net dollar volume for each remaining calendar year by $548.28 to get an estimated foreclosure volume for each year. 2007 year-end accounts receivables was reported as $3,486,000.  Net dollar volumes per calendar year for the period 2008-2012 were calculated as $41,832,000; $43,862,000; 42,109,000; $34,574,000; and $24,011,000, respectively.

g.  Was (with rare exception) unsigned by an individual Trott PC lawyer; and

h.  Contained the typographic text "Trott & Trot, P.C.," and frequently the additional text "FORECLOSURE DEPARTMENT," at the end of the letter in the signature block.

**The Trott PC Foreclosure Letter**

62.     On or about May 3, 2012, Trott PC, David Trott, Jane Doe, and John Doe caused to be sent to plaintiff Martin by U.S. Mail a letter informing him that Trott PC had been retained by Bank of America to foreclose on a home that Martin and his wife owned located at 1844 Pinetree Drive in Trenton, Michigan. A true and correct copy of this letter (redacted) is attached as Exhibit A hereto.

63.     Exhibit A was an attempt to collect a debt allegedly owed by Martin on a note secured by a mortgage on his home.

64.     On or about August 12, 2014, Trott PC, David Trott, Jane Doe, and John Doe caused to be sent to plaintiff Yahmi Nundley by U.S. Mail a letter informing Ms. Nundley that Trott PC had been retained by 21st Mortgage Corporation to foreclose on a home that she owned located at 29143 Carlton Street in Inkster, Michigan. A true and correct copy of this letter (redacted) is attached as Exhibit B hereto.

65.     Exhibit B was an attempt to collect a debt allegedly owed by Nundley on a note secured by a mortgage on her home.

66.     The May 3, 2012, Trott PC letter to Martin and the August 12, 2014, Trott PC letter to Nundley are form letters, in that they were generated based on a standard form of letter used by Trott PC to initiate correspondence with Michigan residents whose mortgages Trott PC had been retained to foreclose. This form letter (as distinct from Exhibits A and B, which are two instances of it) is referred to herein as the "Trott PC Foreclosure Letter".

12

67.     The Trott PC Foreclosure Letter is sometimes referred to as a § 1692g notice, with reference to 15 U.S.C. § 1692g, or "notice of debt."

68.     On information and belief, form letters such as the Trott PC Foreclosure Letter are referred to internally at Trott PC as "default templates" or are generated using such "default templates."

69.     Using the May 3, 2012, Trott PC foreclosure letter to Martin as an example, on information and belief account-specific information such as the addressee, the "RE:" line, the Trott PC file number, the loan number, the principal balance, the unpaid interest, the late charges, any "corporate advance" (if applicable) and "total" was "merged" into the Trott PC Foreclosure Letter to generate such letters to Michigan residents.

70.     On information and belief, the Trott PC Foreclosure Letter has remained substantively consistent throughout the Class Period, with minor changes that do not materially affect the claims presented in this Complaint.

71.     On information and belief, the Trott PC Foreclosure Letter, since 2009:

   a.  Has been printed on Trott PC letterhead;

   b.  Has displayed David Trott's surname;

   c.  Has recited that Trott PC "is the creditor's law firm," and/or that Trott PC "represents" the creditor or servicer;

   d.  Has recited that "this matter was referred to this office to foreclose the mortgage";

   e.  Has not disclaimed that it was from an attorney;

   f.  Has not been signed by an individual attorney at Trott PC, but instead

   g.  Has been signed by a "department" or staff position (e.g, the "FORECLOSURE DEPARTMENT" as in Exhibits A and B).

13

72.     Plaintiffs received and reviewed Exhibits A and B, respectively, shortly after they were sent by or on behalf of Trott PC.

### The Misleading Character of the Trott PC Foreclosure Letter

73.     On information and belief, Exhibit A was not specifically authored by an attorney. In other words, an attorney did not write Exhibit A.

74.     On information and belief, Exhibit B was not specifically authored by an attorney. In other words, and attorney did not write Exhibit B.

75.     On information and belief, the Martin file was not reviewed by an attorney at Trott PC prior to Exhibit A being generated and sent by or on behalf of Trott PC to Martin.

76.     On information and belief, the Nundley file was not reviewed by an attorney at Trott PC prior to Exhibit B being generated and sent by or on behalf of Trott PC to Nundley.

77.     On information and belief, an attorney almost never reviews or specifically authors the Trott PC Foreclosure Letter, and in the rare instances that one does so this fact is discernable from Trott PC's records and files.

78.     On information and belief, Exhibits A and B were processed, in whole or in part, by APC.

79.     Exhibit A was not sent by an attorney.

80.     Exhibit B was not sent by an attorney.

81.     By using Trott PC letterhead, including David Trott's surname, and by containing the other elements recited above, Exhibits A and B suggest to the least sophisticated consumer that they were each sent by an attorney.

82.     By reciting that Trott PC "represents" the creditor or mortgage servicer, and that "this matter was referred to this office to foreclose the mortgage," Exhibits A and B suggest to the least sophisticated consumer that that they were each sent by an attorney.

14

83.     By including a signature block stating:  "Yours very truly, Trott & Trott, P.C.," Exhibits A and B suggest to the least sophisticated consumer that they were each sent by an attorney.

84.     The least sophisticated consumer reading Exhibits A or B could reasonably conclude that they were written by an attorney or, conversely, that they were not written by an attorney. Exhibits A and B are each misleading for this additional reason.

85.     Exhibits A and B and the Trott PC Foreclosure Letter are misleading to gullible or naïve consumers.

86.     The misleading character of Exhibits A and B is not based on a bizarre or idiosyncratic reading of these letters.

87.     The Trott PC Foreclosure Letter sent to each putative class member throughout the Class Period was misleading to the least sophisticated consumer for each of the reasons articulated herein as to Exhibits A and B.

88.     Whether or not a communication in connection with the collection of a debt is sent by an attorney is material to consumers, as indicated by Congress' and the Michigan Legislature's adoption of specific statutory text focusing on this question and establishing violations for misleading consumer on this issue in the FDCPA and the Michigan collection statutes, respectively.

**Violations of 15 U.S.C. § 1692g(a)(1) and Parallel Michigan Collection Statutory  Provisions**

89.     As stated by one Michigan court:

The FDCPA is extraordinarily broad and is treated as a strict liability statute in which a single violation is sufficient to establish liability. In addition, as a remedial statute, the FDCPA is liberally construed in favor of the consumer

*Stolicker v. Muller, Muller, Richmond, Harms, Myers, & Sgroi, P.C.,* 2005 U.S. Dist. LEXIS 32404, 6-7 (W.D. Mich. Sept. 8, 2005) (Bell, J; citations omitted).

90.     The FDCPA requires that within five days of an "initial communication" a debt collector transmit certain required information, including a statement of the amount of debt owed and the debtor's rights to dispute it.

91.     15 U.S.C. § 1692g provides, in pertinent part:

§ 1692g.  <u>Validation of debts</u>

(a)     Notice of debt; contents.  Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—

  (1) the amount of the debt;
    . . .
  (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

  (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

  (5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

(b)     Disputed debts.  . . . Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.

92.     Trott PC, throughout the Class Period, attempted to comply with the requirements of 15 U.S.C. § 1692g by including the required information in its initial letter to the mortgagor, the Trott PC Foreclosure Letter, as reflected in Exhibits A and B, attached.

93.     In April 2009, Trott PC sent a form Trott PC Foreclosure Letter to Tracey Kevelingham relating to a residence located at 2553 Lamplighter Lane, Bloomfield Township, Michigan.[3] A true and correct copy of this letter is attached as Exhibit C hereto.

94.     The April 2009 Trott PC letter to Ms. Kevelingham constituted a notice of debt regarding the Lamplighter Lane property. The letter showed "total indebtedness" of $326,841.41.

95.     Trott PC sent Ms. Kevelingham a reinstatement quote dated May 8, 2009, for the Lamplighter Lane property. A true and correct copy of this letter is attached as Exhibit D hereto.

96.     The May 8, 2009, reinstatement quote from Trott PC to Ms. Kevelingham listed attorneys' fees due as follows: "Recoverable Legal fees & Costs Good Through May 8, 2009: $1,373.00."

97.     As revealed by comparing Exhibits C and D, Trott PC failed to include the amount then due for attorneys' fees in the April 2009 notice of debt letter to Ms. Kevelingham.

98.     Likewise, in Exhibits A and B and, on information and belief, the Trott PC Foreclosure Letters sent to class members, the "total indebtedness" shown does not reflect accrued attorneys' fees due.

99.     As reflected in the May 8, 2009, Ms. Kevelingham reinstatement quote (Exhibit D), Trott PC has the capability to calculate attorneys' fees due from the debtor under the associated mortgage documents at a given point in time.

100.    On information and belief, all or virtually all (meaning with at most trivial exception) mortgages and/or associated notes involving Michigan residences as to which Trott PC

---

[3] As noted in the "Proposed Class" section, *infra*, plaintiffs do not seek to represent Ms. Kevelingham as a member of the class, but cite her publically-available documents in order to demonstrate defendants' business practices upon which their claims are based.

initiated foreclosure processing require a defaulting mortgagor to pay the mortgagee's attorneys'
fees associated with default, acceleration, and foreclosure proceedings.

101.    On information and belief, the mortgages and notes covering residential properties
in Michigan are form documents. These form documents are frequently promulgated to comply
with requirements of the Fannie Mae, Freddie Mac, HUD, VA, or other governmental or quasi-
governmental entities involved in financing residential mortgages.

102.    By way of example, the 2553 Lamplighter Lane mortgage of Ms. Kevelingham
foreclosed upon by Trott PC, a true and correct copy of which is attached as Exhibit E hereto,
utilized a "MICHIGAN--Single Family-- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3023 1/01" commonly used in Michigan. Paragraphs 9, 14 and 22 of this form mortgage
provide for the lender to collect attorneys' fees associated with protecting the lender's rights, with
an event of default and acceleration of the debt, and with invocation of the power of
sale/foreclosure rights, respectively.

103.    On information and belief, throughout the Class Period, Trott PC failed to include
the amount of attorneys' fees due to the debtor in the Trott PC Foreclosure Letters, which
operated as the notice of debt under 15 U.S.C. § 1692g.

104.    By including an incomplete "total indebtedness" amount in Exhibits A and B and
in the Trott PC Foreclosure Letters (by omitting attorneys' fees then owed), these
communications were false, misleading, and incomplete in violation of the FDCPA and the
Michigan collection statutes, whether or not plaintiffs or class members sought a reinstatement
quote.

105.    By routinely falsely stating the total indebtedness, defendants "[made] an
inaccurate, misleading, untrue, or deceptive statement or claim in a communication to collect a
debt …" in violation of the MOC and the RCPA.

## Overshadowing

106.    As set forth above, pursuant to 15 U.S.C. § 1692g(b), under the FDCPA a debt communication cannot "overshadow" a debtor's rights to seek validation or to dispute a debt in whole or in part.

107.    On information and belief, a high percentage (in excess of 50%) of the Trott PC Foreclosure Letters over the Class Period solicit a request for a reinstatement quote.

108.    For example, in Exhibit A, attached, the solicitation of a request for reinstatement quote takes the following form in its second paragraph:

> Under the terms of your mortgage, the creditor has elected to accelerate the total Indebtedness. It may, however, be possible to reinstate the mortgage, subject to the creditor's approval, by paying all past due installments late charges, delinquent taxes, insurance premiums, costs and fees incurred in the foreclosure. Requests for reinstatement information must be received and approved by this office before the date of the sheriff's sale. Please call (248) 593-1302 for information concerning reinstatement.

109.    The form of Trott PC Foreclosure Letter that solicits a request for a reinstatement quote is referred to hereinafter as "Trott PC Foreclosure Letter—SRRQ."

110.    Over the past six years, the group of mailings by defendants of the Trott PC Foreclosure Letter—SRRQ comprise a subset of the larger universe of mailings of all Trott PC Foreclosure Letters.

111.    On information and belief, Trott PC's mailings of the Trott PC Foreclosure Letter—SRRQ can be identified from the broader universe of Trott PC Foreclosure letters by automated means using Trott PC's data systems and records or those of third parties.

112.    Exhibits A and the Trott PC Foreclosure Letter—SRRQ overshadow debtors' validation and dispute rights in at least the following ways:

  a.  The first paragraph of the letter informs the homeowner that "[t]his matter was referred to this office to foreclose the mortgage."

b. The second paragraph proceeds to declare all amounts due under the mortgage to be accelerated, but holds out the promise of reinstating the mortgage if the debtor acts promptly.

c. Specifically, the second paragraph of the letter (before any validation rights are mentioned) emphasizes that the debtor's request for reinstatement information (for which the debtor is asked to call the provided telephone number) "must be received and approved by this office before the date of the sheriff's sale."

d. In context, the letter suggests that a sheriff's sale may be pending and that the debtor risks losing his or her home if he or she takes 30 days to dispute the debt, or even to request validation.

e. Nowhere in the letter or the attachment do defendants inform the debtor that no sheriff's sale will occur before the termination of the federally mandated 30-day dispute/validation period.

f. The least sophisticated consumer:

   i. Is not presumed to be represented by counsel;

   ii. Does not know the requirements of Michigan's non-judicial foreclosure statutes, or how they are applied;

   iii. Does not know, based on the information supplied in the Trott PC Foreclosure Letter, what (if any) of the required steps for foreclosure Trott PC had already taken (e.g., publication in a newspaper of record, or for how many weeks);

   iv. Indeed, would not even understand whether the "foreclosure" referred to by Trott PC was judicial or non-judicial, or whether a court had *already* entered a judgment of foreclosure (thereby increasing the perceived threat of a looming sheriff's sale).

g. Under these circumstances—especially given the emphasis on an unspecified reinstatement deadline that might be looming—the least sophisticated consumer would conclude that she runs the risk of losing the home if she takes advantage of her federally mandated dispute or validation rights.

113. By overshadowing plaintiffs' and class members' dispute and validation rights under 15 U.S.C. § 1692g(b), defendants simultaneously violated the MOC and/or the RCPA by

a. "Making an inaccurate, misleading, untrue, or deceptive statement or claim in a communication to collect a debt …", and by

b. "Misrepresenting in a communication with a debtor" both:

    i.    "The legal status of a legal action being taken or threatened"; and

    ii.    "The legal rights of the creditor or debtor."

M.C.L. §§ 331.915(e); 331.915(f)(i) &(ii) ; 445.252(e) & (f).

## Willfulness

114.    On February 26, 2008—more than seven years prior to the filing of the Complaint in this matter—the United States Court of Appeals for the Sixth Circuit issued a published opinion in *Amanda Kistner v. The Law Offices of Michael P. Margelefsky, LLC and Michael P. Margelefsky,* 518 F.3d 433 (6th Cir. 2008). In the *Kistner* decision, the court states: "This court has not previously had occasion to decide an "attorney letterhead" case under the FDCPA." *Id.* at 438.

115.    The Sixth Circuit in *Kistner* held that a form debt collection letter on law firm letterhead sent to "thousands" of debtors that was block signed "ACCOUNT REPRESENTATIVE" which did not disclaim that it was from an attorney suggested to the least sophisticated consumer that it was sent by an attorney, and therefor was potentially misleading where no attorney specifically reviewed or authored the letter.

116.    Alternatively, the *Kistner* court held that a debt collection letter sent to a consumer on law firm letterhead that was not individually signed by an attorney could reasonably be construed either to have been sent or, conversely, not to have been sent by an attorney and was therefore was potentially misleading to the least sophisticated consumer.

117.    The *Kistner* court further held that an individual named member of a limited liability company who engaged in the following conduct was a "debt collector":

    a.    Drafting of the form letter that was sent to plaintiffs and putative class members;

    b.    Being the sole member of the LLC;

    c.   Negotiating  terms with the mailing service provider used in the debt-collection practice;

    d.   Overseeing "compliance with applicable collection laws"; and

    e.    Becoming involved when the "intervention of a lawyer becomes necessary."

The *Kistner* court determined that such an individual may be held individually liable as a matter of law under the FDCPA without piercing the corporate veil.

118.    *Kistner* reversed summary judgment entered on the FDCPA claim and on a related state statutory claim in favor of both the corporate and the individual defendants and remanded the case to the district court for trial.

119.    On information and belief, in 2009 and throughout the Class Period Trott PC and David Trott held out Trott PC as Michigan's foremost foreclosure law firm.

120.    On information and belief, in 2009 and throughout the Class Period Trott PC and David Trott marketed their services by promoting Trott PC as having special expertise in the area of mortgage default services and foreclosures.

121.    As reflected in Exhibits A and B and in the Trott PC Foreclosure Letter, defendants included a disclosure required by the FDCPA in these form letters:

    THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE.

122.    The inclusion of the aforesaid notice reflects defendants' recognition throughout the Class Period that Trott PC's communications relating to the initiation of foreclosure-by-advertisement proceedings in connection with Michigan residents are or may be subject to the FDCPA, as communications relating to attempts to collect debts by a debt collector under that statute.

123.    On information belief, David Trott, Jane Doe, John Doe, and Trott PC—at least since the United States Supreme Court decided in *Heintz v. Jenkins*, 514 U.S. 291 (1995), that the

FDCPA applies to lawyers who regularly engage in debt collection—monitored published and unpublished FDCPA, MOC, RCPA and other consumer rights case law issued by the United States Supreme Court, the United States Court of Appeals for the Sixth Circuit, the United States District Courts for the Eastern and Western Districts of Michigan, and other courts on a periodic basis.

124.    To the extent that defendants did not monitor published Supreme Court and Sixth Circuit Court of Appeals debt collection practices case law their failure to do so was more than merely careless in view of the focus of Trott PC's practice and the volume of default services and related foreclosure proceedings the firm handles.

125.    On information and belief, prior to the publication of the *Kistner* case by the Sixth Circuit, Trott PC, David Trott, Jane Doe, and John Doe caused initial foreclosure letters to be sent to Michigan homeowners substantially in the form attached as Exhibit F hereto (December 10, 2007, Trott PC foreclosure letter to Gregory Keith, Jr.).

126.    A comparison between Exhibit F, attached (Trott PC Foreclosure letter sent the month before *Kistner* was issued) and Exhibit A, attached (Martin foreclosure letter sent more than five years later) reveals that defendants made no material change to the Trott PC Foreclosure Letter post-*Kistner*.

127.    Notwithstanding the publication of the *Kistner* decision, defendants continued to cause the Trott PC Foreclosure Letter—on Trott PC letterhead—to be sent to Michigan residents on information and belief by non-attorney collection staff prior to any specific review by an attorney.

128.    Defendants' conduct is "willful" as that term is used in M.C.L. § 445.257(2) because in continuing to send the Trott PC Foreclosure Letter in its pre-*Kistner* form for years after publication of that decision they "'ran a risk of violating the law substantially greater than

the risk associated with a reading that was merely careless.'" *Boggio v. USAA Fed. Sav. Bank,*

696 F.3d 611, 620 (6th Cir. 2012) (quoting *Safeco Ins. Co. v. Burr,* 551 U.S. 47, 57 (2007)

(construing "willful" under Fair Credit Reporting Act).

129.    In June 2000, the United States Courts of Appeal for the Seventh Circuit held:

> The dunning letter said that the "unpaid principal balance" of the loan (emphasis added) was $ 178,844.65, but added that "this amount does not include accrued but unpaid interest, unpaid late charges, escrow advances or other charges for preservation and protection of the lender's interest in the property, as authorized by your loan agreement. The amount to reinstate or pay off your loan changes daily. You may call our office for complete reinstatement and payoff figures." An 800 number is given.

> The statement does not comply with the [FDCPA] . . . . The unpaid principal balance is not the debt; it is only a part of the debt; the Act requires statement of the debt. The requirement is not satisfied by listing a phone number.

*Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, L.L.C.*, 214 F.3d 872, 875 (7th Cir.

2000) (Posner, C.J.) ("*McCalla*"). *McCalla* involved a claim against a law firm for violating 15

U.S.C. § 1692g(a)(1) by not listing "the amount of the debt."

130.    Attorneys employed at Trott PC have argued in briefs filed in this Court that courts

in this District follow *McCalla*. In other words, Trott PC lawyers have argued *McCalla* in support

of motions to dismiss FDCPA cases filed against Trott PC.

131.    Trott PC has been on at least constructive notice since June 2000 that it is required

under 15 U.S.C. § 1692g(a)(1) to list the amount of the debt inclusive of accrued attorneys' fees

in the "total" listed in the Trott PC Foreclosure Letter order to state the statutorily required

"amount of the debt."

132.    Defendants' failure to cause Exhibits A and B and the Trott PC Foreclosure Letter

to list "the amount of the debt" inclusive of accrued attorneys' fees was more than merely careless

in light of the plain language of the statute and the *McCalla* decision.

**Individual Responsibility of David Trott**

133.    On information and belief, David Trott as late as summer/early fall of 2014 owned an 80% interest in Trott PC.

134.    An October 30, 2012, Oakland County Legal News article identified David Trott as President and Managing Partner of Trott PC.  David Trott was President of Trott PC at least through October 2011.

135.    On information and belief, David Trott was the Chief Executive Officer of Trott PC in June 2014 and had held that position for the past several years.

136.    On a web site which, on information and belief, is or was subject to the control of David Trott, the following statement was posted in June 2014 regarding David Trott's management of Trott PC: "As an innovator, Dave applied his unique problem solving ability to evolving technologies, accounting services, E-mail optimization and staffing processes." Thus David Trott's own description of his activities at Trott PC paint him as a hands-on owner/manager.

137.    On information and belief, in his capacities as owner, Managing Partner, Managing Member, President and/or CEO of Trott PC, David Trott has had direct supervisory control and involvement until recently in the following throughout most of the Class Period:

   a.   The operations of Trott PC;

   b.   Establishing compliance policies and protocols for Trott PC, including compliance with state and federal collection practices laws;

   c.   Establishing the processes and work flow of Trott PC's foreclosure and "loss mitigation" services;

   d.   Appointing, supervising, and receiving reports from other managers and attorneys in management positions at Trott PC involved in the foreclosure services offered by the firm; and

      e.    Review and direct or indirect approval of form letters used in Trott PC's foreclosure services area, including the Trott PC Foreclosure Letter.

138.    On information and belief, David Trott was personally involved in creating, reviewing, and/or approving the Trott PC Foreclosure Letter and the Trott PC Foreclosure Letter—SRRQ, and in the adoption or implementation of the procedures whereby these form letters were sent to plaintiffs and to class members.

139.    On information and belief Jane Doe and John Doe are or were other Trott PC partners, shareholders, or members with substantial managerial and responsibility that materially participated in causing the Trott PC Foreclosure Letters and the Trott PC Foreclosure Letter—SRRQ to be sent to plaintiffs and to class members.

### Class Allegations

140.    Plaintiffs seeks certification of the following class(es) under Federal Rule of Civil Procedure 23(b)(3), as may be refined from time to time in its Motion for Class Certification, or any motion to amend or modify such certification based on further investigation or discovery:

> All individuals to whom Trott PC caused to be sent any version of the Trott PC Foreclosure Letter in connection with mortgages conveyed for residential real property located in Michigan, which was not returned as undelivered by the U.S. Post Office, dated from six years prior to the filing of the Complaint through the date that the Court issues an order certifying any class requiring notice in this matter, and through the date of entry of final judgment as to any class for which notice is not required under Federal Rule of Civil Procedure 23.

This proposed class is referred to herein as the "Class," and the time period indicated as the "Class Period."

141.    Pursuant to Rule 23 (c)(5), plaintiffs seek certification of the following subclasses:

      a.    All individuals to whom Trott PC caused to be sent any version of the Trott PC Foreclosure Letter in connection with mortgages conveyed for residential real property located in Michigan, which was not returned as undelivered by the U.S. Post Office, dated from one year prior to the filing of the Complaint through the date that the Court issues an order certifying any class requiring notice in this matter, and through the date of entry of final judgment as to any class for which

notice is not required under Federal Rule of Civil Procedure 23 ("FDCPA Subclass");

b.  All individuals to whom Trott PC caused to be sent any version of the Trott PC Foreclosure Letter—SRRQ soliciting a request for reinstatement quote in connection with mortgages conveyed for residential real property located in Michigan, which was not returned as undelivered by the U.S. Post Office, dated from six years prior to the filing of the Complaint through the date that the Court issues an order certifying any class requiring notice in this matter, and through the date of entry of final judgment as to any class for which notice is not required under Federal Rule of Civil Procedure 23 ("Overshadowing Subclass").

142.    Excluded from the Class and from each Subclass are any current employees of Trott PC and any individual who has either (i) litigated a claim against a defendant based upon the Trott PC Foreclosure Letter to final judgment, or (ii) signed a release encompassing the claims presented in this Complaint, to the extent released.

143.    Plaintiffs reserve the right to extend the Class Period to reflect any tolling of applicable statutes of limitations based upon other intervening class actions encompassing any claim stated herein.

144.    On information and belief, the Class is so numerous that joinder is impracticable in that it comprises over 200,000 individuals.

145.    On information and belief, the FDCPA Subclass is so numerous that joinder is impracticable in that it comprises over 3,000 individuals.

146.    On information and belief, the Overshadowing Subclass is so numerous that joinder is impracticable in that it comprises over 75,000 individuals.

147.    Plaintiffs' claim are typical of all class members in that plaintiffs and each putative class member were sent a substantially identical form of the Trott PC Foreclosure Letter that was misleading and incomplete in at least the ways set forth in this Complaint. Plaintiff Martin's overshadowing claim is typical of that of all Overshadowing Subclass members in that he and each putative Overshadowing Sublcass member were sent a substantively identical Trott PC

Foreclosure Letter—SRRQ, and each of their validation rights was violated in the ways alleged. Plaintiffs' claims arise from the same events or practices or course of conduct that gives rise to the claims of other class members, and their claims are based on the same legal theories.

148.    One or more common issues of law or fact are presented by the Class claims and each of the Subclass claims, including, *inter alia*:

a.  Whether the Trott PC Foreclosure Letter is misleading in any of the ways alleged in this Complaint;

b.  Whether the Trott PC Foreclosure Letter was sent by an attorney;

c.  Whether the least sophisticated consumer might reasonably believe the Trott PC Foreclosure Letter to have been sent by an attorney;

d.  Whether the least sophisticated consumer might reasonably believe the Trott PC Foreclosure Letter not to have been sent by an attorney;

e.  Whether the Trott PC Foreclosure Letter failed to state "the amount of the debt" as required by 15 U.S.C. § 1692g(a)(1);

f.  Whether the content and structure of the Trott PC Foreclosure Letter-SRRQ sent to the Overshadowing Subclass members overshadowed their validation rights under 15 U.S.C. § 1692g(b) and therefore the Michigan debt collection statutes;

g.  Whether this Court should enter a declaratory judgment declaring that the Trott PC Foreclosure Letter violates the FDCPA and the Michigan debt collection statutes as alleged;

h.  Whether this Court should enjoin defendants Trott PC, Jane Doe, and John Doe's violations of the debt collection statutes as alleged;

i.  Whether David Trott, Jane Doe, and John Doe are each individually liable for the violations of the federal and state debt collection statutory violations alleged;

j.  Whether Trott PC's, David Trott's, and the remaining defendants' violations of the Michigan debt collection statutes were "willful";

k.  What the net worth of Trott PC, David Trott, and the other defendants are for applying the FDCPA $500,000 statutory cap for absent class members;

l.  Whether the FDCPA Subclass members should be awarded statutory damages, attorneys' fees, and costs of suit under the FDCPA; and

m. Whether each class member should be awarded statutory damages under the Michigan debt collection statutes in the amount of $50, plus a civil fine of $150 per class member together with attorneys' fees and costs of suit.

149. These and other common issues are central to the claims of the Class and permit them to be resolved "in one stroke" on a classwide basis.

150. Plaintiffs are adequate representatives of the Class in that they have no conflict with other putative class members, understand their obligations as class representatives, and are represented by experienced class counsel with the expertise vigorously and competently to prosecute the class claims. Plaintiffs and their counsel will fairly and adequately represent the interest of the Class and the Subclasses.

151. The claims of the Class and of the Subclasses present a predominance of common over individual issues. More particularly:

a. In part because the least-sophisticated-consumer standard applicable to the claims is an objective one, whether or not the Trott PC Foreclosure Letter is misleading under the FDCPA and the Michigan debt collection statues presents overwhelmingly predominant common issues of fact and law, and

b. In part because the United States Court of Appeals for the Sixth Circuit has held that both the FDCPA and the RCPA are "strict liability" statutes, there are no defenses unique to individual class members that would create a predominance of individual issues.

152. Litigation of these claims on a classwide basis is superior to individual litigation because, *inter alia:*

a. The amounts at issue in an individual case are so small that individual lawsuits would otherwise be economically infeasible for the vast majority of class members;

b. Individual lawsuits would overburden the Court; and

c. Individual class members do not typically have an interest in controlling litigation of their own claims.

153. Class members will be identifiable from records in the possession or control of Trott PC, David Trott, Jane Doe, or John Doe, or that they have the effective power to obtain.

154. Counsel for plaintiffs does not anticipate any significant case management issues that would militate against certifying the Class and the Subclasses.

155. Additionally and in the alternative, plaintiffs request certification of a Class and Subclasses under Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief.

COUNT I

FAIR DEBT COLLECTION PRACTICES ACT – ATTORNEY LETTERHEAD CLAIMS

15 U.S.C. § 1692, *et seq.*

(Against All Defendants)

156. Plaintiffs incorporate by this reference the preceding paragraphs of this Complaint as if fully set forth herein.

157. Trott PC, David Trott, Jane Doe, and John Doe are or have been regularly engaged, directly and indirectly, in the collection of mortgage debts.

158. Trott PC, David Trott, Jane Doe, and John Doe are or have been "debt collectors" under the FDCPA. *Glazer v. Chase Home Fin. LLC,* 704 F.3d 453, 459 (6th Cir. 2013) (reversing dismissal of FDCPA claim against law firm that initiated foreclosure proceedings on the ground that it was not a "debt collector").

159. Exhibits A and B and the Trott PC Foreclosure Letter are communications in connection with the collection of residential mortgage debts.

160. Plaintiffs and class members are consumers.

161. The Trott PC Foreclosure Letter is misleading, false, and/or deceptive in violation of 28 U.S.C. §§ 1692e, 1692e(3) & 1692e(10) for at least the reasons set forth in this Complaint.

162.     David Trott, as Managing Member, President, and/or CEO of Trott PC during most of the Class Period, materially participated, directly and indirectly, in formulating and implementing the Trott PC business practices that caused the Trott PC Foreclosure Letter to be composed and sent to Nundley and to members of the FDCPA Subclass, and in drafting, approving, authorizing, or directing the issuance on behalf of Trott PC of the Trott PC Foreclosure Letter to Nundley and to members of the FDCPA Subclass, such that he is individually liable for violating the FDCPA and for Trott PC's violations of the FDCPA.

163.     On information and belief, Jane Doe and John Doe have each materially participated, directly or indirectly, in drafting, approving, authorizing, or directing the issuance on behalf of Trott PC of the Trott PC Foreclosure Letter during the Class Period to Nundley and to members of the the FDCPA Subclass, such that they are individually liable for violating the FDCPA and for Trott PC's violations of the FDCPA.

164.     Trott PC, David Trott, Jane Doe, and John Doe have profited from and were enriched by the acts and practices alleged herein to violate the FDCPA.

WHEREFORE, plaintiffs pray that this Court:

- Certify the FDCPA Subclass pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), and pursuant to Rule 23(c)(5);

- Designate them as representatives of the FDCPA Subclass;

- Designate plaintiffs' counsel as for the FDCPA Subclass;

- Enter judgment in favor of plaintiff Nundley and for each intervening FDCPA plaintiff in the amount of $1,000.00, plus applicable pre-judgment interest;

- Enter judgment in favor of the FDCPA Subclass, and against each defendant in the amount of $500,000, or 1% of their respective net worth (whichever is less), to be distributed *pro rata* (net of any attorneys' fees and costs reimbursement awarded by this Court to class counsel) to each subclass member who does not properly request to be excluded from the FDCPA Subclass;

- Enter an award in favor of plaintiffs and the FDCPA Subclass and against defendants for attorneys' fees and costs of suit, including notice costs and any fees and costs associated with any appeal; and

- Award such other and further relief as may be just and appropriate.

COUNT II

REGULATION OF COLLECTION PRACTICES ACT – ATTORNEY LETTERHEAD CLAIMS

Michigan Compiled Laws § 445.251, *et seq.*

(Against All Defendants)

165.    Plaintiffs incorporate by this reference the preceding paragraphs of this Complaint as if fully set forth herein.

166.    Plaintiffs' residential real estate mortgage and the debt secured thereby, and those of class members, were primarily for personal or household purposes for purposes of M.C.L. § 445.251(a). Plaintiffs and all class members are consumers.

167.    Trott PC, David Trott, Jane Doe, and John Doe are each "regulated persons" under the RCPA.

168.    Exhibits A and B and the Trott PC Foreclosure Letter are communications conveying information regarding residential mortgage debts.

169.    Plaintiffs and all class members suffered harm to their statutory rights under the RCPA to be free from misleading communications in connection with the collection of a debt.

170.    In light of the RCPA's purpose to avoid misleading communications by regulated persons, plaintiffs and all class members suffered an injury under the RCPA because Exhibit A and B and the Trott PC Foreclosure Letter suggests that the letters were sent by an attorney when they were not, rendering the letters misleading and causing actual and potential confusion, anxiety, and mental distress to plaintiffs and class members.

171.    In light of the RCPA's purpose to avoid misleading communications by regulated persons, plaintiffs and all class members suffered an injury under the RCPA because Exhibits A and B and the Trott PC Foreclosure Letter are subject to two possible reasonable interpretations—that they were and that they were not authored by an attorney—rendering the letters misleading and causing actual and potential confusion, anxiety, and mental distress to plaintiffs and class members.

172.    Plaintiffs and all class members had money collected from them by the use of Exhibits A and B and the Trott PC Foreclosure Letter  in at least one of the following ways:

a.    Foreclosure of their homes via a sheriff's sale as threatened in the letters, with the proceeds of the sale applied to the mortgage debt due;

b.    Reinstatement of the mortgage declared to be default in the letters by payment of allegedly past-due amounts and fees, as solicited by the letters; or

c.     Redemption of the foreclosed real property within the statutory period by payment on the debtor's behalf of the amounts statutorily required.

173.    Exhibits A and B and the Trott PC Foreclosure Letters sent to class members are misleading for at least the reasons set forth in this Complaint in violation of M.C.L. § 445.252(e).

174.    Exhibits A and B and the Trott PC Foreclosure Letter sent to class members violate M.C.L. § 445.252(a) because they are on attorney letterhead when in fact they were not sent by an attorney.

175.    In violation of M.C.L. § 445.252(q), Trott PC has failed to implement procedures designed to prevent its employees from violating the RCPA as alleged in this Complaint.

176.    Trott PC's , David Trott's, and Jane Doe's and John Doe's violations of the RCPA are willful.

177.    David Trott, as Managing Member, President, and/or CEO of Trott PC throughout most of the Class Period was directly and indirectly involved in formulating and implementing

33

the Trott PC business practices that caused Exhibits A and B and the Trott PC Foreclosure Letter

to be constructed and sent to plaintiffs and to class members, such that he is individually liable,

directly and indirectly, for violating the RCPA and for Trott PC's violations of the RCPA.

178.    Trott PC, David Trott, and Jane Doe and John Doe profited from and were

enriched by the acts and practices alleged herein to violate the RCPA.

WHEREFORE, plaintiffs pray that this Court:

- Certify the Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3);

- Designate plaintiffs as class representatives;

- Designate plaintiffs' counsel as class counsel;

- Enjoin defendants from engaging in further violations of the RCPA in connection with the Trott PC Foreclosure Letter in any of the ways alleged in this Complaint as determined by the Court or at trial;

- Enter judgment in favor of plaintiffs and the Class, and against defendants jointly and severally, in the amount of $200 for each plaintiff and for each class member who does not properly request exclusion from the Class;

- Enter an award in favor of plaintiffs and the Class and against defendants for attorneys' fees and costs of suit, including notice costs and any fees and costs associated with any appeal; and

- Award such other and further relief as may be just and appropriate.

## COUNT III
## FAIR DEBT COLLECTION PRACTICES ACT –
### FAILURE TO STATE THE AMOUNT OF THE DEBT

### 15 U.S.C. § 1692, *et seq.*

(Against All Defendants)

179.    Plaintiffs incorporate by this reference the preceding paragraphs of this Complaint

as if fully set forth herein.

180. Defendants caused Exhibits A and B and the Trott PC Foreclosure Letter to be sent to plaintiffs and the members of the proposed Class without including the total accrued attorneys' fees due from the debtor as of the date of the letter.

181. In so doing, defendants failed to state "the amount of the debt" as required by 15 U.S.C. § 1692g(a)(1).

WHEREFORE, plaintiffs pray that this Court:

- Certify the FDCPA Subclass pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), and pursuant to Rule 23(c)(5);

- Designate plaintiffs as subclass representatives;

- Designate plaintiffs' counsel as subclass counsel;

- Enter judgment in favor of plaintiff Nundley and for each intervening FDCPA plaintiff in the amount of $1,000.00, plus applicable pre-judgment interest;

- Enter judgment in favor of the Subclass, and against each defendant in the amount of $500,000, or 1% of their respective net worth (whichever is less), to be distributed *pro rata* (net of any attorneys' fees and costs reimbursement awarded by this Court to class counsel) to each subclass member who does not properly request to be excluded from the Subclass;

- Enter an award in favor of plaintiffs and the Subclass and against defendants for attorneys' fees and costs of suit, including notice costs and any fees and costs associated with any appeal; and

- Award such other and further relief as may be just and appropriate.

COUNT IV
REGULATION OF COLLECTION PRACTICES ACT –
FAILURE TO STATE THE AMOUNT OF THE DEBT

Michigan Compiled Laws § 445.251, *et seq.*

(Against All Defendants)

182. Plaintiffs incorporate by this reference the preceding paragraphs of this Complaint as if fully set forth herein.

183.    By omitting accrued attorneys' fees from the "total indebtedness" figure listed in Exhibits A and B and in the Trott PC Foreclosure Letter, defendants communicated with debtors "in a misleading or deceptive manner" in violation of M.C.L. § 445.252(a), and made "an inaccurate, misleading, untrue, or deceptive statement or claim in a communication to collect a debt" in violation of M.C.L. § 445.252(e).

WHEREFORE, plaintiffs pray that this Court:

- Certify the Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3);

- Designate plaintiffs as class representatives;

- Designate plaintiffs' counsel as class counsel;

- Enjoin defendants from engaging in further violations of the RCPA in connection with the Trott PC Foreclosure Letter in any of the ways alleged in this Complaint as determined by the Court or at trial;

- Enter judgment in favor of plaintiffs and the Class, and against defendants jointly and severally, in the amount of $200 for each plaintiff and for each class member who does not properly request exclusion from the Class;

- Enter an award in favor of plaintiffs and the Class and against defendants for attorneys' fees and costs of suit, including notice costs and any fees and costs associated with any appeal; and

- Award such other and further relief as may be just and appropriate.

COUNT V

FAIR DEBT COLLECTION PRACTICES ACT –
CLAIMS BASED ON OVERSHADOWING

15 U.S.C. § 1692, *et seq.*

(Against All Defendants)

184.    Plaintiffs incorporate by this reference the preceding paragraphs of this Complaint as if fully set forth herein.

185.    As set forth in the "Overshadowing" section of this Complaint, *supra*, Exhibit A and the Trott PC Foreclosure Letter—SRRQ, in their content and structure, overshadow the ostensible notice of debtors' dispute and validation rights contained in those letters.

186.    Exhibits A and the Trott PC Foreclosure Letter —SRRQ constitute "communications during the 30-day period [that] overshadow or [are] inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor" in violation of 15 U.S.C. § 1692g(b).

WHEREFORE, plaintiffs pray that this Court:

- Certify the Overshadowing Subclass pursuant to Federal Rules of Civil Procedure 23(b)(2) and Rule 23(b)(3), and pursuant to Rule 23(c)(5);

- Designate plaintiffs as subclass representatives;

- Designate plaintiffs' counsel as subclass counsel;

- Enter a declaratory judgment that the Trott PC Foreclosure Letter—SRRQ violates the FDCPA by overshadowing the notice of consumers' dispute and validation rights;

- Enter judgment in favor of each intervening Overshadowing Subclass plaintiff who was sent a Trott PC Foreclosure Letter—SRRQ within the past year in the amount of $1,000.00, plus applicable pre-judgment interest;

- Enter judgment in favor of the Overshadowing Subclass, and against each defendant in the amount of $500,000, or 1% of their respective net worth (whichever is less), to be distributed *pro rata* (net of any attorneys' fees and costs reimbursement awarded by this Court to class counsel) to each Overshadowing Subclass member who does not properly request to be excluded from the such Subclass;

- Enter an award in favor of the Overshadowing Subclass and against defendants for attorneys' fees and costs of suit, including notice costs and any fees and costs associated with any appeal; and

- Award such other and further relief as may be just and appropriate.

COUNT VI

REGULATION OF COLLECTION PRACTICES ACT –
CLAIMS BASED ON OVERSHADOWING

Michigan Compiled Laws § 445.251, *et seq.*

(Against All Defendants)

187.     Plaintiffs incorporate by this reference the preceding paragraphs of this Complaint as if fully set forth herein.

188.     Defendants caused Exhibits A and the Trott PC Foreclosure Letter—SRRQ to be sent to plaintiff Martin and the Overshadowing Subclass members, and in so doing "misrepresent[ed] in a communication with a debtor 1 or more of the following:  (i) The legal status of a legal action being taken or threatened; [or] (ii) The legal rights of the creditor or debtor" in violation of M.C.L. § 445.242(f), and communicated in a misleading manner and made misleading or deceptive statements in violation of M.C.L. §§ 445.252(a) & (e), by*, inter alia*:

    a.  Suggesting that a sheriff's sale was imminent; by failing to disclose whether a judicial or non-judicial foreclosure proceeding had been initiated; and by failing to indicate when a sheriff's sale might be scheduled in relation to debtors' validation rights; and

    b.  By overshadowing plaintiffs' and class members' validation rights under federal law as set forth above.

WHEREFORE, plaintiffs pray that this Court:

- Certify the Overshadowing Subclass pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), and Rule 23(c)(5);

- Designate plaintiffs as subclass representatives;

- Designate plaintiffs' counsel as subclass counsel;

- Enjoin defendants from engaging in further violations of the RCPA in connection with the Trott PC Foreclosure Letter—SRRQ in any of the ways alleged in this Complaint as determined by the Court or at trial;

- Enter judgment in favor of plaintiff Martin and the Overshadowing Subclass, and against defendants jointly and severally, in the amount of $200 for each plaintiff and for each Overshadowing Subclass member who does not properly request exclusion from the Class;

- Enter an award in favor of plaintiffs and the Overshadowing Subclass and against defendants for attorneys' fees and costs of suit, including notice costs and any fees and costs associated with any appeal; and

- Award such other and further relief as may be just and appropriate.

COUNT VII
DECLARATORY RELIEF

28 U.S.C. §§ 2201 & 2202

(Against All Defendants)

189. Plaintiffs incorporate by this reference the preceding paragraphs of this Complaint as if fully set forth herein.

190. There is an actual controversy between plaintiffs and the Class on one hand, and defendants on the other, regarding the whether the Trott PC Foreclosure Letter and Trott PC Foreclosure Letter-SRRQ violate the FDCPA and the RCPA as alleged.

191. Pursuant to 28 U.S.C. § 2201, this Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

192. On information and belief, Trott PC, Jane Doe, and John Doe continue to send foreclosure letters that violate of the FDCPA and the RCPA as alleged herein.

WHEREFORE, plaintiffs pray that this Court enter a judgment declaring that:

a. the Trott PC Foreclosure Letter violates the FDCP by misleading the least sophisticated consumer as to whether or not it was sent by an attorney;

b. the Trott PC Foreclosure Letter violates the RCPA by misleading the least sophisticated consumer as to whether or not it was sent by an attorney;

c.  the Trott PC Foreclosure Letter violates Section 1692g(a)(1) of the FDCPA by failing to state the amount of the debt;

d.  the Trott PC Foreclosure Letter violates the RCPA because it "[made] an inaccurate, misleading, untrue, or deceptive statement or claim in a communication to collect a debt …" by failing accurately to state the amount of the debt;

e.  the Trott PC Foreclosure Letter—SRRQ violates the FDCPA by overshadowing debtor' dispute and validation rights;

f.  the Trott PC Foreclosure Letter—SRRQ violates the RCPA by misleading debtors about "[t]he legal status of a legal action being taken or threatened," and about "[t]he legal rights of the creditor or debtor," M.C.L. §§ 445.252(e) & (f); and

g.  such other and further declaratory relief to which plaintiffs and the class are entitled.

## JURY DEMAND

Plaintiffs request a trial by jury for every issue so triable.

Dated: August 11, 2015

Respectfully submitted,

Andrew J. McGuinness (P42074)
ANDREW J. MCGUINNESS, ESQ.
122 S. Main St., Suite 118
P. O. Box 7711
Ann Arbor, Michigan  48107
Phone:  (734) 274-9374
drewmcg@topclasslaw.com

Paul F. Novak (P39524)
Diana Gjonaj (P74637)
MILLBERG LLP
One Kennedy Square
777 Woodward Avenue, Suite 890
Detroit, Michigan  48226
Phone: (313) 309-1760
pnovak@milberg.com
dgjonaj@milberg.com

Daniel R. Karon
Beau Hollowell
KARON LLC
700 W. St. Clair Avenue, Suite 200
Cleveland, Ohio 44113
Telephone: (216) 622-1851
dkaron@karonllc.com
bhollowell@karonllc.com

*Counsel for Plaintiffs and the Proposed Class*

# EXHIBIT A

# TROTT & TROTT

*A PROFESSIONAL CORPORATION*

| HEADQUARTERS: | GRAND RAPIDS: |
|---|---|
| 31440 Northwestern Hwy - Suite 200 | 4024 Park East Court Suite B |
| Farmington Hills, MI 48334 | Grand Rapids, MI 49546 |
| 248-642-2515 Fax 248-642-3628 | 616-942-0893 Fax 616-942-0921 |

**THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT.
ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE.**

May 03, 2012



Brian J. Martin
1844 Pinetree Dr
Trenton, MI 48183-1713

RE: Martin, Brian
1844 Pinetree Dr
Trenton, MI 48183-1713
T&T # 294671F02
Loan #
HUD #

Dear Borrower(s)

This office represents Bank of America, N.A., which is the creditor to which your mortgage debt is owed or the servicer for the creditor to which the debt is owed. This matter was referred to this office to foreclose the mortgage. As of the date of this letter the total indebtedness is:

| | |
|---|---|
| Principal Balance | $143,059.85 |
| Unpaid Interest | $6,035.95 |
| Late Charges | $45.45 |
| Corporate Advance | $101.75 |
| Total: | $149,243.00 |

Under the terms of your mortgage, the creditor has elected to accelerate the total indebtedness. It may, however, be possible to reinstate the mortgage, subject to the creditor's approval, by paying all past due installments, late charges, delinquent taxes, insurance premiums, costs and fees incurred in the foreclosure. Requests for reinstatement information must be received and approved by this office before the date of the sheriff's sale. Please call (248) 593-1302 for information concerning reinstatement.

The debt described above will be assumed to be valid by this office, the creditor's law firm, unless you, the debtor/consumer, within thirty (30) days after the receipt of this notice, dispute the validity of the debt, or any portion thereof. If you notify this office in writing within thirty (30) days of the receipt of this notice, that the debt, or any portion thereof, is disputed, we will obtain a verification of the debt and a copy of the verification will be mailed to you. If the debt is based on a judgment, a copy of the judgment will be provided for you upon request.

If the creditor named in paragraph one of this letter is not the original creditor, and if you make a written request to this office within thirty (30) days from the receipt of this notice, the name and address of the original creditor will be mailed to you.

Written requests should be addressed to:
FAIR DEBT COLLECTION CLERK - FC X
Trott & Trott, P.C.
31440 Northwestern Highway Ste 200
Farmington Hills, MI 48334-2525

Please contact this office at the aforementioned number if you are on active military duty. To the extent your original obligation has been discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this notice is for compliance and/or informational purposes only and/or is notice of the creditor's intent to enforce a lien against the property and does not constitute a demand for payment or an attempt to impose personal liability for such obligation.

Yours very truly,
Trott & Trott, P.C.
FORECLOSURE DEPARTMENT





This page intentionally left blank.

NOTICE REQUIRED BY THE
FAIR DEBT COLLECTIONS PRACTICES ACT
15 U.S.C. SECTION 1692g AS AMENDED

1. The amount of the debt is stated in paragraph one of the letter which is attached hereto.

2. The name of the creditor to whom the debt is owed, or the servicing agent for the creditor to whom the debt is owed, is set forth in paragraph one of the letter which is attached hereto.

3. The debt described in the letter attached hereto will be assumed to be valid by this office, the creditor's law firm, unless you, the debtor/consumer, within thirty (30) days after the receipt of this notice, disputes the validity of the debt or any portion thereof.

4. If you notify this office, in writing, within thirty (30) days of the receipt of this notice, that the debt, or any portion thereof, is disputed, we will obtain a verification of the debt and a copy of the verification will be mailed to you.

5. If the creditor named in paragraph one of the Letter attached hereto is not the original creditor, and if you make a written request to this office within thirty (30) days from the receipt of this notice, the name and address of the original creditor will be mailed to you.

6. Any information obtained from you will be used for the purpose of foreclosing the mortgage that is in default.

7. Written requests should be addressed to: FAIR DEBT COLLECTION CLERK - FC X

Trott & Trott P.C.
31440 Northwestern Highway Ste 200
Farmington Hills, MI 48334-2525


@@@@

# EXHIBIT B

FC H

Yahmi Nundley
29143 Carlton St
Inkster, MI 48141-1621



# TROTT & TROTT

*A PROFESSIONAL CORPORATION*

**HEADQUARTERS:**
31440 Northwestern Hwy - Suite 200
Farmington Hills, MI 48334
248-642-2515  Fax 248-642-3628

**GRAND RAPIDS:**
4024 Park East Court Suite B
Grand Rapids, MI 49546
616-942-0893  Fax 616-942-0921

**THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT.
ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE.**

August 12, 2014

Yahmi Nundley
29143 Carlton St
Inkster, MI 48141-1621

RE: Nundley, Yahmi
    29143 Carlton St
    Inkster, MI 48141-1621
    T&T #    6F02
    Loan #    03
    #   3311



Dear Borrower(s):

This office represents 21st Mortgage Corporation. This matter was referred to this office to foreclose the mortgage. Under the terms of the mortgage, our client has elected to accelerate the total indebtedness due and owing under the mortgage. Because of interest, and other charges that may vary from day to day, the total amount due may differ depending on the day of payment.

As of the date on this letter the total indebtedness is:

| | |
|---|---|
| Principal Balance | $68,000.00 |
| Unpaid Interest | $26,070.78 |
| Late Charges | $302.43 |
| Less Suspense Amount | $10.53 |
| *Total:* | $94,362.68 |

Identification of Creditor: The mortgage debt is owed to 21st Mortgage Corporation. 21st Mortgage Corporation is the servicer of the debt. The mortgage loan payments are made to the servicer.

Unless you notify this office within thirty (30) days after receiving this notice that you dispute the validity of this debt, or any portion thereof, this office will assume this debt is valid.  If you notify this office in writing within thirty (30) days after receiving this notice that you dispute the validity of this debt, this office will obtain verification of the debt or a copy of the judgment, if applicable, and mail a copy of such verification or judgment to you.  If you request, in writing, within thirty (30) days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

Please contact this office if you are on active military duty.  To the extent the mortgage debt has been discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this notice is for compliance and/or informational purposes only and/or is notice of the creditor's intent to enforce a lien against the property and does not constitute a demand for payment or an attempt to impose personal liability for such obligation.

Yours very truly,
Trott & Trott P.C.

## TROTT & TROTT

A PROFESSIONAL CORPORATION

31440 Northwestern Highway • Suite 200
Farmington Hills, MI 48334



U.S. POSTAGE >> PITNEY BOWES

ZIP 48334   **$ 000.48**
02 1W
0001381313 AUG  12  2014





This page intentionally left blank.

# EXHIBIT C

# TROTT & TROTT

*A PROFESSIONAL CORPORATION*

| HEADQUARTERS: | GRAND RAPIDS: |
|---|---|
| 31440 Northwestern Hwy - Suite 200 | 4024 Park East Court Suite B |
| Farmington Hills, MI 48334 | Grand Rapids, MI 49546 |
| 248-642-2515  Fax 248-642-3628 | 616-942-0893  Fax 616-942-0921 |

**THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT.
ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE.**

April, 2, 2009

Tracey Kevelighan                                                RE: Kevelighan, Tracey
2553 Lamplighter Ln                                                  2553 Lamplighter Ln
Bloomfield Hills, MI 48304-1934                                      Bloomfield Hills, MI 48304-1934
                                                                     T&T #          F01
                                                                     Loan #          0713

Dear Borrower(s)

This office represents America's Servicing Company, which is the creditor to which your mortgage debt is owed or the
servicing agent for the creditor to which the debt is owed. The creditor has referred this matter to this office with
instructions to commence foreclosure proceedings against the property. As of the date of this letter the total
indebtedness owing to the creditor on the mortgage is:

| | |
|---|---|
| Principal Balance | $275,559.56 |
| Unpaid Interest | $24,791.87 |
| Late Charges | $2,380.25 |
| Corporate Advance | $1,744.15 |
| Escrow Advance | $22,305.58 |
| Inspection Fees | $60.00 |
| *Total:* | **$326,841.41** |

Under the terms of your mortgage, the creditor has elected to accelerate the total indebtedness. It may, however, be
possible to reinstate the mortgage, subject to the creditor's approval, by paying all past due installments, late charges,
delinquent taxes, insurance premiums, costs and fees incurred in the foreclosure. Requests for reinstatement
information must be received and approved by this office before the date of the sheriff's sale. Please call 248.593.1309
for information concerning reinstatement.

The debt described above will be assumed to be valid by this office, the creditor's law firm, unless you, the
debtor/consumer, within thirty (30) days after the receipt of this notice, dispute the validity of the debt, or any portion
thereof. If you notify this office in writing within thirty (30) days of the receipt of this notice, that the debt, or any portion
thereof is disputed, we will obtain a verification of the debt and a copy of the verification will be mailed to you. If the debt
is based on a judgment, a copy of the judgment will be provided for you upon request.

If the creditor named in paragraph one of this letter is not the original creditor, and if you make a written request to this
office within thirty (30) days from the receipt of this notice, the name and address of the original creditor will be mailed to
you.

Written requests and checks for less that the full amount of the debt should be addressed to:
FAIR DEBT COLLECTION CLERK - FC D
Trott & Trott, P.C.
31440 Northwestern Highway Ste 200
Farmington Hills, MI 48334-2525

Please contact this office at the aforementioned number if you are on active military duty. If you have previously received
a discharge in a bankruptcy this correspondence is not and should not be construed as an attempt to collect a debt;
instead this correspondance is notice of the creditor's intent to enforce a lien against property.

Yours very truly,
Trott & Trott, P.C.
FORECLOSURE DEPARTMENT

EXHIBIT "12," p.1/2

**NOTICE REQUIRED BY THE**
**FAIR DEBT COLLECTIONS PRACTICES ACT**
**15 U.S.C. SECTION 1692g AS AMENDED**



1. The amount of the debt is stated in paragraph one of the letter which is attached hereto.

2. The name of the creditor to whom the debt is owed, or the servicing agent for the creditor to whom the debt is owed, is set forth in paragraph one of the letter which is attached hereto.

3. The debt described in the letter attached hereto will be assumed to be valid by this office, the creditor's law firm, unless you, the debtor/consumer, within thirty (30) days after the receipt of this notice, disputes the validity of the debt or any portion thereof.

4. If you notify this office, in writing, within thirty (30) days of the receipt of this notice, that the debt, or any portion thereof, is disputed, we will obtain a verification of the debt and a copy of the verification will be mailed to you.

5. If the creditor named in paragraph one of the Letter attached hereto is not the original creditor, and if you make a written request to this office within thirty (30) days from the receipt of this notice, the name and address of the original creditor will be mailed to you.

6. Any information obtained from you will be used for the purpose of foreclosing the mortgage that is in default.

7. Written requests should be addressed to: FAIR DEBT COLLECTION CLERK - FC D

Trott & Trott P.C.
31440 Northwestern Highway Ste 200
Farmington Hills, MI 48334-2525


@@@@

EXHIBIT "12," p.2/2

# EXHIBIT D

# TROTT & TROTT

*A PROFESSIONAL CORPORATION*

|  |  |
|---|---|
| HEADQUARTERS: | GRAND RAPIDS: |
| 31440 Northwestern Highway • Suite 200 | 4024 Park East Court • Suite B |
| Farmington Hills, MI 48334 | Grand Rapids, MI 49546 |
| 248-642-2515 • Fax 248-642-3628 | 616-942-0893 • Fax 616-942-0921 |

THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT.
ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE.

May 8, 2009

Tracey Kevelighan
2553 Lamplighter Ln
Bloomfield Hills, MI 48304-1934

RE: Tracey Kevelighan
2553 Lamplighter Ln
Bloomfield Hills, MI 48304 1934
T&T #                  F01
Loan                   0713

Dear Tracey Kevelighan :

Our office represents America's Servicing Company in the foreclosure matter referenced above. This letter is in response to your request for a reinstatement amount. The amount that you owe, including legal fees and costs, may increase between the date of this letter and the date that you actually reinstate your loan. This is due to additional steps that may occur in the foreclosure process and additional amounts associated with those steps may become due.

It is our understanding that you intend to reinstate the loan at a future date. If you pay by June 1, 2009, we estimate that the reinstatement amount will be as follows:

| | |
|---|---|
| Total Monthly Payments | $60,282.99 |
| Corporate Advance | 1,761.65 |
| Late Charges | 2,475.46 |
| Inspection Fees | 60.00 |
| Recoverable Legal Fees & Costs Good Through May 8, 2009 | 1,373.00 |

Total Estimated Reinstatement Amount Due as of May 29, 2009 $65,953.10

Please note that this estimated reinstatement quote expires on June 1, 2009. Payment should be received by Trott & Trott, P.C. on or before 4:00 PM on June 1, 2009 and remitted as follows:

One certified check or cashiers check payable to America's Servicing Company in the amount of $65,953.10.

If you want to reinstate your loan after June 1, 2009, you must contact us for a new reinstatement amount. Please call us when you are actually ready to reinstate your loan so we can give you the current reinstatement amount at that time. Please be advised that the reinstatement amount is subject to final verification by America's Servicing Company. You will be responsible to reimburse America's Servicing Company if it pays taxes, insurance or other miscellaneous expenses allowed by law.

If you are moving or no longer live at the property, please provide us with a new address. If we receive legal fees and costs in excess of the amount you owe, you will receive a refund by first class mail at the property address unless you have provided us with a different address.

There may be other options available to help you avoid foreclosure. You may contact your lender and/or Trott & Trott, PC to discuss these options. However, if applicable, the foreclosure action will continue until full reinstatement funds, acceptable to America's

EXHIBIT "15,"p.1/2

# EXHIBIT E

LIBER 37434 P 403

RECEIVED
APR 03 2006
Ruth Johnson Register of Deeds
Oakland County, MI
CHECKED AND FILED
AT REGISTER OF DEEDS
APR 04 2006
Ruth Johnson Register of Deeds
Oakland County, MI

104808
LIBER 37434 PAGE 403
$67.00 MORTGAGE
$4.00 REMONUMENTATION
04/19/2006 08:31:16 A.M. RECEIPT# 44780

PAID    RECORDED - OAKLAND COUNTY
RUTH JOHNSON, CLERK/REGISTER OF DEEDS

**LAND TITLE OF MICHIGAN**

LAW 13178

[Space Above This Line For Recording Data]

## MORTGAGE

KEVELIGHAN
Serv #: 11492977          Loan #: 11492977
DEFINITIONS              MIN:   100136300114929770
                        PIN:   19-11-228-005

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "**Security Instrument**" means this document, which is dated **March 17, 2006**        , together with all Riders to this document.

**(B)** "**Borrower**" is TRACEY L KEVELIGHAN, A MARRIED WOMAN

Borrower's address is    **2553 LAMPLIGHTER LANE, BLOOMFIELD TOWNSHIP, MI 48304**
                          . Borrower is the mortgagor under this Security Instrument.
**(C)** "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D)** "**Lender**" is WMC MORTGAGE CORP.

Lender is a **Corporation**                              organized and existing under the laws of
**CALIFORNIA**                . Lender's address is    **P.O. BOX 54089, LOS ANGELES,**
**CA 90054-0089**

**(E)** "**Note**" means the promissory note signed by Borrower and dated  **March 17, 2006**        . The Note states that Borrower owes Lender
**Two Hundred Seventy-Seven Thousand Six Hundred And 00/100**
Dollars (U.S. $  277,600.00  ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **April 1, 2036**        .

**MICHIGAN**--Single Family-- Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**        Form 3023 1/01
DOCUKMI1                                                    (page 1 of 14 pages)
DOCUKMI1.VTX  08/27/2005

O.K. - MH

11492977

11492977

**(F)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [x] Adjustable Rate Rider
- [ ] Condominium Rider
- [ ] Second Home Rider
- [ ] Balloon Rider
- [ ] Planned Unit Development Rider
- [ ] Biweekly Payment Rider
- [ ] 1-4 Family Rider
- [x] Other(s) [specify] **Balloon Rider**

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** **"Escrow Items"** means those items that are described in Section 3.

**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

COUNTY of **OAKLAND**

[Type of Recording Jurisdiction]    [Name of Recording Jurisdiction]

**LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AND KNOWN AS EXHIBIT 'A'.**

**MICHIGAN**--Single Family-- **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** Form 3023 1/01
DOCUKMI2 *(page 2 of 14 pages)*
DOCUKMI2.VTX 08/27/2005

EXBHIT "1," p.2/20

11492977
which currently has the address of **2553 LAMPLIGHTER LANE**
[Street]
11492977

**BLOOMFIELD TOWNSHIP**                    , Michigan    48304             ("Property Address"):
[City]                                                   [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    **1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
    Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
    **2.  Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

**MICHIGAN**--Single Family-- **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**    **Form 3023 1/01**
DOCUKMI3                                                          *(page 3 of 14 pages)*
**DOCUKMI3.VTX**   08/27/2005

11492977                                                                                    11492977

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time durin g the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESP A, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by

**MICHIGAN**--Single Family-- **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                    **Form 3023 1/01**
DOCUKMI4                                                                                        *(page 4 of 14 pages)*
**DOCUKMI4.VTX    08/27/2005**

LIBER 3 7 4 3 4 PL 4 0 7

11492977                                                                                11492977

RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing.

**MICHIGAN**--Single Family-- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                     **Form 3023 1/01**
DOCUKMI5                                                                                    *(page 5 of 14 pages)*
**DOCUKMI5.VTX**    08/27/2005

∎∥∥ ⫴⦚⦚⦚⦚⦚ ∎∥ ∥∥

EXBHIT "1," p.5/20

11492977                                                11492977

any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security

MICHIGAN--Single Family-- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT         Form 3023 1/01
DOCUKMI6                                                       *(page 6 of 14 pages)*
DOCUKMI6.VTX   08/27/2005

Case 2:15-cv-12833-DML-DRG ECF No. 1 filed 08/11/15 PageID.268 Page 63 of 72
Case 2:15-cv-12833-DML-MMG Doc # 1 Filed 08/11/15 Page 22 of 72
LIBER 37434 P409

11492977                                            11492977

Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

**MICHIGAN**--Single Family-- **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**         **Form 3023 1/01**
DOCUKMI7                                                              *(page 7 of 14 pages)*
**DOCUKMI7.VTX**    **08/27/2005**

11492977                                                                11492977

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

MICHIGAN--Single Family-- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3023 1/01
DOCUKMI8                                                                     (page 8 of 14 pages)
DOCUKMI8.VTX     08/27/2005

11492977                                                                          11492977

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent

MICHIGAN--Single Family-- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                **Form 3023 1/01**
DOCUKMI9                                                                            *(page 9 of 14 pages)*
**DOCUKMI9.VTX**    08/27/2005

11492977                                                                                    11492977

by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or

---

**MICHIGAN**--Single Family-- **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                    **Form 3023 1/01**
DOCUKMI10                                                                                        *(page 10 of 14 pages)*
**DOCUKMIA.VTX** 08/27/2005

EXBHIT "1," p.10/20

(d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

   **20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

   Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

   **21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

   Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

   Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**MICHIGAN**--Single Family-- **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          **Form 3023 1/01**
DOCUKMI11                                                                                                                               *(page 11 of 14 pages)*
**DOCUKMIB.VTX**   08/27/2005

LIBER 37434 PG 414

11492977                                                                                    11492977

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in Section 15. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

Case 2:15-cv-12838-DML-DRG ECF No. 1-1 PageID.69 Filed 08/11/15 Page 69 of 72
Case 2:09-cv-12343-BDM-MM Doc # 5-9 Filed 02/27/09 Pg 42 of 58 Pg ID 230
LIBER 37434 PG 415

11492977                                        11492977

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

3/17/06

\- Borrower - TRACEY L KEVELIGHAN - Date -

A MARRIED WOMAN

EXBHIT "1," p.13/20

# EXHIBIT F

# TROTT & TROTT

*A PROFESSIONAL CORPORATION*

| HEADQUARTERS: | GRAND RAPIDS: |
|---|---|
| 31440 Northwestern Hwy - Suite 200 | 1787 Grand Ridge Court NE Suite 203 |
| Farmington Hills, MI 48334 | Grand Rapids, MI 49525 |
| 248-642-2515  Fax 248-642-3628 | 248-642-2515  Fax 616-364-1472 |

December, 10 2007

Gregory Keith Jr
5725 Tuttle Hill Rd
Ypsilanti, MI 48197-7043

RE: Keith, Gregory
    5725 Tuttle Hill Rd
    Ypsilanti, MI 48197-7043
    T&T # ████18F01
    Loan # ████5003
    HUD #█████████4729

Dear Borrower(s)

This office represents Countrywide Home Loans, Inc., which is the creditor to which your mortgage debt is owed or the servicing agent for the creditor to which the debt is owed. The creditor has referred this matter to this office with instructions to commence foreclosure proceedings against the property. As of the date of this letter the total indebtness owing to the creditor on the mortgage is:

| | |
|---|---|
| Principal Balance | $218,180.11 |
| Unpaid Interest | $4,871.69 |
| Late Charges | $214.35 |
| Escrow Advance | $127.54 |
| *Total:* | **$223,393.69** |

Under the terms of your mortgage, the creditor hereby elects to accelerate the total indebtness. It may, however, be possible to reinstate the mortgage, subject to the creditor's approval, by paying all past due installments, late charges, delinquent taxes, insurance premiums, costs and fees incurred in the foreclosure. Requests for reinstatement information must be received and approved by this office before the date of the sheriff's sale. Please call 248.593.1302 for information concerning reinstatement. Please contact this office at the aforementioned number if you are in active military duty.

The debt described above will be assumed to be valid by this office, the creditor's law firm, unless you, the debtor/consumer, within thirty (30) days after the receipt of this notice, dispute the validity of the debt, or any portion thereof. If you notify this office, in writing within thirty (30) days of the receipt of this notice, that the debt, or any portion thereof, is disputed, we will obtain a verification of the debt and a copy of the verification will be mailed to you. If the debt is based on a judgment, a copy of the judgment will be provided for you, upon request.

If the creditor named in paragraph one of this letter is not the original creditor, and if you make a written request to this office within thirty (30) days from the receipt of this notice, the name and address of the original creditor will be mailed to you.

Written requests and checks for less that the full amount of the debt should be addressed to:
FAIR DEBT COLLECTION CLERK - FC X
Trott & Trott, P.C.
31440 Northwestern Highway Ste 200
Farmington Hills, MI 48334-2525

If you have previously received a discharge in a bankruptcy, this correspondence is not, and should not be construed to be, an attempt to collect a debt from you personally, but only enforcement of a lien against property.

Yours very truly,
Trott & Trott, P.C.
FORECLOSURE DEPARTMENT

**NOTICE REQUIRED BY THE**
**FAIR DEBT COLLECTIONS PRACTICES ACT**
**15 U.S.C. SECTION 1692g AS AMENDED**

1. The amount of the debt is stated in paragraph one of the letter which is attached hereto.

2. The name of the creditor to whom the debt is owed, or the servicing agent for the creditor to whom the debt is owed, is set forth in paragraph one of the letter which is attached hereto.

3. The debt described in the letter attached hereto will be assumed to be valid by this office, the creditor's law firm, unless you, the debtor/consumer, within thirty (30) days after the receipt of this notice, disputes the validity of the debt or any portion thereof.

4. If you notify this office, in writing, within thirty (30) days of the receipt of this notice, that the debt, or any portion thereof, is disputed, we will obtain a verification of the debt and a copy of the verification will be mailed to you.

5. If the creditor named in paragraph one of the Letter attached hereto is not the original creditor, and if you make a written request to this office within thirty (30) days from the receipt of this notice, the name and address of the original creditor will be mailed to you.

6. Any information obtained from you will be used for the purpose of foreclosing the mortgage that is in default.

7. Written requests should be addressed to: FAIR DEBT COLLECTION CLERK - FC X

Trott & Trott P.C.
31440 Northwestern Highway Ste 200
Farmington Hills, MI 48334-2525