IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
Southern Division

BRIAN J. MARTIN, et al., individually and on
behalf of all others similarly situated,

Case No. 2:15-cv-12838

v.

Hon. David M. Lawson

TROTT LAW P.C., et al.,

Mag. Judge David R. Grand

Defendants.

_____/

Andrew J. McGuinness (P42074)
ANDREW J. MCGUINNESS, ESQ.
122 S Main St, Suite 118
P O Box 7711
Ann Arbor, MI  48107
Phone: (734) 274-9374
drewmcg@topclasslaw.com

Paul F. Novak (P39524)
Diana Gjonaj (P74637)
MILBERG LLP
Chrysler House
719 Griswold St, Suite 620
Detroit, MI  48226
Phone: (313) 309-1760
pnovak@milberg.com
dgjonaj@milberg.com

Daniel R. Karon (*admitted*)
Beau Hollowell
KARON LLC
700 W St Clair Ave, Suite 200
Cleveland, OH  44113
Phone: (216) 622-1851
dkaron@karonllc.com
bhollowell@karonllc.com

*Counsel for Plaintiffs and the Proposed Class*

Charity A. Olson (P68295)
OLSON LAW GROUP
2723 S State St, Suite 150
Ann Arbor, MI  48104
Phone: (734) 222-5179
colson@olsonlawpc.com

*Counsel for Trott Law P.C.*

Joseph Aviv (P30014)
Bruce L. Segal (P36703)
HONIGMAN MILLER SCHWARTZ & COHN LLP
39400 Woodward Ave, Suite101
Bloomfield Hills, MI  48304
Phone: (248) 566-8300
javiv@honigman.com
bsegal@honigman.com

*Counsel for David A. Trott*

# PLAINTIFFS' MOTION FOR PROTECTIVE ORDER

Plaintiffs Brian J. Martin, Yahmi Nundley, and Kathleen Cadeau (collectively "Plaintiffs"), through counsel, hereby respectfully move this Court pursuant to Federal Rule of Civil Procedure 26(c) for a protective order requiring defendants to jointly notice each plaintiff for his or her deposition. In further support hereof, movants state as follows:

1.     This is a class action under federal and state debt collection practice statutes. Each of the three named Plaintiffs, who lost their homes in foreclosure proceedings handled by defendant Trott Law P.C., f/k/a Trott & Trott P.C. ("Trott PC"), seek only statutory damages available under these statutes, on their own behalves and on behalf of the class.

2.     Plaintiffs, through counsel, have repeatedly engaged counsel for defendants in an attempt to obtain their consent to the requested relief, or to narrow the scope of the dispute, but have been unsuccessful in obtaining such consent or in narrowing the dispute.

3.     Counsel for David Trott, Mr. Segal, has refused to suspend or to adjourn without date the three deposition notices he served on August 11, 2016, prompting this Motion to protect Plaintiffs' interests. *See Paige v. Consumer Programs, Inc.,* 248 F.R.D. 272, 275 (C.D. Cal. 2008) (Exh. A, attached).

4.     Defendants have, for no (as yet) articulated reason, refused to accommodate a typical and customary request in connection with the deposition of

2

Plaintiffs in a consumer class action. Under all of the circumstances, defendants' conduct is not substantially justified.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order requiring that co-defendants cross-notice their depositions of each plaintiff, and order such other and further relief as may be deemed appropriate by the Court.

## ISSUE PRESENTED

Should this Court enter a protective order requiring defendants Trott Law P.C. and

David Trott each to take the deposition of each named plaintiff on the same date?

The Court should Answer "Yes."

## CONTROLLING OR MOST PERTINENT AUTHORITY

Fed. R. Civ. P. 26(c)

Fed. R. Civ. P. 30

MANUAL FOR COMPLEX LITIGATION, FOURTH (Federal Judicial Center, 2004)

*Paige v. Consumer Programs, Inc.,* 248 F.R.D. 272 (C.D. Cal. 2008)

ECF No. 38, Opinion and Order Granting in Part and Denying in Part Motions to Dismiss (July 26, 2016)

*Schroyer v. Frankel*, 197 F.3d 1170 (6th Cir. 1999)

*Kistner v. The Law Offices of Michael P. Margelefsky, LLC and Michael P. Margelefsky,* 518 F.3d 433 (6th Cir. 2008)

2

## <u>INDEX OF EXHIBITS</u>

**Exhibit**

A     *Paige v. Consumer Programs, Inc.,* 248 F.R.D. 272, 275 (C.D. Cal. 2008)

B     August 11, 2016 Email from Mr. McGuinness to Mr. Segal and Ms. Olson

C     August 13, 2016 Letter from Mr. McGuinness to Mr. Segal

D     August 14, 2016 Email from Mr. McGuinness to Ms. Olson

E     August 18, 2016 Email from Mr. McGuinness to Ms. Olson

F     August 18, 2016 Email from Mr. McGuinness to Mr. Segal

G     August 18, 2016 Email from Mr. Segal to Mr. McGuinness

H     Order, *In re Lithium Ion Battery Antitrust Litigation*, Case No. 13-md-2420 (N.D. Cali. Oct. 19, 2015)

I     Transcript, *In re Auto Parts Antitrust Litigation,* Case No. 12-md-0231, (E.D. Mich. Jan. 28, 2015)

3

# BRIEF IN SUPPORT

## Background

Plaintiffs present claims under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, and the Michigan Regulation of Collection Practices Act ("RCPA"), M.C.L. § 445.251, *et seq.* At the first scheduling conference in this action, on December 2, 2015, counsel for defendants urged the Court to stay discovery pending resolution of their anticipated motions to dismiss, over Plaintiffs' objection. The Court did so.

On July 26, 2016, the Court granted in part and denied in part defendants' motions, and granted Plaintiffs' motion for leave to add an additional named plaintiff, Cadeau, and two more claims. In particular, the Court rejected David Trott's contention that he is not individually subject to liability based on the well-plead allegation of the First Amended Complaint ("FAC"). Opinion and Order, ECF No. 38 at 22-25. The Court's Order also set an August 10, 2016, second scheduling conference. Shortly afterwards, the Court denied David Trott's Motion to Reconsider. ECF No. 46.

At the second scheduling conference, Judge Lawson set a February 9, 2017, deadline for Plaintiffs' motion for class certification, and a May 1, 2017, fact discovery cutoff. At this conference, counsel for David Trott, Mr. Segal, advised the Court that he intended to notice the deposition of his own client. Curious,

4

Judge Lawson asked "Why?" Mr. Segal responded that he wanted to use such deposition to support a motion for summary judgment. The Court inquired why he did not just use an affidavit instead. Mr. Segal responded that if he used an affidavit, Plaintiffs might depose Mr. Trott in regard to the affidavit. At that point, lead counsel for Plaintiffs assured the Court that Plaintiffs were planning to depose Mr. Trott in any event, to which the Court signaled no surprise.

The next day, August 11, Mr. Segal served deposition notices for each of the named Plaintiffs for the third week in September. Acknowledging that he had not cleared the dates with Plaintiffs' counsel before serving the notices, Mr. Segal's cover letter appeared to offer a conditional accommodation:

> I would like to take the Plaintiffs' depositions on September 20, 21, and 22 if these dates are acceptable to you. Enclosed are deposition notices that I have prepared as placeholders setting these dates "or such other date[s] and time[s] as may be agreed to by counsel." If these dates do not work for you, please provide me with suggested alternatives as soon as possible.

Aug. 11, 2016, letter from Mr. Segal to Mr. McGuinness. The letter does not indicate what Mr. Segal meant by "placeholders." Each enclosed deposition notice contained the clause quoted in Mr. Segal's letter in the first sentence, e.g.:

> PLEASE TAKE NOTICE that on Tuesday, September 20, 2016, at 9:30 a.m., or such other date and time as may be agreed to by counsel, at the offices of Honigman Miller Schwartz and Cohn LLP, 39400 Woodward Avenue, Suite 101, Bloomfield Hills, Michigan 48304, Defendant David A. Trott, by his attorneys, will take the deposition of Plaintiff Brian J. Martin upon oral examination pursuant to the Federal Rules of Civil Procedure.

Aug. 11, 2016, Notice of Deposition of Plaintiff Brian J. Martin (emphasis added).

Plaintiffs' counsel was not initially suspicious of this language or the cover letter.

> Mr. McGuinness promptly responded by email, copying Ms. Olson:

> Bruce: Have you cleared these dates with Ms. Olson? If not, please do so before you propose dates to me, so that I do not have to attempt to clear the dates with our clients and only after find out that they do not work for her.

> Thanks, Drew.

Aug. 11, 2016, email from Mr. McGuinness to Mr. Segal. Certain Plaintiffs work

in hourly wage jobs during weekdays and need to receive supervisor clearance to

miss work. They naturally want to minimize the disruption to their employers, co-

workers, and supervisors, and therefore naturally do not want to have to repeatedly

ask for days off.

> As alleged in part in the Complaint, and largely admitted in David Trott's

Answer, Mr. Segal's client, David Trott, owned and managed Trott PC for

decades, sold his 80% (or more) interest in the firm to several of his partners in

approximately December 2014, and the firm is currently run by at least one of his

long time partners and colleagues.

> About a half-hour later, Mr. Segal responded to all (including Ms. Olson):

> Charity,
> Are these dates and times ok for you?
> Bruce

6

Aug. 11, 2016, email from Mr. Segal to Ms. Olson, et al. Clearly, Mr. Segal had

not pre-cleared his suggested dates with co-defendant, Trott PC, either.

Mr. McGuinness thought Mr. Segal's conduct a tad unusual. So 15 minutes

later he sent an email stating in relevant part:

> I should probably clarify something before Charity answers: We
> intend to produce our clients each once for deposition (by each
> defendant, at that same sitting for that named plaintiff). . . .
>
> Accordingly, the times need to "work" for Trott Law PC in the sense
> that Ms. Olson is prepared to take her own deposition of each plaintiff
> at the time and place that David Trott's counsel does so.

Aug. 11, 2016, email from Mr. McGuinness to Mr. Segal and Ms. Olson (Exh. B,

attached). This email also asked defense counsel how much time they each needed

for each deposition. *Ibid*.

The next day, Mr. Segal responded, in part:

> Andrew,
>
> You are, of course, free to take whatever position you want
> with respect to discovery. *By the same token, you do so at your own
> risk, if, for example, you decline to produce your clients or to cross-
> examine a party or witness at a properly-noticed deposition*.

Aug. 12, 2016, email from Mr. Segal to Mr. McGuinness, copying Ms. Olson

(emphasis added). Mr. Segal's "at-your-own-risk" threat was a transparent

invocation of Federal Rule of Civil Procedure 37(d), which provides in part:

> Party's Failure to Attend Its Own Deposition . . ..
>
> (1) In General.

7

(A) *Motion; Grounds for Sanctions.* The court where the action is pending may, on motion, order sanctions if:

> (i) a party . . . fails, after being served with proper notice, to appear for that person's deposition;

. . .

(3) Types of Sanctions. Sanctions may include any of the orders listed in Rule 37(b)(2)(A)(i)—(vi) [including (v) dismissing the action or proceeding in whole or in part.].

With this threat, Mr. McGuinness became concerned about Mr. Segal's conduct, including his apparent offer to accommodate "such other time as may be agreed to by counsel" in lieu of the "placeholder" dates referenced in his letter. So he called Mr. Segal, who told him that:

- Plaintiffs sued *two* defendants (emphasis is Mr. Segal's), suggesting that in his view that David Trott was free to notice Plaintiffs' depositions without coordinating with his former law firm;

- he refused to call Ms. Olson to coordinate Plaintiffs' depositions; and

- he was not willing to wait until the close of fact discovery to file a motion for summary judgment.

When Mr. McGuinness pointed out that there were three Plaintiffs in this action, but that they would not be claiming the prerogative each to notice Mr. Trott for three different deposition dates, he had no response. Mr. Segal then refused to negotiate further, and instead insisted that the parties wait until a scheduled August 24 Rule 26(f) conference (then almost two weeks away) because "we might not have a problem." However, he did not offer to suspend or withdraw the notices.

8

After this call, Mr. McGuinness sent Mr. Segal a letter, stating, *inter alia*:

> As I told you initially, we are not trying to delay defendants' depositions of plaintiffs, but I do not want to hassle them (or me) by attempting to clear dates until we have dates on which Ms. Olson is willing to cross-notice. Otherwise, defendants will be able to "tag team" the named plaintiffs. Moreover, in a class action such as this a contrary approach would amount to harassment of named plaintiffs who, individually, have relatively small claims but seek to represent a broad class of similarly situated consumers. If you do not agree, that's your prerogative; you just need to tell me that so that we can (if Ms. Olson does not agree with your dates) file a Rule 26(c) motion.

Aug. 13, 2016, Ltr. from Mr. McGuinness to Mr. Segal at 2 (Exh. C, attached).

Ms. Olson was copied on all these communications, but had remained unresponsive so far. She therefore was fully aware that the issue was not whether she would show up on the dates selected by Mr. Segal, but whether she was willing to take Trott PC's depositions of Plaintiffs (i.e., cross-notice them) on those dates. When she finally weighed in she conspicuously avoided the issue:

> Andrew:
>
> Your presumption that dates have not been "cleared" with me is erroneous.
>
> Please spare us further theatrics and confirm the dates with your clients.

Aug. 13, 2016, email from Ms. Olson to Mr. McGuinness.[1]

---

[1] Ms. Olson's suggestion that Mr. Segal had first cleared the dates with her is hard to reconcile with the fact that he immediately emailed her on August 11 after Mr. McGuinness raised this question, and asked whether the dates were "ok for [her]."

In context, and giving Ms. Olson the benefit of the doubt as to her good faith, Plaintiffs ought to have been able to rely on this email as a confirmation that she was willing to cross-notice their depositions for the dates selected. In an abundance of caution, however, and given her failure to directly address the issue, Mr. McGuinness sought confirmation the next morning:

> So you wish to cross-notice for those same dates? Please confirm.
> Thank you, Drew.

Aug. 14, 2016, email from Mr. McGuinness to Ms. Olson (Exh. D, attached). There was no response the rest of that day, August 15, or during most of the day August 16. Late afternoon of August 16, Mr. McGuinness asked Ms. Olson to respond so that he could move forward to clear the dates with Plaintiffs. He received an automated email response stating that Ms. Olson would be out of the office through August 17, and promising to "return your message as soon as I return." There was still no response by the late afternoon of August 18, so again Mr. McGuinness asked for the favor of a response, indicating in part: "If you do agree, just say so and I will proceed to attempt to clear dates." That evening he received a reply:

> Andrew:
>
> You've undoubtedly received my out of office message (and knew I was traveling based on the fairly extensive conversation we had last week).

10

> I returned late last night and begin trial tomorrow. We can discuss depositions and the like on 8/24 as Bruce already indicated.

So rather than a simple "yes" or "no," Ms. Olson adopted Mr. Segal's posture of delay, without offering any real reason why. [2] Mr. McGuinness responded:

> Thanks, Charity, and good luck with your trial. We'll take that as a "no." Drew.

Aug. 18, 2016, email from Mr. McGuinness to Ms. Olson. Remarkably, Mr. Olson disputed that her refusal to confirm her willingness to cross-notice was a "no":

> No; we have both offered to meet in person to discuss the depositions and how best to proceed. You've elected, for whatever reason, to file a motion now as opposed to waiting until we can meaningfully confer on a date and time that has already been scheduled to discuss discovery issues. Such actions do not comport with my understanding of Judge Lawson's practice guidelines. We shall see.

Aug. 18, 2016, email from Ms. Olson to Mr. McGuinness. Mr. McGuinness responded:

> Um, in what sense have we not "meaningfully confer[red]"?
>
> Backing us up toward the deposition dates (which Bruce has not offered to suspend pending the delay) for no articulated—or apparent—reason other than that you and Bruce perceive delay as beneficial is not called for under the Court's guidelines or any rules that I can see. Drew.

---

[2] That is, Ms. Olson never intimated that she needed additional time to evaluate the matter, and neither she nor Mr. Segal suggested that they needed additional time to confer with their clients or any other reason why they might need more time to consider Plaintiffs' clearly articulated request.

11

Aug. 18, 2016, email from Mr. McGuinness to Ms. Olson (Exh. E, attached). Ms.

Olson did not respond further, but Mr. Segal did:

> Drew, You have not asked to "suspend" the dates! Nor have you
> offered alternatives! If that is what you want, why didn't you just say
> so when we spoke or in one of your many emails? Alternatively, why
> don't you just say so now?
> Bruce

Aug. 18, 2016, email from Mr. Segal to Mr. McGuinness.[3] To avoid or at least

delay a further fight, Mr. McGuinness responded:

> Bruce: Will you withdraw/suspend/declare null and void/or render-
> not-operative in any other way you care to describe your deposition
> notices based on your and Charity's manifest desire NOT to confer
> about the issue that they raised? Yes or no?

Aug. 18, 2016, email from Mr. McGuinness to Mr. Segal (Exh. F, attached). Mr.

Segal responded:

> Drew,
> If you are asking me to adjourn the deposition dates, as I already told
> you, I will, but I will not "withdraw / suspend / declare null and void /
> or render not operative," the deposition notices.

Aug. 18, 2016, email from Mr. Segal to Mr. McGuinness. To which Mr.

McGuinness replied:

> Bruce: You never before offered to adjourn the depositions. Please
> don't make things up.

---

[3] Given the abundant, even painstaking, attention paid to the cross-notice issue as
set forth above, Mr. Segal's suggestion in this email that the issue was purely one
of finding dates convenient to Plaintiffs was disingenuous.

> Since you are now offering to do so, please confirm that you agree to
> adjourn without date the three depositions you attempted to notice
> until we either achieve some future agreement among counsel about
> this dispute, or get a court order on our anticipated motion if
> necessary.
>
> Thank you, Drew.

Aug. 18, 2016, email from Mr. McGuinness to Mr. Segal. Instead of making good

on his offer to adjourn the depositions, Mr. Segal again avoided the issue:

> I suggest you reread my August 11 cover letter. In the meantime,
> please provide alternative dates for your clients' depositions, and we
> (or whomever appears for Plaintiffs) can talk at the conference on
> Thursday.

Aug. 18, 2016, email from Mr. Segal to Mr. McGuinness (Exh. G, attached).

## Argument

When an objectionable deposition notice is served, a party cannot protect her

interests by simply objecting:

> Under Rule 37(d), a party's failure to appear at his own deposition "is
> not excused on the ground that the discovery sought was
> objectionable, unless the party failing to act has a pending motion for
> a protective order under Rule 26(c)." Fed. R. Civ. P. 37(d)(2).

*Paige v. Consumer Programs, Inc.,* 248 F.R.D. 272, 275 (C.D. Cal. 2008) (Exh. A,

attached). Only by filing this motion can Plaintiffs effectively protect their interests

and those of the class they seek to represent in light of David Trott's refusal to suspend or adjourn without date his deposition notices.[4]

## I.   DEFENDANTS SHOULD ONLY GET ONE BITE AT THE APPLE.

Plaintiffs' request that defendants take the depositions of each Plaintiff at the same time is eminently reasonable.

### A. The Scope of Named Plaintiffs' Depositions Is Narrow.

Because each Plaintiff (and the class) is seeking only statutory damages, the only relevant topics for their depositions are (i) adequacy of representation, and (ii) defendant's liability.

On the first topic, Rule 23(a)(1) adequacy, the scope of examination is typically constrained. Adequacy turns on (a) whether the named plaintiff is adequate, and (b) whether her counsel is adequate. The latter point is not often disputed, but where it is, it does not turn on the named Plaintiffs' deposition. As to

---

[4] It is no excuse for refusing further attempts to resolve this dispute that there is a Rule 26(f) conference scheduled two weeks after it surfaced. Mr. Segal never mentioned his intention to refuse to coordinate with co-defense counsel at the parties' first Rule 26(f) conference in November 2015, or at either of the Court's two Rule 16 scheduling conferences. The issue was clearly framed on August 11, and in the numerous correspondences among counsel. Mr. Segal's "at risk" threat called for a prompt resolution, not delay. Importantly, neither defense counsel ever said why they needed more time. Moreover, the coordination called for is *between defense counsel*, for which an all parties conference is not required. Finally, if there were a good reason to delay discussion until August 24th, then Mr. Trott should have waited until after that date to serve his deposition notices, or at least agreed to adjourn them without date or suspend them until after the second conference.

the former, both David Trott and Trott PC have an equal interest in examining each

plaintiff on any potential conflict he or she may have with the class, their

understanding of the issues and their role, and their abilities and interests to serve

as class representatives. These depositions cover familiar ground and are generally

quite short.

On liability, only a few issues are in play. As the Court recently held:

> The only element of liability that the parties seriously dispute is
> the fourth: whether any representations made in the letters sent to the
> plaintiffs were false, misleading, deceptive, or otherwise unlawful
> under the relevant statutes. Individual defendant David Trott also
> contends that the amended complaint does not allege sufficient facts
> to establish that he acted as either a "debt collector" or a "regulated
> person.

Opinion and Order Granting in Part and Denying in Part Motions to

Dismiss, ECF No. 38, at 10 (July 26, 2016) ("Order"). With respect to the first

open issue, whether the letters were deceptive or misleading, courts apply a "least

sophisticated consumer" standard for determining whether communications such

as those at issue in this case are misleading. *Kistner v. The Law Offices of Michael*

*P. Margelefsky, LLC and Michael P. Margelefsky,* 518 F.3d 433, 438 (6th Cir.

2008). This is an "objective," not a subjective, test. *Ibid.* Accordingly, whether or

not each named Plaintiff was *actually* confused or mislead by the at-issue

communications is not an element of liability. "The statue imposes strict liability

for violations." *Ibid.*

15

Trott PC has admitted that it is a "debt collector" under the FDCPA. Answer ¶ 172 (ECF No. 18). In any event, this is an issue of law that is not dependent on the individual circumstances of each Plaintiff. 15 U.S.C. § 1692a(6); *Schroyer v. Frankel*, 197 F.3d 1170 (6th Cir. 1999). David Trott disputes that he is a "debt collector," but that question turns on *his* activities (about which named Plaintiffs are likely to have little or no knowledge), and those of his former firm, not on facts within Plaintiffs' personal knowledge. *See Glazier v. Chase Home Fin. LLC*, 704 F.3d 453, 461 (6th Cir. 2013) (attorneys who regularly engage in foreclosure proceedings are "debt collectors" under the FDCPA). The Court has already held that both David Trott and Trott PC are "regulated persons" under the RCPA. Order at 25-26. In brief, these should be short depositions.[5]

### B. Defendants Should Not Be Permitted To Harass Named Plaintiffs With Multiple Depositions In This Consumer Class Action.

In most consumer class actions—including this one—the financial incentives for named Plaintiffs are extremely limited. Here, the maximum statutory damages available to Plaintiffs Numley and Cadeau under the FDCPA are $1,000. For each Plaintiffs' RCPA claim statutory damages are even more limited: $50 upon a finding of violation, expanded to $200 if the violation is determined to be

---

[5] Other facts touching on liability, such as that the Trott firm sent the relevant letters to Plaintiffs, Trott PC Answer ¶¶ 63, 65; are uncontested; and would require minimal attention at deposition even if they were contested.

16

willful. No person wants to risk his or her job for such modest potential rewards. And yet these Plaintiffs have stepped forward to represent the interests of over 250,000 Michigan consumers exposed to defendants' allegedly violative letters.

Predictably, defendants in consumer class actions may be tempted to harass or intimidate named plaintiffs to pressure them to withdraw. While unclear, such a motive would go a long way toward explaining defense counsel's conduct here: threats, lack of clarity, and delay in resolving this issue. In particular, David Trott's warning that Plaintiffs failure to show up for their depositions **as noticed** may lead to severe sanctions, and an overall refusal by both defense counsel clearly to state their positions, is conduct consistent with such a tactic.

## II.    DEFENDANTS WILL NOT BE PREJUDICED BY THE REQUESTED RELIEF.

Despite David Trott's insistence that he has unfettered freedom to go his own way, coordination of adverse party depositions among co-defendants is a commonplace.[6] Because it is such a commonplace, this issue is rarely litigated. Part of what makes the reasonableness of Plaintiffs' request so clear is the lack of prejudice to Defendants that it entails.

---

[6] In 25 years of litigating dozens of class actions, the undersigned cannot recall a single case where co-defendants did not coordinate the taking of adverse or third-party depositions, including of named plaintiffs in class actions, and including three cases in which the Honigman firm represented a co-defendant.

17

The expectation that co-defendants with identical interests will coordinate their depositions of adverse parties is alluded to in the Advisory Committee's note to Rule 30:

> In multi-party cases, the need for each party to examine the witness may warrant additional time, although duplicative questioning should be avoided and parties with similar interests should strive to designate one lawyer to question about areas of common interest. . . . The limitation is phrased in terms of a single day on the assumption that ordinarily a single day would be preferable to a deposition extending over multiple days . . . .

Similarly, the Federal Judicial Center advises:

> The judge should manage the litigation so as to avoid unnecessary depositions, limit the number and length of those that are taken, and ensure that the process of taking depositions is as fair and efficient as possible.

MANUAL FOR COMPLEX LITIGATION, FOURTH § 11.45 (Federal Judicial Center 2004). Elaborating, the MANUAL states:

> *Avoiding duplicative discovery*. Judges should encourage techniques that coordinate discovery and avoid duplication… Filing or cross-filing deposition notices, interrogatories, and requests for production in related cases will make the product of discovery useable in all cases and avoid duplicative activity.

*Id*. § 20.14. These last admonitions are for "related" cases; in the instant action co-defendants have resisted coordinating their depositions *in a single case*.[7]

---

[7] For instance, Judge Donna M. Ryu of the Northern District of California entered a discovery and deposition protocol order last October in a multi-party MDL case that provided in relevant part that "Defendants may *collectively* depose each natural person named Plaintiff or class representative and take two depositions of

18

Here, if counsel for Trott PC, because of an active trial schedule or for other reasons, requires an extra week or two to prepare to depose the named Plaintiffs, David Trott cannot point to any significant burden such a delay would present.[8] The Court has set a deadline for the class certification motion (February 9, 2017), so logically Plaintiffs' depositions need to be taken by then. And while his counsel may be champing at the bit to file a summary judgment motion, named Plaintiffs' depositions are likely to have little or no relevance to such a motion, which logically should wait until the close of fact discovery in any event. Simply put, Defendants cannot demonstrate any real prejudice from being required to take Plaintiffs' depositions at the same time.[9]

---

each government entity named Plaintiff or class representative." *In re Lithium Ion Battery Antitrust Litigation*, Case No. 13-md-2420 (N.D. Calif. Oct. 19, 2015), at 2 (Exh. H, attached). Judge Battani has done the same in the *In re Auto Parts Antitrust Litigation,* Case No. 12-md-0231, pending in this Court. *See* January 28, 2015, trans. at 24 (Exh. I, attached).

[8] While Rule 30(a)(2)(A)(ii) requires leave of court before taking a second deposition of a deponent, the court "must grant leave to the extent consistent with Rule 26(b)(1) and (2)." By imposing a modest requirement of coordination among co-defendants at the outset, the requested protective order will avoid a future claim that David Trott's early deposition notices somehow prejudiced Trott PC.

Of course, a party cannot fairly interfere with an opponent's discretion, Rule 26(d)(3), of when to notice the deposition of an adverse party—such as Plaintiffs' deposition of Mr. Trott—by having his own lawyer notice that party's deposition.

[9] Mr. Segal has acknowledged that he anticipates needing less than seven hours to depose each Plaintiff. Ms. Olson has failed to say how long she thinks she needs. There is no reason that defendants collectively need more than seven hours to depose each Plaintiff.

## Conclusion

For the foregoing reasons, Plaintiffs request that this Court enter an order

requiring that co-defendants cross-notice their deposition of each plaintiff.

Dated:        August 22, 2016

Respectfully submitted,

Andrew J. McGuinness (P42074)
ANDREW J. McGUINNESS, ESQ.
122 S Main St, Suite 118
P O Box 7711
Ann Arbor, MI  48107
Phone:  (734) 274-9374
drewmcg@topclasslaw.com

Paul F. Novak (P39524)
Diana Gjonaj (P74637)
MILBERG LLP
Chrysler House
719 Griswold St, Suite 890
Detroit, MI  48226
Phone: (313) 309-1760
pnovak@milberg.com
dgjonaj@milberg.com

Daniel R. Karon (*admitted*)
Beau Hollowell
KARON LLC
700 W St Clair Ave, Suite 200
Cleveland, OH  44113
Phone: (216) 622-1851
dkaron@karonllc.com
bhollowell@karonllc.com

*Counsel for Plaintiffs and the Proposed Class*

20

<u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on the above date a copy of the

foregoing was filed with the Court using the ECF system, which will send notification of such

filing to all parties who have appeared through their attorneys of record.

*/s/ Andrew J. McGuinness*

21

# Exhibit A



5 of 5 DOCUMENTS

**Shannon Paige, etc. v. Consumer Programs, Inc., et al.**

**Case No. CV 07-2498-FMC (RCx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*248 F.R.D. 272; 2008 U.S. Dist. LEXIS 13106*

**January 18, 2008, Decided
January 18, 2008, Filed**

**SUBSEQUENT HISTORY:** Motion denied by, Motion denied by *Paige v. Consumer Programs, Inc., 2008 U.S. Dist. LEXIS 125067 (C.D. Cal., May 13, 2008)*

**COUNSEL:** [**1] For Shannon Paige, an individual, on behalf of himself and all others similarly situated, Plaintiff: Andre E Jardini, LEAD ATTORNEY, Knapp Petersen & Clarke, Glendale, CA; Thomas W Falvey, LEAD ATTORNEY, Thomas W Falvey Law Offices, Pasadena, CA.

For Consumer Programs Inc, CPI Images LLC, CPI Corporation, Defendants: Dan Chammas, LEAD ATTORNEY, Jennifer C Fercovich, LEAD ATTORNEY, Richard W Kopenhefer, LEAD ATTORNEY, McDermott Will & Emery, Los Angeles, CA.

**JUDGES:** HON. ROSALYN M. CHAPMAN, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** ROSALYN M. CHAPMAN

**OPINION**

[*273] **CIVIL MINUTES--GENERAL**

Date: January 18, 2008

**HON. ROSALYN M. CHAPMAN, UNITED STATES MAGISTRATE JUDGE**

**PROCEEDINGS: (IN CHAMBERS) ORDER GRANTING DEFENDANTS' MOTION FOR AN ORDER COMPELLING PLAINTIFF'S APPEARANCE AT DEPOSITION AND FOR ATTORNEY'S FEES AND COSTS**

On January 9, 2008, defendants filed a notice of motion and motion for an order compelling plaintiff's appearance at deposition and for attorney's fees, costs and sanctions and a joint stipulation including the supporting declarations of Detective James Deal and Dan Chammas, with exhibits, and on January 16, 2008, defendants filed their supplemental memorandum. Pursuant to *Local Rule 7-15*, this matter is decided [**2] in Chambers without oral argument.

**BACKGROUND**

**I**

On March 8, 2007, plaintiff Shannon Paige filed a class action in the Los Angeles County Superior Court against defendants Consumer Programs, Inc., CPI Images LLC, and CPI Corporation (collectively "CPI") on behalf of CPI's hourly employees, claiming CPI violated various

248 F.R.D. 272, *273; 2008 U.S. Dist. LEXIS 13106, **2

provisions of the California Labor Code regarding the payment of wages and overtime compensation and committed unfair business practices in violation of *California Business & Professions Code §§ 17200 et seq.* regarding the payment of proper wages. The plaintiff seeks injunctive relief, the payment by CPI of sums due and owing plaintiff and class members for wages and overtime under California law, attorney's fees, and the like. On April 13, 2007, CPI filed an answer to the complaint and raised several affirmative defenses. On April 16, 2007, CPI removed the action to this district court under the Class Action Fairness Act of 2005, and plaintiff filed a demand for a jury trial.

## II

CPI initially noticed plaintiff's deposition for October 26, 2007, and subsequently agreed with plaintiff to continue the deposition to November 30, 2007. Declaration of Dan Chammas P 2. Prior to [**3] the deposition, CPI's counsel "conducted a background check of Plaintiff." *Id.* P 3. During the course of that background check, CPI's counsel "learned that an arrest warrant for Plaintiff for three felony counts of Grand Theft Auto was issued on June 21, 2007." *Id.* CPI's counsel contacted the Pasadena Police Department on or about November 27, 2007, to inquire about the status of the arrest warrant, and spoke to Detective James Deal. *Id.* P 4. Detective Deal advised CPI's counsel that the police "had been unable to locate [plaintiff] and . . . were still looking for him. . . ." Declaration of Detective James Deal P 2; Chammas Decl. P 4. Detective Deal [*274] then asked CPI's counsel "if he knew of [plaintiff's] whereabouts, and [CPI's counsel] informed [him] that [plaintiff] was supposed to appear at [his] offices for a deposition on November 30, 2007." Deal Decl. P 3; Chammas Decl. P 5. Detective Deal then "informed [CPI's counsel] that [the police] would be coming to [counsel's] offices on November 30, 2007 to arrest [plaintiff]." Deal Decl. P 3; Chammas Decl. P 5.

CPI's counsel asked Detective Deal "if he could contact Plaintiff's counsel prior to the deposition to allow Plaintiff to turn [**4] himself in. . . ." Chammas Decl. P 6; Deal Decl. P 4. However, "since [the police] considered [plaintiff] a flight risk, [Detective Deal] did not want to leave the decision to surrender up to [plaintiff] or his attorneys. [Detective Deal] requested that [CPI's counsel] not alert [plaintiff's] counsel prior to the deposition." Deal Decl. P 4; Chammas Decl. P 6.

CPI's counsel "also specifically asked the Detective to effect the arrest outside of [his] office." Chammas Decl. P 6; Deal Decl. P 4.

On November 30, 2007, the Pasadena police arrested plaintiff at CPI's counsel's office prior to plaintiff's deposition. Deal Decl. P 5; Chammas Decl. P 9, Exh. B. Since plaintiff and his counsel arrived at CPI's counsel's office prior to the Pasadena police, Chammas Decl. P 8, the Pasadena police "were unable to arrest [plaintiff] outside of [CPI's counsel's] office, as planned. . . ." Deal Decl. P 5. Accordingly, plaintiff's deposition did not take place on November 30, 2007. Chammas Decl. P 9, Exh. B.

On December 7, 2007, CPI issued a new notice of deposition, setting the time and place for plaintiff's deposition at CPI's counsel's office on December 21, 2007, and not requesting plaintiff produce [**5] any documents at his deposition. Chammas Decl. P 10, Exh. K. However, plaintiff failed to appear for his deposition on December 21, 2007. *Id.* P 12. CPI prepared for plaintiff's deposition on December 21, 2007, since it was uncertain whether plaintiff would appear or not, and such preparation included paying a stenographer $ 237.00 and a videographer $ 203.00 to appear at the deposition, and CPI's counsel, whose regular billing rate is $ 490.00 per hour, spent 2 hours preparing for the deposition. Chammas Decl. P 13. After December 21, 2007, CPI's counsel spent 2.5 hours traveling to and from plaintiff's counsel's office and conducting a *Rule 37* conference, and 6 hours drafting CPI's portion of the Joint Stipulation. *Id.*

## DISCUSSION

## III

The major discovery dispute before the Court is simple and straightforward: Has plaintiff already been deposed and, if not, should he be compelled to appear for a deposition? CPI argues plaintiff has never been deposed; thus, CPI was entitled to notice his deposition, which it did. However, plaintiff failed to appear for the noticed deposition. On the other hand, plaintiff argues that since he appeared for his deposition on November 30, 2007, and the only [**6] reason the deposition did not go forward was CPI's counsel's "misconduct" in "arrang[ing] for plaintiff's arrest at his deposition[,]" Jt. Stip. at 12:6-16, he has been deposed, and CPI cannot depose him a second time. The Court, having considered all papers, **HEREBY GRANTS** CPI's motion to compel

2:15-cv-12838-DML-DRG   Doc # 48   Filed 08/22/16   Pg 28 of 186   Pg ID 1618

Page 3

248 F.R.D. 272, *274; 2008 U.S. Dist. LEXIS 13106, **6

plaintiff's attendance at his deposition.

*Federal Rule of Civil Procedure 30* governs depositions by oral examination. Specifically, it provides that "[a] party may, by oral questions, depose any person, including a party, without leave of court except as provided in *Rule 30(a)(2)*. . . ." *Fed. R. Civ. P. 30(a)(1)*. "Any party who wants to depose a person by oral questions must give reasonable notice to every other party. . . ." *Fed. R. Civ. P. 30(b)(1)*. The federal rules presumptively limit depositions "to 1 day of 7 hours[,]" *Fed. R. Civ. P. 30(d)(2)*; nevertheless, the "court **must** allow additional time consistent with *Rule 26(b)(2)* if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination." *Id.* (emphasis added). Additionally, a party may obtain leave of court, "and the court must grant leave to the extent consistent [**7] with [*275] *Rule 26(b)(2)*[,] [1] . . . if the parties have not stipulated to the deposition and[, among other things,] . . . the deponent has already been deposed in the case. . . ." *Fed. R. Civ. P. 30(a)(2)(A)(ii)* (footnote added).

1  *Rule 26(b)(2)* provides:

> By order, the court may alter the limits in these rules on the number of depositions . . . or on the length of depositions under Rule 30. . . . [P] On motion or on its own motion, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action,

and the importance of the proposed discovery in resolving the issues.

*Fed. R. Civ. P. 26(b)(2)(A), (C)*.

Under *Rule 37(d)*, a party's failure [**8] to appear at his own deposition "is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under *Rule 26(c)*." *Fed. R. Civ. P. 37(d)(2)*. Although plaintiff attempted to file a notice stating he would not appear at his deposition, [2] it is further undisputed that plaintiff did not file a "motion for a protective order under *Rule 26(c)*." Indeed, although CPI's counsel sought a conference with plaintiff's counsel in advance of the deposition to discuss plaintiff's planned nonappearance at the deposition, plaintiff's counsel refused to meet with CPI's counsel prior to the deposition. Chammas Decl. P 10, Exhs. G-I.

> 2  The Court struck this notice on the ground it was not in compliance with *Local Rule 37*. However, this notice of nonappearance shows plaintiff had actual notice of the time and place of the deposition, but wilfully chose not to appear.

Considering *Rule 30* as a whole, and affording the words in that rule their plain meaning, as we must, *see Business Guides, Inc. v. Chromatic Communications Enterprises, Inc., 498 U.S. 533, 540, 111 S. Ct. 922, 928, 112 L. Ed. 2d 1140 (1991)* ("'We give the Federal [**9] Rules of Civil Procedure their plain meaning.'" (quoting *Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120, 123, 110 S. Ct. 456, 458, 107 L. Ed. 2d 438 (1989)))*; *Kootenai Tribe of Idaho v. Veneman, 313 F. 3d 1094, 1111 (9th Cir. 2002)* ("As a rule of construction, Federal Rules of Civil Procedure are given their plain meaning."), it is clear that a deposition is the examination under oath by "oral questions" of a party or deponent. In other words, a party who merely appears for a deposition that does not take place has not "been deposed" since he has not been examined by oral questions. *See Fed. R. Civ. P. 30(a)(1)*. Here, plaintiff appeared for his deposition on November 30, 2007, but CPI did not ask him any questions; thus, plaintiff "has not already been deposed in the case" within the meaning of *Rule 30(a)(2)(A)(ii)*. Since plaintiff was not deposed on November 30th, CPI was entitled under *Rule 30(a)(1)* to renotice plaintiff's deposition without leave of the court, and CPI did just that, sending notice on December 7, 2007, of plaintiff's

248 F.R.D. 272, *275; 2008 U.S. Dist. LEXIS 13106, **9

deposition on December 21, 2007. Certainly, this is "reasonable notice" of the deposition within the meaning of *Rule 30(b)(1)*. *See In re Sulfuric Acid Antitrust Litigation, 231 F.R.D. 320, 327 (N.D. Ill. 2005)* [**10] ("[T]en business days' notice [of a deposition] would seem to be reasonable."). Yet, plaintiff failed to appear for his duly and properly noticed deposition.

Nevertheless, plaintiff argues he was excused from appearing at his deposition on December 21, 2007, because he had appeared previously for his deposition on November 30, 2007, and that deposition would have proceeded except for CPI's counsel's "misconduct" in arranging for plaintiff's arrest. This argument misses the mark. Rather, if plaintiff believed he had good cause not to appear for his deposition on December 21, 2007, his recourse was to file a motion for a protective order under *Rule 26(c)*. *See Fed. R. Civ. P. 37(d)(2)*. However, plaintiff did not file a motion for a protective order under *Rule 26(c)*; rather, he merely failed to appear for his deposition. Moreover, CPI's counsel sought to confer with plaintiff's counsel prior to the deposition, which would have afforded plaintiff the opportunity to file a [*276] motion for a protective order before the date of the deposition, but plaintiff's counsel refused to confer until after the date of the deposition -- on December 27, 2007. Thus, plaintiff's failure to appear for his deposition [**11] on December 21, 2007, is not excused.

Even if this Court were to find either that plaintiff "ha[d] already been deposed in the case" on November 30, 2007, or that his failure to appear for his deposition on December 21, 2007, was excused, those determinations would not preclude the Court from granting CPI's motion to require plaintiff to appear for another deposition. To the contrary, this Court "must allow additional [deposition] time consistent with *Rule 26(b)(2)* if needed to fairly examine the deponent or . . . if any other circumstance impedes . . . the examination." *Fed. R. Civ. P. 30(d)(2)*. Here, plaintiff's arrest is "[an]other circumstance" that "imped[ed]" CPI's "fair examination" of plaintiff on November 30th, and none of the factors listed in *Rule 26(b)(2)* militate against allowing CPI "additional time" to depose plaintiff. Rather, CPI would be extremely prejudiced if it could not depose plaintiff, who is both the sole individual plaintiff and the sole representative of the class in this class action. For all these reasons, CPI's motion to compel plaintiff to appear for his deposition **should be granted.**

The Court is concerned, however, about the apparent strained relationship [**12] between counsel for the parties. To assure plaintiff's deposition and other depositions proceed smoothly, the Court would like to take this opportunity to advise counsel of what it expects of them at the depositions in this case. Under *Rule 30(c)*:

> An objection at the time of the examination -- whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition -- must be noted on the record, **but the examination still proceeds; the testimony is taken subject to any objection.** An objection must be stated concisely in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under *Rule 30(d)(3)*.

*Fed. R. Civ. P. 30(d)(1)* (emphasis added). Counsel are advised the Court will strictly enforce their proper conduct during the depositions in this case.

**IV**

The parties also dispute whether sanctions should be awarded against plaintiff for his failure to appear at the deposition noticed for December 21, 2007. *Rule 37(d)* specifically addresses the sanctions available [**13] when "a party . . . fails, after being served with proper notice, to appear for that person's deposition. . . ." *Fed. R. Civ. P. 37(d)(1)(A)(i)*. The available sanctions:

> may include any of the orders listed in Rule 37(b)(2)(A)(i)-(vi). [3] Instead of or in addition to these sanctions, the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was not substantially justified or other circumstances make an award of expenses unjust.

*Fed. R. Civ. P. 37(d)(3)* (footnote added); [4] *Lew v. Kona Hospital, 754 F.2d 1420, 1426 (9th Cir. 1985)* [*277] .

248 F.R.D. 272, *277; 2008 U.S. Dist. LEXIS 13106, **13

Similarly, *Rule 37(a)* provides that if a motion compelling discovery is granted:

> the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the [**14] opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust.

*Fed. R. Civ. P. 37(a)(5)(A)*.

3  *Rule 37(b)(2)(A)* provides that the Court may make an order:

> (i) directing that the matters embraced in the order or other designated facts be taken as established . . . ; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) further staying proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; (vi) rendering a default judgment against the disobedient party; or (vii) treating as contempt of court the failure to obey any order. . . .

*Fed. R. Civ. P. 37(b)(2)(A)*.

4  As the Supreme Court has noted in discussing *Rule 37(d)*, "the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." [**15] *National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 643, 96 S. Ct. 2778, 2781, 49 L. Ed. 2d 747 (1976)* (per curiam).

Here, CPI has requested only monetary sanctions in the amount of $ 5,585.00 against plaintiff, and such sanctions are available under both *Rule 37(a)(5)(A)* and *Rule 37(d)(3)*. To support its request for sanctions, CPI has submitted Mr. Chammas's declaration, which establishes CPI prepared for plaintiff's deposition on December 21, 2007; CPI incurred court reporter's fees and videographer fees totaling $ 440.00; Mr. Chammas spent 2 hours preparing for the deposition; Mr. Chammas spent 8.5 hours related to the pending motion to compel plaintiff to attend his deposition; and Mr. Chammas's hourly rate is $ 490.00 per hour. Chammas Decl. P 13. On the other hand, plaintiff asks the Court:

> to sanction defense counsel for misconduct, asks for fees and costs for the deposition appearance and for opposing this meritless motion, and asks the Court to reject Defendant's [sic] attempt to force Plaintiff to appear a second time after being abused and mistreated when he appeared for his deposition as noticed. In the alternative, if Plaintiff is ordered to appear a [**16] second time Plaintiff asks for the same sanctions, fees and costs, asks the Court to appoint a discovery referee if Defendant's [sic] expense to avoid further abuse and misconduct, and asks for a neutral location at Defendant's [sic] expense rather that at defense counsel's office. . . .

Jt. Stip. at 10:13-20.

As an initial matter, this Court finds plaintiff's failure to appear at the properly noticed deposition on December 21st was not "substantially justified." Specifically, plaintiff's failure to appear was not substantially justified since plaintiff, as discussed above, failed to file a motion for a protective order under *Rule 26(c)* before the date of the deposition, despite being offered the opportunity to meet and confer with CPI's counsel in advance of the deposition, which would have allowed for such motion. The correspondence between plaintiff's counsel and CPI's counsel further shows CPI attempted to resolve the

248 F.R.D. 272, *277; 2008 U.S. Dist. LEXIS 13106, **16

dispute about plaintiff's appearance at the deposition without Court intervention, but plaintiff's attorney was not cooperative. In fact, plaintiff's counsel refused to discuss whether plaintiff would appear at the deposition until **after** the date of the deposition! [**17] Clearly, CPI could reasonably have prepared for the deposition to proceed on December 21, 2007.

Despite plaintiff's hyperbole about CPI's counsel's alleged "misconduct," the Court also finds "no other circumstances make an award of expenses unjust." Specifically, CPI's counsel did not act improperly in any regard. It is not improper for a party to investigate the background of an opposing party, and plaintiff cites nothing to suggest otherwise. Further, the declarations of both Detective Deal and Mr. Chammas show CPI's counsel did not "arrange" for plaintiff's arrest, and when counsel learned of the impending arrest, he requested permission to advise plaintiff's counsel of it, but the police did not want him to do so. Thus, the cases plaintiff cites to support his claim of improper conduct are inapposite, as CPI notes in its supplemental memorandum, and an award of expenses against plaintiff is not unjust. Accordingly, CPI's request for monetary sanctions **should be granted.**

Lastly, the Court finds no merit to plaintiff's counter-requests. First, plaintiff's request to sanction CPI's counsel for his "misconduct" and his request for fees and [*278] costs should be denied since CPI has, for the [**18] reasons discussed above, prevailed before the Court. Second, plaintiff's other requests to have a discovery referee present at his deposition and to change the location of his deposition are improperly raised in the Joint Stipulation. Rather, they should be raised by a motion for a protective order under *Rule 26(c). See Rule 26(c)(1)(B), (E)* ("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . specifying terms, including time and place, for the disclosure or discovery; . . . [and] designating the persons who may be present while the discovery is conducted. . . ."). Despite plaintiff's procedural error, the Court addresses the merits of these counterrequests, and finds them to be without merit.

Under *Rule 1 of the Federal Rules of Civil Procedure*, the rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." *Fed. R. Civ. P. 1*; *Moon v. SCP Pool Corp., 232 F.R.D. 633, 636 (C.D. Cal. 2005)*. Appointing a discovery referee, here, would be an unnecessary expense, and in light of the Court's admonishment to counsel regarding [**19] their behavior at depositions, the Court finds this request is without merit. Further, "[f]or good cause [for a protective order] to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." *Phillips v. General Motors Corp., 307 F.3d 1206, 1210-11 (9th Cir. 2002)*; *Rivera v. NIBCO, Inc., 364 F.3d 1057, 1063 (9th Cir. 2004), cert. denied, 544 U.S. 905, 125 S. Ct. 1603, 161 L. Ed. 2d 279 (2005)*. Here, plaintiff has presented no evidence by declaration or otherwise supporting his request to change the location of the deposition from CPI's counsel's office due to his embarrassment at returning to the scene of his arrest. To the contrary, there is no reason plaintiff should be embarrassed to return to CPI's counsel's office for his deposition now, more than three months after his arrest, since plaintiff has no familial or other ties to that office. Thus, plaintiff's counterrequests **should be denied.**

**ORDER**

1. CPI's motion to compel the deposition of plaintiff IS GRANTED, and plaintiff is ordered to attend a deposition commencing no later than February 1, 2008, at CPI's counsel's office, McDermott Will & Emery, located at 2029 Century Park East, 38th [**20] Floor, Los Angeles, California 90067. The exact date and time of the deposition shall be determined by CPI's counsel in consultation with plaintiff's counsel, no later than January 23, 2008, at 4:00 p.m. No additional notice of the deposition need be given by CPI to plaintiff. **The plaintiff is admonished that failure to appear for his deposition may lead to dismissal of his case. *Fed. R. Civ. P. 37(b)(2)(A), (d)(3).***

2. CPI's motion for sanctions IS GRANTED, and CPI is awarded reasonable expenses in the amount of $ 5,585.00 under *Rules 30(d)(3)* and *37(a)(5)(A)*, and plaintiff and his attorney, jointly and severally, shall pay such expenses to CPI, no later than ten (10) days from the date of this Order.

3. The plaintiff's requests for sanctions against CPI and its counsel and to appoint a discovery referee and to change the location of the deposition ARE DENIED.

# Exhibit B

| From: | Andrew J. McGuinness |
|---|---|
| To: | "Segal, Bruce L."; "Aviv, Joseph"; "Johnson, Carolyn"; "colson@olsonlawpc.com" |
| Cc: | "pnovak@milberg.com"; "dgjonaj@milberg.com"; "dkaron@karonllc.com"; "bhollowell@karonllc.com" |
| Subject: | RE: Martin v. Trott - Deposition of Plaintiffs |
| Date: | Thursday, August 11, 2016 5:56:00 PM |

I should probably clarify something before Charity answers:  We intend to produce our clients each *once* for deposition (by each defendant, at that same sitting for that named plaintiff). We view this as an entirely reasonable proposition—since you are each defendants.  NB: This is very different from a situation where, say, Bruce might notice the deposition of his own client (as he told Judge Lawson at yesterday's scheduling conference he intends to do). In that instance, we intend to reserve our right to cross-examine the witness at that deposition (limited to the scope of the direct in that deposition), and later (or before) to notice Mr. Trott's deposition at the stage of discovery of our own determination.  A plaintiff or defendant ought not be able to force an opposing party to take that plaintiff or defendant's own deposition at a date and time of that plaintiff or defendant's own choosing.  While all of this seems obvious, I want to avoid any future misunderstanding, if possible.

Accordingly, the times need to "work" for Trott Law PC in the sense that Ms. Olson is prepared to take her own deposition of each plaintiff at the time and place that David Trott's counsel does so.

Bruce and Charity, how much time do you each anticipate needing for each plaintiff?  Thanks, Drew.

**From:** Segal, Bruce L. [mailto:BSegal@honigman.com]
**Sent:** Thursday, August 11, 2016 5:42 PM
**To:** Andrew J. McGuinness <drewmcg@topclasslaw.com>; Aviv, Joseph <JAviv@honigman.com>; Johnson, Carolyn <CJohnson@honigman.com>
**Cc:** colson@olsonlawpc.com; pnovak@milberg.com; dgjonaj@milberg.com; dkaron@karonllc.com; bhollowell@karonllc.com
**Subject:** RE: Martin v. Trott - Deposition of Plaintiffs

Charity,
Are these dates and times ok for you?
Bruce

HONIGMAN

**Bruce L. Segal**
Partner
Honigman Miller Schwartz and Cohn LLP
Attorneys and Counselors
39400 Woodward Avenue
Suite 101
Bloomfield Hills, MI  48304-5151
Telephone Number: (248) 566-8482
Fax Number: (248) 566-8483
Cell Phone Number: (248) 310-1696
bsegal@honigman.com
www.honigman.com

**From:** Andrew J. McGuinness [mailto:drewmcg@topclasslaw.com]
**Sent:** Thursday, August 11, 2016 5:25 PM
**To:** Segal, Bruce L.; Aviv, Joseph; Johnson, Carolyn
**Cc:** colson@olsonlawpc.com; pnovak@milberg.com; dgjonaj@milberg.com; dkaron@karonllc.com; bhollowell@karonllc.com
**Subject:** RE: Martin v. Trott - Deposition of Plaintiffs

Bruce:  Have you cleared these dates with Ms. Olson?  If not, please do so before you propose dates to me, so that I do not have to attempt to clear the dates with our clients and only after find out that they do not work for her.

Thanks, Drew.

**From:** Johnson, Carolyn [mailto:CJohnson@honigman.com]
**Sent:** Thursday, August 11, 2016 4:50 PM
**To:** drewmcg@topclasslaw.com; colson@olsonlawpc.com; pnovak@milberg.com; dgjonaj@milberg.com; dkaron@karonllc.com; bhollowell@karonllc.com
**Cc:** Segal, Bruce L. <BSegal@honigman.com>; Aviv, Joseph <JAviv@honigman.com>
**Subject:** Martin v. Trott - Deposition of Plaintiffs

Please see the attached from Bruce L. Segal.


HONIGMAN

**Carolyn C. Johnson**
Legal Secretary
Honigman Miller Schwartz and Cohn LLP
Attorneys and Counselors
39400 Woodward Avenue
Suite 101
Bloomfield Hills, MI  48304-5151
Telephone Number: (248) 566-8367
cjohnson@honigman.com
www.honigman.com


This e-mail may contain confidential or privileged information.  If you are not the intended recipient, please delete it and notify the sender of the error.

# Exhibit C

ANDREW J. McGUINNESS, ESQ.                                    ATTORNEY AT LAW

Goodyear Building                                    drewmcg@topclasslaw.com
122 S Main St, Suite 118
P O Box 7711                                          TEL:  734.274.9374
ANN ARBOR, MI 48107                                  FAX:  734.786.9935

August 13, 2016

<u>VIA EMAIL</u>
Mr. Bruce L. Segal
Honigman Miller Schwartz & Cohn LLP
39400 Woodward Ave, Ste 101
Bloomfield Hills, MI  48304

Re:     <u>Martin, et al. vs. Trott Law P.C., et al., Case No. 2:15-cv-12838</u>

Dear Mr. Segal,

I am in receipt of three deposition notices for named plaintiffs Martin, Nundley, and Cadeau in
the above-referenced action, nominally (but not actually, see below) set for September 20-22,
2016, respectively. You did not clear any of these dates with either co-defendant's counsel, Ms.
Olson, or me before serving these notices.

Your cover letter does ask if these dates are acceptable to plaintiffs, and describes these dates as
"placeholders."

The notices themselves each provide the referenced date, followed by the text "or such other date
and time as may be agreed to by counsel." One way to read the "placeholder" reference and the
"or such other" language is this:

> The depositions are NOT noticed for the enumerated "placeholder" dates IF
> those dates and times are not acceptable to ANY counsel (including counsel
> for plaintiffs or counsel for the co-defendant).

This seems a reasonable reading and, given that you did not clear the dates ahead of sending the
notices, the preferred one.

However, in a subsequent email from you, responding to one of my own in which I sought to
clarify our objection to the named plaintiffs in this action being deposed multiple times (a
proposition with which you have not explicitly disagreed in any oral or written communication
with me), you stated:

> You are, of course, free to take whatever position you want with respect to
> discovery.  By the same token, you do so at your own risk, if, for example, you
> decline to produce your clients or to cross-examine a party or witness at a
> properly-noticed deposition.

Mr. Bruce L. Segal
August 13, 2016
Page 2

This email suggests that the language in your cover letter and deposition notices might contain a hidden time bomb: that *you* might think that it ostensibly *obligates* each plaintiff to appear for deposition at the "placeholder" date, time, and place UNLESS it should first occur that ALL counsel (including you) AGREE to change the dates that you have unilaterally chosen.[1] This interpretation, if credited, would give you an absolute veto over any date change. Indeed, you might even believe that your deposition notices under this interpretation could be construed as "properly-noticed."

As I told you initially, we are not trying to delay defendants' depositions of plaintiffs, but I do not want to hassle them (or me) by attempting to clear dates until we have dates on which Ms. Olson is willing to cross-notice. Otherwise, defendants will be able to "tag team" the named plaintiffs. Moreover, in a class action such as this a contrary approach would amount to harassment of named plaintiffs who, individually, have relatively small claims but seek to represent a broad class of similarly situated consumers. If you do not agree, that's your prerogative; you just need to tell me that so that we can (if Ms. Olson does not agree with your dates) file a Rule 26(c) motion.

When I called you after receipt of your "at your own risk" email to conference regarding our objection to your notices/communications, you told me that you refuse to discuss this until the Rule 26(f) conference currently scheduled for August 24, because there "might not be a problem." I'm not precisely sure what you mean by this. You might mean that you agree that our request is reasonable (though you have refused directly to answer that question, despite my request that you do so), and that we can simply find dates that work for both you and Ms. Olson on the 24th. Under the circumstances, however, this seems like wishful thinking.

 What you probably mean instead is that you might have gotten lucky and chosen three dates on which Ms. Olson will be prepared to and agree to depose the named plaintiffs on behalf of her client. Of course, you could find that out with a simply phone call to Ms. Olson, but you expressly refused during our phone call yesterday to call her.

In light of the above, this letter is to advise you:

- We interpret your notices pursuant to the first interpretation set forth above, and hereby (again) notify you that those dates are not acceptable to counsel for plaintiffs if Ms. Olson is not willing to cross-notice plaintiffs' depositions for those same dates. (If she is willing to do so, I still need to clear these dates with my clients.) You should interpret this as a conditional request to you and Ms. Olson for alternative mutually agreeable dates;

- in the event you interpret the notices differently, we do not consider them as "properly-noticed" under the rules;

---

[1] Granted, such an interpretation is a stretch given that it would mean you included a lot of words that serve no purpose whatever (since if everyone agrees to change a deposition date it can be changed without any such language in the first place). But this letter is sent in an abundance of caution.

Mr. Bruce L. Segal
August 13, 2016
Page 3

- we view your refusal to attempt to resolve issue this until August 24 as violating a party's obligation under the federal and local rules to attempt in good faith to conference with opposing counsel in order to avoid or narrow discovery disputes;

- we view David Trott's positon (apparently) that he can attempt unilaterally (i.e., without even consulting with counsel for the firm he owned and ran for many years) to subject named plaintiffs to multiple depositions to be unreasonable under the circumstances of this case; and

- because we are *not* willing to "risk" adverse consequences on the off chance that your notices are deemed proper, we plan to file a motion for protective order but will hold off doing so until after August 24 on your insistence that we first see if we "have a problem." In other words, you are responsible for delaying resolution of this dispute over your own notices.

If you or Ms. Olson are willing to conference to attempt to resolve this issue before August 24, please advise.

Very truly yours,

Andrew J. McGuinness

cc:  Ms. Charity A. Olson        (via email)
     Mr. Joseph Aviv             ( " )
     Co-counsel for plaintiffs   ( " )

# Exhibit D

| | |
|---|---|
| **From:** | Andrew J. McGuinness |
| **To:** | "Charity A. Olson" |
| **Cc:** | "Bruce L. Segal"; "Aviv, Joseph"; "Paul Novak"; "Daniel R. Karon Esq."; "Gjonaj, Diana" |
| **Subject:** | RE: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS |
| **Date:** | Sunday, August 14, 2016 8:09:00 AM |

So you wish to cross-notice for those same dates?  Please confirm. Thank you, Drew.

---

**From:** Charity A. Olson [mailto:colson@olsonlawpc.com]
**Sent:** Saturday, August 13, 2016 9:47 PM
**To:** Andrew J. McGuinness <drewmcg@topclasslaw.com>
**Cc:** Bruce L. Segal <bsegal@honigman.com>; Aviv, Joseph <JAviv@honigman.com>; Paul Novak
<pnovak@milberg.com>; Daniel R. Karon Esq. <dkaron@karonllc.com>; Gjonaj, Diana
<dgjonaj@milberg.com>
**Subject:** Re: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS

Andrew:

Your presumption that dates have not been "cleared" with me is erroneous.

Please spare us further theatrics and confirm the dates with your clients.

Charity A. Olson
Olson Law Group
2723 S. State St., Suite 150
Ann Arbor, MI 48104
734-222-5179

On Aug 13, 2016, at 4:09 PM, Andrew J. McGuinness <drewmcg@topclasslaw.com> wrote:

Please see attached correspondence.  AJM.

| | |
|---|---|
| **\<image003.jpg\>** | **ANDREW J. MCGUINNESS, ESQ.** |
| | 122 S Main St, Suite 118 |
| | P O Box 7711  \|  Ann Arbor, MI  48107  \|  USA |
| | Tel: (734) 274-9374 \| Fax: (734) 786-9935 |
| | vCard Electronic Business Card |
| | www.topclasslaw.com |
| | **Bio:** www.linkedin.com/in/drewmcguinness |

This Internet message may contain information that is privileged, confidential, or exempt from
disclosure. If you have received this in error (1) do not read, forward or use this information in any
way; (2) contact me immediately; and (3) destroy and purge this email and all copies.

\<Andrew J. McGuinness Letter to Bruce L. Segal (Aug. 13, 2016).pdf\>

# Exhibit E

| | |
|---|---|
| **From:** | Andrew J. McGuinness |
| **To:** | colson@olsonlawpc.com |
| **Cc:** | Bruce L. Segal; Aviv, Joseph; Paul Novak; Daniel R. Karon Esq.; Gjonaj, Diana |
| **Subject:** | RE: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS |
| **Date:** | Thursday, August 18, 2016 7:02:02 PM |

Um, in what sense have we not "meaningfully confer[red]"?

Backing us up toward the deposition dates (which Bruce has not offered to suspend pending the delay) for no articulated—or apparent—reason other than that you and Bruce perceive delay as beneficial is not called for under the Court's guidelines or any rules that I can see. Drew.

**From:** colson@olsonlawpc.com [mailto:colson@olsonlawpc.com]
**Sent:** Thursday, August 18, 2016 6:44 PM
**To:** Andrew J. McGuinness <drewmcg@topclasslaw.com>
**Cc:** Bruce L. Segal <bsegal@honigman.com>; Aviv, Joseph <JAviv@honigman.com>; Paul Novak <pnovak@milberg.com>; Daniel R. Karon Esq. <dkaron@karonllc.com>; Gjonaj, Diana <dgjonaj@milberg.com>
**Subject:** RE: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS

No; we have both offered to meet in person to discuss the depositions and how best to proceed. You've elected, for whatever reason, to file a motion now as opposed to waiting until we can meaningfully confer on a date and time that has already been scheduled to discuss discovery issues. Such actions do not comport with my understanding of Judge Lawson's practice guidelines. We shall see.

Thank you.

**Charity A. Olson**
**OLSON LAW GROUP**
2723 S. State St., Ste. 150
Ann Arbor, MI 48104
**Phone** (734) 222-5179
**Fax** (866) 941-8712

The information contained in this e-mail message and any attachments may be privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by replying to this e-mail and delete the message and any attachments from your computer.

--------- Original Message ---------
Subject: RE: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS
From: "Andrew J. McGuinness" <drewmcg@topclasslaw.com>
Date: 8/18/16 6:23 pm
To: "Charity A. Olson" <colson@olsonlawpc.com>
Cc: "Bruce L. Segal" <bsegal@honigman.com>, "Aviv, Joseph" <JAviv@honigman.com>, "Paul Novak" <pnovak@milberg.com>, "Daniel R. Karon

Esq." <dkaron@karonllc.com>, "Gjonaj, Diana" <dgjonaj@milberg.com>

Thanks, Charity, and good luck with your trial. We'll take that as a "no." Drew.

---

**From:** Charity A. Olson [mailto:colson@olsonlawpc.com]
**Sent:** Thursday, August 18, 2016 5:39 PM
**To:** Andrew J. McGuinness <drewmcg@topclasslaw.com>
**Cc:** Bruce L. Segal <bsegal@honigman.com>; Aviv, Joseph
<JAviv@honigman.com>; Paul Novak <pnovak@milberg.com>; Daniel R. Karon
Esq. <dkaron@karonllc.com>; Gjonaj, Diana <dgjonaj@milberg.com>
**Subject:** Re: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS

Andrew:

You've undoubtedly received my out of office message (and knew I was traveling
based on the fairly extensive conversation we had last week).

I returned late last night and begin trial tomorrow. We can discuss depositions and the
like on 8/24 as Bruce already indicated.

Charity A. Olson
Olson Law Group
2723 S. State St., Suite 150
Ann Arbor, MI 48104
734-222-5179

On Aug 18, 2016, at 4:13 PM, Andrew J. McGuinness <drewmcg@topclasslaw.com>
wrote:

> Ms. Olson: It has now been another two days without a reply from my
> query below, re. whether or not Trott PC is willing to cross-notice the
> named plaintiffs in the above-referenced case for the deposition dates
> next month selected by Mr. Segal.
>
> As I informed you and Mr. Segal in my 8/13 letter, we intend to file a
> motion for protective order absent your and Mr. Segal's agreement to
> cross-notice named plaintiffs' depositions for the same dates. You have
> refused to do so. So has Mr. Segal.
>
> While I indicated in my letter that we would not file a motion before our
> 8/24 meeting, at this point I see no reason for further delay. Accordingly,
> if you fail to confirm expressly your client's agreement to cross-notice
> plaintiffs' depositions for the same dates as David Trott's depositions of
> them by noon tomorrow, Friday, 8/19, we will conclude that we have
> failed to achieve your or Mr. Segal's concurrence or willingness to resolve
> the dispute under the local rules, and proceed to file a motion. If you do
> agree, just say so and I will proceed to attempt to clear dates.
>
> Thanks, Drew

p.s. Neither this email nor the Rule 26(c) motion it contemplates should be taken as acknowledgement that David Trott's deposition notices are proper. They are not for the reasons stated in my 8/13/16 letter, which you have confused as "theatrics."

---

**From:** Andrew McGuinness [mailto:drewmcg@topclasslaw.com]
**Sent:** Tuesday, August 16, 2016 7:32 PM
**To:** Charity A. Olson <colson@olsonlawpc.com>
**Cc:** Bruce L. Segal <bsegal@honigman.com>; Aviv, Joseph <JAviv@honigman.com>; Paul Novak <pnovak@milberg.com>; Daniel R. Karon Esq. <dkaron@karonllc.com>; Gjonaj, Diana <dgjonaj@milberg.com>
**Subject:** RE: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS

Ms.  Olson, it's been more than 48 hours; please favor me with a response to my last (see below).  Once you do so I will attempt to clear the dates with our clients as you request.  Thank you, Drew.

---

**From:** Andrew J. McGuinness [mailto:drewmcg@topclasslaw.com]
**Sent:** Sunday, August 14, 2016 8:10 AM
**To:** Charity A. Olson <colson@olsonlawpc.com>
**Cc:** Bruce L. Segal <bsegal@honigman.com>; Aviv, Joseph <JAviv@honigman.com>; Paul Novak <pnovak@milberg.com>; Daniel R. Karon Esq. <dkaron@karonllc.com>; Gjonaj, Diana <dgjonaj@milberg.com>
**Subject:** RE: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS

So you wish to cross-notice for those same dates?  Please confirm. Thank you, Drew.

---

**From:** Charity A. Olson [mailto:colson@olsonlawpc.com]
**Sent:** Saturday, August 13, 2016 9:47 PM
**To:** Andrew J. McGuinness <drewmcg@topclasslaw.com>
**Cc:** Bruce L. Segal <bsegal@honigman.com>; Aviv, Joseph <JAviv@honigman.com>; Paul Novak <pnovak@milberg.com>; Daniel R. Karon Esq. <dkaron@karonllc.com>; Gjonaj, Diana <dgjonaj@milberg.com>
**Subject:** Re: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS

Andrew:

Your presumption that dates have not been "cleared" with me is erroneous.

Please spare us further theatrics and confirm the dates with your clients.

Charity A. Olson
Olson Law Group
2723 S. State St., Suite 150

# Exhibit F

| | |
|---|---|
| **From:** | Andrew J. McGuinness |
| **To:** | "Segal, Bruce L."; Charity A. Olson (colson@olsonlawpc.com) |
| **Cc:** | Paul Novak (pnovak@milberg.com); Daniel R. Karon Esq. (dkaron@karonllc.com); Gjonaj, Diana |
| **Subject:** | RE: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS |
| **Date:** | Thursday, August 18, 2016 9:52:00 PM |

Bruce:  Will  you withdraw/suspend/declare null and void/or render-not-operative in any other way you  care to describe your deposition notices based on your and Charity's manifest desire NOT to confer about the issue that they raised? Yes or no?

As I've already very clearly communicated to you, we're planning to go the Court for a protective order if the parties cannot agree on our request that defendants take their respective depositions of each named plaintiff at a single sitting. You already know this. So what point would be achieved by clearing any (even alternative) dates until this is resolved?  If you and Charity will agree, I can clear dates (as I've already said I would then do). But neither you nor her will agree, you've made that very clear. Zero for two. And unless you *both* agree, there can be no agreement.  So that's that.

But if there is some good reason, which neither of you will even describe, to stall resolving this then just say "yes" to the question posed above, and we can hold off filing a motion.

I hope I'm wrong, but it seems that want to hold a gun to our head (your so-called "properly noticed" deposition notices) and then have us sit on our hands when we call the question.  Silly gamesmanship that gets us nowhere.  Very disappointing.

-----Original Message-----
From: Segal, Bruce L. [mailto:BSegal@honigman.com]
Sent: Thursday, August 18, 2016 8:29 PM
To: Andrew J. McGuinness <drewmcg@topclasslaw.com>
Subject: Re: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS

Drew,  You have not asked to "suspend"  the dates! Nor have you offered alternatives! If that is what you want, why didn't you just say so when we spoke or in one of your many emails?
Alternatively,why don't you just say so now?
Bruce

Sent from my Verizon Wireless 4G LTE DROID


"Andrew J. McGuinness" <drewmcg@topclasslaw.com> wrote:

Um, in what sense have we not "meaningfully confer[red]"?

Backing us up toward the deposition dates (which Bruce has not offered to suspend pending the delay) for no articulated—or apparent—reason other than that you and Bruce perceive delay as beneficial is not called for under the Court's guidelines or any rules that I can see. Drew.

# Exhibit G

| | |
|---|---|
| **From:** | Segal, Bruce L. |
| **To:** | Andrew J. McGuinness |
| **Cc:** | Charity A. Olson; Paul Novak; Daniel R. Karon Esq.; Gjonaj, Diana; Aviv, Joseph |
| **Subject:** | RE: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS |
| **Date:** | Thursday, August 18, 2016 11:05:42 PM |

I suggest you reread my August 11 cover letter. In the meantime, please provide alternative dates for your clients' depositions, and we (or whomever appears for Plaintiffs) can talk at the conference on Thursday.

-----Original Message-----
From: Andrew J. McGuinness [mailto:drewmcg@topclasslaw.com]
Sent: Thursday, August 18, 2016 10:30 PM
To: Segal, Bruce L.
Cc: Charity A. Olson; Paul Novak; Daniel R. Karon Esq.; Gjonaj, Diana
Subject: RE: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS

Bruce: You never before offered to adjourn the depositions. Please don't make things up.

Since you are now offering to do so, please confirm that you agree to adjourn without date the three depositions you attempted to notice until we either achieve some future agreement among counsel about this dispute, or get a court order on our anticipated motion if necessary.

Thank you, Drew.

-----Original Message-----
From: Segal, Bruce L. [mailto:BSegal@honigman.com]
Sent: Thursday, August 18, 2016 10:14 PM
To: Andrew J. McGuinness <drewmcg@topclasslaw.com>
Cc: Segal, Bruce L. <BSegal@honigman.com>; Charity A. Olson <colson@olsonlawpc.com>; Paul Novak <pnovak@milberg.com>; Daniel R. Karon Esq. <dkaron@karonllc.com>; Gjonaj, Diana <dgjonaj@milberg.com>
Subject: Re: Martin, et al., vs. Trott Law PC, et al., AJM letter to BLS

Drew,
If you are asking me to adjourn the deposition dates, as I already told you, I will, but I will not "withdraw / suspend / declare null and void / or render not operative," the deposition notices.

As for the remainder of your email, as I previously indicated, we can talk at the Rule 26(f) conference scheduled for Thursday when all the parties meet, since, as you know, Charity and I were both travelling this week and I won't return until next Tuesday.

Bruce


Sent from my Verizon Wireless 4G LTE DROID


"Andrew J. McGuinness" <drewmcg@topclasslaw.com> wrote:


Bruce: Will you withdraw/suspend/declare null and void/or render-not-operative in any other way you care to describe your deposition notices based on your and Charity's manifest desire NOT to confer about the issue that they raised? Yes or no?

# Exhibit H

1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9                          OAKLAND DIVISION

10

| | |
|---|---|
| IN RE LITHIUM ION BATTERIES ANTITRUST LITIGATION | Case No. 13-md-2420-YGR DMR |
| | MDL No. 2420 |
| This Document Relates to: | [~~PROPOSED~~] ORDER RE DISCOVERY AND DEPOSITION PROTOCOL |
| ALL ACTIONS | |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WHEREAS, this litigation has been consolidated and transferred by the Judicial Panel on Multidistrict Litigation to the above-referenced Court for pretrial proceedings; and

WHEREAS, it is in the interests of justice, and consistent with the Federal Rules of Civil Procedure, to adopt procedures to organize discovery and minimize burdens on the Direct Purchaser Class Plaintiffs, Indirect Purchaser Class Plaintiffs, Direct Action Plaintiffs, and Defendants (each a "Party" and collectively, the "Parties") in these consolidated cases, all actions treated as "Related Cases" pursuant to Civil L.R. 3-12 that have been or may be filed in this District, and any additional present and future actions transferred to this Court as "tag-along actions" by the MDL Panel pursuant to Rule 7.4 of the Rules of Procedure for the Judicial Panel on Multidistrict Litigation (collectively, the "Batteries Cases").

IT IS HEREBY ORDERED:

## I.   NUMBER OF DEPOSITIONS

A.      For purposes of this order, the term "Plaintiffs" shall mean and refer collectively to all Direct Purchaser Class Plaintiffs, Indirect Purchaser Class Plaintiffs and Direct Action Plaintiffs.  The term "Direct Action Plaintiff" means an individual, Corporation, or state government bringing a non-class action proceeding regarding an antitrust conspiracy in the Lithium Ion Batteries industry, which action has been either (i) transferred to this MDL by the Judicial Panel for Multidistrict Litigation, or (ii) ordered "related" under Civil Local Rule 3-12.  If a Direct Action Plaintiff action is transferred to this MDL by the Judicial Panel on Multidistrict Litigation or ordered "related" under Civil Local Rule 3-12, all Parties may meet and confer to determine whether any modifications to this order are appropriate.

B.      At least twenty-one (21) days prior to noticing depositions of specific  percipient witnesses employed by a particular Defendant, Plaintiffs shall provide to that Defendant group a reasonable list of the persons they propose to depose in the initial round of depositions based on their current knowledge of the discovery record.  A Defendant group is defined as each separately represented group of defendants.  For clarity, the Panasonic family of defendants and the Sanyo family of defendants shall be considered separate Defendant groups.  Within fourteen (14) calendar days after service of a list, the Defendant group shall respond in writing to the list and advise Plaintiffs of any

witnesses thereon who that Defendant group believes have no knowledge, or only marginal knowledge, of the relevant facts, as well as identify any witnesses who defendants have been informed will assert their Fifth Amendment privilege against compelled self-incrimination. The Defendant group's representations are to be taken into consideration but are not determinative as to whether a deposition will be noticed.

C.     Plaintiffs may immediately establish "watchlists" of no more than fifteen custodians/witnesses per Defendant group. For each such identified custodian/witness, Defendants shall timely inform Plaintiffs in writing if they become aware that such person intends to leave, or does leave, his or her employment, to the extent reasonably possible. Upon Plaintiffs' request, Defendants shall make that person available for deposition either before or after his or her departure, to the extent reasonably possible. Plaintiffs may make changes to their watchlists by December 31, 2014, and on a quarterly basis thereafter until December 31, 2015. These requirements will cease on June 15, 2016.

D.     Plaintiffs collectively may depose up to 120 percipient witnesses as part of the joint, coordinated discovery in this case, with a maximum of 12 depositions for any single Defendant group. Defendants may collectively depose each natural person named Plaintiff or class representative and take two depositions of each government entity named Plaintiff or class representative. The Parties shall meet and confer with respect to the number of depositions to be taken of business entity named Plaintiffs or class representatives. Defendants also may collectively take up to 12 depositions of each Direct Action Plaintiff group, which is defined as Direct Action Plaintiffs who are part of the same corporate family. These limits do not include Rule 30(b)(6) depositions of defendants or Direct Action Plaintiffs, depositions of third parties, depositions of experts, or depositions of records custodians regarding authentication of documents.

E.     The Parties shall meet and confer about 30(b)(6) topics and witnesses. These 30(b)(6) depositions shall not count towards the number of percipient witness depositions in paragraph I.D.

F.     The limitations herein on the number and the hours of depositions are presumptive only. The purpose of these presumptive limits is to encourage the judicious use of depositions, not to arbitrarily restrict access to evidence. The numbers and the hours of depositions may be expanded or reduced by stipulation, or for good cause upon motion to the Court. This order does not limit any

- 2 -

[PROPOSED] ORDER
RE DISCOVERY AND DEPOSITION PROTOCOL

Party's right to object to or seek a protective order with respect to any deposition noticed in this case. In addition, the presumptive number of depositions and number of hours is without prejudice to any Party seeking to expand or further limit the number or length of depositions.

## II.    DEPOSITION PROCEDURES

A.    All deposition limitations may be modified for good cause or by agreement.

B.    Except for depositions of a corporate representative under Fed. R. Civ. P. 30(b)(6), the Parties shall use reasonable efforts to avoid having more than one substantive deposition taken on any one day.

C.    To the extent that any Party contends that the time provided for deposition in Rule 30(d)(1), namely that an individual fact deposition is limited to 1 day of 7 hours, or the time provided for deposition as modified by this Order is insufficient to adequately complete a particular deposition, counsel for the Party and counsel for the witness shall, prior to any relief being sought from the Court, meet and confer to attempt to reach agreement on the length of the deposition.

D.    A witness may be deposed only once in these proceedings, unless a witness properly revokes an earlier assertion of the Fifth Amendment, by agreement of the Parties, or by order of the Court based on a showing of good cause.  This limitation will not affect the rights of a Party to seek to depose as a fact witness an individual who has been previously deposed solely as a corporate representative of a Party designated under Fed. R. Civ. P. 30(b) (6), or of other Parties to object to such depositions.  Nor will this procedure affect the rights of a Party to seek a corporate representative deposition under Fed. R. Civ. P 30(b) (6) when the corporate representative has been previously deposed as a fact witness, or of other Parties to object to such depositions.  If it appears that the same individual will be deposed both as a fact witness and as a corporate representative under Fed. R. Civ. P 30(b)(6), the Parties agree to meet and confer to attempt to reach agreement about deposing the individual only once for both purposes.

E.    Plaintiffs shall presumptively have 7 hours to depose each non-30(b)(6) witness.  In the event the same witness is noticed by the Direct Purchaser Class Plaintiffs or Indirect Purchaser Class Plaintiffs and counsel for any Direct Action Plaintiff, the deposition will be limited to 11 hours of deposition, consecutive when reasonably practicable, with 7 hours allocated to the Direct/Indirect

- 3 -

Purchaser Plaintiffs and 4 hours allocated to the Direct Action Plaintiffs.[1]  Provided, however, that (i) any plaintiff may, in their sole discretion, cede their allocated deposition time to any other plaintiff; and (ii) counsel for the Direct Action Plaintiffs may take the lead in a deposition.  The parties shall meet and confer in good faith to discuss their anticipated examination time in advance of any scheduled deposition, taking into account whether a witness is being noticed as an individual fact witness only or as both a 30(b)(6) witness and an individual fact witness.  If any Defendant cross-notices a deposition, Defendants collectively may depose the witness for an additional 7 hours, and Plaintiffs may thereafter depose the witness for an additional 2 hours.  All of these time limits are subject to the provisions below expanding time in the case of translated depositions.

### III.   SCHEDULING, NOTICING AND LOCATION OF DEPOSITIONS

A.     Each of the Parties shall select one attorney to serve as its liaison counsel for purposes of communications related to the scheduling of depositions in this case.  To the extent reasonably practicable, following service of any deposition notice or subpoena in this case, each of the Parties' liaison counsel shall be copied on all written correspondence that relates to deposition scheduling or location issues.  The Parties will cooperate in the scheduling of all depositions.

B.     Depositions of a corporation pursuant to Federal Rule of Civil Procedure 30(b)(6) will presumptively take place in the Northern District of California.  The noticing Party or Parties shall be responsible for payment of the reasonable travel and lodging expenses for any 30(b)(6) foreign resident witnesses produced in the United States.  The expenses required under this Paragraph shall be split equally among the noticing Parties (*e.g.*, if all of the Plaintiffs notice the deposition, the expenses shall be paid: 1/3rd by the Direct Purchaser Class Plaintiffs, 1/3rd  by the Indirect Purchaser Class Plaintiffs, and 1/3rd by the Direct Action Plaintiffs).  The Parties should consider whether the United States, including but not limited to the Northern District of California, is the most efficient and inexpensive location for the depositions of non-30(b)(6) foreign resident witnesses.

---

[1] This Order shall not disrupt previously-scheduled depositions.  With respect to depositions that have already been scheduled at the time this Order is entered, the Parties shall meet and confer on a case-by-case basis regarding the length of the deposition and allocation of time to the Direct Action Plaintiffs.

- 4 -

C.     The Federal Rules of Civil Procedure and this court's orders will apply to the conduct of any deposition occurring in a foreign location.  To the extent that the laws of the foreign location prohibit the application of the Federal Rules of Civil Procedure and this court's orders or substantially interfere with the ability to take a deposition in that location, the Parties shall meet and confer, and hold the deposition in an alternate location which allows for their application.

D.     A letter or telephone call suffices to begin the process of scheduling a deposition.  The court anticipates that the Parties should be able to confirm the date and location of a deposition within three weeks of a request.  The Parties shall meet and confer regarding a process by which they will track objective, non-argumentative information related to deposition scheduling, *e.g.*, an agreed upon log format that reflects dates of initial requests to schedule depositions, response/follow-up dates, and reasons provided for unavailability.  If a dispute arises, the court expects to receive a joint log containing agreed-upon content, rather than competing logs containing different "spins" on the same log entry.

E.     Counsel for Plaintiffs will consult with one another so that, to the extent practicable, depositions can be coordinated as to scheduling, notice, and taking.  The duty to consult in advance is neither intended to give any Party or group of Parties a veto right over other Parties, nor intended to lessen the previously assigned role of Plaintiffs' counsel in co- coordinating this litigation.

F.     The Defendants will consult with one another so that, to the extent practicable, depositions noticed by the Defendants can be coordinated.

G.     Depositions shall be noticed pursuant to the Federal Rules of Civil Procedure and all notices shall be served on all Parties electronically.  Any subpoenas for deposition testimony shall be served on witnesses as required by law, but copies may be served electronically on all Parties.  Deposition notices shall have the legal effect of a deposition notice in all Batteries Cases.

H.     Once a deposition has been scheduled, it shall not be taken off calendar, postponed, or rescheduled, except by agreement of the counsel responsible for scheduling as set forth above, or by other relief obtained from the Court for good cause shown.

## IV. INTERPRETERS, INTERPRETED TESTIMONY AND DOCUMENT TRANSLATIONS

A.      Any Party requesting an interpreter shall bear the expense of providing their own interpreter.  The Parties shall meet and confer to create an agreed-upon list from which the Parties shall select interpreters.  The agreed-upon list should be as expansive as possible; in other words, the court expects the Parties to conduct due diligence now to identify mutually agreeable interpreters beyond those with which they currently are familiar.  If a listed interpreter is not available, the parties shall meet and confer regarding the selection of an alternative.  If the Parties are unable to reach an agreement, the deposition should go forward and the noticing Party or Parties shall select and bear the expense of the lead interpreter.  This ruling is made without prejudice to any witness timely moving for a protective order on the basis of a dispute regarding an interpreter.

B.      If any Party brings a check interpreter to a deposition, and that check interpreter disagrees with any portion of an interpretation, the check interpreter's requested correction shall be stated simply for the record.  The interpreter of record need not respond. All questions, answers, and objections shall be interpreted for the witness as necessary; however, all counsel shall refrain from unnecessary colloquy and speaking objections, so as not to obstruct the depositions.

C.      The Parties shall use reasonable efforts at the deposition to resolve any objection to any interpretation or translation.

D.      To the extent an interpreter is used for all or nearly all of the deposition, the time limits set forth in Paragraph II.C and II.E above shall be doubled.  In all other situations, the Parties will cooperate in good faith to extend the deposition time to account for the use of the interpreter, guided by the principle that deposition time during which an interpreter is used should be counted at 50% or one half the actual amounts against the above set limits.

E.      All translations entered as an exhibit during deposition shall be certified by a professional translator accredited or certified by, or holding a certificate in translation from a program approved by, the American Translator's Association or another member organization of the Federation Internationale de Traducteurs; and those approved and authorized to translate in California courts, including this District, by the Judicial Conferences of California.  By consent of the Parties, translators

- 6 -

with comparable qualifications may be utilized in order to meet a high volume of requests. Translators shall be required to execute Exhibit A to the Stipulated Protective Order if they review any documents subject to the Stipulated Protective Order.

F.  Document translations shall bear the same Confidential or Highly Confidential designation as the original if such designation is in place as of the time that the translation is prepared. A translation should also share the same Bates and deposition exhibit numbers as the underlying document and should be followed with the letter "A" signifying it as a translated version of the document. Because languages occupy different amounts of space to say the same thing, it may be impractical for the translation to be paginated in the exact same way as the original. Parties should ensure the Bates numbers are located in the same location within the text as would be found in the underlying document (*e.g.*, the Bates number may physically fall in the middle of a page, rather than at the bottom). Unless otherwise agreed, document translations shall use the same Bates number as the original, followed by .01, .02, etc. for any additional pages required for the translated text. A translation may not contain independent notes that are not within the text of the original document (*e.g.*, notes from the translator or counsel). Emphasis in the translation (*e.g.*, bold, italics, underlined) must appear in the same form as in the original document. However, translator notations such as "original text is in English," "original text is handwritten," or "untranslatable symbol" may be included in brackets.

G.  If another Party (or Parties) introduces a subsequent translation of the same underlying document, the subsequent translation(s) should also share the same Bates and exhibit numbers as the underlying document and should be followed consecutively with the letter "B," "C," etc. Should a translated document entered into the record become altered as a result of resolved objections to the translation, the updated version should be labeled with the same numbered designation and followed with "AF" (or "BF" or "CF", etc.) signifying a final translated version.

H.  All certified translations shall be presumed to be accurate. Objections to the accuracy of any document translations introduced as exhibits or used at a deposition shall be asserted within 60 days after the final transcript of the deposition is provided to the deponent for correction. Objections shall state the specific inaccuracies of the translation and offer an alternative translation of the portions

of the document objected to.  If the Parties are unable to resolve the dispute, it may be submitted to the Magistrate.  If no objection is made to a translation within the 60-day limit, it shall be deemed accurate, and no objection to admissibility on grounds of inaccuracy of the translation will be permitted.

     I.     The Parties may agree on adjustments to this translation protocol to promote efficiency or fairness, and advise the Court accordingly.  Notwithstanding the provisions of this Order, the Court retains discretion to alter the treatment and admissibility of translated documents at trial if necessary.

## V.    DEPOSITION EXHIBITS

     A.     In accordance with Local Rule 30-2(b)(3), to the extent practicable, any exhibit which is an exact duplicate of an exhibit previously numbered must bear the same exhibit number, regardless of which Party is using the exhibit.  Any new document, or any version of any exhibit which is not an exact duplicate, must be marked and treated as a different exhibit bearing a new exhibit number.

     B.     To the extent reasonably possible, all exhibits shall be marked sequentially. In the case of multiple depositions occurring on or about the same date, deposition liaison counsel for the Parties shall meet and confer in advance of the depositions and attempt to allocate a range of sequential exhibit numbers to each deposition.

     C.     If a Party intending to examine a deponent so chooses, not later than four (4) business days before a deposition, it may serve on deposition liaison counsel for all Parties via electronic mail, a non-binding list of documents (identified by Bates number) that the Party anticipates using or referring to during the deposition.  If a Party serves a non-binding list of documents, examining counsel is not responsible for bringing to the deposition copies of pre- designated exhibits for other counsel.  Counsel are not obligated to pre-designate exhibits.  Any examining counsel who chooses not to pre-designate some or all of the documents to be used at a deposition shall not forfeit the right to use them, but in that case shall bring sufficient copies of such documents to the deposition unless otherwise agreed by the Parties.  With respect to all exhibits that have been marked and used in a prior deposition, "sufficient copies" shall mean at least four (4) hardcopies and electronic versions of the same for attending counsel, either via disk or email.  With respect to any "new" exhibits (i.e., an exhibit that has not been marked and used in prior deposition), "sufficient copies" shall mean at least ten (10)

- 8 -

hardcopies or electronic versions of the same for attending counsel, either via disk or email.  In all events, examining counsel, defending counsel, and all other counsel attending the deposition shall cooperate in good faith so that counsel for each Party attending the deposition will have adequate access during the deposition to any exhibit used by examining counsel during the deposition.

D.     Interim Lead Counsel for Direct Purchaser Plaintiffs and Interim Lead Counsel for Indirect Purchaser Plaintiffs will maintain a master exhibit list to facilitate sequential numbering of exhibits, and will reasonably share this list with any Party that requests it.

## VI.  PARTICIPATION BY TELECONFERENCE

To minimize travel and related costs, counsel may participate in any deposition by telephone to the extent practicable.  Counsel intending to do so must notify counsel for the Party that noticed the deposition and counsel for the witness at least seven (7) business days before the date of the deposition.  Counsel noticing the deposition shall make arrangements so that a conference call line and a real-time video and text feed are available during the deposition, to the extent practicable.  The Parties participating by telephone shall bear the costs of the conference call and/or live video and text feed, to the extent one is used.  To the extent that it is not practicable to provide a conference call line and a real time video and text feed, counsel noticing the deposition must make reasonable efforts to cause all liaison counsel to be notified that a conference call line and/or a real time video and text feed will not be provided at least five (5) business days before the date of the deposition.  Examining counsel and counsel intending to participate by telephone shall cooperate in good faith to facilitate such participation, including reasonable efforts to identify any exhibit used during the deposition by bates number.

## VII.  CONDUCT OF DEPOSITIONS

A.     Objections shall be limited to objection to the form of the question ("asked and answered," "compound," etc.) unless the objection involves privilege or the examining attorney asks for an explanation.  Speaking objections or those which the court could interpret as coaching the deponent are prohibited.  Attorneys shall not argue disputed objections or assertions of privilege on the record.  Any objection to the form of a question shall be deemed to have been made on behalf of all other Parties.  The objection of one counsel to a question need not be repeated by another counsel to

- 9 -

preserve that objection on behalf of such other counsel, and counsel shall avoid repeating objections already preserved.

      B.     The court-reporter service shall maintain a total running time for actual depositions in order to measure compliance with the time limitation and the time allocation provisions above.

      C.     Direct Purchaser Class Plaintiffs, Indirect Purchaser Class Plaintiffs and Direct Action Plaintiffs shall coordinate in order to avoid duplicative questioning during depositions.

# VIII.   STANDARD STIPULATION

      The following stipulation shall apply to all depositions taken in these actions and shall be included in each transcript by the court reporter:

      1.     Upon completion of the transcription of today's session, the original transcript shall be sent to counsel for the witness by the court reporter. Counsel shall promptly forward it to the witness for review, correction, and signature under penalty of perjury. Within 30 days of receiving the transcript from the court reporter, or within 60 days if a translator or translated documents were used at deposition, the witness's counsel shall then forward the original transcript plus corrections to the court reporter, who will promptly notify all counsel of its receipt and any changes to testimony made by the witness.

      2.     If the witness is not represented by counsel, the original transcript will be sent to the witness by the court reporter. After review, correction, and signature within 30 days from the date of receipt, or within 60 days if a translator or translated documents were used at deposition, the witness shall return the original transcript to the court reporter, who will notify all counsel of its receipt and any changes to testimony made by the witness.

      3.     The court reporter will provide the original transcript to the first examining attorney. If, for any reason, the original is lost, misplaced, not returned, not signed, or unavailable, a certified copy may be used in its place for all purposes.

## IX. **FIFTH-AMENDMENT ASSERTIONS**

A.    Upon receipt of notice that a witness intends to assert his or her Fifth Amendment right against self-incrimination, the noticing Party's and any other examining Party's attorneys may submit a list of written questions to the witness to speed up the deposition, delivered to each Party no fewer than five (5) business days before the scheduled deposition.  At the deposition, the written questions and any associated documents shall be introduced as an exhibit to the deposition, and the witness shall be asked summarily whether the witness would assert the Fifth Amendment to each of the written questions if they were posed individually.  If the answer to the summary question is "yes," the deposition shall last no more than one hour.  To the extent the answer to the summary question is "yes," use of the questions and answers at trial shall not be precluded on the basis that the written questions were not asked and answered individually.  The use of the written questions and associated documents shall not prevent questions from being asked other than those contained in the written ones subject to the time limits described herein and under the Federal Rules of Civil Procedure.

B.    All objections to written questions submitted to a deponent will be reserved, including objections to form.

C.    Any person who at deposition asserts his or her right not to testify under the Fifth Amendment of the United States Constitution will be bound by that assertion of the privilege and shall not be permitted to revoke that assertion and testify otherwise at trial if allowing the person to testify would be unduly prejudicial to another Party.  There is no undue prejudice where notice of intent to revoke is provided and the person is made available for deposition 30 days prior to the close of fact discovery.  A rebuttable presumption of undue prejudice shall apply, however, if the person, after revoking the assertion of the privilege, is not made available for deposition at least 30 days prior to the close of fact discovery.  Notice of intent to revoke the assertion of privilege shall be provided to all Parties in writing.  If such notice is provided and the person is not available for deposition until after the close of fact discovery, the revoking person shall make himself or herself available for deposition at his or her expense in San Francisco, California.

## X. <u>USE OF DEPOSITIONS</u>

A.     The depositions taken by any Party pursuant to this Deposition Protocol may be made available and used in all Batteries Cases, and in any substantially similar action not part of this proceeding that directly relates to lithium ion batteries, such as cases filed in state courts by State Attorneys General.

B.     Before a deposition taken pursuant to this Order may be used by any person not part of this proceeding, including State Attorneys General, that person must agree either (1) to abide by the terms of the Stipulated Protective Order entered in this proceeding and execute Exhibit A thereto, or (2) to abide by the terms of a substantially similar protective order.

## XI. <u>PRESERVATION OF RIGHTS AND DEFENSES</u>

Any Party's agreement to and appearance on this stipulation does not constitute a waiver of any defense or right not specifically addressed.  Defendants preserve all rights and defenses, including all defenses under Federal Rule of Civil Procedure 12 and their right to move to compel arbitration.

## XII. <u>COORDINATION OF DISCOVERY</u>

A.     Discovery in all actions transferred to this MDL proceeding shall be coordinated. Counsel for the Direct Purchaser Class Plaintiffs and the Indirect Purchaser Class Plaintiffs, in consultation with the Direct Action Plaintiffs, shall be responsible for coordination of discovery in all actions transferred to this MDL proceeding.  The duty to consult and coordinate amongst the Plaintiffs is not intended to give any Party or group of Parties a veto right over the other Parties, nor is it intended to lessen the previously assigned role of the Direct Purchaser Class Plaintiffs / Indirect Purchaser Class Plaintiffs.

B.     All Parties shall be served with all pleadings, deposition notices, discovery (limited to requests for production, interrogatories, requests for admission, subpoenas, and responses and documents produced thereto), and expert reports served in the MDL after entry of this Order.

C.     All discovery previously produced by the Defendants in the MDL shall be produced by Defendants to the Direct Action Plaintiffs within 10 days of the filing of this Proposed Order Re Discovery and Deposition Protocol.  DAPs agree to be bound by the existing, operative Protective Order (MDL Dkt. No. 193).  Subject to the provisions herein, all Parties may use this previously-

- 12 -

produced discovery during discovery, in pretrial motions, at trial, or for any other purpose to the same degree as if the discovery was provided in response to requests propounded by the Direct Action Plaintiffs. This provision is without prejudice to the Direct Action Plaintiffs' ability to propound additional discovery on the Defendants. In making requests, Direct Action Plaintiffs should (1) confirm the information they seek is not contained in the documents previously produced in the MDL; and (2) identify the information they seek as specifically as possible. Defendants may assert duplication as a proper objection to any written discovery requests propounded by Direct Action Plaintiffs.

D. Defendants may refer to their previously produced discovery in response to any discovery propounded by the Direct Action Plaintiffs if, and to the extent that, the previously-produced materials are responsive to the Direct Action Plaintiffs' discovery requests. Defendants do not waive (a) any previously lodged objection to the production of documents, or (b) any objection to the admissibility or use of any document for any purpose except an objection based on the fact that the Defendants produced the documents in the first instance to other plaintiffs in the above-captioned action. Any Defendant's objection to the admissibility or use of any document by any Party shall apply equally to the Direct Action Plaintiffs' admission or use of that document.

E. Direct Action Plaintiffs that were validly served with a third-party subpoena pursuant to Federal Rule of Civil Procedure 45, prior to consolidation as a party in this MDL proceeding, shall continue, consistent with the Federal Rules of Civil Procedure, to respond to any outstanding subpoena.

F. All Parties shall engage in their best efforts to conduct discovery efficiently and without duplication.

G. Counsel for Direct Purchaser Class Plaintiffs, Counsel for Indirect Purchaser Class Plaintiffs, and Counsel for Direct Action Plaintiffs shall attempt to determine in good faith ways to avoid duplicative discovery. Likewise, Defendants shall consult in good faith in an effort to propound joint written discovery requests, but to the extent separate written discovery is served, Defendants shall not duplicate interrogatories, requests for admission, and requests for documents. Duplication is a proper objection in written discovery requests. This paragraph in no way prejudices or diminishes any

- 13 -

[PROPOSED] ORDER
RE DISCOVERY AND DEPOSITION PROTOCOL

Party's right to serve their own written discovery requests regarding issues that are not common to any other Parties.

## XIII. BINDING ORDER

This Deposition and Discovery Protocol is binding on all Parties to MDL No. 2420, including all current or future Parties to this MDL. This Deposition and Discovery Protocol Order may be modified only by stipulation and order, or by order of the Magistrate or the Court for good cause shown.

**IT IS SO ORDERED.**

DATED: October 19 2015



HON. DONNA M. RYU
United States Magistrate Judge

# Exhibit I

UNITED STATES OF AMERICA

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

– – –

IN RE:  AUTOMOTIVE PARTS            Master File No. 12-md-02311
ANTITRUST LITIGATION                Hon. Marianne O. Battani

_____/

STATUS CONFERENCE / MOTION HEARINGS

BEFORE THE HONORABLE MARIANNE O. BATTANI
United States District Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
Wednesday, January 28, 2015

APPEARANCES:


**Direct Purchaser Plaintiffs:**


WILLIAM G. CALDES
**SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 496-0300


MANUEL J. DOMINGUEZ
**COHEN MILSTEIN**
3507 Kyoto Gardens Drive, Suite 200
Palm Beach Gardens, FL  33410
(561) 578-6850


DAVID H. FINK
**FINK & ASSOCIATES LAW**
100 West Long Lake Road, Suite 111
Bloomfield Hills, MI  48304
(248) 971-2500

2:12-md-02311-MOB-MKM   Doc # 492  Filed 08/20/15   Pg 67 of 186   Pg ID 16520
Status Conference / Motion Hearings • January 28, 2015

2

```
 1 │ APPEARANCES:  (Continued)
   │ Direct Purchaser Plaintiffs:
 2 │
   │ GREGORY P. HANSEL
 3 │ PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
   │ One City Center
 4 │ Portland, ME  04112
   │ (207) 791-3000
 5 │
   │
 6 │ WILLIAM E. HOESE
   │ KOHN, SWIFT & GRAF, P.C.
 7 │ One South Broad Street, Suite 2100
   │ Philadelphia, PA  19107
 8 │ (215) 238-1700
   │
 9 │
   │ JONATHAN M. JAGHER
10 │ SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
   │ 181 Market Street, Suite 2500
11 │ Philadelphia, PA  19103
   │ (215) 496-0300
12 │
   │
13 │ STEVEN A. KANNER
   │ FREED, KANNER, LONDON & MILLEN, L.L.C.
14 │ 2201 Waukegan Road, Suite 130
   │ Bannockburn, IL  60015
15 │ (224) 632-4502
   │
16 │
   │ SARAH GIBBS LEIVICK
17 │ KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
   │ 1633 Broadway
18 │ New York, NY  10019
   │ (212) 506-1765
19 │
   │
20 │ MICHAEL MOSKOVITZ
   │ FREED, KANNER, LONDON & MILLEN, L.L.C.
21 │ 2201 Waukegan Road, Suite 130
   │ Bannockburn, IL  60015
22 │ (224) 632-4502
   │
23 │
   │ MATTHEW RUAN
24 │ COHEN MILSTEIN
   │ 1100 New York Avenue NW, Suite 500 West
25 │ Washington, D.C.  20005
   │ (202) 408-4600
```

```
 1   APPEARANCES:  (Continued)
     Direct Purchaser Plaintiffs:
 2

 3   EUGENE A. SPECTOR
     SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
 4   1818 Market Street, Suite 2500
     Philadelphia, PA  19103
 5   (215) 496-0300

 6

 7   JASON J. THOMPSON
     SOMMERS SCHWARTZ, P.C.
 8   2000 Town Center, Suite 900
     Southfield, MI  48075
 9   (248) 355-0300

10   RANDALL B. WEILL
     PRETI, FLAHERTY, BELIVEAU &
11   PACHIOS, L.L.P.
     One City Center
12   Portland, ME  04112
     (207) 791-3000
13

14

15

16

17

18

19

20

21

22

23

24

25
```

2:15-md-02311-DBH-DRG Doc # 492 Filed 08/24/15 Pg 64 of 186 Pg ID 16592
Status Conference / Motion Hearings • January 28, 2015

4

```
 1   APPEARANCES:  (Continued)
     End-Payor Plaintiffs:
 2
     WARREN T. BURNS
 3   SUSMAN GODFREY, L.L.P.
     901 Main Street, Suite 5100
 4   Dallas, TX  75202
     (214) 754-1928
 5

 6   DAVID C. KURLANDER
     ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
 7   601 Lexington Avenue, Suite 3400
     New York, NY  10022
 8   (212) 980-7400

 9
     OMAR OCHOA
10   SUSMAN GODFREY, L.L.P.
     901 Main Street, Suite 5100
11   Dallas, TX  75202
     (214) 754-1913
12

13   ADAM T. SCHNATZ
     THE MILLER LAW FIRM, P.C.
14   950 West University Drive, Suite 300
     Rochester, MI  48307
15   (248) 841-2200

16
     MARC M. SELTZER
17   SUSMAN GODFREY, L.L.P.
     190 Avenue of the Stars, Suite 950
18   Los Angeles, CA  90067
     (310) 789-3102
19

20   STEVEN N. WILLIAMS
     COTCHETT, PITRE & McCARTHY, L.L.P.
21   840 Malcolm Road
     Burlingame, CA  94010
22   (650) 697-6000

23

24

25
```

2:12-md-02311-MOB-DRG   Doc # 492   Filed 08/20/15   Pg 76 of 186   Pg ID 16623
Status Conference / Motion Hearings • January 28, 2015

5

```
 1   APPEARANCES:  (Continued)
     Dealership Plaintiffs:
 2
     DON BARRETT
 3   BARRETT LAW OFFICES
     P.O. Drawer 987
 4   Lexington, MS  39095
     (601) 834-2376
 5

 6   JONATHAN W. CUNEO
     CUNEO, GILBERT & LaDUCA, L.L.P.
 7   507 C Street NE
     Washington, D.C.  20002
 8   (202) 789-3960

 9
     JOHN KAKINUKI
10   KAKINUKI LAW OFFICE, P.C.
     2 Civic Center Drive, #4222
11   San Rafael, CA  94913
     (415) 492-2011
12

13   BRENDAN FREY
     MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
14   1361 East Big Beaver Road
     Troy, MI  48083
15   (248) 457-9200

16
     GERARD V. MANTESE
17   MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
     1361 East Big Beaver Road
18   Troy, MI  48083
     (248) 457-9200
19

20   SHAWN M. RAITER
     LARSON KING, L.L.P.
21   30 East Seventh Street, Suite 2800
     Saint Paul, MN  55101
22   (651) 312-6500

23
     VICTORIA ROMANENKO
24   CUNEO, GILBERT & LaDUCA, L.L.P.
     507 C Street NE
25   Washington, D.C.  20002
     (202) 789-3960
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      ALDEN L. ATKINS
 3    VINSON & ELKINS, L.L.P.
      2200 Pennsylvania Avenue NW, Suite 500 West
 4    Washington, D.C.  20037
      (202) 639-6613
 5

 6    GARY K. AUGUST
      ZAUSMER, KAUFMAN, AUGUST & CALDWELL, P.C.
 7    31700 Middlebelt Road, Suite 150
      Farmington Hills, MI  48334
 8    (248) 851-4111

 9
      RICHARD D. BISIO
10    KEMP KLEIN LAW FIRM
      201 West Big Beaver Road, Suite 600
11    Troy, MI  48084
      (248) 528-1111
12

13    MICHAEL G. BRADY
      WARNER, NORCROSS & JUDD, L.L.P.
14    2000 Town Center, Suite 2700
      Southfield, MI  48075
15    (248) 784-5032

16
      LISA BROWN
17    DYKEMA GOSSETT, P.L.L.C.
      400 Renaissance Center
18    Detroit, MI  48243
      (313) 568-6943
19

20    JEREMY CALSYN
      CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
21    2000 Pennsylvania Avenue NW
      Washington, D.C.  20006
22    (202) 974-1500

23    PATRICK J. CAROME
      WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
24    1875 Pennsylvania Avenue NW
      Washington, D.C.  20006
25    (202) 663-6610
```

```
 1   APPEARANCES:  (Continued)
     For the Defendants:
 2
     MATTHEW CELESTIN
 3   WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
     1875 Pennsylvania Avenue NW
 4   Washington, D.C.  20006
     (202) 663-6600
 5

 6   STEVEN F. CHERRY
     WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
 7   1875 Pennsylvania Avenue NW
     Washington, D.C.  20006
 8   (202) 663-6321

 9
     JAMES L. COOPER
10   ARNOLD & PORTER, L.L.P.
     555 Twelfth Street NW
11   Washington, D.C.  20004
     (202) 942-5000
12

13   MOLLY CRABTREE
     PORTER, WRIGHT, MORRIS & ARTHUR
14   41 South High Street, Ste. 2900
     Columbus, OH  43215
15   (614) 227-2015

16
     DAVID CROSS
17   CROWELL & MORING
     1001 Pennsylvania Avenue NW
18   Washington, D.C.  20004
     (202) 624-2774
19

20   KENNETH R. DAVIS, II
     LANE POWELL, P.C.
21   601 SW Second Avenue, Suite 2100
     Portland, OR  97204
22   (503) 778-2100

23
     DAVID P. DONOVAN
24   WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
     1875 Pennsylvania Avenue, NW
25   Washington, D.C.  20006
     (202) 663-6868
```

8

```
 1   APPEARANCES:  (Continued)
     For the Defendants:
 2
     DAVID F. DuMOUCHEL
 3   BUTZEL LONG, P.C.
     150 West Jefferson Avenue
 4   Detroit, MI  48226
     (313) 225-7000
 5

 6   J. CLAYTON EVERETT, JR.
     MORGAN, LEWIS & BOCKIUS, L.L.P.
 7   1111 Pennsylvania Avenue NW
     Washington, D.C.  20004
 8   (202) 739-5860

 9
     PETER M. FALKENSTEIN
10   JAFFE, RAITT, HEUER & WEISS, P.C.
     535 W. William, Suite 4005
11   Ann Arbor, MI  48103
     (734) 222-4776
12

13   MICHAEL FELDBERG
     ALLEN & OVERY, L.L.P.
14   1221 Avenue of the Americas
     New York, NY  10020
15   (212) 610-6360

16
     DANIEL T. FENSKE
17   JENNER & BLOCK
     353 N. Clark Street
18   Chicago, IL 60654-3456
     (312) 222-9350
19

20   MICHELLE K. FISCHER
     JONES DAY
21   51 Louisiana Avenue NW
     Washington, D.C.  20001
22   (202) 879-4645

23
     LARRY S. GANGNES
24   LANE POWELL, P.C.
     1420 Fifth Avenue, Suite 4100
25   Seattle, Washington  98101
     (206) 223-7000
```

```
 1   APPEARANCES:  (Continued)
     For the Defendants:
 2
     JASON R. GOURLEY
 3   BODMAN P.L.C.
     1901 St. Antoine Street, 6th Floor
 4   Detroit, MI  48226
     (313) 259-7777
 5

 6   FRED K. HERRMANN
     KERR, RUSSELL & WEBER, P.L.C.
 7   500 Woodward Avenue, Suite 2500
     Detroit, MI  48226
 8   (313) 961-0200

 9
     BROOK HOPKINS
10   WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
     1875 Pennsylvania Avenue, NW
11   Washington, D.C.  20006
     (202) 663-6868
12

13   WILLIAM R. JANSEN
     WARNER, NORCROSS & JUDD, L.L.P.
14   2000 Town Center, Suite 2700
     Southfield, MI  48075
15   (248) 784-5178

16
     FREDERICK JUCKNIESS
17   SCHIFF HARDIN, L.L.P.
     350 South Main Street, Suite 210
18   Ann Arbor, MI  48104
     (734) 222-1507
19

20   STEVEN M. KOWAL
     K&L GATES
21   70 West Madison Street, Suite 3100
     Chicago, IL  60602
22   (312) 372-1121

23
     FRANK LISS
24   ARNOLD & PORTER, L.L.P.
     555 Twelfth Street NW
25   Washington, D.C. 20004
     (202) 942-5969
```

```
 1   APPEARANCES:  (Continued)
     For the Defendants:
 2
     TIMOTHY J. LOWE
 3   McDONALD HOPKINS, P.L.C.
     39533 Woodward Avenue, Suite 318
 4   Bloomfield Hills, MI  48304
     (248) 220-1359
 5

 6   ERIC MAHR
     WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
 7   1875 Pennsylvania Avenue, NW
     Washington, D.C.  20006
 8   (202) 663-6099

 9
     JOHN M. MAJORAS
10   JONES DAY
     51 Louisiana Avenue NW
11   Washington, D.C.  20001
     (202) 879-3939
12

13   MICHELLE A. MANTINE
     REED SMITH, L.L.P.
14   225 Fifth Avenue, Suite 1200
     Pittsburgh, PA  15222
15   (412) 288-4268

16
     ANDREW S. MAROVITZ
17   MAYER BROWN, L.L.P.
     71 South Wacker Drive
18   Chicago, IL  60606
     (312) 701-7116
19

20   BRIAN M. MOORE
     DYKEMA GOSSETT, P.L.L.C.
21   39577 Woodward Avenue, Suite 300
     Bloomfield Hills, MI  48304
22   (248) 203-0772

23
     WILLIAM H. RAWSON
24   LATHAM & WATKINS, L.L.P.
     555 Eleventh Street NW, Suite 1000
25   Washington, D.C.  20004
     (202) 637-2200
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      ALEXANDER B. REICH
 3    CALFEE, HALTER & GRISWOLD, L.L.P.
      1405 East Sixth Street
 4    Cleveland, OH  44114
      (216) 622-8621
 5

 6    JOHN ROBERTI
      ALLEN & OVERY, L.L.P.
 7    1101 New York Avenue, NW
      Washington, D.C.  20005
 8    (212) 683-3682

 9    COURTNEY ROSEN
      SIDLEY AUSTIN, P.C.
10    1 South Dearborn Street
      Chicago, IL 60603
11    (312) 853-7669

12
      MICHAEL RUBIN
13    ARNOLD & PORTER, L.L.P.
      555 Twelfth Street NW
14    Washington, D.C.  20004
      (202) 942-5094
15

16    WM. PARKER SANDERS
      SMITH, GAMBRELL & RUSSELL, L.L.P.
17    Promenade Two, Suite 3100
      1230 Peachtree Street NE
18    Atlanta, GA  30309
      (404) 815-3684
19

20    LARRY J. SAYLOR
      MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
21    150 West Jefferson Avenue, Suite 2500
      Detroit, MI  48226
22    (313) 496-7986

23
      CRAIG SEEBALD
24    VINSON & ELKINS, L.L.P.
      2200 Pennsylvania Avenue NW, Suite 500 West
25    Washington, D.C.  20037
      (202) 639-6585
```

```
1    APPEARANCES:  (Continued)
     For the Defendants:
2
     CHARLES SKLARSKY
3    JENNER & BLOCK
     353 N. Clark Street
4    Chicago, IL 60654-3456
     (312) 923-2904
5

6    JESSE T. SMALLWOOD
     WILLIAMS & CONNOLLY, L.L.P.
7    725 Twelfth Street NW
     Washington, D.C.  2005
8    (202) 434-5162

9
     JASON STARLING
10   PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P.
     41 South High Street, Suites 2900
11   Columbus, OH  43215
     (614) 227-2147
12

13   ANITA STORK
     COVINGTON & BURLING, L.L.P.
14   One Front Street
     San Francisco, CA  94111
15   (415) 591-7050

16
     MARGUERITE M. SULLIVAN
17   LATHAM & WATKINS, L.L.P.
     555 Eleventh Street NW, Suite 1000
18   Washington, D.C.  20004
     (202) 637-2200
19

20   JOANNE GEHA SWANSON
     KERR, RUSSELL & WEBER, P.L.C.
21   500 Woodward Avenue, Suite 2500
     Detroit, MI  48226
22   (313) 961-0200

23
     MAUREEN T. TAYLOR
24   BROOKS, WILKINS, SHARKEY & TURCO
     401 South Old Woodward, Suite 400
25   Birmingham, MI  48009
     (248) 971-1721
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      MICHAEL F. TUBACH
 3    O'MELVENY & MYERS, L.L.P.
      Two Embarcadero Center, 28th Floor
 4    San Francisco, CA  94111
      (415) 984-8700
 5

 6    MICHAEL R. TURCO
      BROOKS, WILKINS, SHARKEY & TURCO, P.L.L.C.
 7    401 South Old Woodward Avenue, Suite 400
      Birmingham, MI  48009
 8    (248) 971-1713

 9
      LINDSEY ROBINSON VAALA
10    VINSON & ELKINS, L.L.P.
      2200 Pennsylvania Avenue NW, Suite 500 West
11    Washington, D.C.  20037
      (202) 639-6585
12

13    ALISON WELCHER
      SHEAVMAN & STERLING
14    801 Pennsylvania Avenue, NW, Suite 900
      Washington, D.C.  20004
15    (202) 508-8112

16
      OTHER APPEARANCES:
17
      PATRICK F. MORRIS
18    MORRIS & MORRIS, L.L.C.
      4001 Kennett Pike, Suite 300
19    Wilmington, DE  19807
      (302) 426-0400
20

21    ROB NOBLIN
      GREEN & NOBLIN, P.C.
22    4500 East Pacific Coast Highway, Fourth Floor
      Long Beach, CA  90804
23    (562) 391-2487

24

25
```

```
 1    APPEARANCES:  (Continued)

 2    R. SCOTT PALMER
      OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA
 3    The Capital, PL-01
      Tallahassee, FL  32399
 4    (850) 414-3300

 5

      JAYE QUADROZZI
 6    YOUNG & ASSOCIATES
      27725 Stansbury Boulevard, Suite 125
 7    Farmington Hills, MI  48334
      (248) 353-8620
 8

 9    LESLEY E. WEAVER
      GREEN & NOBLIN, P.C.
10    700 Larkspur Landing Circle, Suite 275
      Larkspur, CA  94939
11    (415) 477-6700

12

13    Attorneys Present Via Telephone:

14    ELIZABETH A. CATE
      WINSTON & STRAWN, L.L.P.
15
      J. MANLY PARKS
16    DUANE MORRIS, L.L.P.

17    HOLLIS L. SALZMAN
      ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
18
      A. PAUL VICTOR
19    WINSTON & STRAWN, L.L.P.

20

21

22

23

24

25
```

```
 1                      TABLE OF CONTENTS

 2                                                      Page

 3   STATUS CONFERENCE................................ 18

 4   DEFENDANTS' JOINT MOTION TO DISMISS END PAYERS'
     CONSOLIDATED CLASS ACTION COMPLAINT............... 62
 5
     DEFENDANTS' COLLECTIVE MOTION TO DISMISS CLASS
 6   ACTION COMPONENTS OF THE PUBLIC ENTITIES'
     COMPLAINT........................................ 66
 7
     DEFENDANTS' MOTION TO DISMISS END PAYERS' AND
 8   AUTO DEALERS' CONSOLIDATED AMENDED CLASS
     ACTION COMPLAINTS................................105
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1   Detroit, Michigan

 2   Wednesday, January 28, 2015

 3   At about 10:04 1

 4                          —    —    —

 5              (Court and Counsel present.)

 6              THE CASE MANAGER:  Please rise.

 7              The United States District Court for the Eastern

 8   District of Michigan is now in session, the Honorable

 9   Marianne O. Battani presiding.

10              All those having business before this Honorable

11   Court, please draw near and you shall be heard.  God save

12   these United States and this Honorable Court.

13              You may be seated.

14              The Court calls Case No. 12-md-02311, Automotive

15   Parts Antitrust Litigation.

16              THE COURT:  All right.  Good morning, everyone.

17              THE ATTORNEYS:  (Collectively)  Good morning, Your

18   Honor.

19              THE COURT:  I didn't expect to see so many of you,

20   I thought that storm might keep some of you away, but we do

21   have several people on the phone.  All right.  Let's begin

22   the agenda.

23              First of all, I have a question because this is

24   kind of mysterious to me, who actually prepares this agenda

25   and the status report?

1    MR. HANSEL:  Your Honor, I take full responsibility

2  but not the blame.

3    THE COURT:  Put your appearance on the record.

4    MR. HANSEL:  Thank you, Your Honor.  Greg Hansel

5  for the direct purchasers.

6    We usually coordinate it, and we start off by

7  trying to get the plaintiffs to agree and then we try to get

8  the defendants to agree, and if there is a disagreement we

9  put the disagreement in the proposed agenda but they often

10  disappear, and so I hope these are satisfactory to Your

11  Honor.

12    THE COURT:  I think they are wonderful, and I just

13  wanted to acknowledge, I didn't know who amongst you was

14  principal for getting this ready, and it is extremely helpful

15  and I particularly like the status report, so I thank you.

16    MR. HANSEL:  Happy that's helpful, and I'm sure

17  everyone shares that view because we all do put some work

18  into it, everyone contributes.

19    THE COURT:  I'm sure everyone contributes, and if

20  there is anybody who wants something added to the agenda that

21  we don't have there, you know, we kind of get into our

22  protocol I guess for meetings and sometimes maybe don't think

23  of other things, but if anybody ever does, when you get the

24  agenda please do not hesitate to call and say I would like

25  this or talk to counsel to have it added.  Okay.  Thank you

 1   very much.

 2            MR. HANSEL:  Thank you.

 3            THE COURT:  Again, I want to thank those that came

 4   in, and I know some of you came in a couple days in advance

 5   to be here, I know Mr. Morris particularly, but I thank you

 6   for doing that.  This meeting, it was kind of up in the air,

 7   I didn't know if it was going to come off or not come off

 8   today, but I'm very, very glad it did.  Thank you.

 9            I want to, first of all, change the schedule in the

10   agenda because Mr. Esshaki, our master, is here and he's

11   going to have to leave, so I would like to deal with some

12   matters while he's here.

13            Gene, I would like to start first of all with your

14   report, there are pending matters referred to the master, it

15   is number 3 on the agenda.

16            MASTER ESSHAKI:  Yes.  Thank you very much, Your

17   Honor.

18            Again, I want to thank everyone who I have been in

19   contact with for the professionalism and the level of work

20   that you have provided me.

21            Right now the only matter that I have pending is

22   the discovery protocol in the wire harness cases.  We had a

23   conference call on that with the interested parties last

24   Wednesday.  The parties were kind enough to prepare the

25   deposition protocol and lay out all of the points that they

 1   agreed upon and then highlighted six points upon which there

 2   was disagreement.  They then each provided me with a position

 3   statement as to their respective positions on those six

 4   contested points.

 5            I conducted a conference call where I believe each

 6   side was provided adequate opportunity to argue their

 7   respective positions.  I -- these were points that could not

 8   really be consolidated or mediated, and as a consequence I

 9   made rulings and I asked counsel for the defendants,

10   Ms. Romanenko, to redraft the deposition protocol order, to

11   identify those six points in which the master made the ruling

12   so that it would be clear which ones were ruled upon, and to

13   add at the bottom of the order that the order is subject to

14   appeal to Judge Battani pursuant to the order appointing

15   special master.  She was then to submit it to counsel for the

16   plaintiffs, obtain their consent as to the language, and then

17   give it to me to be signed and filed with the Court.  And I

18   would image that at least one side or perhaps both may take

19   an appeal.  So I think the ball is in Ms. Romanenko's court

20   or it may be in the plaintiffs' court, I just don't know.

21            MS. SULLIVAN:  Good morning.  Maggie Sullivan from

22   Latham & Watkins on behalf of Sumitomo, and I will be

23   speaking on behalf all the defendants on this.

24            Just to clarify, Master Esshaki, you asked me --

25            MASTER ESSHAKI:  Yes, you are right.  I

```
1    apologize.
2            MS. SULLIVAN:  -- Ms. Sullivan, to draft an order.
3            No apologies necessary, sir.
4            MASTER ESSHAKI:  Sorry, Ms. Romanenko.
5            MS. SULLIVAN:  We did draft the order and we sent
6    it along to the plaintiffs on Friday last week, and all
7    parties have signed off except for the auto dealers.  We
8    received some edits late last night from the dealers that we
9    believe are inconsistent with your rulings on one of the
10   disputes in particular and so we are going to talk with them
11   about that after the hearing and I hope that we would be able
12   to work it out.  If we aren't able to we will present it back
13   to you.
14           MASTER ESSHAKI:  Please give me an e-mail and let
15   me know what you need of me.
16           MS. SULLIVAN:  We will.  There was one point that
17   came up during the mediation and also in the submissions
18   related to the deposition protocol that relates to the
19   coordination of depositions generally, and so we wanted to
20   clarify --
21           THE COURT:  Coordination amongst the parts?
22           MS. SULLIVAN:  Well, we have committed in the wire
23   harness protocol to attempt to coordinate with the other
24   parties in the other cases on the plaintiffs' side
25   depositions, so we have indicated that we will send them --
```

```
 1    we will notify the plaintiffs -- the defendants in the other
 2    cases of the depositions, provide the transcripts subject to
 3    the plaintiffs' agreement, and also provide our preparation
 4    materials in an effort to avoid duplication across the auto
 5    parts cases.  And during the course of the submissions and
 6    also in the mediation the end payers and auto dealers both
 7    represented to us and to the Court that they are dropping or
 8    withdrawing their claims based on purchases of replacement
 9    parts in the wire harness case, and so we would like that to
10    be confirmed.  And we also would like both the end payers and
11    auto dealers to inform the Court as to whether they intend to
12    pursue those claims in the other auto parts cases or whether
13    they have also dropped the claims in those other cases.
14              Thank you.
15              THE COURT:  So if I understand you correctly, the
16    auto dealers in the wire harness --
17              MS. SULLIVAN:  Correct.
18              THE COURT:  -- have dropped the aftermarket -- the
19    replacement parts claims --
20              MS. SULLIVAN:  Correct.
21              THE COURT:  -- those parts of their cases, okay,
22    but the end payers have not?
23              MS. SULLIVAN:  No, the end payers have as well in
24    the wire harness case.
25              THE COURT:  Okay.
```

```
 1              MS. SULLIVAN:  So the question is whether they have
 2    also withdrawn or are intending to withdraw those claims in
 3    the other auto parts cases other than wire harnesses.
 4              THE COURT:  Thank you.
 5              MR. WILLIAMS:  Good morning, Your Honor.
 6    Steve Williams for the end payers.  It is good to see you
 7    again.
 8              What Ms. Sullivan has said is correct, and we did
 9    confirm that with her this morning, that we are not pursuing
10    claims for replacement parts, we are pursuing claims for
11    people who purchased automobiles -- vehicles with price-fixed
12    parts in them.
13              THE COURT:  Thank you, Mr. Williams.
14              MR. WILLIAMS:  Thank you.
15              THE COURT:  Ms. Romanenko?
16              MS. ROMANENKO:  Good morning, Your Honor, Special
17    Master Esshaki.
18              With regards to the deposition protocol order, as
19    Ms. Sullivan stated, they sent us their draft, we sent them
20    our edits a couple days later, we believe our edits
21    memorialize what the special master stated but, of course, we
22    are going to meet and confer with them so we can avoid any
23    further disputes and get the order to the master for entry.
24              With regard to the replacement part issue, as
25    Ms. Sullivan stated, we have agreed to withdraw claims with
```

1    regard to replacement parts in wire harness, we are reviewing

2    the other cases and we will let defendants know our

3    determination as quickly as possible.

4            THE COURT:  Thank you.  Ms. Sullivan?

5            MS. SULLIVAN:  I apologize, but it was not entirely

6    clear what the end payers' position is with respect to the

7    other auto parts, whether he was speaking -- Mr. Williams was

8    speaking just in the wire harness case or across all the auto

9    parts cases.  I just want to make sure it is clear.

10           THE COURT:  Mr. Williams?

11           MR. WILLIAMS:  Thank you.  I apologize if I was not

12   clear but, yes, what I said about pursuing claims for people

13   who purchased or leased automobiles with the price-fixed

14   parts in them applies across the board to all the cases we

15   presently have filed.  We are not pursuing damage claims for

16   replacement parts, only parts.

17           THE COURT:  In any of the cases?

18           MR. WILLIAMS:  Correct.

19           THE COURT:  Thank you.

20           MR. WILLIAMS:  Thank you.

21           THE COURT:  Okay.  Something has come up, and this

22   may be a first time when I run into a master, as I said, I

23   haven't used a master before, but I have been thinking about

24   this deposition protocol and I know -- I can't get into

25   details with Mr. Esshaki at all because I may be doing

```
 1   appeals for it, but let me put my two cents' worth in here.
 2          I was thinking about the depositions for the
 3   individual plaintiffs in all of the auto parts.  I have been
 4   thinking about the issue, do you take a deposition of each
 5   plaintiff in each part?  That's impossible, that is not going
 6   to happen.  First of all, certainly end payers and, unless
 7   somebody could convince me otherwise, auto dealers don't buy
 8   cars by parts, they buy the car.  Certainly your end payers
 9   probably don't even know these parts exist in their cars.  So
10   I would assume, and I don't know this, but I would assume
11   what you want to know is about how much they paid for the car
12   and where they purchased the car, that type of thing.  And I
13   would also assume that that's true for every defendant would
14   want this basic information and that this can all be done in
15   one deposition of a named plaintiff.
16          I don't know in detail what you have discussed in
17   your protocol but, you know, maybe I'm jumping the gun here
18   but I'm throwing this out because this case has to move along
19   with a little more swiftness, and that is that it is my
20   intention to do something -- I mean, if we have to innovative
21   we will be innovative but that there be one deposition.
22          So, Mr. Williams, before I go on, go ahead.
23          MR. WILLIAMS:  I just want to respond, Your Honor,
24   to your point.  This actually was a matter that the parties
25   discussed and mediated with Mr. Esshaki.
```

```
 1         THE COURT:  See, I'm already interfering with --
 2         MR. WILLIAMS:  It is in the proposal but I don't
 3    think that rules out us and the defendants and the master, if
 4    he's so willing, from evaluating this in light of the
 5    comments that you have made today.  I think we are all in
 6    favor of efficiencies.
 7         THE COURT:  Well, I have thought about this and I
 8    know particularly from defendants' point of view, I mean,
 9    maybe each defendant has something unique they want to do so
10    I thought about this, well, okay, defendants, and you haven't
11    even answered yet, a lot of you, but that's okay, discovery
12    can start anyway, we don't need to have the answers to do
13    discovery, under the rules I can allow it and, of course, I
14    am in this case.  You can if you want, each of you, submit
15    questions you would ask of a plaintiff, be it an auto dealer
16    or an end payer, I don't think the OEMs are a big deal, but
17    in terms of those two groups you can also submit questions
18    and then either the master or myself could call those
19    questions so that you would literally have your questions
20    asked, so when the person comes in he's going to be asked the
21    question, or she, only one time, and you could decide for
22    yourself a group of you that will be taking these depositions
23    using this script.
24         Or another way of doing it is a group of you could
25    get together and come up with one set of questions so you're
```

2:12-15-cv-02318-VAR-DML-NDKRG   Doc # 892   Filed 02/24/15   Pg 92 of 186   Pg ID 16644
Status Conference / Motion Hearings • January 28, 2015

26

1    not all doing it.  Either -- which way I don't care but I

2    want you to have the opportunity to ask, you know, to get the

3    information you need and at the same time only do a single

4    deposition of most of these named plaintiffs.  Granted there

5    may be something that comes up that would require an extra

6    deposition, I don't know what that could be, you would know

7    that, and we would deal with that, but that's kind of what I

8    had in mind for the depositions.  So I just throw that out so

9    when you are doing your protocol it may be a little late but

10   I've just been thinking about this.

11           Ms. Sullivan?

12           MS. SULLIVAN:  I do think that the language that

13   Master Esshaki has instructed the parties to include in the

14   protocol does envision the types of things that you may be

15   thinking about in terms of cooperating with each other and

16   trying to avoid duplication.  This is one of the reasons why

17   I asked for clarification regarding replacement parts because

18   speaking only on behalf of the wire harness defendants, not

19   on behalf of any defendant in any of the other cases, for us

20   it seems much more likely that we will be able to accomplish

21   having only a single deposition of the end payers when if it

22   is true that that's all that they are claiming is damages

23   based on the purchase of a car, and that applies in all of

24   the cases.  Again, I'm not speaking on behalf of any of the

25   other defendants in those other cases but I do expect that we

1    should be able to accomplish what you are envisioning with

2    respect to the end payers.

3         The auto dealers are differently situated.  First,

4    they have not yet withdrawn their replacement part claims in

5    the other cases and that will make a difference, I suspect,

6    because if they are claiming damages based on those other

7    purchases of the other parts the parties in those other cases

8    will need to explore the prices that they paid, whether the

9    prices were negotiated, the prices for which they sold those

10   parts, et cetera, et cetera, and so that will add to the

11   complexity significantly.

12        THE COURT:  Unless they drop as they did in the

13   wire harness?

14        MS. SULLIVAN:  Correct.  In addition, the auto

15   dealers are more complicated as well because of where they

16   sit in the distribution chain, so not only do we need to

17   explore their purchases of cars but also their sales of cars,

18   and that relates to the pass-through issue that Your Honor

19   identified back in the motion to dismiss ruling back in 2013

20   I believe.  So those are more complicated depositions.  We

21   are hopeful that we will be able to avoid as much duplication

22   as possible.  We are making -- we have committed to using our

23   best efforts to do that, and we will take every step that we

24   can think of to try to avoid duplication.

25        THE COURT:  Okay.  Well, there is not going to be

Status Conference / Motion Hearings • January 28, 2015

1    duplication unless it comes before me first that you need a

2    second deposition, let me start with that, because we just

3    cannot start doing two depositions or more of everyone, so

4    I'm not barring it, I'm just saying I need to know why.

5         MS. SULLIVAN:  Your Honor, for the wire harness

6    defendants, our primary concern is that our depositions are

7    not delayed and because many of the other cases are far

8    behind us we have been concerned that if there is a ruling

9    that only one deposition may occur across the entire auto

10   parts MDL that we will then have to wait for those other

11   cases to catch up, and it is very important to us that we not

12   have to wait.  As you know, we have been in discovery in this

13   case for a very long time, and we would like to move forward

14   with our depositions.

15        THE COURT:  Well, you may have to wait, you may

16   have to wait.  I don't think this is a big deal.  I think

17   that every one of these defendants knows right now what

18   information they want from each person.

19        MS. STORK:  Your Honor if I could just say a word?

20   Good morning.  My name is Anita Stork and I represent

21   Alps Electric, with case number 4, heater control panels, and

22   I also represent another defendant who was just recently

23   served in fuel injection systems, namely Tahen (phonetic)

24   North America.

25             I think -- and I know that we are all for

2:21-cv-02813-MOB-MKM   Doc # 892   Filed 08/27/21   Pg 929 of 1351   Pg ID 16347
Status Conference / Motion Hearings • January 28, 2015

29

 1   efficiency and coordination as much as possible, but I think

 2   one issue to consider is that the deposition protocol so far

 3   has only been negotiated between wire harness defendants and

 4   plaintiffs in auto dealers, end payers and also directs, but

 5   the defendants in the later cases haven't been involved in

 6   that at all so it is a little bit difficult to say that

 7   negotiations that one set of defendants is doing now is going

 8   to bind everybody in the subsequent 24, 25, however many

 9   cases there are.

10            I'm not saying that we are not eager to do this,

11   I'm just saying that some defendants really aren't in a

12   position to know because they have just been served or are

13   recently in the case to know exactly what information they

14   need, and that submitting questions really is no substitute

15   for at some point being able to ask additional questions if

16   you think that's needed.  I mean, I certainly wouldn't

17   contradict anything Your Honor has said -- the Court has said

18   about the approach to it, I'm just suggesting that, one,

19   these later defendants haven't been involved in this

20   negotiation but that secondly one alternative for the Court

21   to consider would be to have depositions of the named

22   plaintiffs sooner rather than later but then keep in reserve

23   like an extra two hours if defendants in later cases feel

24   like they have to ask additional questions and can make a

25   case to the Court that these are additional questions that

 1    need to be asked.  It is just very difficult when you have

 2    only just been served and other defendants have been in their

 3    wire harness case for four years to immediately know what

 4    your client who just got the summons really needs to ask.

 5              THE COURT:  Okay.

 6              MS. STORK:  Thank you, Your Honor.

 7              THE COURT:  Mr. Williams?

 8              MR. WILLIAMS:  Just speaking on behalf of end

 9    payers, we are all in favor of doing whatever we would need

10    to do to avoid duplication.  We had offered across all the

11    cases to make our discovery responses in the first cases

12    available to all defendants, and we think that it makes a lot

13    of sense to think of ways to avoid the duplication.  I think

14    the suggestions the Court made makes a lot of sense.  From

15    the top of my head, an alternative could also be a set of

16    depositions upon written questions for the basic facts of

17    purchases.  There are a lot of creative ways -- really not

18    that creative ways to do this to create efficiencies that the

19    Court is talking about, and we for the end payers will do

20    everything we can to make that happen and to not cause any

21    delay for defendants whether they have been in the cases or

22    whether they are new defendants.

23              THE COURT:  All right.

24              MR. KANNER:  Good morning, Your Honor.

25    Steve Kanner on behalf of direct purchasers.

1      We have been listening with interest, and we have

2  been involved in these discussions.  Of course the direct

3  purchasers are in a slightly different position, there are

4  certainly fewer plaintiffs in each of these cases.  And with

5  respect to wire harness I believe the protocols have largely

6  been worked out in an extremely cooperative fashion.  Of

7  course, we also buy the product somewhat differently than the

8  end payers, we are not buying the cars, we are actually

9  buying the parts directly, but certainly off the top of my

10 head I think three plaintiffs who bought -- at least two who

11 bought wire harness parts and other parts, Findlay and ACAP,

12 and certainly another client, Tiffin, purchased four or five

13 different parts directly from the defendants, so we are

14 certainly in favor of doing whatever is necessary to make the

15 process more efficient and to have these people sit for one

16 deposition as opposed to four and five separate times.

17      It makes sense -- it certainly makes sense from the

18 standpoint of the economy of efforts by the attorneys as

19 opposed to all going to four and five separate depositions,

20 we can do it at one time.  And to the extent that we can do

21 this in a written form beforehand, certainly the purchase

22 information, the defendants from whom we have purchased know

23 exactly what our clients have purchased, when and for how

24 much.  So that ought to be considered in terms of how we

25 streamline this process, and we are certainly open to, as

 1    Your Honor suggested, being creative and innovative.

 2            THE COURT:  Okay.

 3            MR. KANNER:  Thank you, Your Honor.

 4            MS. SULLIVAN:  Your Honor, just very briefly to

 5    respond to one of Mr. Williams' suggestion about some form of

 6    written questioning.  We have served written discovery

 7    requests on the plaintiffs and really have not been able to

 8    collect the information that we need from them.  We really do

 9    need to move forward with depositions.  We've been working

10    hard with the plaintiffs to set a class certification

11    schedule, and I believe that that proposed schedule will be

12    filed today with the Court, so we have succeeded in agreeing

13    upon a schedule and it really is critical that we move

14    forward now and take the depositions that we need in the wire

15    harness case so that we can meet those deadlines for class

16    certification that the parties agreed upon.

17            THE COURT:  All right.  I have to tell you, even

18    though I want you to go ahead with the class cert for the

19    wire harness as we discussed at our last meeting, and, again,

20    I think we mentioned this at the last meeting, I don't know

21    that that's going to be the way it is going to go for the

22    future but we need to get one of these class certs under our

23    belt so we see where we are heading, but, but I am not going

24    to allow the depositions to go forward on the one part, I'm

25    simply not going to do that.  You will have to get together

1     and there is some urgency here because wire harness does need

2     to proceed, but you are going to have to do these depositions

3     on behalf of all of the defendants.

4          I'm not asking you to do them written first, you

5     can start taking your depositions, but what we need to know

6     what's the template, what's the template of the questions

7     that are going to be asked, and who amongst the defendants --

8     which groups are going to actually be taking the depositions.

9     So you will have to get together, form a group of, I don't

10    know, three, four, five -- well there are a lot of defendants

11    so you can decide how many you want to take the depositions

12    but only one person is going to be questioning at a time.

13    And we are going to hold it up because I think it is well

14    worth it to extend the class cert a little bit in order to

15    get this all done, but I really don't see any reason why it

16    could not be done with, for the most part, a single dep.  And

17    I say for the most part because I really -- you know your

18    cases and you know there may be something specific that you

19    have to ask but how you do it I don't know.

20          And, Gene, I would like to address to you because

21    this may change whatever you have done in the protocol, but

22    we need like a time period in which the defendants can submit

23    either individually their list of questions they would ask

24    each end payer and each auto dealer, recognizing the auto

25    dealers may be a little different than the end payers, or

 1   time for all of the defendants to have their representatives

 2   get together and come up with one format.

 3            MASTER ESSHAKI:  Judge, I think your ruling just

 4   now alters completely the deposition protocol that we

 5   discussed and I ruled upon, and I think the parties are going

 6   to have to get back together and redraft that deposition

 7   protocol to implement what I think was a direct instruction

 8   that there will be one dep of each end payer or whoever it

 9   may be and it is going to cover all the parts so that the

10   defendants need to get together, they need to come up with a

11   template of what the deposition outline is going to look

12   like, all of the parts the defendants will have input into

13   that, if they have any particular questions they can add

14   those questions, and they will designate who's going to be

15   conducting the examination.

16            But the problem here is that, as we said during our

17   discussions, there are approximately as I remember 50

18   dealers, there were four deps, we agreed I think on the 50

19   dealers, that's 200 deps, maybe there were less, I think in

20   my mind it is 160, but if we have to do that for wire harness

21   and then for air bags and then for motors it is impossible.

22   So the judge, I think, made this instruction very clear, one

23   dep, one person, across all parts and you need to figure out

24   how you are going to do that, and we need to start from

25   scratch on that protocol, salvage as much as you can but we

```
 1   need to feed in the judge's new ruling.
 2           THE COURT:  So, Gene, before we go on, you are
 3   agreeing with what I said?
 4           MASTER ESSHAKI:  I agree completely.
 5           THE COURT:  I don't want to have a run-in with my
 6   master.
 7           MASTER ESSHAKI:  I agree completely, I think
 8   otherwise you are going to have thousands of depositions in
 9   this case.
10           MR. WILLIAMS:  Your Honor, once we receive a
11   transcript, which we will order today, we will promptly put
12   together a revised draft keeping as much as we can from what
13   was done, send it to the defendants so we can take care of
14   this without delay.
15           THE COURT:  Let me say I am going to set some
16   deadlines here.  Do you think -- the defendants, do you think
17   in 45 days you can come up with such a template, I mean,
18   questions together?  And also those who just entered in
19   response to what was said here -- I'm sorry, I forgot your
20   name?
21           MS. STORK:  Anita Stork.
22           THE COURT:  Okay.  In terms of what you said just
23   coming in the case and maybe not knowing, I want you to
24   participate and, yes, there may be things as you do your
25   preliminary discovery that you decide that you need to ask
```

```
 1    then just bring that to my attention, but I think after, you
 2    know, at least the first 20 of you have to be ready and know
 3    the case well enough to come up with a template that there is
 4    probably not much more any one party would ask but, you know,
 5    it may be, I don't know, I just don't want you to think that
 6    you are barred, it is just that we have to proceed.
 7              MS. SULLIVAN:  Your Honor, may I just ask a point
 8    of clarification?  Are you requesting that we submit a
 9    template to Master Esshaki or to other parties or just among
10    the defendants in the various cases?  We agree amongst
11    ourselves --
12              THE COURT:  You can do whatever you want.
13    Hopefully you come to terms amongst yourself and you don't
14    have to bother Mr. Esshaki, these are the questions -- we as
15    a group are saying these are the questions that we need to
16    ask of every named party.  Okay.  If you can't do that then
17    I'm going to say submit your conflicting whatever -- I'm
18    calling them templates for want of any better word, and then
19    Mr. Esshaki can determine which questions will be asked.
20              MS. SULLIVAN:  Thank you.  With respect to the
21    protocol itself, the wire harness protocol, the parties have
22    been negotiating that protocol since February of 2014, and
23    this issue that you are identifying that relates to the
24    number of times an end payer or an auto dealer may be deposed
25    throughout the entire auto part MDL really only impacts a
```

1    couple of the provisions, so I would like to suggest that we

2    move forward with the wire harness deposition protocol and

3    just revise those provisions to account for Your Honor's

4    ruling.  I think we can accomplish that without significant

5    delay and we can get moving with the -- or enter the wire

6    harness protocol as negotiated by the parties in the wire

7    harness case.

8             THE COURT:  Wonderful, if you can do that quickly

9    I'm all for it but you have to get all of these other

10   defendants to join in with you.

11            MR. WILLIAMS:  I know Mr. Barrett wants to speak,

12   but that's more or less what I just said I would do, I will

13   receive the transcript and revise those portions that are

14   affected by what we have discussed today.

15            MR. BARRETT:  Right, and auto dealers concur with

16   that.

17            THE COURT:  All right.

18            MS. STORK:  Your Honor, I would just say -- repeat

19   again that the defendants in the later cases certainly are

20   all for efficiency.  I would just suggest again that there be

21   some type of stopgap measure if parties in the later cases at

22   some point as those cases progress and motions have gone

23   through and discovery actually begins that they could apply

24   to the Court or Mr. Esshaki for permission for additional

25   questions if that's needed.  It may not be, I guess I'm just

2:25-md-02311-MDM-DRG   Doc # 492   Filed 08/24/16   Pg 103 of 186   Pg ID 16956
Status Conference / Motion Hearings • January 28, 2015

38

```
 1   suggesting that --
 2           THE COURT:  I agree with you, don't worry about it.
 3           MS. STORK:  Okay.
 4           THE COURT:  Okay.
 5           MS. STORK:  Thank you.
 6           THE COURT:  If there is something that comes up and
 7   you haven't thought about it then I will entertain that in
 8   the future.  I am, of course, depending upon all of these
 9   legal brains to think of everything up front.  Okay.
10           So with that let's see if we can't have a revised
11   protocol, Gene, maybe in 45 days.
12           MASTER ESSHAKI:  Yes, Your Honor.
13           THE COURT:  All right.  Now, the next issue that I
14   would like to get to before we go to the beginning of the
15   agenda is the class cert deadlines which may have been -- you
16   said you've worked something out, and I would like to know
17   whether this would change what you have worked out?
18           MR. BURNS:  Good morning, Your Honor.  Warren Burns
19   for the end payers, and I believe Steve Cherry will be
20   joining for the defendants.
21           We actually have worked out a stipulation -- a
22   proposed stipulation that we had planned on submitting to you
23   today.  I think in light of this ruling we probably want to
24   have a discussion about whether those dates make sense, and I
25   haven't had a chance to confer with Mr. Cherry yet.
```

1          THE COURT:  Okay.

2          MR. BURNS:  But we were prepared to go forward with

3     that.  The deadlines that we were going to propose for the

4     initial motions was July 1st, 2016 but I'm happy to go back

5     and quickly confer with Mr. Cherry and see if we need to add

6     just those dates at all in light of your ruling.

7          THE COURT:  Your motion for cert was July 1st,

8     2016?  Okay.

9          MR. BURNS:  Built into the stipulation, Your Honor,

10    actually a number of discovery deadlines as well and

11    recognizing the fact that even with your ruling this morning

12    we are facing in excess of 100 depositions in wire harness

13    alone, especially given the number of defendants and what

14    needs to be done there.  And the current status of discovery

15    and production of documents in addition to those that were

16    previously produced as part of the DOJ production, but I'm

17    happy to confer with Mr. Cherry and we can --

18         THE COURT:  100 in wire harness alone, so before

19    this you were thinking of 100 times 29?

20         MR. BURNS:  No, I don't think that's true, Your

21    Honor, it is going to vary by case and defendant, and there

22    is no formula in that regard.

23         THE COURT:  Let's keep it to 100.  All right.

24         MR. CHERRY:  We can talk but I don't think this

25    should affect the schedule at all.  I mean, we were already

```
 1   undertaking a commitment to coordinate with the other cases
 2   and I think in particularly with the plaintiffs dropping the
 3   replacement part claim --
 4           THE COURT:  Could you speak up a little bit?
 5           MR. CHERRY:  Yes.  Again, I'm Steve Cherry from
 6   Wilmer Hale.
 7           MR. VICTOR:  Your Honor, this is Paul Victor.  It
 8   is very hard for us to hear not you but the other speakers.
 9   I wonder if they can come to the microphone?
10           THE COURT:  Let's see if we can -- let me turn this
11   around and see if it helps.  Keep your voices up.
12   Mr. Cherry?
13           MR. VICTOR:  Thank you.
14           MR. CHERRY:  Yes.  So I don't believe this should
15   affect the schedule.  We were already contemplating just that
16   type of coordination and sharing of our outlines with the
17   other defendants and inviting input and coming up with a
18   master outline, that was already part of our contemplated
19   process so I don't see why this would affect the schedule.
20           MR. BURNS:  Mr. Cherry, I have canvassed the --
21           THE COURT:  Speak into the microphone so everyone
22   can hear.
23           MR. BURNS:  Certainly.  I have canvassed the
24   plaintiffs' groups and we are prepared to go forward with the
25   dates that we have negotiated.
```

```
 1              THE COURT:  I know you will prepare an order but
 2     will you tell me what those dates are now?  You said --
 3              MR. CHERRY:  Actually it is -- it has been filed
 4     so --
 5              THE COURT:  It has been filed?
 6              MR. CHERRY:  Yes.
 7              MR. BURNS:  By memory, Your Honor, July 1st, 2016
 8     for the filing of motions for class certification, four
 9     months later, which would be November 1st, 2016, would be the
10     responses, and then we have -- I believe it is March 1st for
11     the replies.  We have not agreed as to whether sur replies
12     are appropriate, we have kicked that can down the road a
13     little bit, and then there are a number of discovery
14     deadlines built in before those dates.
15              THE COURT:  So basically we are talking about
16     arguments maybe in the middle of 2017?
17              MR. BURNS:  That's right, Your Honor.
18              THE COURT:  Wow.  Both sides have agreed to the
19     schedule?
20              MR. BURNS:  We have after quite a bit of
21     negotiations back and forth on those points.
22              MR. CHERRY:  Yes.
23              THE COURT:  Okay.  Given the amount of work that
24     needs to be done I think it is reasonable, I also think that
25     the other parts classes should be thinking ahead to do this
```

1   and it may be able to move along faster and we will get more

2   of these motions resolved in 2017.

3          MR. CHERRY:  There is one issue that I think is

4   related to the schedule, Your Honor, and that is discovery of

5   third-party OEMs because that data will be very important for

6   both of us I think to our respective experts' analysis and to

7   our motions.  And we have made some efforts and Mr. Williams

8   has made some efforts to talk to each other to try to

9   coordinate on that so we can do that together, and I think

10  there has been from our perspective a little delay in trying

11  to get together on a call and just make sure that we can come

12  to finality on some subpoenas that we can serve to the OEMs

13  so we can do that jointly and do it one time.

14         And I think what we would benefit from is to have a

15  deadline that just sort of holds our feet to the fire so that

16  we can keep our schedule in place and maybe agree within two

17  weeks or just some date that we will either come to agreement

18  on a joint subpoena or go forward together or if we have a

19  dispute I guess submit it to Master Esshaki, but I think we

20  need something here because it is sort of dragging on trying

21  to come to some coordinated process.

22         THE COURT:  Well, how does this fit in with the

23  OEMs and all the other defendants?  I mean, we are not

24  going to be -- the OEMs especially we don't want to be

25  taking --

```
 1              MR. WILLIAMS:  Your Honor --
 2              THE COURT:  -- a lot of deps.
 3              MR. WILLIAMS:  Your Honor, that's a very important
 4    question, and I want to make a couple points first.  We are
 5    committed to doing this.  We need to do this.  In fact, we
 6    are the ones who reached out to them in the last month to
 7    have this discussion.  We don't need an arbitrary deadline
 8    imposed though because, as you just noted, this affects
 9    third-party OEMs not just in one case or two or three cases
10    but a lot of cases, it relates to my class, the auto dealers,
11    the directs, the City of Richmond and the new truck case, we
12    don't want to delay, we want to do it soon too because this
13    is critical for us but what we don't need is an arbitrary
14    make it happen in two weeks deadline, it is much too
15    important to the case and the schedule to have an arbitrary
16    deadline.
17              We will commit to engaging with them right away,
18    they have sent us a draft, we have a draft we can share with
19    them.  My suggestion though would be we have all worked very
20    well with Master Esshaki, if there is a problem that needs to
21    be brought up with the master we can do it that way but we
22    shouldn't set an arbitrary deadline of two weeks or anything
23    like that.
24              THE COURT:  Mr. Spector?
25              MR. SPECTOR:  Good morning, Your Honor.
```

 1    Eugene Spector on behalf of direct purchasers.

 2          I only wanted to say that we would like to

 3    participate in this process of defining what is in the

 4    subpoenas to the OEMs because that's the class that we

 5    represent, and we would like to have some view as to what is

 6    going on, what is going to be asked and maybe some input as

 7    to what might be in the interest of the OEMs with regard to

 8    that.  We are in regular contact with them in any event and

 9    we would like to see what we can do to help move this process

10    along so it works for all of us.

11          THE COURT:  You can talk to counsel and participate

12    in that.  I don't think that's a problem.  You all have to

13    work together.

14          MS. SPECTOR:  We have, Your Honor.

15          THE COURT:  Mr. Cherry?

16          MR. SPECTOR:  Thank you.

17          MR. CHERRY:  Your Honor, again, we can coordinate

18    with the other defendants and try to do this in the most

19    efficient manner possible, but it is -- it will be very

20    difficult to do this one time with the OEMs because we are

21    talking about different products being purchased by them and

22    they do have different divisions and different product groups

23    that do that purchasing, it is not even the same people, it

24    may be different data in different places we are seeking.

25    The downstream data ought to all be the same, you know, the

```
 1   cars coming from the auto manufacturers we can obtain that
 2   one time and it will fit every case, but the purchasing may
 3   be different and we can coordinate with the other defendants
 4   to be efficient as possible and minimize that but --
 5           THE COURT:  Well, I think that's all that can be
 6   asked, if you can coordinate those parts that make sense I
 7   think you can do that.  And, I mean, I wouldn't think you as
 8   defendants would want to irritate your OEMs.
 9           MR. CHERRY:  Exactly, Your Honor, exactly.  And the
10   idea of an arbitrary deadline, I think these things, as
11   Ms. Sullivan mentioned, our deposition protocol, which took
12   from February until now to get resolved, is this can't take
13   six months or no schedule is going to stick.  I think --
14           THE COURT:  Okay.  Let me --
15           MR. CHERRY:  -- whatever the deadline is we have 30
16   days, some period of time --
17           THE COURT:  Let me do this, I have given you
18   45 days on the other one, I will give you 45 days on this one
19   max.  If you can do it sooner, wonderful.  If you need to --
20   if that's not suitable then you have an issue and you will
21   have to bring that up before Mr. Esshaki.
22           MR. CHERRY:  Thank you, Your Honor.
23           MR. WILLIAMS:  Your Honor, I apologize but just to
24   clarify, 45 days to do what?  They -- I think that Mr. Cherry
25   was saying was 45 days to actually serve the discovery.
```

```
 1            THE COURT:  No, no, just to coordinate all of it.
 2            MR. WILLIAMS:  Certainly.  Thank you.
 3            THE COURT:  Okay.  Anything else on discovery or
 4    other protocols?
 5            (No response.)
 6            THE COURT:  Mr. Esshaki, anything else?
 7            MASTER ESSHAKI:  No, Your Honor, I have nothing
 8    further.
 9            THE COURT:  Okay.  Ms. Sullivan?
10            MS. SULLIVAN:  Yes, Your Honor.  Mr. Williams
11    mentioned the new truck dealer class complaint, and I just
12    want to confirm that all of these deadlines that Your Honor
13    is imposing will, in fact, apply to the truck dealer
14    plaintiffs as well.  I know that one of their lawyers
15    submitted a letter to Your Honor I believe yesterday
16    indicating that they expected that they would have different
17    deadlines and a different schedule, and we would like them to
18    be on the same schedule.  It is very important that they --
19            THE COURT:  But they won't have different deadlines
20    on what we are talking about now unless something comes up,
21    as I indicated for the later groups, that requires something
22    different but that's going to have to be brought specifically
23    to the Court's attention.
24            MS. SULLIVAN:  Thank you, Your Honor.
25            THE COURT:  Okay.  All right.  Let's go back to one
```

1    on the agenda, the status of the settlements.

2              MR. WILLIAMS:  Your Honor, Steve Williams, again,

3    for the end payers.  I'm here with John Cuneo.

4              We are very pleased to announce to the Court that

5    we have arrived at a settlement with the Hitachi defendants.

6    Hitachi are defendants in nine separate cases, and this will

7    resolve end payer and auto dealer claims against Hitachi in

8    all of those cases.  We are hard at work on the final written

9    settlement agreement, and we would hope to present that to

10   the Court well before the May 6th date, I think that's our

11   desire and I think Hitachi shares this, would be to have this

12   done if we can within the next 30 days, present it to the

13   Court for preliminary approval.  And I would add to that that

14   as the Court may recall, we have reached agreement with

15   Panasonic and we have made progress on finalizing that

16   agreement, and what I would hope we could do would be to

17   consult with the parties and identify a date for which

18   preliminary approval of both Panasonic and Hitachi can be

19   presented to the Court in the next 30 to 45 days.

20             THE COURT:  Mr. Cuneo?

21             MR. CUNEO:  Just to be clear, I represent the auto

22   dealers.  I second everything he said, and we would like to

23   at least pencil in a date for preliminary approval and

24   maybe --

25             THE COURT:  What are you thinking of?

```
 1              MR. CUNEO:  March 1st, somewhere around there.
 2              THE COURT:  Okay.  Just one minute.
 3              MR. CUNEO:  Somebody here said March 1st is a
 4     Sunday.
 5              THE COURT:  So we are all available, right?
 6              MR. CUNEO:  Maybe later in the week.
 7              THE COURT:  Yes, March 2nd is Monday.
 8              MR. WILLIAMS:  Your Honor, I have been consulting
 9     with counsel for Hitachi, and at least for Hitachi and us we
10     are thinking essentially any date the first or second week of
11     March.
12              THE COURT:  I have an afternoon on Wednesday,
13     March 1st, it would be in the afternoon, is that --
14              MR. WILLIAMS:  That's fine for the end payers.
15              MR. CUNEO:  That's fine for the auto dealers.
16              THE COURT:  Okay.  So I'm going to put down
17     March 11th at 2:00.
18              MR. ATKINS:  Your Honor, Alden Atkins for Hitachi,
19     and I have with me Craig Seebald, and that date works for us.
20              THE COURT:  Works for you.  Okay.  Good.
21              MR. ATKINS:  The one thing I would add with respect
22     to Hitachi is we have pending a motion to dismiss in the
23     motor generators case which is one of the motions scheduled
24     to be heard today.  We would like to suspend consideration of
25     the motion as to Hitachi only, we know that the motion will
```

1    continue as to Denso, and I believe that Mr. Cherry intends

2    to argue that.

3            In addition, as Mr. Williams stated, we have some

4    cases that are scheduled for motions to dismiss coming up in

5    the next few weeks, that would be valve timing control

6    devices, fuel injectors and inverters, and we would like to

7    follow the same process that Panasonic followed, which is to

8    suspend those dates while we are completing the settlement

9    agreement.

10           THE COURT:  We will adjourn all of those matters

11   without a date pending resolution of this.  Okay.  That takes

12   care of Hitachi, but what about Panasonic, do we have a date

13   for preliminary --

14           MR. WILLIAMS:  What I would suggest, Your Honor, is

15   we will confer with Panasonic's counsel after court today and

16   see if the 11th date will work with them as well, if not we

17   will consult with Hitachi and Panasonic and contact the Court

18   with alternate proposed dates.

19           THE COURT:  Okay.  But right now we are keeping

20   3/11, I'm going to put Panasonic on there, and then you can

21   call to change the date if not so we keep track of that.

22           MR. WILLIAMS:  Thank you, Your Honor.

23           MR. BURNS:  Your Honor, Warren Burns for the end

24   payers.

25           We actually have a pending settlement with T. Rad

```
 1    as well, and we anticipate that we should be able to move for

 2    preliminary approval on the same date.  We will confer with

 3    T. Rad's counsel and hopefully have it teed up.

 4              THE COURT:  Mr. Cuneo, you agree with that?

 5              MR. CUNEO:  Yes, Your Honor.

 6              THE COURT:  Why don't I put all three of them on

 7    for the 11th and if something happens that one of you can't

 8    make it we will have to do another date, that's all, and then

 9    we have dates for them.

10              MR. CUNEO:  Thank you.

11              MR. BURNS:  Thank you, Your Honor.

12              THE COURT:  Thank you.  How about steering angle

13    sensors, is that one of the -- who represents steering

14    angle --

15              MR. WILLIAMS:  If my recollection is correct,

16    sensors are part of the Panasonic settlement.

17              THE COURT:  And the ballast, is that part of

18    Panasonic?

19              MR. WILLIAMS:  I believe they are.

20              THE COURT:  And T. Rad, the automotive transmission

21    fluid --

22              MR. WILLIAMS:  I'm informed that that is correct,

23    Your Honor.

24              THE COURT:  I'm trying to keep track of these

25    parts, you know, I've never heard of them either, so -- all
```

```
 1    right.  That's all of the dates we need to set for the
 2    preliminary approvals, right?
 3              MR. WILLIAMS:  Yes, Your Honor.
 4              THE COURT:  Okay.  Thank you.
 5              MR. WILLIAMS:  Thank you.
 6              THE COURT:  Anything else on the status?  Do we
 7    have any problem on service with the last group or are they
 8    all in process?
 9              (No response.)
10              THE COURT:  No problem.  Okay.
11              MR. CHERRY:  Your Honor, can I just --
12              THE COURT:  Yes, Mr. Cherry.
13              MR. CHERRY:  On scheduling, Your Honor set a
14    schedule for responding to a set of the next wave of
15    complaints, wipers and some other things.
16              THE COURT:  Just before we do that I want to --
17    there is one other I have down here and I think this is part
18    of the Panasonic -- no, the T. Rad, the radiators, is that
19    right?
20              MR. BURNS:  Excuse me, Your Honor, I'm sorry.
21              THE COURT:  For the end payers -- the T. Rad for
22    auto dealers and end payer settlement that's going on the
23    11th also?
24              MR. BURNS:  Yes, Your Honor, we had planned to do
25    it then, we will confirm with Mr. Simmons, T. Rad's counsel
```

```
 1   -- I was actually just e-mailing him.

 2           THE COURT:  Okay.  Thank you.

 3           MR. BURNS:  Thank you.

 4           THE COURT:  All right.

 5           MR. CHERRY:  Your Honor, there are two scheduling

 6   issues.  So Your Honor set a briefing schedule for the next

 7   wave of motions, and one of the issues is we have agreed to

 8   follow the same sort of briefing that we did with the last

 9   wave, so for state law issues there will be one big brief up

10   to 85 pages that can address those issues so we don't have to

11   do it in separate cases.

12           THE COURT:  Right.

13           MR. CHERRY:  But when Your Honor set the schedule

14   you truncated it and left only one week for the reply and so

15   what we would like -- what the plaintiffs have agreed to is

16   just one additional week, so we have two weeks for that reply

17   because we really need that for that one brief.

18           THE COURT:  So the reply would be due when?

19           MR. CHERRY:  March 20th rather than March 13th, and

20   that would still give you all the time before May 6th so --

21           THE COURT:  May 6th is our next conference?

22           MR. CHERRY:  Yes.

23           MR. SELTZER:  Mark Seltzer for the end-payer

24   plaintiffs, and we are agreeable to that proposal.

25           THE COURT:  Very good.  That's fine.
```

2:25-md-02311-MOB-MKM   Doc # 892   Filed 08/20/15   Pg 158 of 186   Pg ID 17671
Status Conference / Motion Hearings • January 28, 2015

53

```
 1              MR. SELTZER:  Thank you.
 2              MR. CHERRY:  The only other scheduling issue is for
 3    the wipers case, I understand that the direct purchasers
 4    intend to file an amended complaint today.
 5              MR. HOESE:  Your Honor, William Hoese, Kohn, Swift
 6    & Graf for the directs.
 7              Mr. Cherry and I spoke earlier, and it will be
 8    either today or tomorrow, Your Honor.
 9              MR. CHERRY:  So we are going to receive the
10    complaint today or tomorrow, and as it stands motions are due
11    I think February 13th, and so the plaintiffs are amenable to
12    a two-week extension, so we will keep -- what we propose is
13    to keep the schedule Your Honor proposed but just to move
14    everything two weeks out so we have a little more time with
15    that complaint which we haven't received yet.
16              THE COURT:  Okay.  When would that end?  I would
17    like the end date to see if I can get it down.
18              MR. CHERRY:  So two weeks beyond March 13th.
19              THE COURT:  So the end of March, and we have April
20    and May?
21              MR. CHERRY:  Yes.
22              THE COURT:  Okay.  That's fine.
23              MR. CHERRY:  Thank you, Your Honor.
24              MS. ROMANENKO:  Your Honor, just a request for
25    clarification.  With regard to wipers I wanted to clarify we
```

```
 1   are just talking about the directs' motion, the defendants'

 2   motion against the directs' wipers complaint and not the

 3   motions concerning the end payer and auto dealers'

 4   complaints, I assume those deadlines will stay the same.

 5          MR. CHERRY:  Yes, Your Honor, this -- just because

 6   we are just now getting the complaint, everything would stay

 7   the same with the auto dealers and end payers.

 8          THE COURT:  Okay.  It is just the amended complaint

 9   that is being filed that he needs the extension so direct

10   purchasers only.  Okay.  Good.

11          MS. SULLIVAN:  Your Honor, I have one more deadline

12   request.  May we have a deadline for the auto dealers to

13   inform defendants whether they will be withdrawing their

14   replacement part claims?

15          THE COURT:  Okay.  Auto dealers, who is going to

16   speak for auto dealers?  Ms. Romanenko?

17          MS. ROMANENKO:  Good morning, again, Your Honor.

18   We think we can inform the defendants by the end of the week.

19          THE COURT:  Okay.  So let's -- we will just say one

20   week from today.  Okay.  Any other dates?

21          (No response.)

22          THE COURT:  All right.  The next item is the status

23   of the temporary stay of the discovery.  Is there anyone here

24   from the DOJ, or I will give you the report that they gave

25   us?
```

```
 1            (No response.)

 2            THE COURT:  Okay.  The DOJ says that the document

 3    discovery may proceed on all parts but air conditioning

 4    systems and constant velocity boosters and any new part that

 5    was filed, which we haven't had any new parts recently.

 6    Okay.  Counsel?

 7            MR. WILLIAMS:  Your Honor, Steve Williams for the

 8    end payers.

 9            In light of the DOJ's position I would like to move

10    the Court that, as we did at the outset of all of these

11    cases, when we began the Court had ordered that defendants

12    would provide to the plaintiffs whatever productions they had

13    made to the Department of Justice.  We did that in the first

14    four cases, and that only ceased when the Department came in

15    and asked for the stay.  We are not at least today asking for

16    full merits discovery because we know there are motions being

17    briefed, but it has been our experience that those

18    productions of the DOJ documents have significantly advanced

19    our ability to prosecute, understand the cases, to

20    significantly advance our ability to try to resolve cases,

21    and we don't think that there is any justification to change

22    the approach that the Court had taken.

23            THE COURT:  So you are basically asking the

24    defendants to give you all of the DOJ documents they

25    received?
```

```
 1              MR. WILLIAMS:  That's correct.

 2              THE COURT:  They submitted, excuse me?

 3              MR. WILLIAMS:  Yes.  Thank you.

 4              THE COURT:  Any defendant want to speak on that?

 5              (No response.)

 6              THE COURT:  Okay.  Let's follow that same protocol

 7      then as to the defendants, if you would submit to the

 8      plaintiffs all the documents that you gave to the DOJ.

 9              The Government also says that the deposition

10      discovery may proceed on wire harness, fuel sender, heating

11      control panels, instrument panel clusters, bearings, occupant

12      safety systems and anti-vibration rubber parts.

13      Mr. Williams?

14              MR. WILLIAMS:  Thank you, Your Honor.  I don't have

15      a comment on the deposition discovery, I think that is

16      something we would need to address in light of what we have

17      talked about concerning the deposition protocol and timing

18      because I know some of those cases don't yet have motion to

19      dismiss decisions.

20              I wanted to though step back a moment to the

21      Department of Justice documents and see if we can set a

22      deadline for those productions, and also to confirm that, as

23      was done before, that would include translations of documents

24      that were provided by defendants to the department.

25              THE COURT:  How much time did we give defendants in
```

 1      the first four parts, do you recall?

 2              MR. WILLIAMS:  I have a recollection, I'm not

 3      certain but it was about 90 days.

 4              THE COURT:  Defendants, any comment?  Do you think

 5      90 days is sufficient?

 6              (No response.)

 7              THE COURT:  Okay.  90 days.

 8              MS. STORK:  Your Honor, Anita Stork.

 9              I'm just asking for clarification.  90 days for the

10      later cases from what triggering date?

11              THE COURT:  From what?

12              MS. STORK:  What triggering date?

13              THE COURT:  Let's say 90 days from now, from today.

14              MS. STORK:  Or is it finish of rulings on motions

15      to dismiss because there are a number of cases that just

16      started?

17              THE COURT:  No, no, no, just 90 days from today,

18      not from motions to dismiss.

19              MR. HANSEL:  Greg Hansel for the direct purchasers,

20      Your Honor.

21              The direct purchasers have conferred with the

22      end payers and the auto dealers, and we are -- in light of

23      the DOJ's new, you know, comments on their stay, we are

24      working on a discovery plan for the next three cases after

25      wire harness, which are instrument panel clusters, heater

2:15-md-02311-MOB-MKM   Doc # 892   Filed 08/20/15   Pg 123 of 186   Pg ID 17636
Status Conference / Motion Hearings • January 28, 2015

58

 1   control panels and fuel senders, similar to the supplemental

 2   discovery plan in the wire harness case, with the goal of

 3   moving the discovery forward in those cases.  So the

 4   plaintiffs are working on a proposal which we will eventually

 5   present to the defendants on that.

 6        THE COURT:  Okay.  Let me -- I hate to even ask

 7   this, but I thought I heard some mumblings that there may be

 8   three more parts.  Are there more parts that plaintiffs -- is

 9   plaintiff -- any plaintiff know about three more parts?  This

10   is not from the DOJ so this is --

11        MR. WILLIAMS:  Your Honor, Steve Williams.

12        Again, if my memory serves me correct, there are a

13   couple of additional parts, the investigations had become

14   public with some guilty pleas probably a few months ago, and

15   we will be filing those but those could have a slightly

16   different presentation to the Court in terms of the

17   relationship between those parts, which is the reason why it

18   has not yet been filed, but I -- we had hoped to have those

19   filed before today, but they will be filed I think within the

20   next two weeks.

21        THE COURT:  Okay.  Thank you.

22        MR. CHERRY:  Your Honor, with respect to the

23   90 days, can we agree that if we think that's going to be a

24   problem we will discuss it with the plaintiffs and try to

25   come to agreement on another date?

```
 1              THE COURT:  Sure.

 2              MR. CHERRY:  Because we are in several cases and

 3     that might be a problem meeting all of that in 90 days.

 4              THE COURT:  You are in more than several cases.

 5              MR. CHERRY:  We are in several.  Thank you.

 6              THE COURT:  Okay.  Absolutely.  If you can agree on

 7     a different date or you need more time and you agree, that's

 8     fine.

 9              Okay.  We did the next two.  And, again, if there

10     is any other protocols that need to be developed as these

11     come in that you can't use the others, please see Mr. Esshaki

12     about doing that.

13              I have -- okay.  The next settlement conference is

14     May 6th, and we will keep that date.  Then I was thinking for

15     the next conference September 16th.  Does anybody have any

16     known conflicts for that period?

17              (No response.)

18              THE COURT:  We will set May 6th and we will set

19     September 16th.  On May 6th I'm not sure what motions to

20     dismiss, I will have to look at that, will we be looking at.

21     We talked about the extended dates for a couple of those so

22     we will do those.  If there's any other motions that come in,

23     you know, all I ask, regardless of what they are on, is that

24     you give us some time before May 6th to prepare for them but

25     I think we have the list, and then we will look at the next
```

```
 1    group that will come in for September 16th, okay, and have a
 2    schedule on those.
 3            MR. HANSEL:  Excuse me, Your Honor.  Greg Hansel
 4    for direct purchasers.
 5            What time on the 16th?
 6            THE COURT:  Well, we will do it at 10:00, the same
 7    as we do now.
 8            We need a briefing schedule for the
 9    direct-purchaser plaintiffs' motions for leave to amend the
10    consolidated complaint or has that been -- that was filed on
11    1/26/15.
12            MR. HOESE:  Your Honor, William Hoese again for the
13    direct purchasers.
14            This has been consented to by Denso and Mitsuba, I
15    think, according to what Mr. Cherry has told me.
16            MR. CHERRY:  Yes.
17            MR. HOESE:  So unless Your Honor deems it
18    necessary, we were just going to file it as a consented to --
19            THE COURT:  No, that's great, I just had a note to
20    take care of.
21            MR. HOESE:  Thank you, Your Honor.
22            THE COURT:  All right.  Is there any other matter
23    anyone has before we proceed to the motions?
24            (No response.)
25            THE COURT:  No.  Okay.  We will go into motions.
```

```
 1    We will take a ten-minute break and then resume on motions.

 2    Thank you.

 3              THE LAW CLERK:  All rise.  Court is in recess.

 4              (Court recessed at 11:06 a.m.)

 5                        —   —   —

 6              (Court reconvened at 11:21 a.m.; Court, Counsel and

 7              all parties present.)

 8              THE LAW CLERK:  All rise.  Court is back in

 9    session.  You may be seated.

10              THE COURT:  Mr. Spector?

11              MS. SPECTOR:  Your Honor, Gene Spector again.

12              I would like to ask the Court if we can change the

13    date for the status conference in September from the 16th to

14    the week before, to the 9th if possible, because of the

15    Jewish high holidays on the 14th, 15th and then again on the

16    22nd?

17              THE COURT:  Okay.  Let me just take a look.  I can

18    do it on the 9th, that is -- Labor Day weekend would have

19    been the 7th, I don't know if that means anything to anybody,

20    but if you agree on the 9th, we can do it the 9th -- no, the

21    2nd is before Labor Day.

22              MR. SPECTOR:  The 9th is fine, Your Honor,

23    apparently.

24              MR. TUBACH:  The 2nd, Your Honor.

25              THE COURT:  Pardon me?  The 9th is not good for
```

```
 1    defendants, is that what we are saying?

 2              MR. MAJORIS:  No, it's good.

 3              THE COURT:  It's good.  Okay.

 4              MR. SPECTOR:  Thank you.

 5              THE COURT:  We will do it the 9th.  Thank you.  For

 6    motions -- I'm sorry, Chris, was that motor generators that

 7    you wanted to take first?

 8              THE LAW CLERK:  Yes, that's the one they wanted to

 9    do.

10              THE COURT:  Just give me a minute to clear up here.

11    All right.  This is defendants' joint motion to dismiss the

12    end payers consolidated class action.  Mr. Cherry?

13              MR. CHERRY:  As to motor generators, yes, Your

14    Honor.  Thank you.

15              So this morning we've spoken with the plaintiffs

16    and I believe have reached an agreement.

17              MR. SELTZER:  Yes.

18              MR. CHERRY:  So for the end payers I understand --

19    we have pointed out, I guess, that they were 38 in our

20    initial motion, we have determined now it is 41 of the 58 end

21    payers who we know did not purchase hybrids and there are

22    some that's unknown still, but I think what we have agreed to

23    stipulate that end payers would dismiss those who didn't buy

24    hybrids, those 41 from the case without prejudice, and we

25    will -- and they will inform us let's say within 30 days of
```

1   the others when they have determined those unknowns whether

2   they bought hybrids or not and if they didn't they would be

3   dismissed as well.

4        MR. SELTZER:  Yes, Your Honor, Mark Seltzer for the

5   end payers.

6        What we have agreed to is that we will prepare a

7   stipulation and proposed order which will dismiss those end

8   payer named plaintiffs who did not buy a hybrid car or lease

9   a hybrid car or purchase or lease an electric car.  We will

10  verify the identity of those plaintiffs and that will be part

11  of the stipulation.  The case will proceed as to the ten

12  plaintiffs who are conceded to have purchased hybrid cars and

13  who have standing to pursue the case.

14       MR. CHERRY:  Actually as to that, Your Honor, we do

15  have an argument -- a Twombly argument as to the other ten, I

16  guess, who did purchase hybrids which we fully briefed.  We

17  don't believe further argument is necessary on that, but we

18  don't agree that those should not be dismissed, but I think

19  that's along the lines of some of the arguments that you have

20  already heard, Your Honor.

21       THE COURT:  So you're maintaining your Twombly

22  argument as to the ten, it doesn't really make any

23  difference?

24       MR. CHERRY:  Yes, and the point there is really

25  from our perspective the claim rests on a single plea as to a

 1   single RFQ involving GM for cars that haven't gone to market

 2   yet, and the ten here bought Priuses and two bought a Camry,

 3   and we just see a disconnect there but we don't think there

 4   is argument necessary beyond that.

 5           THE COURT:  The Court will do an opinion on that.

 6           MR. SELTZER:  We are submitting on the papers too

 7   but I would invite the Court's attention to the Hitachi plea

 8   agreement, particularly paragraphs 2, 4-A and 4-B regarding

 9   the scope of conspiracy.

10           THE COURT:  All right.

11           MR. SELTZER:  Thank you.

12           THE COURT:  Thank you.

13           MR. CHERRY:  Your Honor --

14           THE COURT:  You know, I was going to come to that

15   same conclusion.

16           MR. CHERRY:  Your Honor, as to the auto dealers, we

17   have also spoken about working out a stipulation that would

18   accomplish approximately the same thing with respect to the

19   auto dealers to determine which of these dealerships actually

20   bought hybrids and which didn't and where a dealer has

21   multiple brands which -- for which ones did they actually buy

22   a hybrid and which they didn't.  And I think we would like to

23   try to work out within let's say 30 days some resolution of

24   that and then stipulate to a dismissal without prejudice as

25   to those who did not buy a hybrid and for brands for which

1    they did not buy a hybrid so we know what's left in the case.

2              THE COURT:  Okay.

3              MR. CHERRY:  Thank you.

4              THE COURT:  Ms. Romanenko?

5              MS. ROMANENKO:  Your Honor, we are happy to enter

6    into a stipulation with the defendants with regard to motor

7    generators concerning just the standing of the dealerships to

8    bring motor generator claims, and we are hopeful that

9    defendants will withdraw that portion of their motion.  We do

10   want to state for the record that we investigated the claims

11   of those dealers who are listed in the motor generators

12   complaint or who are bringing motor generator claims and we

13   believe, and we named them, that they each had a good-faith

14   basis to proceed in this case.  However, if the defendants

15   can demonstrate to us that some of them should be removed we

16   are happy to negotiate with them on that basis.

17              And Your Honor notes there is another motion coming

18   up on inverters where we believe defendants will raise the

19   same issue.  We hope that the issue about whether certain

20   plaintiffs are able to bring these claims based on purchases

21   of hybrid or electric vehicles is not going come up again in

22   the inverters' motion given the resolution we discussed in

23   motor generators.  If defendants want to meet and confer with

24   us on that issue before they file their motion that's

25   certainly fine but we don't see a need to engage in any

```
 1    further briefing or oral argument on that particular issue.

 2            THE COURT:  Okay.  Mr. Cherry?

 3            MR. CHERRY:  Yes, Your Honor.  I think we have

 4    pointed out at least one auto dealer who did not -- certainly

 5    did not buy any hybrids and they have agreed that was

 6    inadvertently part of the complaint, and we believe there are

 7    a fair number who assert claims on behalf of certain brands

 8    that we pointed out didn't sell hybrids, so I expect we

 9    should be able to come to resolution on this.

10            THE COURT:  So you are going to work that out with

11    the information that you have and have in the case only those

12    dealers that, in fact, purchased hybrids?

13            MR. CHERRY:  And as to the brand for which they

14    purchased hybrids.

15            THE COURT:  And the brand.  Okay.

16            MR. CHERRY:  Thank you.

17            THE COURT:  Thank you.  And the public entities

18    argument?

19            MR. CAROME:  Good morning, Your Honor.  My name is

20    Patrick Carome.  I'm with the law firm of Wilmer Hale.  We

21    are counsel for Denso.  I'm going to be arguing the

22    collective motion to dismiss in the public entity wire

23    harness case.

24            THE COURT:  Okay.

25            MR. CAROME:  This motion is unlike any that this
```

2:12-cv-02311-MOB-MKM   Doc # 92   Filed 08/24/16   Pg 132 of 186   Pg ID 1725
Status Conference / Motion Hearings • January 28, 2015

67

 1    Court has considered to date in these MDL proceedings.  In

 2    this case five local governments from four states represented

 3    solely by private counsel seek injunctive relief on behalf of

 4    every local government in the entire country, and they also

 5    are seeking to assert damage claims on behalf of every local

 6    government in 17 states and on behalf of every state level

 7    government entity in 9 of those 17 states.

 8            THE COURT:  So I wasn't quite clear, so this local

 9    unit -- one of these named local units is going to represent

10    for the damages part the state?

11            MR. CAROME:  That's correct and, in fact, there is

12    an interesting hodgepodge.  I mean, for example, the original

13    lead plaintiff in this case, the City of Richmond from

14    California, is purporting to represent eight other states but

15    not its own State of California.  It is a bit of a mystery to

16    us how we got this hodgepodge of claims, they are not

17    bringing -- they are only choosing damages claims on behalf

18    of 17 states, not all of the Illinois Brick repeller states,

19    so there is an interesting hodgepodge of claims being made

20    here by solely private lawyers.

21            THE COURT:  These states did not join Florida in

22    the Florida case?

23            MR. CAROME:  That's exactly right, Your Honor.

24            THE COURT:  And we have no attorney general or

25    anybody like that?

```
 1            MR. CAROME:  That's exactly right, even though it
 2    is nearly a year since City of Richmond filed this action,
 3    not a single government lawyer for any member of the punitive
 4    class or even any of the five local governments that purport
 5    to be named plaintiffs have appeared in this case or have
 6    stepped forward to give any indication whatsoever that it is
 7    okay that this broad government entities proceeding is going
 8    on on their behalf.
 9            THE COURT:  Now we have 11th Amendment issues as to
10    the state?
11            MR. CAROME:  That's correct, I have a chart which I
12    have given to your law clerk and I think we are going to put
13    up on the screen to sort of lay out the arguments, but before
14    I get there a lot is riding on this motion, Your Honor, and
15    on this Court's willingness to decide this motion now rather
16    than letting this case proceed on behalf of a massive complex
17    class of governments.  This is especially so because
18    governments are very different from private litigants.
19            Four months ago in the In Re: Lithium Ion Batteries
20    antitrust litigation, another federal district judge
21    dismissed at the threshold a similarly massive punitive class
22    action on behalf of government entities from across the
23    country.  That court ruled that the sensitive issues that may
24    arise in the context of government plaintiffs and the
25    prospect of massive discovery concerning a class comprised of
```

```
 1    municipal and regional governments across the nation made
 2    immediate dismissal of the case both appropriate and
 3    necessary.  That result should also be the same here.
 4           Referring to the chart, I have laid out -- this
 5    chart sort of explains the scope of each of the three basic
 6    arguments that the defendants are making here.  On the
 7    left-hand in the blue column this just reflects the damages
 8    class.  The blue column is the states for which the
 9    plaintiffs are purporting to assert state law damages claims.
10    The next column relates to our -- the 11th Amendment issue,
11    those are the -- that second column, the highlight of red
12    with respect to each of those states, those are the nine
13    states that they purport to be bringing claims on behalf of
14    the states and every state level entity, every state
15    university, every state agency, those are all immune entities
16    and we assert dismissal is necessary as to all of those
17    entities based on the 11th Amendment.
18           Then the next column relates to our argument that
19    all of these states -- this applies to all of the 17 states,
20    each of those jurisdictions has laws that specify that only
21    official government counsel for government entities there in
22    general can represent those government entities.  Some allow
23    there to be special circumstances where private counsel can
24    step in in lieu of or in assistance to those official
25    government counsel but there are special detailed procedures
```

 1   for when that has happened and there has been no indication

 2   of anything like that has happened.

 3          THE COURT:  You argue, yes, that there is no

 4   indication that any of these representatives have filed on

 5   behalf of their counsel, it is just this private counsel that

 6   has filed on behalf of the state?

 7          MR. CAROME:  And then just previewing the last

 8   argument is the third column, those are the states where they

 9   are in red for which there is no named plaintiff from that

10   state, and we have a standing argument there which we think

11   goes well beyond the type of standing argument that this

12   Court has addressed before.

13          So if I may, let me first turn to the

14   11th Amendment sovereign immunity point.  So under the

15   11th Amendment the state and their sovereign subunits may not

16   be subject to federal jurisdictional authority absent a clear

17   and affirmative advance consent and waiver of sovereign

18   immunity.  Therefore to proceed on behalf of state entities

19   the plaintiffs here would have to show that each state entity

20   in the class has affirmatively authorized and consented to

21   this Court's jurisdiction.  They have completely failed to do

22   that, and dismissal is therefore necessary.

23          The plaintiffs concede that the 11th Amendment

24   applies to efforts to include nonconsenting states on the

25   offensive side of the case, which is what is happening here,

2:25-md-02311-MOB-MKM   Doc # 492   Filed 08/24/16   Pg 136 of 186   Pg ID 17669
Status Conference / Motion Hearings • January 28, 2015

71

```
 1    and they also concede I believe that the 11th Amendment
 2    applies to class members -- bringing class members into a
 3    certified class.  I think the only thing that they contest is
 4    whether the 11th Amendment applies with respect to absent
 5    class members before class certification.
 6            Despite all of the bluster, plaintiffs have not
 7    identified a single case in which any federal court has
 8    permitted states to remain in a class action in the face of
 9    an 11th Amendment challenge.
10            THE COURT:  Even though they may be able to opt
11    out?
12            MR. CAROME:  That's correct, Your Honor.  The key
13    case on this point is the Walker vs. Liggett case, that's the
14    only case to address this issue, and it held that absent
15    states must be dismissed from a class action at the threshold
16    based on the 11th Amendment.
17            Now, while dismissal occurred in that Walker case
18    after there had been a preliminary certification of a class,
19    that happened at the very front end of that case, the court
20    was very clear that this was a matter of threshold
21    jurisdiction, and it used the device of 12(b)(1) -- a
22    12(b)(1) motion as the basis for dismissing from that case
23    all of the state entities that were purportedly included in
24    that case.
25            THE COURT:  Even though in that case they did get
```

1    to class cert?

2           MR. CAROME:  That was a strange case, Your Honor,

3    it was within a few days of the filing of that case, it was

4    sort of a pre-set-up class.  There was an immediate --

5    without any motions practice or anything there was an

6    immediate filing of a settlement class and a proposed

7    settlement.

8           THE COURT:  But the court decided this on the

9    12(b)?

10          MR. CAROME:  The court decided it at the 12(b)(1)

11   stage, and it dismissed all of the states who were

12   purportedly within that class.  Only a handful of the states,

13   not all of the states who were in that class came forward and

14   objected, but the court spelled out that all of the states

15   had to be dismissed at the threshold because the court simply

16   cannot assert jurisdiction with respect to nonconsenting

17   states.

18          THE COURT:  And there was no state here -- as I

19   looked again at that complaint there is no state that is

20   named?

21          MR. CAROME:  Amazingly, Your Honor, yes, we have a

22   village in New York and a county here and there and a city

23   here and there purporting to assert claims on behalf of

24   states, it is really an extraordinary thing.

25          So Walker rejected explicitly the argument that the

1  plaintiffs make here, which is somehow this whole

2  11th Amendment problem can be made to evaporate by an opt-out

3  proceeding.  Walker said no, you cannot do it, an opt-out

4  proceeding would itself involve the court exercising

5  jurisdiction over states, and that cannot -- that cannot

6  happen.

7          Walker's ruling has been cited favorably by other

8  courts, including the McKesson and Sobel cases, and there are

9  no -- there's no case in which Walker has ever been

10  criticized.

11          So the plaintiffs' main response to the

12  11th Amendment problem here doesn't go to the substance of

13  the problem, it goes -- they argue that the issue is not

14  justiciable, that somehow we, the defendants in this case,

15  don't have standing to raise the issue, and that just doesn't

16  work.  The 11th Amendment issue is a jurisdictional issue, it

17  is jurisdictional in nature, and for that reason the

18  6th Circuit has stated repeatedly that even if no party

19  raises the issue courts can and should, should, that's a

20  quote from multiple 6th Circuit cases, including the Nair

21  case, should raise the 11th Amendment sua sponte to avoid

22  subjecting nonconsenting states to the jurisdiction of a

23  federal court.

24          Courts always have jurisdiction to determine their

25  own jurisdiction, that's one of the most basic things that

 1    courts have to do, and questions of standing and they also

 2    argue ripeness are simply inapplicable to these kinds of

 3    threshold issues.

 4         Plaintiffs also argue as we noted that -- their

 5    other main argument is as well, yeah, there may be an

 6    11th Amendment problem but we are going to solve it without

 7    opt-outs.  I have already pretty much addressed that, but an

 8    opt-out procedure by definition would either compel each of

 9    these sovereign states and all of their state universities

10    and different state-level agencies in the class they would

11    have to come before this Court to request exclusion, and if

12    they didn't then they would be bound by the results of the

13    litigation without ever having consented to it, and Walker

14    said that it is simply inappropriate to require any state to

15    opt out because that would suggest the court claims

16    jurisdiction over the states which it cannot do.

17         Plaintiffs also seem to suggest that well, maybe

18    there can be some sort of special sets of notice here where

19    we can let states give them notice and let them come forward

20    and join the class if they want to.  The problem with that is

21    that Rule 23 has been held time and time again not to permit

22    opt-in classes, and that would be a classic opt-in situation,

23    and that doesn't -- that doesn't solve the problem.

24         Plaintiffs -- you know, I don't think we need to go

25    here but the plaintiffs also suggest well, the states aren't

 1   going to be bothered at all if we just kick the can down the

 2   road on --

 3           THE COURT:  They claim there is no harm until they

 4   have the opportunity to opt out?

 5           MR. CAROME:  Yes, and that's wrong at two levels.

 6   One, the court's exercising -- or purporting to exercise

 7   jurisdiction over them itself is the very harm that the

 8   11th Amendment --

 9           THE COURT:  Even though they don't know about it?

10           MR. CAROME:  Even though they don't know about it

11   and especially because they don't know about it, especially

12   because they don't know about it.  And in addition, you know,

13   there is -- they will also -- to pick one thing that is

14   clear, if the states and the agencies are not dismissed at

15   the threshold we will have to immediately start taking

16   discovery from some of those entities.  As the Court noted,

17   states, you know, are a world of difference from the Village

18   of Northport, New York, and we'll have to be engaged in lots

19   of discovery as to how do they buy their cars, how do they

20   buy their fleets of cars, all kinds of issues to figure how

21   can the Village of Northport and the City of Richmond even

22   represent them.  We -- I think we can be fairly confident

23   that those states are not going to be very happy and it is

24   going to actually present an immediate 11th Amendment issue

25   if we begin --

 1            THE COURT:  Slow down, slow down.

 2            MR. CAROME:  -- if we begin serving them with

 3    discovery requests.

 4            This is not an issue -- the law on this issue is

 5    clear, there is nothing more to be developed between now and

 6    some further states.

 7            THE COURT:  Well, it would be interesting to see

 8    how our little vacation spot of Traverse City can represent

 9    17 states.

10            MR. CAROME:  It is quite curious, it is quite

11    curious.  It is nine states because they have this

12    hodgepodge, we don't know why they have chosen the nine, no

13    rhyme or reason to it that they have been willing to explain

14    to us.  So that's the 11th Amendment arguments.

15            Let me turn now to the government attorneys'

16    statute problem.  So as we have laid out in our brief, under

17    state law applicable to all of the jurisdictions included in

18    the damages class and absent exceptional circumstance and

19    special government approvals, state and local governments

20    generally may be represented in court only by their official

21    government lawyers such as the attorneys general, county

22    attorneys, city attorneys.  This is a big problem for these

23    public entities here who are represented solely by private

24    counsel, and it is a problem just as much for the named

25    plaintiffs as it is for the absent ones.

```
 1              Now let me just give you an example of what these
 2    laws are like.  We have given you a full appendix in our
 3    briefs of examples -- of the laws in these jurisdictions but
 4    at the state level here is New York's executive law 63(1),
 5    the attorney general shall prosecute and defend all actions
 6    and proceedings in which the state is interested.  The other
 7    state statutes are discussed in our memorandum at pages 14
 8    and 15 and, as I said, they are in the appendix.
 9              At the local level, just an example, the charter
10    for the Michigan cities of Alpena, Cheboygan, Buchanan and
11    Hillside all provide as follows, I quote, the city attorney
12    shall conduct for the city all cases in all courts and before
13    all legally-constituted tribunals whenever the city is a
14    party thereto.
15              So this is -- and the plaintiffs admit that these
16    laws are ubiquitous.  They don't contend that these are -- we
17    have just picked out a handful, they concede that these laws
18    are ubiquitous.  Every published case that has addressed the
19    impact of these types of government attorneys' laws on class
20    actions brought on behalf of government entities has held
21    that these laws preclude class actions on behalf of
22    government entities when they are attempting to be
23    represented by private counsel.
24              THE COURT:  Do we know or have any indication of
25    any delegation of this authority by counsel for the cities or
```

```
 1    the states to private counsel?
 2           MR. CAROME:  We asked that even as to the five
 3    named plaintiffs here, Your Honor, we asked it in repeated
 4    meet and confer sessions and we even went so far as to write
 5    a letter before we filed our motion, it is in -- actually
 6    those are appendix B and C of our brief are the letters on
 7    this.  We asked even to the five named plaintiffs, how is it
 8    that you, represented by the plaintiffs, have the authority
 9    to proceed just on these five named plaintiffs?  They refused
10    to give us any answer to that question at all, and that's
11    just the five named plaintiffs, we have thousands and
12    thousands of government entities around these 17 states.
13           THE COURT:  So they argue that a named attorney on
14    any pleading -- we don't question whether they have the
15    authority by the plaintiff?
16           MR. CAROME:  That's the difference between private
17    litigants and government entities, Your Honor.  Government
18    entities are a special kind of litigant and they, unlike
19    private plaintiffs, have state laws that specify how they can
20    proceed, and this -- they are different and they must -- they
21    must do this.
22           Now, as I said just -- I said every published case
23    that has considered this has gone our way, and just so the
24    Court has those, those are -- the key cases on this are the
25    Walker case, which ruled on this alternative ground in
```

1    dismissing the states in that case, the Ackel case from the

2    5th Circuit, and the Dallas County vs. MERS Corp. case.

3            There is also a case that plaintiffs brought to the

4    Court's attention from Nevada, Southwest Gas, relying on the

5    Nevada government attorney statute to dismiss class actions

6    on behalf of all Nevada counties, so the case law actually

7    goes really one way on this issue.

8            Now, they try to argue that a couple of cases from

9    states don't -- you know, have sanctioned this kind of

10   private representation but, in fact, they are wrong about

11   that too.  They point to a case from the California Supreme

12   Court called County of Stanislaus, and that Court -- that

13   case, the Stanislaus case, did not involve any representation

14   of a government entity by a private counsel.  In that case

15   the counsel for the named plaintiff, the County of

16   Stanislaus, was represented by its official county counsel.

17   And the issue in this case actually that was decided and

18   presented to the California Supreme Court involved could it

19   be the county counsel for the County of Stanislaus or the

20   state attorneys general -- the state attorney general that

21   could litigate that antitrust claim in California.

22           The issue of the government attorney statute was

23   not presented at all or decided at all in the California

24   Supreme Court, there was some consideration of that issue in

25   the California Intermediate -- this Court, which plaintiffs

 1   have improperly cited in their brief, that case was

 2   depublished by the California Supreme Court and it is

 3   impermissible at least as a matter of California law even to

 4   cite that case, and so there is no decision in California

 5   remotely suggesting that private counsel can represent

 6   government entities.

 7          They also refer to some Texas state cases.  Texas

 8   is not one of the states at issue here, but they point out

 9   that there have been some class actions that have gone

10   forward on behalf of counties -- or actually cities in Texas.

11   The issue of the government attorney statute was not actually

12   at issue in those cases so they don't even stand for it.  And

13   the 5th Circuit in Ackel has made clear that this is a

14   question of Rule 23, and you can't -- you can't -- what Ackel

15   says is you can't do a class action in this fashion without

16   making it an opt-in class contrary to Rule 23 because each

17   and every jurisdiction would have to go through a process to

18   authorize -- both for the named plaintiff and for the absent

19   plaintiffs to authorize representation by private counsel and

20   obviously we haven't even begun -- there is no way that can

21   happen in a massive nationwide effort such as this.

22          So again the plaintiffs' main argument here is to

23   sort of dodge these statutes and say well, those statutes are

24   overridden here by Rule 23 and Shady Grove -- the Supreme

25   Court's decision in Shady Grove Orthopedics vs. Allstate, and

```
 1    that's their main argument as to how to get around these
 2    government attorney statutes, and they are wrong on that
 3    score on multiple scores as well.
 4         Most fundamentally when that Shady Grove issue
 5    comes up when there is a conflict between the state laws that
 6    you are talking about and the federal rule, and here there is
 7    no conflict except in sort of the way -- sort of the
 8    consequence to how these laws end up playing out, but the
 9    government attorneys' laws don't have anything to do with
10    class actions and the criteria for when a class action can
11    proceed, they concern the structure of state government, how
12    states and their political subdivisions may act and which
13    officials can control that action.  Rule 23 obviously deals
14    with when is a class action appropriate.
15         These are completely different laws that go in
16    completely different directions, address completely different
17    topics.  There is not a conflict, there is just a problem, it
18    wouldn't be just a class action even if the City of Richmond
19    was bringing this case just on its own behalf without -- as a
20    class action it would still have to comply with this law and
21    get around this problem.  But even if there were a conflict
22    between Rule 23 and the government attorneys' laws, the test
23    for resolving that conflict would actually not be the Shady
24    Grove test, rather it be the much more stringent -- or more
25    stringent, I think Shady Grove is a stringent test as well,
```

Status Conference / Motion Hearings • January 28, 2015

 1   but it would be the more stringent plain statement test that

 2   the Supreme Court has prescribed for determining whether a

 3   federal law may be interpreted to override a state law

 4   concerning core attributes of state sovereignty.

 5        The Supreme Court has made clear that when it comes

 6   to matters of state prerogative federal law does not abrogate

 7   the state law unless Congress makes it -- makes its

 8   intention, I'm quoting it, makes its intention unmistakably

 9   clear in the language of the statute, that's the Will vs.

10   Michigan Department of State Police case from the Supreme

11   Court.

12        Government attorneys' laws are within this special

13   sovereign sphere as the Supreme Court has said through, and

14   I'm quoting, through the structure of its government and the

15   character of those who exercise government authority, a state

16   defines itself as a sovereign.  That's the Gregory vs.

17   Ashcroft case.

18        So applying the plain-statement test to this

19   alleged conflict between the state attorneys' laws and

20   Rule 23 makes clear that Rule 23 or the Rules Enabling Act

21   does not displace these state government attorneys' laws

22   because nothing in either of the Rules Enabling Act or

23   Rule 23 makes it, quote, unmistakably clear, close quote,

24   that a federal rule of civil procedure can override a state

25   sovereign determination regarding who may represent the state

2:15-md-02311-MOB-MRM   Doc # 892   Filed 08/20/15   Pg 148 of 186   Pg ID 17391
Status Conference / Motion Hearings • January 28, 2015

83

```
 1    and its subdivisions.  In fact, the Rules Enabling Act does
 2    just the opposite, it says that the rules promulgated
 3    pursuant to the Rules Enabling Act cannot, quote, abridge or
 4    modify any substantive right, that's the opposite of a plain
 5    statement that Congress intended for these rules to abrogate
 6    something as fundamental as the state's laws regarding how
 7    its government is organized.
 8              THE COURT:  What would it abrogate though even
 9    if -- I mean, Rule 23 --
10              MR. CAROME:  I would say, Your Honor --
11              THE COURT:  It doesn't seem to have much connection
12    with the attorneys -- the government attorneys law.
13              MR. CAROME:  Go back to that New York statute, the
14    attorney general shall prosecute and defend all actions or
15    proceedings in which the state is interested.  Here there is
16    no doubt that the State of New York is an -- interested in
17    this case, and there is no doubt that the state attorney
18    general is not going to be representing the State of New York
19    and the universities of New York and all of those agencies if
20    the case proceeds as the plaintiffs want it to proceed.  I
21    think it is direct abrogation.
22              So that's -- we think that this conflict if it
23    exists would have to be resolved under this plain-statement
24    rule and that clearly the state laws prevail under that even
25    if just -- I won't go into this in too much detail, but even
```

```
 1    if you went to the Shady Grove test for trying to reconcile
 2    this alleged conflict between state law and federal rules,
 3    which we don't believe exist, but even if you went there
 4    there are two prongs to the Shady Grove test.  The first is
 5    do the federal rules and the state laws answer the same
 6    question?  And courts have made clear that in answering -- in
 7    assessing that issue, do the laws and the rule address the
 8    same question, you look at the face of the state laws and the
 9    face of the rule.  And here, you know, perhaps I've already
10    addressed it, it couldn't be clearer I would say that the
11    state government attorneys' laws and Rule 23 don't remotely
12    address the same question, they are addressed at two
13    completely different matters, and that just ends the inquiry
14    at that point and state law prevails.
15          Even if you had to get to prong two, prong two
16    would permit Rule 23 to trump the government attorneys' laws
17    only if such application did not abridge or modify any
18    substantive right under state law, and it absolutely would,
19    we submit.  Plainly the government attorneys law define as
20    substantive state right, i.e., the state's right to delegate
21    to particular public officials the responsibility for
22    representing the state or its divisions -- political
23    subdivisions in court.
24          This Court -- Your Honor's ruling in June and
25    July -- this didn't involve government entities but I think
```

 1    that your own decision in the wire harness and fuel senders

 2    cases regarding the Illinois statute which says that class

 3    actions in Illinois under the Illinois antitrust laws may

 4    only be pursued by the attorney general, this Court found

 5    that that law was not trumped by Rule 23, and really the same

 6    analysis I would submit applies here.  These government

 7    attorneys' laws are not part of the states' procedural laws

 8    and they clearly address matters of important policy and

 9    sovereign right of the states.

10          THE COURT:  All right.  What about your third issue

11    here?

12          MR. CAROME:  Turning to the third issue, just as

13    you can see from the chart there's no named plaintiff from 13

14    out of the 17 states under the laws the plaintiffs are suing,

15    and we submit for this reason all claims brought under the

16    state laws other than California, Michigan, New York and

17    North Carolina should be dismissed.

18          Now, there are critical differences between this

19    public entity's case and the other auto parts cases in which

20    Your Honor has ruled that this standing -- this type of

21    standing question should be addressed later.  The first of

22    those few differences is there's an extreme disconnect here

23    between the named plaintiffs and the states that are covered

24    by their punitive class.  I mean, in prior cases that Your

25    Honor considered there was only one or a couple of states

1   that were without representation by the named plaintiffs.

2   Here the entire size and shape of this case would be

3   fundamentally altered and the burden of litigation would be

4   greatly increased by permitting this case to proceed on

5   behalf of government entities in 17 states rather than four.

6          The second big difference between this case and the

7   prior decisions by this Court on standing matters is that

8   there is a big difference, as I said before, between

9   government entities and private plaintiffs but it is quite

10  specific here.  Private plaintiffs move from state to state,

11  they are free to do so and as we know people move around

12  during their lives and so it is at least conceivable that

13  private plaintiffs -- end payer plaintiffs may have made a

14  purchase in the state that is different from which they now

15  live or that they went and purchased a car outside of their

16  own home state.  Government entities are quite different.  By

17  definition government entities don't move around the country,

18  they stay in one place, and they also have special reasons

19  and sometimes even laws to buy products like automobiles for

20  their use within their own borders at home.

21         So this Court indicated in the bearings part case

22  that the inability of a nonresident of a state to bring a

23  claim under that state's laws is certainly a consideration,

24  and I would say even a basis, for dismissing for lack of

25  standing where there is no instate plaintiff for that, and so

```
 1    I think that the Court has already set itself on a path

 2    towards dismissing in this situation.

 3              THE COURT:  Let me back up.  There really are no

 4    named states here, there are municipalities -- I keep asking

 5    this question but the way the argument goes I get confused

 6    again.  There are --

 7              MR. CAROME:  We have one village, two cities and

 8    two counties.

 9              THE COURT:  Within these states while --

10              MR. CAROME:  Those five named plaintiffs come from

11    four states.

12              THE COURT:  But they have not named those states, I

13    mean, they are not a named plaintiff?

14              MR. CAROME:  There is no state or state level

15    agency, we don't have the University of California, City of

16    New York, et cetera, none of those -- we don't have a state

17    entity at all.

18              THE COURT:  Okay.  I just want to get that clear

19    because by the argument I'm getting a little confused as

20    to --

21              MR. CAROME:  So we think that it is important,

22    because of the differences I pointed to it makes a lot of

23    sense for this Court not to kick the can down the road on the

24    standing question; to allow the case to proceed here would be

25    really extraordinary I think.
```

```
 1              So lastly, in the later part of the briefing we
 2     cited a number of specific statutes, Maryland, Nevada, West
 3     Virginia, Iowa and Nebraska, which all make it very clear we
 4     submit that a government that under -- for example, under
 5     Maryland's law only the State of Maryland itself or one of
 6     its political subdivisions could bring an action under
 7     Maryland law -- Maryland's antitrust law.  Maryland's
 8     antitrust law does not allow a California government entity
 9     to sue under the Maryland law.  And I think that's probably
10     true for all of these state laws but specifically for
11     Maryland, Nevada, West Virginia, Iowa and Nebraska, that's
12     very clear on the face of the statute, that's just another
13     reason why there is a massive standing problem here.
14              THE COURT:  Okay.  Thank you.
15              MR. CAROME:  Thank you.
16              THE COURT:  Let's hear what plaintiff has to say.
17              MR. NOBLIN:  It is barely but good afternoon, Your
18     Honor.
19              THE COURT:  Good afternoon.
20              MR. NOBLIN:  I'm Rob Noblin of Green & Noblin for
21     the public-entity plaintiffs.
22              Defense counsel stated more than once --
23              THE COURT:  How do you spell your last name?
24              MR. NOBLIN:  N-O-B-L-I-N.
25              THE COURT:  Thank you.
```

```
 1              MR. NOBLIN:  Sure.  Defense stated more than once,
 2    I wrote this down, government is different than private
 3    litigants, and he said I think that was a big difference but
 4    in this context that's actually not true.
 5              THE COURT:  How is that?
 6              MR. NOBLIN:  The reason we know that is a U.S.
 7    Supreme Court case interpreting the federal antitrust law and
 8    the County of Stanislaus case interpreting the California
 9    Cartwright Act.  Each of those cases drew a distinction when
10    you are talking about a government plaintiff in an antitrust
11    action, and on one side of the distinction is when the
12    government is exercising sovereign or quasi sovereign powers,
13    in other words, prosecuting for criminal antitrust violations
14    or seeking to impose civil penalties for those violations.
15              On the other side of the distinction is when a
16    government entity is suing for injury to its business or
17    property.  On that side of the distinction government
18    entities are simply another consumer.  As the County of
19    Stanislaus case --
20              THE COURT:  But when you read the laws of those
21    states regarding counsel representing them it sounds like
22    they require their own attorneys to represent them even when
23    they are claiming injuries to themselves?
24              MR. NOBLIN:  Well, those statutes talk about -- for
25    example, counsel quoted some Michigan municipal statutes that
```

```
 1   said the city attorney must represent the city when the city
 2   is, quote, a party thereto, close quote.  The absent class
 3   members here are not parties.  The law is clear on that that
 4   they are not parties and therefore those statutes don't apply
 5   on their face.  They aren't retaining us, just like in a
 6   consumer class you would not --
 7          THE COURT:  But who is retaining you, you have got
 8   four municipalities -- four or five, I forgot?
 9          MR. NOBLIN:  We have five.
10          THE COURT:  You're claiming -- five municipalities
11   and you're claiming that they represent states, the
12   municipality, the little city represents the state?
13          MR. NOBLIN:  We maintain that they are named
14   representatives of all the absent class members, the nine
15   states we are talking about, I should emphasize out of this
16   class the states are nine, that they represent all of the
17   members of the class.  Now, as to their adequacy to do so
18   that's an issue for class certification but that's a far cry
19   from saying that these statutes prevent anyone from
20   representing government entities as absent class members,
21   something that has not been held by any of these states
22   themselves.
23          Now, as we are -- when we are trying to apply state
24   statutes the job here is to predict how the Supreme Court of
25   that state would apply the statute.
```

1      THE COURT:  So let me -- I have to stick with these

2  municipalities.  So you have authority from these

3  municipalities to sue on their behalf?

4      MR. NOBLIN:  Yes, Your Honor.  So the -- but if I

5  could return to that point about that the government here

6  when they are acting this way they are acting like consumers?

7  County of Stanislaus said, quote, counties that have been

8  injured by price fixing are no different than other persons

9  or businesses that have been injured by such conduct, close

10  quote.  The court went on to make that clear that that

11  includes the power to bring a class action in federal court

12  based on the state antitrust law.

13      THE COURT:  That's the County of Stanislaus?

14      MR. NOBLIN:  Yes, Pacific Gas and Electric vs.

15  County of Stanislaus, and the quote I read appears at

16  947 Pacific 2nd at 300.

17      So when we come to that point that Your Honor

18  raised about representing -- these class members representing

19  states and others, the absent class members, as I said,

20  aren't parties therefore the statutes that say who can

21  represent a city or county as a party are inapplicable.  Here

22  the absent class members, just as in all the consumer

23  classes, they are protected by the court and the named

24  plaintiffs, and then through class certification the various

25  obligations to the class as a whole but class actions would

 1    be impossible if somebody had to run around and retain all
 2    the individual members of the class, that's one reason why we
 3    have class actions.
 4         The other point is that the purposes of these
 5    statutes about retaining private counsel would not be
 6    furthered by applying them here.  The cases we cite in our
 7    papers make clear there are two purposes behind these
 8    statutes.  One is to control who exercises the sovereign
 9    power of the government, but as the Hawaii case and the
10    County of Stanislaus I just referred to you indicate, here we
11    are not talking about an exercise of sovereign power, here we
12    are talking about a government who suffered damage to its
13    business or property by buying something just like consumers,
14    so in this context they should be treated like consumers.
15         The other rationale for these statutes is to
16    protect the public fisc to prevent unwarranted expenditures
17    of public funds, but that rationale clearly doesn't apply
18    hereto because the absent class members are not going to have
19    to pay the attorneys' fees and litigation costs and, indeed,
20    if things go well the public fisc will receive revenue, not
21    an expenditure from this.
22         Turning to the 11th Amendment point, we think the
23    standing situation is very different here from the
24    6th Circuit cases as cited by defendants because in those
25    cases the state was a named defendant, and so the state can

 1    raise the issue itself or the court could sua sponte say to

 2    the state is there any realistic prospect the state would

 3    want to be a defendant here.

 4         We are in a much more unusual situation where the

 5    state here is an absent class member of a plaintiff class,

 6    and in that context the state may well want to waive its

 7    11th Amendment rights, there are benefits to doing so in

 8    terms of perhaps being able to recover for alleged harm

 9    through the usual class process.  The 11th Amendment entitles

10    the state to make that choice, not the defendants, because

11    the state is going to weigh the benefits and costs of

12    allowing this to go forward.  The defendants, their only

13    incentive is to get the state out of court, so they can't

14    possibly fairly weigh the competing considerations the state

15    would.

16         THE COURT:  But the state would be in the class

17    until it opts out?

18         MR. NOBLIN:  Well, that's true for everybody.  I

19    mean, until the class is certified there is nothing for them

20    to do --

21         THE COURT:  Right, but isn't their sovereign

22    immunity impinged by automatically being a member of the

23    class until such time as they opt out?

24         MR. NOBLIN:  I don't believe so.  They are -- there

25    is no binding consequence that happens to them until they

 1    have to decide whether to be in or out of the class.  As for

 2    any precertification discovery, it is the rule in this

 3    circuit that there would have to be a particularized showing

 4    approved by the Court for such discovery and that since they

 5    aren't parties that discovery should be conducted as -- by

 6    way of witness discovery and it's long been held that the

 7    11th Amendment does not preclude states, just like every

 8    other witness, from having to comply with witness discovery.

 9            THE COURT:  Okay.

10            MR. NOBLIN:  The cases relied upon by defendants --

11    well, some just don't get as far as they want.  The

12    defendants cite the Ackel case but in Ackel the plaintiff

13    conceded all the big points that we're arguing here including

14    Shady Grove and the applicability of the statute, they

15    conceded that they would have had to get retention agreements

16    for every absent class member, we certainly do not.

17            In the Walker case, which is only really on the

18    11th Amendment, they -- Walker did not even try to construe

19    Rule 23 in a Constitutionally permissible manner, which is

20    its obligation, and then referred to those 11th Amendment

21    cases that really say it is a matter of consent, is the state

22    consenting to the jurisdiction, and what do you need to

23    establish that consent.  We believe that Rule 23 opt out is

24    sufficient in that the state's probably in a lot better

25    position to respond to one of those than is a typical

1    consumer.

2         THE COURT:  Well, you're talking about assuming the

3    class is certified notifying every state, municipality,

4    governmental entity all over and if they don't opt out of

5    course they are in the class for which they may not have

6    waived -- they may simply ignore it like we all ignore a lot

7    of these notices for class actions, so here they are in the

8    class without any waiver or any of their own attorneys if

9    these laws apply coming in.

10        MR. NOBLIN:  Well, first I would like to draw the

11   line between the nine states which have an 11th Amendment

12   argument and all the other local government entities --

13        THE COURT:  Which do not.

14        MR. NOBLIN:  -- which do not.

15        We are only talking about the nine states as to

16   waiver, and that's where we pointed out in our papers we

17   believe this is an issue more suited for certification, what

18   exact sort of notice do you want to give the states.

19        THE COURT:  And why do we have only nine states,

20   why not all the states except for Florida of course?

21        MR. NOBLIN:  We have various -- we looked at the

22   facts and the law of each one as we proceeded and through the

23   meet and confer process, and we believed that this was the

24   most appropriate plaintiff grouping for strategic purposes.

25        THE COURT:  It must be very strategic because I

```
 1    don't know -- I mean, certainly the states know about this
 2    one would assume, we have got Florida in here and once one
 3    attorney general files something we know just from past
 4    actions that they all know about it.
 5            MR. NOBLIN:  We certainly know that a lot of states
 6    are aware of the litigation, yes, Your Honor.
 7            THE COURT:  So you are just saying these states you
 8    don't want to get in there but don't worry about it because
 9    we will get you in there anyway?  I'm having a hard time with
10    this concept.
11            MR. NOBLIN:  We filed a complaint shortly before
12    that we believed was a possible statute-of-limitations state
13    but we thought would preserve the rights of some states but
14    if any state objected we certainly wouldn't go forward in
15    their name, you know, because we know that if they assert
16    that 11th Amendment right they wouldn't be here for long.
17            THE COURT:  Or could they decide not to assert
18    their 11th Amendment right by not having their attorney
19    general file an action?
20            MR. NOBLIN:  Well, now you are having to read the
21    tea leaves.  There's are a lot of reasons why an attorney
22    general --
23            THE COURT:  Well, I am --
24            MR. NOBLIN:  -- wouldn't file an action besides the
25    11th Amendment.
```

```
 1              THE COURT:  I agree, I'm just trying to get over
 2    this how you can as a municipality bring in all of these
 3    states.
 4              MR. NOBLIN:  Well, all nine of the states we are in
 5    the class but I don't want that part of the case to get
 6    conflated with all the thousands of municipalities which
 7    don't have an 11th Amendment right to assert.
 8              THE COURT:  Okay.
 9              MR. NOBLIN:  The Dallas County case really gave no
10    reasoning for extending these statutes to absent class
11    members, didn't mention Shady Grove at all, and distinguished
12    the City of San Benito in which the Texas Supreme Court said
13    sure, Texas local government entities can be in a class
14    action and the distinctions are completely unpersuasive as
15    far as distinguishing cities from counties and distinguishing
16    the Texas statute from Rule 23 when they are virtually
17    identical on the pertinent points.
18              The County of Stanislaus case that was derogated by
19    defense counsel we think is right on point because the issue
20    there was a particular county government official was
21    asserting a class action of all others similarly situated
22    including all the other California counties, so as to those
23    California counties they weren't being represented by their
24    own county counsel, and the court said that's not a problem
25    at all, the case should proceed.
```

```
 1              If I could turn to Shady Grove because we think
 2    that does govern here.  When it comes to -- defendants say
 3    that it doesn't because Rule 23 and the statutes answer
 4    different questions, but that's clearly wrong and we know
 5    that from Shady Grove itself where under prong one as it is
 6    put, which we believe defendants have overstated, in Shady
 7    Grove it was put this way, quote, we must first determine
 8    whether Rule 23 answers the question in dispute, close quote.
 9    And that -- and the Supreme Court said it did because
10    plaintiffs there just wanted to proceed under the rule, they
11    just wanted to establish typicality and numerosity and common
12    questions and proceed, and that's what we want to do.  It is
13    defendants here as defendants did in Shady Grove that said
14    oh, no, there are these other provisions that keep you from
15    doing that.  So prong one is clearly met.
16              And when you get to prong two we believe defense
17    counsel has just misunderstood the Shady Grove as far as what
18    it is saying about substance and procedure and how they
19    interrelate.
20              THE COURT:  Well, let's stick with prong one a
21    minute which says that Rule 23 answers the question in --
22    must answer the question in dispute.  What is the question in
23    dispute?
24              MR. NOBLIN:  Can we proceed -- can our named
25    representatives proceed in a class action in representing
```

1    these absent class members?  And we want to do so by meeting

2    the elements of Rule 23.

3             THE COURT:  How does Rule 23 answer that question?

4             MR. NOBLIN:  As they said in Shady Grove, it

5    provides the exclusive mechanism for proceeding on a class

6    action.  If you meet its elements you may -- and it is the

7    plaintiff's option, you may proceed as a class action.  Those

8    are all the elements we need to meet.  Defendants are trying

9    to erect other hurdles to doing so.

10            THE COURT:  Okay.  Question two?

11            MR. NOBLIN:  On prong two -- and I think it becomes

12   clear when you see prong two as well as how this should work,

13   both the plurality in Shady Grove and Justice Stevens were

14   completely in agreement that sometimes the federal rules will

15   override state substantive matters.  That's not the question.

16   In fact, the Shady Grove plurality would say as long as the

17   federal rule is procedural it will trump the state provision

18   and since the Federal Rules of Civil Procedure almost all

19   proceed they are always going to trump.

20            As for requiring a plain statement of that, the

21   plain statement of that intent is in the Rules Enabling Act

22   itself and Shady Grove is the last word on the U.S. Supreme

23   Court interpretation of that statute, but we have to look at

24   Justice Stevens carefully because his vote turned the

25   plurality into a majority.  And he wanted to create a narrow

```
 1   exception going beyond the plurality, and his exception is if
 2   a state is creating a cause of action it can define the
 3   limits of that cause of action short of the federal rules and
 4   the federal courts should respect that.
 5         And we know that from the dialogue essentially
 6   between Justice Stevens and the plurality on a case called
 7   Sibbach v. Wilson decided a year after Erie in which it was a
 8   state personal injury action in federal court on diversity
 9   and the defendant wanted a physical exam which he could get
10   under federal rules.  The plaintiff there said well, I
11   wouldn't be subjected to that in state court and that's an
12   important right I have, an important substantive right, yet
13   Sibbach followed the federal rules, and they did so in
14   language which I think undermines what defendants are saying
15   about the importance of these state statutes because Sibbach
16   said that's not the test.  Quote, if we were to adopt the
17   suggested criterion of the importance of the alleged right we
18   should invite endless litigation and confusion where it's
19   confounded, close quote.  It is not the importance.
20         What Stevens -- Justice Stevens indicated what is
21   important when he described Sibbach v. Willis as, quote,
22   reasoning that the phrase substantive rights embraces only
23   those state rights that are sought to be enforced in the
24   judicial proceedings, close quote.  In other words, the cause
25   of actions being asserted in the case itself.
```

```
 1          Now, I know this is all pretty abstract but
 2   fortunately Justice Stevens gave us a practical test for at
 3   least determining when this exception doesn't apply, and he
 4   said if the provisions being asserted would apply not only to
 5   the causes of action at issue but other causes of action of
 6   that state or the laws of other states or federal claims then
 7   we know it can't be part of the state's definition of that
 8   single cause of action.
 9          We know from this motion that the defendants
10   flunked that test because they are not trying to dismiss our
11   state claims, we have a federal claim under the federal
12   antitrust laws for injunctive and equitable relief, and they
13   want to throw that out on these same grounds, so under
14   Justice Stevens' test the state grounds do not apply and
15   Rule 23 does, and I think it is actually an illustrative
16   contrast of when the exception does apply with what Your
17   Honor did earlier with the Illinois Antitrust Act that was
18   referenced by defense counsel.  That act within the Antitrust
19   Act itself says this act will not be enforced by a class
20   action and that fits what Justice Stevens is saying, it is
21   defined in that cause of action that won't include a class
22   action, we will respect that.
23          THE COURT:  Okay.
24          MR. NOBLIN:  For all of these reasons, there is a
25   long history and we cited it in our papers of class actions
```

```
 1    consisting of government entities.  There is no way that can
 2    happen if defendants' arguments prevailed.  And it is
 3    important to understand that the logic of defendants'
 4    argument does not depend upon the class consisting only of
 5    government entities.  If that logic is followed in the class
 6    of all purchasers of some item that was allegedly
 7    overinflated by an antitrust violation all of those classes
 8    would have -- the government entities would have to be
 9    stripped out.
10            So that leaves us that if these government entities
11    wanted to recover they would have to -- in every case across
12    the country they would have to retain counsel and appear on
13    their own behalf, and that's just not practical.  I think
14    defendants admit that's not practical and would thwart the
15    case, but it has real-world consequences.  For example, the
16    County of Oakland here in Michigan has about 1.2 million
17    residents, it has 12 full-time lawyers and one part-time
18    lawyer in the civil unit applicable.  They have to handle all
19    the suits against the county at which there are over 100 at
20    times, and each attorney gets about 116 requests per year for
21    legal advice from within the county.
22            There is simply no way that they can retain and
23    appear in all of the cases, which means that what the
24    defendants are arguing is essentially the government agencies
25    should never be entitled to recover as consumers in
```

 1    class-action cases, and, one, that would give defendants an

 2    incentive -- would decrease the deterrence for them to

 3    violate antitrust laws and everybody else, but it is also

 4    nothing that any of the -- I would think many taxpayers in

 5    these entities would want to see that other consumers can

 6    recover except the one that spends their tax dollars.

 7              THE COURT:  Okay.  Thank you.  Brief response?

 8              MR. CAROME:  Thank you, Your Honor.  I think most

 9    of what counsel just said was already pretty much addressed

10    in my opening so I'm not going to try to cover everything at

11    all.

12              The County of Stanislaus, I just want to emphasize

13    again that there was no private counsel involved in the

14    California County of Stanislaus case, it was only government

15    counsel was involved.  And the issue of the application of

16    the California government attorney statutes was not addressed

17    in the California Supreme Court, so that is not -- that's not

18    really relevant here.

19              Counsel said that they -- he's now finally said

20    they have authority from these five government entities to

21    sue, that's more than he was actually willing to say when we

22    wrote them about this.  But we have moved for a more definite

23    statement under Rule 12(E) spelling out exactly how that is

24    the case so we can then respond to it and see whether, in

25    fact, what they are doing here is in conformity with the laws

```
 1    of these local jurisdictions.
 2           The -- one of counsel's last points was well, this
 3    is going to leave the government entities out in the cold
 4    somehow.  Not at all.  The tried and true way for these kinds
 5    of claims to be litigated is through actions by the state
 6    attorneys general on behalf of sometimes even the people of
 7    the state but certainly it can be on behalf of the government
 8    entities within the state.  So this not a question of anyone
 9    being left out in the cold, these issues can be addressed in
10    a far more appropriate way that conforms with these laws
11    through parens patriae actions on behalf of or other actions
12    on behalf where the state AG is running the case.
13           I think the other points have already been
14    addressed.  Thank you very much for hearing us out at such
15    length.
16           MR. NOBLIN:  Your Honor, if I may, just two brief
17    points in response to what was just said?
18           It is just not true that there was no private
19    counsel involved in the County of Stanislaus, there was for
20    the County of Stanislaus in addition to the county counsel.
21           THE COURT:  What are you saying, there was private
22    counsel along with --
23           MR. NOBLIN:  Along with the county counsel in
24    County of Stanislaus.
25           THE COURT:  Okay.
```

```
 1              MR. NOBLIN:  And then as far as the argument that

 2    the state attorney general can always bring all of these

 3    actions for the local government entities, that's not always

 4    true either.  In the State of California the state attorney

 5    general cannot represent the local government entities and

 6    also then you run into the simple fact of limited

 7    prosecutorial resources and that there is simply no way they

 8    can bring every valid claim that they have and thus they

 9    should be entitled, as are other persons and corporations, to

10    bring it by way of a class action which was designed for the

11    situation where individuals may not be able to bring it for

12    themself.

13              THE COURT:  Okay.  Thank you.

14              MR. NOBLIN:  Thank you.

15              THE COURT:  All right.  The Court will issue an

16    opinion on that interesting issue.

17              What's our next motion?  This is the

18    vertical/horizontal motion?

19              MR. SKLARSKY:  Yes, that's a good description, Your

20    Honor.

21              THE COURT:  Okay.

22              MR. SKLARSKY:  I am Charles Sklarsky.  I represent

23    Mitsubishi Electric Company in this matter and the other

24    cases.  I'm here with my colleague, Dan Fenske.

25              I'm speaking on behalf of all of the defendants
```

 1    with regard to the joint motion that we filed and on behalf

 2    of Mitsubishi and Mitsuba on behalf of the motion that

 3    Mitsubishi filed on its own behalf and in which Mitsuba

 4    joined in.

 5            We filed this motion because we believed after

 6    reading the complaint that it raised an issue the Court had

 7    not considered before in connection with the auto parts

 8    cases.  We have also raised -- and that's the

 9    vertical/horizontal issue that Your Honor has referenced.  We

10    have raised a number of other motions -- issues in the

11    motions, but I only intend to address the vertical/horizontal

12    issue in argument today.

13            THE COURT:  I realize the other motions are there.

14            MR. SKLARSKY:  They are there but we stand on the

15    pleadings with respect to those.

16            THE COURT:  But you do -- you argue about this

17    vertical/horizontal but plaintiff in response has said, and I

18    would like you to address this, that's not what they said in

19    their complaint.

20            MR. SKLARSKY:  And I will address that and that's

21    really where I will direct the argument.

22            THE COURT:  Okay.

23            MR. SKLARSKY:  But before I get to that specific

24    issue I think it is important by way of background because it

25    would help us understand the horizontal/vertical issue to

 1    understand the defendants in this case and the differences

 2    between them --

 3            THE COURT:  Okay.

 4            MR. SKLARSKY:  -- based on what the complaint says.

 5            So there are four defendants.  The first defendant

 6    is JTEKT.  JTEKT is a manufacturer of electric power steering

 7    assemblies, so what they sell is a finished product to

 8    various markets, primarily to OEMs, original equipment

 9    manufacturers, to the Fords, the Chryslers, the Nissans, the

10    Hondas of the world.  They entered a plea of guilty with

11    respect to sales of those finished power steering assemblies

12    to manufacturers.

13            Showa, the other defendant, is also a manufacturer

14    and seller of these finished power steering assemblies, and

15    they entered a plea of guilty in connection with the sale of

16    a different kind of assembly than JTEKT manufactured or pled

17    to but nonetheless a finished power steering assembly.

18            There is Mitsuba, the third defendant.  It is a

19    maker of electric motors and seller of electric motors, and

20    that motor is one component of this finished electric power

21    steering assembly.

22            THE COURT:  But does the complaint say that Mitsuba

23    also manufactured power steering assemblies?

24            MR. SKLARSKY:  Only by way of definition.  The

25    plaintiffs in the complaint say a broad statement that all

Status Conference / Motion Hearings • January 28, 2015

```
1    defendants -- all four defendants manufactured and sold,
2    rigged bids and allocated markets in connection with the sale
3    of power steering assemblies, but then the complaint goes on
4    to define power steering assemblies as including all of the
5    component parts.  So what the plaintiffs are saying, if you
6    sold an electric motor, put aside the issue of to whom you
7    sold it, if you sold an electric motor you have by their
8    definition sold an electric power steering assembly.  Now,
9    that's sort of a slight-of-hand definition but that's what
10   they plead in their complaint.
11        It is like saying that if you sell a car and I --
12   my company sells a tire that goes on that car by definition I
13   have sold a car.  It is clearly not the case but that's what
14   their complaint says, but I think we can get away from that
15   issue because of the response they filed.
16        So Mitsubishi is like Mitsuba, it makes motors and
17   it sells those motors.  Neither Mitsuba nor Mitsubishi has
18   entered any guilty plea with respect to motors.  So we said
19   well, who do we sell these motors to?  We sell them to
20   companies that make these finished assemblies that a motor is
21   one component and that's to whom we sell those products.  So
22   right away on the face of the complaint we have got two
23   defendants that are customers in the category of people that
24   are our customers, so that's a very unusual situation.  So
25   that would be -- and if that were the sales they were
```

 1    including that would be a vertical conspiracy.  That's the
 2    basis of our motion.
 3            In response and in briefing plaintiff said no,
 4    that's not the sales we mean to have as part of this
 5    conspiracy.
 6            THE COURT:  So they may be but that's not what they
 7    are talking about.
 8            MR. SKLARSKY:  Well, their complaint doesn't make
 9    that clear and obviously I don't think they can amend their
10    complaint by the briefing on the issue.  If that's really
11    what they are saying then they ought to amend their complaint
12    to make it clear that they are not including sales that
13    Mitsubishi or Mitsuba made to these assembly manufacturers.
14    They ought to say that.  But if that's really their position
15    that addresses the issue of whether there is a vertical or
16    horizontal conspiracy, if they eliminate those sales that
17    eliminates the verticality issue, but it begs the question of
18    what are they saying the conspiracy is?  Are they saying that
19    they are conspiring -- that all four defendants are
20    conspiring with respect to the sale of finished assemblies to
21    automobile companies?  I mean, that would be a horizontal
22    conspiracy if that's what they are alleging, but if they are
23    alleging that they would have to establish some facts to show
24    that, indeed, Mitsubishi and Mitsuba even make finished
25    assemblies, they would have to plead some facts to show that

1  a conspiracy existed because they can't rely on guilty pleas,

2  we didn't plead guilty in those areas.  You know, when did

3  this conspiracy start?  What communications were there?  Who

4  was involved with them?  What RFQs were at issue?  I don't

5  believe they can plead those in good faith.

6           Or are they saying that the conspiracy is that the

7  two assembly -- finished assembly manufacturers, JTEKT and

8  Showa, conspired with the motor manufacturers to rig the bids

9  in the sale of motors to the motor customers?  If that's what

10 they are saying that would be a horizontal conspiracy but it

11 would be an implausible one.  Why would the assembly

12 manufacturers want to raise the price of motors which they

13 buy from us?

14          Or are they saying the opposite, that the motor

15 manufacturers conspired with the assembly -- finished

16 assembly manufacturers to rig the bids on the prices of the

17 finished assemblies?  That would make no sense, but I suppose

18 that would state a horizontal conspiracy but it is

19 implausible.

20          Or are they saying both?  You can't tell from this

21 complaint, and their response is not helpful on that point,

22 it only eliminates the vertical issue.

23          Their other response is, well, it is horizontal so

24 it is just like wire harness, but it is not wire harness.

25 Wire harness really didn't have defendants that sold to each

```
 1    other these parts.  It didn't have that issue.  So they have
 2    cured that issue but they still leave us wanting to know what
 3    conspiracy are they alleging?  Why is it plausible and what
 4    are the facts because they don't have guilty pleas for
 5    Mitsuba or Mitsubishi that they can rely on?  That's really
 6    the essence of our argument.
 7              THE COURT:  Okay.
 8              MR. SKLARSKY:  Thank you.
 9              THE COURT:  Let's get them to answer those
10    questions.
11              MR. WILLIAMS:  Good afternoon, Your Honor.
12    Steve Williams for the end payers.
13              I want to get right to the answer of the question
14    but I kind of feel like this is old wine in new bottles.
15    This is a motion to dismiss, there is no discovery and, in
16    fact, these defendants, including this defendant, when we
17    asked back last summer for them to tell us what are the parts
18    that were involved in their guilty pleas, they refused, they
19    would not tell us and they were not required to, but now they
20    come and say well, you didn't say who met with who, you
21    didn't say what was the agreement, we don't have to do that
22    at the motion to dismiss.  So what did we plead?  We pled
23    exactly what our complaint says and exactly what we say on
24    page 1 of our brief.  We allege based on what we know now,
25    which is very little, that these four defendants conspired to
```

```
 1   fix the price of electronic powered steering assemblies which
 2   include steering motors.  Okay.  So all four of these
 3   defendants make those parts, as counsel said.
 4           THE COURT:  I'm not understanding that.  They
 5   conspired to fix the power steering assemblies which include
 6   motors?
 7           MR. WILLIAMS:  Correct.
 8           THE COURT:  Right.
 9           MR. WILLIAMS:  And there is no reason why those
10   defendants who make those parts because the motors are
11   required to be part of the assembly could not conspire
12   together to fix the prices to the OEMs, and, in fact, all of
13   them have pled guilty to fixing the prices of parts they sell
14   to OEMs.
15           THE COURT:  But even if some of them don't do the
16   finished product, even if they don't do the assemblies --
17           MR. WILLIAMS:  Correct, it doesn't matter.
18           THE COURT:  -- they still conspire on the motors,
19   but why would the assembly manufacturer conspire on the cost
20   of the motor?
21           MR. WILLIAMS:  Well, one, because they conspired to
22   fix the price to manufacturers.
23           THE COURT:  Except to keep it low.
24           MR. WILLIAMS:  Two, we are alleging a price cartel
25   and we are alleging market allocation, and I don't want to
```

1   keep repeating we don't have discovery but we don't.  So it

2   is very plausible that when Nissan, who JTEKT, Mitsuba and

3   Mitsubishi have all admitted fixing prices to, say we need a

4   new electronic power steering assembly that Mitsuba, JTEKT,

5   Mitsubishi say we are going to respond to this bid from

6   Nissan, we want to coordinate the pricing, we want to make

7   sure this time JTEKT and Mitsubishi get the business,

8   Mitsuba, you will get it next time, you bid lower, now JTEKT

9   and Mitsubishi get together and say what prices are we going

10  to put in so we can raise the numbers to the level we want

11  without arising the suspicions of Nissan.

12          Now, the point of all of this, and counsel may get

13  up and say that's not in your complaint, our point is it

14  doesn't have to be in our complaint, that is what discovery

15  is going to tell us.  For now the question is have we

16  plausibly pled enough to let us go forward in discovery to

17  find out if there is a claim here.  I don't see how they

18  could argue we don't other than through discretion of it is a

19  horizontal rule of reason conspiracy, and it is not, or to

20  say Matsushita, that Supreme Court court case about summary

21  judgment standards that says you have to exclude

22  possibilities, we should import that standard to the motion

23  to dismiss stage which the Supreme Court in Iqbal went

24  carefully to say no, that's not what we are doing at all, and

25  I think this is the Morton's Salt case from the 6th Circuit

Status Conference / Motion Hearings • January 28, 2015

1   that explicitly rejects that.

2           In their arguments they say that's really not what

3   we are doing, we are just saying this is so implausible that

4   it doesn't make sense but I think in the end that's what they

5   are doing because they are asking the Court to accept their

6   version of what the ultimate facts will be by saying it is

7   impossible that we, us four, all admitted price fixers to the

8   same OEMs at issue in this case, it is impossible we would

9   have gotten together to conclude on the pricing we submit.

10  That's not a standard we have to meet now when there are

11  guilty pleas, when these markets are both so closely related,

12  we are not talking about the Southeast Area Milk case, I

13  think that was the name, which was at summary judgment where

14  the only way that the Court could read the evidence presented

15  at summary judgment was one of the three conspirators would

16  have agreed to be harmed, that was on a full evidentiary

17  record at summary judgment.

18          We are at a motion to dismiss, they don't have to

19  be harmed.  It is entirely possible, for example, for

20  Mitsubishi to coordinate with JTEKT to whom it is going to

21  sell to ensure the pricing they both submit will satisfy

22  their interests in elevating those prices, will satisfy their

23  interest in securing Nissan against a competitor who might

24  seek that business, and there is no reason to then say well,

25  this turns it into a horizontal rule of reason conspiracy, it

     1   is simply not the law.

     2           And, in fact, in the cases they cite to, and I

     3   think if I can find it it is called Care Heating, it is a

     4   6th Circuit case, I think if I'm quoting it right it makes

     5   the point of saying, and this was in the context of talking

     6   about group boycotts to which the rule of reason does apply,

     7   and the court says actions like price cartels are entirely

     8   void of any redeeming value, they are always per se, and

     9   that's what this is, this is a price cartel, this is not

    10   within this rule of reason scenario.

    11           But coming back to the more important point, it is

    12   not implausible that these four guilty pleaders would have

    13   worked together on the motors which are necessary to make the

    14   steering assembly work when they are all responding to these

    15   bids.

    16           Earlier when the Court asked about some complaints

    17   that are going to be filed and I mentioned the fact they

    18   haven't been yet, it is for that very reason, we are further

    19   along in understanding how the defendants' conspiracy worked

    20   in this case and understanding that it is not this strict

    21   division for just finished parts, that there is a

    22   relationship because these defendants have to work together

    23   to make this conspiracy work to the OEMs who ultimately buy

    24   these parts.

    25           And counsel mentioned the wire harness case and

```
 1    said this -- plaintiffs just point to wire harness and they
 2    say this isn't like that, but here is how it is like that.
 3    If you recall in wire harness Denso's argument was we only
 4    make electronic control units, that's not a wire harness, it
 5    is part of the wire harness but it is not part of the wire
 6    harness and we can't be in that case.  That argument was
 7    rejected, and there is -- really was no meaningful difference
 8    between the argument that MELCO makes here and the argument
 9    that Denso made there with the point being it is a motion to
10    dismiss.  We don't know facts, we know the floor that the
11    guilty plea set and what has been presented to you in many
12    ways was that same argument from before; the guilty pleas say
13    A, and therefore that's all that ultimately discovery may
14    show.  The guilty --
15            THE COURT:  They never limited to the guilty plea?
16            MR. WILLIAMS:  The guilty pleas for us are the
17    floor, and they are entitled to go forward to try to
18    determine what are the rest of the facts but the question for
19    now is is what we pled so implausible that we shouldn't have
20    an opportunity to plead that, that we should be forced to go
21    back and guess what it is these defendants did before we can
22    state a claim when they have all pled guilty to a per se
23    price-fixing cartel?  I think the answer is no, that this is
24    enough to go forward and the evidence and the facts will show
25    what really took place but we can't be forced into this box
```

```
 1    of having to guess what the ultimate answers will be while
 2    they on their side have those facts and come back and say we
 3    wouldn't do this because then it would have made it cost more
 4    for the tier one or tier two, we don't know those answers
 5    now.
 6              THE COURT:  Okay.
 7              MR. WILLIAMS:  But we do know -- and there are
 8    other arguments made in the papers and I'm not going to
 9    address them now that counsel has chosen not to so I will
10    submit on the papers as to those.
11              THE COURT:  All right.
12              MR. WILLIAMS:  Thank you.
13              THE COURT:  Counsel, reply?
14              MR. SKLARSKY:  Very briefly, Your Honor.
15              Arguments of counsel are fine but they are not in
16    the complaint, and what we are entitled to is not whether all
17    of his statements, we are entitled to a complaint that
18    clearly states with well-pleaded facts the nature and scope
19    and definition of the conspiracy with which we are charged.
20    This complaint does not do that.  And once they have clearly
21    defined the nature, scope and definition of the conspiracy
22    then they need to well plead some facts that show it is
23    plausible, not counsel's argument about why it is plausible
24    but some facts that establish its plausibility.
25              We don't have to define from Supreme Court justices
```

1   about that requirement.  Everybody agrees that's the law, and

2   the starting point is to clearly describe the conspiracy, and

3   they haven't done that.  They have relied on this definition

4   which throws in all of the component parts as part of a

5   finished assembly.  Well, yes, in reality they are a finished

6   assembly but when you sell an electric motor you are not

7   selling a finished assembly, those are different things

8   although they have eliminated that difference by their

9   definition in the complaint.

10          THE COURT:  Okay.

11          MR. SKLARSKY:  I will say one other thing just

12  about wire harness, when Ford or Chrysler or whoever goes to

13  buy they don't buy a wire harness system, they can buy a

14  power steering assembly, that is a part, it has a lot of

15  components to it but they buy a part, but our understanding

16  of the industry is in wire harness they call it a system but

17  it consists of lots of parts which are sold separately, not

18  as an integrated system, and that's an important distinction

19  it seems to me between this case and the wire harness case.

20          THE COURT:  So your distinction is that the OEMs

21  put together the wire harness system themselves?

22          MR. Sklarsky:  Yes, and all of those parts.

23          THE COURT:  And here you are saying you sell the

24  system all together, the power steering --

25          MR. SKLARSKY:  Right, we -- at least two of the

```
 1    defendants do.  Thank you.
 2            MR. WILLIAMS:  Your Honor, I just want to respond
 3    very briefly.
 4            I was criticized for talking about things not in
 5    the complaint, which I don't think I did, but the argument
 6    just now about what wire harnesses are as bought by Ford or
 7    GM, that's nowhere in any of the facts, and I think it
 8    illustrates why we should get to discovery to find out what
 9    the facts are and not have counsel just asserting how it is
10    that GM buys a wire harness.
11            THE COURT:  Okay.
12            MR. WILLIAMS:  Thank you.
13            THE COURT:  Okay.  Next actually continuing
14    along -- do we have another -- we have another part of a
15    motion, part of it was settled?  No, it was all settled.
16    Okay.
17            MR. WILLIAMS:  Well, I think we have completed the
18    agenda.
19            THE COURT:  I'm looking at MELCO but MELCO was the
20    one that we took care of today.
21            MR. SKLARSKY:  We did, Your Honor.  There was a
22    third part to it that Showa and American Showa is on the
23    agenda but --
24            THE COURT:  But there is no argument, I think
25    they --
```

Status Conference / Motion Hearings • January 28, 2015

```
 1            MR. WILLIAMS:  I believe, Your Honor, that's all
 2   been resolved, there is nothing to address with the Court
 3   today.
 4            THE COURT:  Okay.  So that's it.
 5            MR. WILLIAMS:  That's it.
 6            THE COURT:  Okay.  Anything else before we get
 7   dismissed, anything we need to handle?  All right.  Our next
 8   meeting then will be May 6th.  Everybody have a safe trip
 9   back.
10            MR. WILLIAMS:  Thank you, Your Honor, and at least
11   a few of us might see you before.
12            THE LAW CLERK:  Court is adjourned.
13            (Court recessed at 12:52 p.m.)
14                            —   —   —
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                        CERTIFICATION

 2

 3              I, Robert L. Smith, Official Court Reporter of

 4    the United States District Court, Eastern District of

 5    Michigan, appointed pursuant to the provisions of Title 28,

 6    United States Code, Section 753, do hereby certify that the

 7    foregoing pages comprise a full, true and correct transcript

 8    taken in the matter of AUTOMOTIVE PARTS ANTITRUST LITIGATION,

 9    Case No. 12-02311, on Wednesday, January 28, 2015.

10

11

12                        s/Robert L. Smith
                          _____
                          Robert L. Smith, RPR, CSR 5098
13                        Federal Official Court Reporter
                          United States District Court
14                        Eastern District of Michigan

15

16

17    Date:  02/04/2015
           _____
18    Detroit, Michigan

19

20

21

22

23

24

25
```