```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3
     Brian J. Martin, et al.,
 4
                        Plaintiffs,
 5                                          Case No. 15-12838
        -v-
 6
     Trott Law P.C., et al.,
 7
                        Defendants.
 8   _____/

 9             MOTION TO STRIKE AFFIRMATIVE DEFENSES
                      MOTION TO DISMISS
10
                BEFORE THE HONORABLE DAVID M. LAWSON
11                 United States District Judge
              Theodore Levin United States Courthouse
12                 231 West Lafayette Boulevard
                       Detroit, Michigan
13                       March 2, 2017
     APPEARANCES:
14
     FOR THE plaintiff:    Andrew J. McGuinness
15                         122 S Main Street, Suite 118
                           P.O. Box 7711
16                         Ann Arbor, Michigan  48107

17
     FOR THE DEFENDANT     Charity A. Olson
18   TROTT LAW, P.C.:      Brock & Scott, PLLC
                           2723 S. State Street, Suite 150
19                         Ann Arbor, Michigan  48104

20   FOR THE DEFENDANT     Bruce L. Segal
     DAVID A. TROTT:       Joseph Aviv
21                         Honigman Miller Schwartz & Cohn
                           38500 N. Woodward Avenue, Suite 100
22                         Bloomfield Hills, Michigan  48304

23

24
                To Obtain a Certified Transcript Contact:
25             Rene L. Twedt, CSR-2907, CRR, RMR, RDR
                      www.transcriptorders.com
```

Martin v Trott - 15-12838

```
 1                       TABLE OF CONTENTS

 2    MATTER                                              PAGE

 3    MOTION TO STRIKE AFFIRMATIVE DEFENSES
      Argument by Mr. McGuinness..............................   5
 4    Argument by Mr. Segal..................................  10
      Argument by Ms. Olson.................................  12
 5    Further Argument by Mr. McGuinness....................  18
      Motion Taken Under Advisement by the Court............  20
 6

 7    MOTION TO DISMISS
      Argument by Mr. Segal..................................  21
 8    Argument by Mr. McGuinness............................  39
      Argument by Ms. Olson.................................  50
 9    Argument by Mr. Segal.................................  51
      Motion Taken Under Advisement by the Court............  55
10

11    CERTIFICATE OF COURT REPORTER.........................  56

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  Detroit, Michigan

2  March 2, 2017

3  11:02 a.m.

4                              *     *     *

5          THE CLERK:  All rise.  The United States District

6  Court for the Eastern District of Michigan is now in session.

7  The Honorable David M. Lawson presiding.

8          THE COURT:  You may be seated.

9          THE CLERK:  Now calling the case of Martin versus

10  Trott, Case Number 15-12838.

11          THE COURT:  Good morning, counsel.  Would you put

12  your appearances on the record, please?

13          MR. McGUINNESS:  Good morning, your Honor.  Andrew

14  McGuinness for the plaintiff.

15          THE COURT:  Stand when you address the Court,

16  counsel.

17          MR. McGUINNESS:  Apologize, your Honor.  Andrew

18  McGuinness for the plaintiffs.

19          MR. SEGAL:  Bruce Segal appearing on behalf of David

20  Trott, your Honor.

21          MR. AVIV:  Joe Aviv appearing on behalf of defendant

22  David Trott, your Honor.

23          MS. OLSON:  Charity Olson on behalf of Trott Law, P.C.

24  Good morning, your Honor.

25          THE COURT:  Well, here we are together again.

1          There are two motions.  Mr. McGuinness has filed a

2    motion to strike or for judgment on the pleadings with respect

3    to certain affirmative defenses.  And individual defendant

4    Trott has filed a motion to dismiss or for summary judgment.

5          Let's -- these really don't overlap all that much,

6    so let's take them as two separate arguments, I think.

7          Mr. McGuinness, your motion was earlier filed, and

8    as I understand it you are contending that the defenses of

9    statute of limitations, the assertion that the defendant is

10   not subject to the statute because the defendant is not a

11   regulated person, the bona fide error defense, the allegation

12   of the absence of actual damages, the defense of failure to

13   state a claim, and the defense relating to intent, estoppel,

14   laches, ought to be either stricken or the Court ought to rule

15   in your favor on those.  Did I get all of them?

16         MR. McGUINNESS:  That's correct, your Honor.  That --

17   I apologize, your Honor.

18         That's correct.  It would be David Trott's

19   affirmative defenses 1, 2, 4, 5, 6, 7, 8, 9, and 10, and

20   Trott P's affirmative defenses number 1, 3, 4, 5, 7, and 8.

21         THE COURT:  All right.  I have identified them by

22   name.  I don't know that I have them noted here with respect

23   to the number that they are listed in the pleadings.

24         My question, though, is:  Did I cover all of them or

25   are there others that you want to address?

1          MR. McGUINNESS:  I believe you have covered all of

2    them.

3          THE COURT:  All right.  You may proceed with your

4    motion argument.

5          MR. McGUINNESS:  Your Honor, in preparing for our

6    argument I took a look at the briefs.  I think the briefs have

7    covered this pretty well.  There is one open issue with

8    respect to whether the heightened pleading standards of Iqbal

9    and Twombly apply to affirmative defenses.

10          There is a split of authority, as you know, on that.

11    There is no Sixth Circuit ruling.  It's twice made the point

12    that it hasn't reached that issue.

13          We think that Judge Cleland's decision in Safeco is a

14    really good decision.  We think that he has got it right.

15          THE COURT:  I have to tell you that he and I have

16    debated this question on a number of occasions, in a friendly

17    manner, of course.

18          MR. McGUINNESS:  Of course.

19          THE COURT:  And I can assure you that I have come out

20    both ways on it.

21          MR. McGUINNESS:  Well, I'll just -- I just figure --

22    I took a look at the Shepard's yesterday for Safeco and it's

23    been -- according to the Lexis Shepard's, as of yesterday,

24    22 cites; 11 favorable, 10 critical.

25          So, you know, he is -- he is one of the leading

1     lights on this, because it came out fairly early.  I think

2     Judge Pepe got it right, as well.

3              You know, I have -- we have structured this argument

4     to suggest to the Court that you need not resolve that issue.

5              Judge Quist, who I have a great deal of respect for

6     as well, came out the other way, although, when you look at

7     his ruling, he basically applies a little tougher fair notice

8     standard after he then says, I'm not persuaded the Sixth

9     Circuit will go, you know, the way of Twombly.

10             So we have structured our argument to say, they are

11    not really telling us the basis of these arguments.  Some of

12    them, honestly, whether or not you strike, you know, failure

13    to state a claim, that's probably a tempest in a teapot.  I

14    mean, they get to file that motion whenever they want.

15             They have filed a second one now that we will be

16    hearing in a minute.  But --

17             THE COURT:  Well, I understood that Trott Law, P.C.

18    agreed to withdraw that affirmative defense anyway.

19             MR. McGUINNESS:  Right.  I think -- I think David

20    Trott is still arguing it.

21             It said that the two reasons we're wrong about that

22    is, while you had ruled on the first amended complaint, not

23    the second.  Well, that's not an argument, that's not a valid

24    argument, because we fashioned the second amended complaint to

25    comply with the Court's ruling.  So that doesn't make a lot of

```
 1    sense.
 2            And the second argument was, well, the rule says we
 3    can file a motion on the pleadings at any time.  And they're
 4    right about that.  That doesn't make it an affirmative
 5    defense.  So it just means you don't need to put it in as an
 6    affirmative defense.  So again, that's not the big problem.
 7            The big problem is discovery and surprise at trial.
 8    For example, in the FDCPA claim, you can -- there is a bona
 9    fide error defense.  But we think they are dancing around this
10    error of law idea, which the Supreme Court, as you know, in
11    Jerman versus Carlisle, said is not a -- does not qualify for
12    that defense.  And so it's a problem of discovery.  We're
13    going to --
14            THE COURT:  Why is it a problem?  I thought discovery
15    was a solution, not a problem.
16            MR. McGUINNESS:  Well, I wish that were the case.
17    But what we have found is, you know, we -- in my experience,
18    you know, you say, give us everything that supports that
19    defense.
20            Well, you're bringing a class action on behalf of
21    hundreds of thousands.  Maybe some of the people made a
22    mistake.  You know, we're not seeing -- I have talked to some
23    of the officers.  We're doing this on -- you know, form
24    letters.  What's your practice?  What's your training?
25            But I don't want to get surprised at trial and find
```

1    out that they are going to come up with people that --

2         THE COURT:  Well, isn't the bona fide error defense

3    not that the plaintiffs made a mistake, it's that, we made a

4    mistake as defendants?

5         MR. McGUINNESS:  No, that's true.  But that's the

6    point.  They've got -- over various periods of times, they

7    might have had 25 attorneys reviewing these letters.

8         They are going to bring in some people -- I mean,

9    they've already -- David Trott has already identified

10   30-some-odd people on his 26A disclosure.  So far, the

11   Magistrate Judge has only given me 16 depositions.  So, I

12   mean, he has left it open, I can come back and ask for more.

13   The scheduling is difficult.

14        I am trying to avoid fights.  If they have a factual

15   basis for a defense, let me know what it is, and then I can

16   direct my discovery.  But just to make a blanket -- a blanket

17   defense with no detail, no factual basis, just sort of

18   prophylactically --

19        THE COURT:  Now, this argument is focusing on the

20   bona fide error defense primarily, right?

21        MR. McGUINNESS:  That -- there is a lot of laches,

22   estoppel.  I mean, you know, there is just a lot of

23   boilerplate.

24        THE COURT:  Well, with respect to the laches, waiver,

25   consent, unclean hands, estoppel, I understand the law firm

```
 1   also is withdrawing that defense, is that correct?

 2          MR. McGUINNESS:  I did not understand that, but I

 3   will rely on the briefing for that.  If they have withdrawn it

 4   and I've forgotten that, I apologize, your Honor.

 5          THE COURT:  Yes?

 6          MS. OLSON:  Yes, your Honor.  Page ID 2119 of our

 7   response, we agreed to withdraw affirmative defense number 8

 8   at this time, with leave to amend if the facts take a

 9   different direction in the course of discovery.

10          MR. McGUINNESS:  And I thought you were asking about

11   David Trott, I apologize, your Honor.

12          THE COURT:  Well, no, I guess I was not precise with

13   my question, but --

14          MR. McGUINNESS:  So, if they have a factual basis

15   for any of these, give me the factual basis, I'll direct my

16   discovery that way.  That's efficient.  But just to make

17   boilerplate, have more fights over, well, you know, we're

18   still doing our investigation.  I'm going to get a supplement

19   two weeks before trial, whatever it is.  I mean, I just --

20   I think it's -- I think fair notice, at a minimum, is fair

21   notice.

22          If you have got -- in the context of this case, in

23   a class action with potentially 250,000 named class members,

24   absent class members, give me a basis.  Tell me that there was

25   somebody -- there was some supervisor in the department for
```

```
 1    this six-month period who, on her own accord, decided to do an

 2    uber -- you know, a super review of the files before the

 3    letters or that everybody was going to sign, individually

 4    sign the letters.

 5         If that's the fact, then I can take discovery on

 6    that.  But they haven't given me anything like that.  And so

 7    for me to guess and poke holes in the -- you know, that's not

 8    efficient.  That's not fair notice.  I think the burden is on

 9    them.

10         And I'll rely on the briefs for the rest, your Honor.

11         THE COURT:  All right.  Thank you.

12         Mr. Segal, do you want to take the first crack at it?

13         MR. SEGAL:  Sure.  Like Mr. McGuinness, I am content

14    to rely on the briefs.  I believe they address all the issues.

15    If your Honor has any questions, I'd be happy to respond.

16         THE COURT:  Well, with respect to the bona fide error

17    defense, that's essentially a defense that says, we made a

18    mistake, but it's in good faith, and therefore, we shouldn't

19    be hoisted on that one, correct?

20         MR. SEGAL:  That's correct, your Honor.

21         THE COURT:  Well, how do you reconcile the

22    requirement of Rule 9B that says if you're pleading mistake,

23    you have to plead facts with particularity, even though it's

24    an affirmative defense?

25         MR. SEGAL:  Your Honor, Mr. Trott, as you know, is no
```

 1   longer with Trott Law, P.C.  We --

 2           THE COURT:  Well, actually, I didn't know that, but --

 3           MR. SEGAL:  Yes.  He left back in 2014.

 4           THE COURT:  Oh, you know what, yeah, I guess I would

 5   be charged with notice of that because I think we dealt with

 6   that in an earlier opinion.

 7           MR. SEGAL:  Yes.  But the point is, your Honor, to

 8   the extent Trott Law has -- we are relying on that defense

 9   piggybacking on Trott Law.  If Trott Law doesn't have that

10   defense, Mr. Trott would not have it.

11           THE COURT:  Oh, I see.  So you're saying whatever

12   facts they have, those would be your facts, but no additional

13   ones?

14           MR. SEGAL:  Correct, your Honor.

15           THE COURT:  Fair enough?

16           MR. SEGAL:  Yes.

17           THE COURT:  Okay.  I don't have any additional

18   questions.

19           MR. SEGAL:  Thank you, your Honor.

20           THE COURT:  Thank you.  You have no additional

21   argument on this?

22           MR. SEGAL:  No, your Honor.  We will rely on our

23   briefs.

24           THE COURT:  All right.  Mr. Aviv, do you want to be

25   heard on this at all?

```
 1              MR. AVIV:  No, your Honor.
 2              THE COURT:  All right.
 3              MR. AVIV:  Thank you.
 4              THE COURT:  Very well.  Ms. Olson?
 5              MS. OLSON:  Yes, briefly, your Honor.
 6         Your Honor --
 7              THE COURT:  So are you in the Cleland Quist -- the
 8  Cleland camp or the Quist camp on this?
 9              MS. OLSON:  I'm in the Quist camp for the time being.
10              THE COURT:  Both, I must state for the record, are
11  excellent jurists for whom I have unbounded respect.
12              MS. OLSON:  I agree, particularly with Judge Cleland,
13  who I have had the pleasure of appearing in front of and
14  reading his opinions.  I agree with that statement
15  wholeheartedly.
16              THE COURT:  Well, so where does that leave Judge
17  Quist?
18              MS. OLSON:  Well, I just -- nobody can be right all
19  of the time, or so I'm told, oftentimes around the dinner
20  table.
21         Your Honor, I went back to your decision in the
22  Beattie versus CenturyTel.  I know it's pre-Twombly, but I
23  think the circumstances that you raised in that opinion are
24  applicable to this scenario.  And there you said, very
25  clearly, courts disfavor motions to strike.  The defense must
```

1    be insufficient as a matter of law.  And if there are disputed

2    facts or disputed areas of the law, the motion should be

3    denied.

4           THE COURT:  Well, how about a motion for judgment on

5    the pleadings?  That would apply here.  It would not address

6    the structural integrity of the defense as pleaded, but it

7    would address the merits, right?

8           MS. OLSON:  It would, but in this instance, there is

9    not a motion to strike all of the affirmative defenses.  And

10   there are, in fact, issues of fact and law that would preclude

11   your Honor from granting a 12(c) motion on this basis.

12          THE COURT:  Oh, maybe, maybe not.  But I guess the

13   standard that I would have to apply, then, is whether there is

14   any conceivable set of facts that could support the defense

15   under the circumstances, right?

16          MS. OLSON:  Correct.  With the exception of the

17   statute of limitations defense.  The Sixth Circuit has

18   actually looked at whether a statute of limitations or reposed

19   defense must meet the heightened pleading standard in

20   Montgomery Wyeth 580 F.3d 455 2009.  And they have indicated

21   that as it relates to that particular defense, it would not

22   need to meet the heightened pleading standard.

23          So separate and apart from that, we have the bona

24   fide error defense.  And again, I want to be very clear, this

25   notion that the bona fide error defense has been pled by Trott

 1    masquerading as a mistake of law defense -- I'm well aware

 2    with the Jerman decision, I have to deal with it on a daily

 3    basis in my practice, which is, as you know, exclusively in

 4    this area of the law -- we are not, in fact, arguing a mistake

 5    of federal law defense for purposes of this case.

 6         Our basis is twofold.  One is a factually-based

 7    defense, one is a -- to a lesser degree, a legally-based

 8    defense, but only as it would relate to a mistake of state

 9    law, which the Jerman decision very clearly carved out and

10    said, we are not going to weigh in at this point in time,

11    whether a mistake of state law could form the basis for a

12    bona fide error defense.

13         And, in fact, there are a number of federal district

14    courts around the country who have held, in the last year, in

15    fact, that a mistake of state law can form the basis for a

16    bona fide error defense under the Act.

17         And I believe, I don't know if it's Judge Bell, Judge

18    Quist, somebody closer to Michigan, has weighed in on that,

19    and at best, the case law on that issue is conflicting.  But

20    as it relates to the factual defense, there are a number of

21    claims that have been made by plaintiff in this particular

22    case.

23         The first one is a meaningful involvement claim; that

24    letters went out without meaningful attorney involvement.  We

25    have established through the course of discovery, which is not

1    complete by any stretch of the imagination, that the law firm

2    has policies and procedures in place for meaningful attorney

3    review at various steps during the foreclosure process.  One

4    of the attorneys who was responsible for that step sat in a

5    seven-hour dep and outlined the review that happens as it

6    relates to those particular letters.

7         We have a third letter at issue in this case.  The

8    attorney who was identified as having completed that step has

9    not yet even been deposed in this case.  But if discovery

10   establishes that certain steps were not followed in the review

11   process, that would form the factual basis for a bona fide

12   error defense.  So at this stage in the proceeding, the

13   defense is viable.

14        We also have corporate advance claims, your Honor.

15   And those corporate advance claims, which you're very well

16   aware of, having rendered a decision in another case involving

17   these corporate advances, involve assembling a series of

18   figures and amounts and making a determination as to whether

19   or not they are, you know, covered under the mortgage, whether

20   or not that they should be included or not.

21        If there is a calculation error and corporate

22   advances were included that should not have been included,

23   indeed, if a letter including a corporate advance should not

24   have gone out because there was not, in fact, a corporate

25   advance, we maintain that that would, at this stage in the

Motion Hearing - March 2, 2017

1    pleadings, still be properly subject to a bona fide error

2    defense and the parties should be able to flesh that out.  So

3    there is a factual basis for that defense as it currently sits

4    in this case.

5            Furthermore, there has been much ado made of

6    attorney's fees and whether or not state law allows for the

7    recovery of certain attorney's fees and what Michigan law

8    provides those fees should be.

9            And again, to the --

10           THE COURT:  That's the error of state law claim that

11   you would be --

12           MS. OLSON:  Exactly, your Honor.  If there were

13   attorney's fees that were calculated incorrectly or

14   misinterpreted based on a good faith but mistaken belief of

15   Michigan state law, those defenses, too, would be viable under

16   the Supreme Court's holding in Jerman.

17           So, at the end of the day, I find myself in the same

18   spot your Honor was in Beattie, which again is an older case,

19   saying:  What is the prejudice?

20           There is no basis at this point in time to say that

21   there is no factual development or legal basis why these

22   defenses can't be maintained at this stage in the proceeding.

23           For that reason, your Honor, and to the extent there

24   is no real prejudice, erring on the side of caution and

25   allowing these defense to proceed, I think the motion should

1    be denied and we should move on to more substantive aspects of

2    this particular case.

3              THE COURT:  Are you still hanging onto the regulated

4    person affirmative defense?

5              MS. OLSON:  I've got to do that, your Honor.  And

6    I've got to do that -- and I respect your Honor's opinion on

7    this, I respect Judge Rosen's opinion on this.  I know that

8    there is another opinion that's hanging out there.  And there

9    are some strict interpretations of the statute that would

10   support that defense.  The Sixth Circuit has never weighed in

11   on the language of the Michigan Regulation of Collection

12   Practices Act.

13             THE COURT:  Yes, but I can -- since I have ruled on

14   it, we can dispense with that in this lawsuit, true?

15             MS. OLSON:  I -- I think to the extent I'm preserving

16   the record and making the defense.

17             THE COURT:  Oh.

18             MS. OLSON:  I think it's incumbent upon me.  I

19   understand your position on the defense.

20             In fact, when I take that position, I very delicately

21   cite the other cases in an effort to make clear that I am

22   doing so in a way that I think comports with Rule 11, your

23   Honor.  But I respect the Court's opinion and I realize the

24   case law that's out there.

25             THE COURT:  Well, what I mean to say is, you have

1    raised it, you're entitled to raise it, you have lost on it,

2    so we're done with it for this case.  Is that a fair way to

3    look at it?

4            MS. OLSON:  Well, I don't think you're going to grant

5    a motion for summary judgment on the basis that my client is

6    not a regulated person.  Certainly, to the extent I have pled

7    it and I intend to preserve the record, that's the predicament

8    I'm in when the law is not settled.

9            THE COURT:  All right.  Fair enough.

10           MS. OLSON:  Thank you, your Honor.

11           THE COURT:  Anything else, Ms. Olson?

12           MS. OLSON:  No, your Honor.  Thank you.

13           THE COURT:  Mr. McGuinness, do you have anything

14   further?  Don't feel obliged.

15           MR. McGUINNESS:  Just very briefly.

16           In the Montgomery case, the panel did not discuss or

17   even cite Iqbal or Twombly.  So this idea that that's a

18   holding that there is no heightened review, I think every

19   Court that's come at it since that in the Sixth Circuit, every

20   District Court Judge in Michigan and out of Michigan has said

21   that's really not a holding that we can rely on.

22           Ms. Olson makes the argument that the second attorney

23   who reviewed -- first of all, the first attorney, Mike

24   Montgomery, who was deposed for seven hours, didn't say there

25   was any -- any factual basis for clerical error whatsoever.

1   He followed firm policy.  He laid that out.  I'm sure we will

2   argue at trial about whether or not that is sufficient, maybe

3   even before then, but there is no defense.  Didn't even allude

4   to one there on a bona fide error.

5           The other, the second attorney is her client's

6   employee.  If there is a factual basis, where are the facts?

7   I mean, where is the allegation?  Where is -- there is no --

8   she is saying -- she literally said to you there is a factual

9   basis, but she doesn't even know if there is a factual basis.

10  She hasn't articulated a factual basis.  She hasn't come here

11  and argued a factual basis.  She hasn't put it in a brief.

12          The other thing she didn't put in the brief were any

13  of these cases she just talked about and didn't cite.

14          So I'm at a loss to know -- I mean, I don't know if

15  we want to do something on the briefing.  If that's the basis

16  of her argument that it's a state law error, It's the first

17  time I have heard this argument.  It's not in her brief.  And

18  she hasn't cited any cases.  So I don't know if she wants to

19  give me something to shoot at.

20          I don't -- the cases, the case law is clear in both

21  the Supreme Court Jerman decision and in the Sixth Circuit

22  cases after that, that it refers to clerical error.  How is a

23  clerical error an issue of law?  That's not a clerical error.

24          So, you know, it's a clever argument.  I'm surprised

25  by it.  I don't think it holds water.

```
1              THE COURT:  Thank you.
2              The motion is submitted.  I'll take it under
3    advisement and give you a written decision.
4              MR. SEGAL:  Your Honor, may I make one comment first
5    just to make sure of clarity on an issue that you discussed
6    with Ms. Olson?
7              THE COURT:  Sure.  Of course.
8              MR. SEGAL:  Your Honor did not rule with regard to
9    the regulated person defense as to Mr. Trott.  What your Honor
10   said --
11             THE COURT:  Oh, right.  Okay.
12             MR. SEGAL:  Okay.  I just want to make sure the
13   record is clear on that, because what your Honor said was,
14   that may be proven or not, depending on the evidence that
15   plaintiffs ultimately may present.
16             THE COURT:  Right.  You are correct.  That was my
17   decision.
18             MR. SEGAL:  Thank you.
19             THE COURT:  Since you're up, Mr. Segal, you have your
20   motion for -- motion to dismiss, or in the alternative, motion
21   for summary judgment.
22             MR. SEGAL:  Yes, your Honor.
23             THE COURT:  The grounds that you have asserted, I
24   have identified and enumerated four of them, as I understand
25   it.
```

Motion Hearing - March 2, 2017

21

```
1              First of all, you argue that the plaintiffs lack
2       Article III standing under both the state and federal statute
3       because they have not suffered -- or alleged that they have
4       suffered actual damages.  It's a Spokeo-type argument.
5              MR. SEGAL:  No, your Honor.  Not under the federal
6       statute.  The federal statute I think has been spoken to by
7       Spokeo and the cases that have come after it, which is why
8       I'm surprised that plaintiffs' counsel has raised all those
9       informational injury cases.
10             THE COURT:  All right.  The next, you're claiming
11      that the plaintiffs lack statutory standing to pursue the
12      claim under the RCPA because they have not suffered or
13      testified or alleged that they suffered injury, loss or damage
14      with respect to any alleged defective practices by defendant
15      Trott.
16             Third, you assert that the Court does not have
17      jurisdiction under CAFA, essentially asserting the local
18      action exception.
19             And then finally, you argue that the Court should not
20      exercise supplemental jurisdiction over the state law claims
21      if the federal claims do not support continuing with the
22      lawsuit.
23             Is that pretty much it?
24             MR. SEGAL:  Yeah.  I don't believe it's the local
25      controversy exception, but they are both -- both exceptions
```

1    under CAFA turn on the number of plaintiffs who are in

2    Michigan or outside of Michigan.  So both would apply, but we

3    have -- what we have addressed in our motion is really the --

4    I'm having a mental block, your Honor.  It's the state law

5    exception.

6              MR. McGUINNESS:  The home state exception.

7              MR. SEGAL:  The home state exception.  Thank you,

8    Mr. McGuinness.

9              THE COURT:  The home state exception, right.  Okay.

10             MR. SEGAL:  Your Honor, simply put, what we have got

11   here, and your Honor hit, you know, kind of the nail on the

12   head, which may answer one of my questions is, the plaintiffs

13   want to treat their state law claims as a mere tag-along,

14   while they ignore the statutory differences between the RCPA

15   and the FDCPA.  And they downplay the fact that their state

16   law claims are basically the substantially predominant claims

17   here.  It's a six-year class versus a one-year class.  And

18   it's $50 million in alleged damages versus $50,000 in alleged

19   damages.

20             THE COURT:  50,000 or 500,000?

21             MR. SEGAL:  500,000, excuse me.  50 million versus

22   500,000.

23             We are not -- our motion does not address any of the

24   FDCPA claims.  And that's why I have been puzzled that not

25   only in their response brief did they put in a bunch of

1    informational injury cases under cases that have come after

2    Spokeo, but just two days ago we received a supplemental

3    citation of authority citing, I believe it was, eight cases.

4    All of those cases are federal cases, none are from Michigan,

5    none address the RCPA, and they are all informational injury

6    cases that are just not applicable to any of the issues that

7    we have raised in our motion.

8           Basically, your Honor, to establish Article III

9    standing you have to show an injury in fact that's fairly

10   traceable to the defendant's challenged behavior rather than

11   to the actions of a third party and that is likely to be

12   redressed by a favorable judgment.

13          In the context of the -- back up, your Honor.

14          There is one context in which we address the FDCPA,

15   and that's with regard to their declaratory judgment action

16   and request for injunctive relief.  But they have said that

17   they are not looking for declaratory injunctive relief, or

18   injunctive relief, against Mr. Trott.  So that takes it out

19   of the picture altogether, and that, at some point I assume

20   Ms. Olson will address, but they have said they are not

21   looking for that against Mr. Trott.  So that is basically a

22   concession that those claims against him should be dismissed.

23          But what here the complaint alleges is that letters

24   were sent by Trott & Trott, P.C. and its successor, Trott

25   Law, P.C. that violate the FDCPA and the RCPA.

1     But the deposition testimony shows that their only

2  purported injury that they suffered is an uncorroborated

3  generalized anxiety that was caused by prior and continuing

4  conduct of their own third-party lenders, not by the content

5  of the letters that they received from Trott Law and Trott &

6  Trott.

7     Now, your Honor, I get an unexpected phone call from

8  my kids, I'm anxious.  I'm fearful.  But that does not mean I

9  have suffered an injury, loss or damage.  And that's what is

10  required under the RCPA.  It's not required under the FDCPA.

11     In Mr. Martin's case, his anxiety was caused by Bank

12  of America, who told him they were going to give him a loan

13  modification, but they continued to foreclose on his mortgage.

14  That is, in Mr. Barton's words, dual tracking, and that is

15  what gave him fear and anxiety.  He didn't know what they

16  were doing.  It's not that the letter that he got caused him

17  anxiety.  He testified that his fear was caused by the dual

18  tracking that was going on.

19     Same thing in Ms. Nundley's case.  Her source of

20  anxiety was her lender.  Her fear was based on the fact that

21  in her prior bankruptcy, she had given up the right to

22  possession of her home and she didn't know when she was going

23  to be evicted.  Her testimony wasn't that any content or lack

24  of content in the letter that she received made her fearful.

25  What made her fearful is that she didn't know when she was

1    going to be evicted.

2            In other words, their concerns were the actions of

3    their -- based on what their third-party lenders were doing.

4    It was not fairly traceable to the content of the letters that

5    are an issue in this case.

6            Now, your Honor, we get -- the next -- that is really

7    Article III standing.

8            Statutory standing is slightly different, because it

9    addresses whether the plaintiffs fall within the class of

10   claimants who are authorized by statute to bring a cause of

11   action.

12           When the statute identifies the parties who can bring

13   a cause of action, which the RCPA does, only those parties may

14   bring a claim under the statute.  And what they say, what the

15   legislature said in the RCPA is that a person who suffers an

16   injury, loss or damage, or from whom money was collected by

17   use of a method, act or practice in violation of the RCPA is

18   authorized to bring a private action.

19           It doesn't say you can bring a claim for an

20   informational injury, which is what the federal courts have

21   said with regard to the FDCPA.  It says they have to suffer an

22   injury, loss or damage.

23           Here, they say they have suffered an emotional

24   injury.  And while under Michigan law, medical evidence is not

25   necessary, a plaintiff who relies on his own testimony still

1   must have specific and definite evidence of mental anguish,

2   anxiety or distress.

3          Generalized comments, bare conclusions, I see a phone

4   call from my daughter coming in at, you know, 10:00, that's

5   not sufficient to show an injury, loss or damage.  There must

6   be evidence from the third party, from the claimant's conduct,

7   or the observations of others.  None of that has been offered.

8   None of it is identified in their initial disclosures of

9   anybody who is going to testify to that.

10          All we have is their testimony, and all of that has

11   been presented to you.  And with respect, your Honor, in this

12   district, the courts have explained that because mental

13   distress damages are so easy to manufacture, courts have

14   imposed a strict standard for them to be applied.

15          And what the Court said in the Flood case is,

16   pursuant to this standard, when the plaintiff's own testimony

17   is his only evidence of emotional damages, he must explain the

18   circumstances of his injury in reasonable detail and not rely

19   on conclusory statements unless the facts underlying the case

20   are so inherently degrading that it would be reasonable to

21   infer that a person would suffer emotional distress from the

22   defendant's actions.

23          There is no claim that anything in the letters are

24   inherently degrading.  They have to show something.  But

25   plaintiffs say, no, we don't.  Plaintiffs say, we don't have

1    to follow these evidentiary standards because we're not really

2    looking for money.

3            But, your Honor, that is the statutory scheme.  They

4    say that you don't have to follow these evidentiary standards

5    because it would eviscerate, and I'm quoting, "would eviscerate

6    the RCPA's remedial scheme."  But the RCPA's remedial scheme

7    is where this language comes from.  You have to suffer an

8    injury, loss or damage.

9            They also try to get around it, as I said, by

10   referring to the informational injury cases, but this is not

11   that.  The Michigan Legislature knew how to create a cause of

12   action for an informational injury.  It did that for the

13   Attorney General.  It says that if the Attorney General wants

14   to bring an individual action he can bring it to restrain, by

15   temporary or permanent injunction, an act or practice in

16   violation of the RCPA.  It says nothing about suffering an

17   injury, suffering a loss or suffering damage.

18           They created an informational injury claim that could

19   be brought by the Attorney General's Office.  They did not

20   create an informational injury claim that could be brought by

21   an individual.

22           The only other argument that the plaintiffs make

23   in response to this is that they don't have to establish an

24   injury, loss -- that they suffered an injury, loss or damage,

25   because they were persons from whom money was collected.  And

1      again, to support this argument, the plaintiffs referred to

2      the FDCPA and its definition of debt.

3             They do that because the FDCPA talks about debt, the

4      RCPA says, from whom money was collected.  The RCPA has a

5      definition of debt, but it's not in the statutory section that

6      creates a cause of action.  It says from whom money was

7      collected.

8             And if the plaintiffs want to rely on that provision,

9      they would have to show that money was collected from them

10     based on an action taken pursuant to these letters.  They

11     can't do that.

12            And how do I know they can't do that?  Because they

13     all testified that they paid no money as a result of these

14     letters.  So they can't rely on this second provision, your

15     Honor.  They have already given it up.  They have testified

16     that they haven't.

17            It's one thing to allege something in a complaint to

18     try and get before the Court, but when you're testifying and

19     you say at your deposition, I didn't do this, you can't then

20     come into Court and still try and create an argument based on

21     that.

22            So we believe that the RCPA claims must be dismissed

23     on the basis of both Article III and statutory standing.

24            THE COURT:  Thank you, Mr. Segal.

25            MR. SEGAL:  Your Honor, the next issue, as you

1    pointed out, was jurisdiction under CAFA.  We moved to dismiss

2    initially under CAFA because, again, they alleged in their

3    complaint that they had diversity jurisdiction because, quote,

4    "A number of more than the 250,000 estimated class members who

5    were Michigan residents when Trott, P.C. sent them the Trott

6    foreclosure letters have since moved" -- I'm paraphrasing --

7    have since moved their domicile outside of Michigan.

8          So when I deposed the plaintiffs, I said, do you know

9    anyone else who received a letter?  No.

10         Do you know anyone who moved out of Michigan?  No.

11         So we move to dismiss CAFA because they can't support

12   their allegation.

13         In response, in an effort to get around their

14   testimony, plaintiffs' counsel argued for the first time in

15   his response brief, first time we have seen this, that the

16   Court could take judicial notice of census data.

17         And the census data they rely on is data showing the

18   total number of persons who have moved out of Michigan over

19   the class period.  And they say from -- you can extrapolate

20   from this that if all these people moved out of Michigan

21   during the class period, a proportion of them must have been

22   people whose homes were foreclosed based on letters they

23   received from Trott Law.  No evidence that any of these people

24   moved out of Michigan based on foreclosure or letters they

25   received from Trott Law, simply saying it's reasonable to

Motion Hearing - March 2, 2017                              30

1   assume that based on an extrapolation from the census data.

2           Well, quite frankly, your Honor, if, as they suggest,

3   27,000 out of 250,000 people moved out of Michigan, that would

4   satisfy the diversity standard.  But once they say that, you

5   then have to look at the rest of CAFA, which has a home state

6   exception and a local controversy exception, because CAFA says

7   that a district court shall decline to exercise jurisdiction

8   if two-thirds or more of the members of all proposed plaintiff

9   classes in the aggregate and the primary defendants are

10  citizens of the state in which the action was originally

11  filed.

12          THE COURT:  Do you agree that the home state

13  exception does not address initial subject matter

14  jurisdiction?

15          MR. SEGAL:  Oh, it does not, your Honor.  That's been

16  ruled upon recently.  Well, 2014, that it's -- that it is --

17  first you have jurisdiction, then home state exception, and

18  the local controversy exception, have been characterized as

19  abstention doctrines, your Honor.

20          THE COURT:  Right.  And as such, they are subject to

21  the concept of waiver and forfeiture, correct?

22          MR. SEGAL:  There is a very limited waiver provision

23  that the Clark case articulated, your Honor.  And quite

24  frankly, the plaintiffs have grossly overstated that.

25          Clark, in Clark, the plaintiff had her claims

1    dismissed without ever raising an issue of standing.  Her case

2    started out in state court.  It was removed by the defendants

3    to federal court.  She never raised a CAFA exception as

4    grounds to remand it to state court until she got to the Court

5    of Appeals.

6           And what the Court of Appeals said in response to

7    that argument is that, "While perhaps the home state and local

8    controversy exceptions may have applied, the plaintiffs did

9    not make that argument to the district court.  Because the

10   exceptions are not jurisdictional and the plaintiffs did not

11   alert the district court of their potential applicability,

12   this Court will not consider whether they should have applied

13   on appeal."

14          Your Honor, until the plaintiffs raised this issue,

15   until they testified that they didn't have the evidence to

16   support their CAFA allegations, until we filed our motion to

17   dismiss, we didn't know that the plaintiffs were going to try

18   to rely on census data.

19          Once they relied on that census data, it shows the

20   home state exception applies.  Otherwise, we would have to

21   wait until the either class certification or discovery from

22   Trott Law shows the number of people who are actually in the

23   class, sit down, and run that calculation.  But plaintiffs

24   have come forward and said to your Honor, the census data is

25   sufficient to establish CAFA jurisdiction.

```
1              And, your Honor, if the census data is sufficient to
2      establish CAFA jurisdiction, it goes both ways.  If the data
3      shows that 27,000 of the 250,000 class members moved out of
4      Michigan, which is what they say, it's simple math to compute
5      that 230,000 class members remained in Michigan.  It's also
6      simple math to compute that 223,000 over 250,000 is
7      89 percent.  89 percent is greater than two-thirds, and that
8      triggers the CAFA home state exception.
9              THE COURT:  Very well.
10             MR. SEGAL:  So we don't believe their census data is
11     sufficient to establish diversity jurisdiction in the first
12     place, but if your Honor decides that that is sufficient, even
13     though they haven't shown any relationship to foreclosures,
14     any relationship to foreclosures after Trott Law letters, if
15     your Honor decides that the census data is sufficient in
16     itself to show diversity, then it is also sufficient to show
17     that the home state abstention applies.
18             There is one additional response to their waiver
19     argument, and that's that, as I said CAFA, the CAFA exceptions
20     are treated as an abstention doctrine, your Honor.
21             Your Honor's order allowing the plaintiffs to file a
22     surreply directed that no response, no further briefing would
23     be accepted.  There are a number of cases that say that the
24     abstention provision -- that the CAFA exception provisions
25     are similar to other abstention doctrines, and in the Sixth
```

1    Circuit, the mere failure to raise the abstention issue is not

2    sufficient to waive it.

3           That case I'm quoting is Fifth Column LLC versus

4    Village of Valley View, 221 F.3d 1334.  It's at star four,

5    your Honor.  It's an unpublished decision that considered

6    Pullman extension.

7           In fact, the Sixth Circuit has also held that the

8    failure to make an abstention argument before arguing for the

9    dismissal of claims on the merits, which is what plaintiffs

10   would have you believe Clark said, is not a waiver of

11   abstention grounds.  That's the Neill versus Coughlan case,

12   your Honor, it's 511 F.3d at page 643.  Again,  that's a 2008

13   Sixth Circuit case.

14          There's a number of cases both from the various

15   circuits across the country and from various district courts

16   that say that abstention doctrine are not waived by not

17   raising them in your initial motion or pleading.

18          And quite frankly, your Honor, this case is very

19   different from Clark, where the action was dismissed, as

20   opposed to the action was not dismissed.  We don't believe

21   there is any support for waiver.

22          And that brings us to supplemental jurisdiction, your

23   Honor.  Supplemental jurisdiction is something that the Court

24   should review at every stage of the litigation.  Plaintiffs

25   again argue waiver, but they overlook that the Supreme Court

Motion Hearing - March 2, 2017

1    of the United States said just the opposite.

2         When deciding -- and I quote, "When deciding whether

3    to exercise supplemental jurisdiction, a federal court should

4    consider and weigh, in each case and at every stage of the

5    litigation, the values of judicial economy, convenience,

6    fairness and comity."

7         Well, this motion was filed shortly after we took the

8    plaintiffs' depositions, learned that they didn't have CAFA

9    jurisdiction.  If they had CAFA jurisdiction, and there are a

10   number of cases that talk about this, your Honor, you don't

11   need to get to supplemental jurisdiction, because you have got

12   CAFA.

13        It's only when we learned that they had no support

14   for their CAFA claim that we realized that supplemental

15   jurisdiction was an issue.  That's, quite frankly, the reason

16   it wouldn't have been raised earlier.

17        But even though it hadn't been raised earlier, this

18   motion was brought within less than 60 days after we deposed

19   the plaintiffs, found this out.  The plaintiffs had taken only

20   one deposition at that point in time.  At this point, I think

21   they have taken four of their sixteen depositions, your Honor.

22        This case is still regrettably in its infancy and

23   there is absolutely no prejudice to addressing the issue of

24   supplemental jurisdiction, even if the Supreme Court hadn't

25   said that you're supposed to consider it at every stage of the

1    litigation.

2          But that brings us to 1367, and 1367(c)(2) in

3    particular, your Honor, because that talks about declining

4    jurisdiction when the state law claim substantially

5    predominates over the claim or claims over which the Court

6    has original jurisdiction.

7          And in this case, your Honor, you know, we have

8    articulated this in our brief, and I'll just go through it

9    real quickly.  The state law claims are 100 times greater than

10   the federal claims.  50 million versus --

11         THE COURT:  On the basis of the amount claimed, is

12   that it?

13         MR. SEGAL:  Yes, your Honor.  And it's been repeated

14   by plaintiffs' counsel in papers that they have sent to us.

15   There is at least one exhibit of it that we attached to our

16   papers because we asked for a supplementation of their initial

17   damages, because I wanted to see what they were actually

18   asking for under the RCPA.  And it's in there.  It's attached

19   as, I believe, the last exhibit to our motion, your Honor.

20         Second, based on the applicable statutes of

21   limitations, you have got a six-year class period for the RCPA

22   claims.  You have got a one-year class period for the FDCPA

23   claims.  That means that there's different class sizes.  It

24   greatly expands the scope of discovery.  It greatly expands

25   the administration of the state law claims.

1           And quite frankly, because of the difference in the

2    standard and informational injury, because of under the FDCPA

3    versus the need to show the claimants have suffered an injury,

4    loss or damage under the RCPA, it's also going to create a

5    significant difference in evidentiary proofs, which, quite

6    frankly, could result in jury confusion.

7           Jury confusion is not always an issue.  If you're

8    talking about whether the letters are confusing, on the one

9    hand, both analyses would be the same, but if you're talking

10   about whether the plaintiffs have met the requirement of being

11   plaintiffs that can bring an action, that is, that they have

12   suffered an injury, loss or damage -- harm or damage, excuse

13   me, your Honor -- that is different.  And the plaintiffs are

14   going to have to prove that.  The class claimants are going to

15   have to prove that.  They don't have to prove that under the

16   FDCPA claim.

17          The other -- the last issue that the Supreme Court

18   has said should be considered is comity.  And quite frankly,

19   comity and federalism are two issues that at least one Court

20   has recognized, we attached a copy to our papers, are grounds

21   for not considering this case, because under state law the

22   RCPA claims could not be brought as a class action.

23          When you seek only statutory damages under Michigan

24   law, you can only bring that claim as a class action if the

25   statute authorizes it.  There is no authority for that in the

1   Michigan law.

2           THE COURT:  Now, on that you are relying on the

3   Michigan Court Rule to that effect, correct?

4           MR. SEGAL:  That's correct, your Honor.

5           THE COURT:  Which, of course, has no application

6   here.

7           MR. SEGAL:  That's -- when you say it has no

8   application here, I would not concede that it would not fall

9   within the Rules Enabling Act as a substantive provision.  It

10  is a rule, but there are cases, including the Auto Support

11  Group versus Hightower case, Sixth Circuit 2012, that said

12  that when some case -- there are some state procedural rules

13  that federal courts must apply in diversity cases because they

14  function as part of the state's definition of substantive

15  rights and remedies.

16          THE COURT:  Well, right, but this has to do with

17  class certification, and didn't Shady Grove pretty much

18  dispose of that?

19          MR. SEGAL:  Shady Grove was a different case and

20  different circumstances, your Honor, because what Shady Grove

21  addressed was --

22          THE COURT:  Whether a claim could be brought as a

23  class claim or not under state law in federal court, where the

24  state law prohibited the application -- the pursuit of a claim

25  as a class claim.

```
 1              MR. SEGAL:  Shady Grove --
 2              THE COURT:  Right?
 3              MR. SEGAL:  Shady Grove was based on diversity
 4    jurisdiction, your Honor, as opposed to supplemental
 5    jurisdiction.  I think --
 6              THE COURT:  I don't see the difference.
 7              MR. SEGAL:  It's difficult -- the Shady -- in Shady
 8    Grove there was a state statute that said you cannot recover
 9    penalties, I believe it was -- I don't recall exactly -- in a
10    class action, period, flat out.
11              In this case, what the Michigan rule says is not
12    that you cannot recover -- or is not that you cannot bring a
13    class action for only statutory damages.  It said, if the
14    legislature is going to create a cause of action it has to
15    say if you are going to be able to bring it for class actions;
16    that's the difference.  Shady Grove was an absolute prohibition
17    on bringing a class action for a judicial penalty.
18              In this case, the Supreme Court provided a direction
19    to the legislature.  It's not been litigated, your Honor.  I
20    don't have any authority to support this argument, other than
21    the Auto Support Group case.
22              If it becomes necessary, we would certainly be happy
23    to brief it, but until there is a -- until there is a class
24    certification motion -- that's been withdrawn.  So there is no
25    class certification motion.  There is no issue that we raise.
```

```
 1   We simply raise it as there is an issue of comity and
 2   federalism because this may be an issue that arises, your
 3   Honor.
 4             THE COURT:  All right.
 5             MR. SEGAL:  And we think that in addition to
 6   everything else --
 7             THE COURT:  Mr. Segal, I think I understand your
 8   position on that.
 9             MR. SEGAL:  I have nothing further, your Honor.
10   Thank you.
11             THE COURT:  Very well.  Thank you.
12             Do you wish to be heard on this motion?  I don't know
13   that it directly affects you, correct?
14             MS. OLSON:  Correct, your Honor.  I do not, at this
15   time.
16             THE COURT:  All right.
17             Mr. McGuinness, you may proceed.
18             MR. McGUINNESS:  Thank you, your Honor.
19             Just quickly on the -- so I don't forget to get to it
20   in the end.  On the declaratory relief, we did say in our
21   paper at page 32 that there is not -- we're not seeking an
22   injunction against David Trott, since he is no longer at the
23   firm.  We do say on the very next page we are still seeking a
24   declaratory judgment against defendants, which is what the
25   complaint says.
```

1           And there is no basis to say that the behavior of the

2    firm during the time when Mr. Trott was the chairman, CEO,

3    president, managing partner, owner, should be exempt from

4    that scope of that declaratory judgment, which is provided

5    by federal statute, that you have the power to issue a

6    declaratory judgment, which is really the focus of that claim.

7    So I'll just correct Mr. Segal or at least respond to his

8    argument in that respect.

9           With respect to standing in Article III and statutory

10   standing, I just want to point out that all the argument you

11   just heard about what is required, and I'm going to skip to

12   statutory standing, which is the phrase Mr. Segal uses under

13   the RCPA, the state statute, it's just argument.  He doesn't

14   cite a single case that says, here's what the Michigan Courts

15   say the word "injury" under the RCPA means.  He doesn't have a

16   single case.

17          And so this whole idea that there is a different

18   standard for injury under the state law than the FDCPA is

19   something he is arguing, but there is no basis for it.  There

20   is no authority.

21          THE COURT:  Well, the basis is the text of the

22   statute.

23          MR. McGUINNESS:  But it says injury.  And the

24   whole analysis of all of the cases we have, including the

25   supplemental authority that we cited, we submitted a few days

1    ago, is talking about injury under the FDCPA, which in the

2    Gambee case, the Sixth Circuit --

3              THE COURT:  Well, I think that's his point.  He's

4    saying they are not co-extensive and you can't overlay the

5    analysis under the FDCPA onto the RCPA because the statutory

6    language is different.  That's the essence of his argument, as

7    I understand it.

8              MR. McGUINNESS:  He is making that argument.  And you

9    have captured it, Judge.  But let me quote to you from the

10   Sixth Circuit in the Gambee case.  And it says, 462 F.App'x

11   552, we cited this, it describes the FDCPA as, "a parallel

12   federal statute to the RCPA."

13             In the footnote 5, the FDCPA contains language that

14   is very similar to that found in the -- they call it the MCPA.

15   Section 1692(e), for example, states, quote, "A debt collector

16   may not use any false, deception or misleading representation

17   or means in connection with the collection of any debt."

18   15 U.S.C. Section 1692(e).

19             And they are comparing that with the analogous part,

20   MCL 445.225(e), which had essentially the same language about

21   misleading and deceptive language.

22             The attorney letterhead claim, you have already gone

23   over this in your ruling on the first motion to dismiss.

24   It's -- it's the same proscription.  You can't send a letter

25   that looks like it's from an attorney, on attorney letterhead,

1    if it's not from an attorney.

2         So the language of the statutes are virtually

3    identical in the substantive conduct.  The word "injury" there

4    is no authority, there is no suggestion, there is no reason to

5    believe that what would suffice for constitutional standing in

6    the use of the word "injury" in all of these cases, concrete

7    injury, that's what the Supreme Court in Spokeo and all the

8    other cases have been talking about.

9         So, you know, he could be mystified about why we're

10   focused on where all the case law is, but that's where all the

11   analysis has been, because it's -- because the federal courts

12   have been grappling with this issue in a much more extensive

13   fashion, much more recently because of Spokeo, and there are

14   now dozens of opinions on it.

15        And he has just cited no authority and no logic,

16   frankly, for the notion that I can have a statutory right

17   under federal law, and the same statutory right under state

18   law, and I'm injured, and I'm concretely injured under federal

19   law when I get that letter with that informational injury, but

20   I'm not under state law.  He has just made up the argument, as

21   far as I'm concerned.

22        He has looked at -- and he has done two things:  He

23   has looked at the Attorney General provision -- and I have

24   handed opposing counsel a copy of that provision, and I would

25   like to approach the bench, and just so that you can follow

1    this argument.

2              If I may, your Honor?

3              THE COURT:  You may.

4       (Document tendered to the Court.)

5              THE COURT:  This is the same thing, Michael.  There's

6    two copies.

7              MR. McGUINNESS:  I left one for Michael, too, your

8    Honor.  I'm sorry.

9              This is Section 445.254, Section 4 of the Regulation

10   of Collection Procedures Act, state law.  And it says, "The

11   Attorney General may bring an action to restrain by temporary

12   or permanent injunction --"

13             THE COURT:  I can read it, Mr. McGuinness.

14             MR. McGUINNESS:  And he is saying, well, look, there

15   is no word "injury" in here, so therefore, the absence of the

16   word "injury" here means that when they put "injury" in the

17   private cause of action section's statute, that they meant --

18   they knew how to say that the internal -- you know, if you

19   didn't have to suffer an injury.

20             All this means is, the Attorney General didn't have

21   to get the letter from the Trott Law firm.  He didn't have

22   to -- he or she didn't have to have his house foreclosed on

23   to bring an action.  That doesn't support a notion -- what

24   they are trying to derive from that, that when the state

25   legislature wanted an informational injury, it knew how to

1    articulate it.

2            It's not a credible argument, Judge.  It's a creative

3    one, it's a clever one, but it doesn't hold water.

4            And then they go on and they talk about all these

5    common law emotional distress damages cases.  And I -- I get

6    it, there is a whole body of law that says if your only injury

7    is, you know, emotional distress, you have got to -- you can't

8    just rely on your own testimony.  But that doesn't mean that

9    you're not -- that the legislature can't say, we're going to

10   provide --

11           THE COURT:  What you're saying essentially is that

12   there is a difference between an informational injury claim

13   and a claim in which the injury is based on emotional distress.

14           MR. McGUINNESS:  Absolutely.

15           THE COURT:  All right.  I understand that argument.

16           MR. McGUINNESS:  It's been characterized in the

17   supplemental citations and in many of the discussions as

18   intangible harm.  That's what it's called.

19           And what's -- what legislatures, state and federal,

20   do when they want to protect consumers and consumer protection

21   statutes from intangible harm is they say, well, we're going

22   to set a statutory damage for that, because it's hard to

23   prove, and to avoid all that issue.

24           And so that's what the federal congress did when they

25   said $1,000 per individual named plaintiff in the FDCPA and

1    $50 or $200 in the state.

2          THE COURT:  Whereas emotional harm is not intangible

3    harm, it's tangible, but --

4          MR. McGUINNESS:  Absolutely.

5          THE COURT:  -- the standard of proof has to be

6    established in a different way under state law; is that where

7    you're going with that?

8          MR. McGUINNESS:  That's absolutely correct, your

9    Honor.

10          So there really is no distinction, in our view,

11    between the requisites of Article III standing, which I

12    understand is a unique requirement that this Court meet under

13    its limitations under Article III of the Constitution, and

14    statutory standing in this case.

15          I want to move to CAFA and 1367.  I find it fantastic

16    that the Honigman firm and Mr. Trott -- because I'll just

17    point out that the law firm hasn't brought this motion, they

18    haven't joined the motion, either -- but looked at the second

19    amended complaint where we said on information and belief at

20    least one of the 250,000 people have moved out of the state

21    of Michigan, and thought that we were relying on the personal

22    knowledge of three people who had their houses foreclosed

23    upon.

24          So this notion that they had to wait to take the

25    depositions of the three named plaintiffs to find out that

1   they personally didn't know anybody that got a Trott letter

2   who had moved out of state was the basis of this claim, to me,

3   is rather fantastic.

4            So there's two separate arguments why the home

5   state -- they can't win under the governing Sixth Circuit

6   law on the home state exception.  And this is goose for

7   the good -- goose for the gander, Judge, stuff because CAFA

8   said --

9            THE COURT:  You have totally booted that analogy --

10           MR. McGUINNESS:  I did, Judge.

11           THE COURT:  -- Mr. McGuinness, but I understand what

12   you mean.

13           MR. McGUINNESS:  Well, yeah.  I shortened it, and I

14   butchered it, you're right, Judge.

15           But the point is, the purpose of CAFA was to get the

16   state class actions to federal court.  And what they did was

17   they said, minimal diversity.  Just one person in the putative

18   class has to be from a different -- a resident of a different

19   state, citizen of a different state, than one defendant.

20   That's minimal diversity.

21           So we said, well, you know, we have 250,000 people.

22   In fact, this came up in the oral argument briefly.  You asked

23   me the question, how do you -- you just sort of -- you know,

24   in the oral argument on the first motion to dismiss, how is

25   there CAFA jurisdiction?  And I said, because of the 250,000

1    people, at least one person had moved out of state, because --

2    oh.  And you -- and so that was right -- that was right on the

3    table a year before.  We had to wait for that ruling.  And I

4    understand that that was -- you know, we have had this case

5    go on for a year and-a-half.

6          So there's two arguments on CAFA.  One, they

7    shouldn't have waited that long if that was their argument.

8    There is no surprise.  They didn't have to wait for the

9    depositions.  That's just -- I don't -- I just think that's

10   an incredible argument.

11         Secondly, there is a second argument.  And the second

12   argument, which Mr. Segal did not address is, whose burden is

13   it?  And we know the answer to that question.  The Sixth

14   Circuit has told us the answer to that question.  The burden

15   is on the party, here, seeking to assert the home state

16   exception.  That ain't me.  That's them.

17         And we cited to you a published Seventh Circuit case

18   that says you can't rely on census data alone to get you over

19   that hump.  And he didn't address that.  So they have done

20   nothing to establish the applicability of the home state

21   exception.  It's not my burden.  It's his burden.

22         And the fact that we were -- we were very careful in

23   our briefing to say, we're not saying that only these many

24   people moved out of state, we're saying in the context of

25   foreclosure, we said the exact opposite, the census data is

1    going to be a bare minimum.  We used the word very

2    conservative.

3              So they haven't met their burden.  That's the second

4    argument, Judge.  And the Sixth Circuit says they have to do

5    it.  They haven't done it.  You have CAFA jurisdiction.

6              Now, let's go to the 1367.  Even if you didn't

7    have CAFA jurisdiction, the remarkable thing here is, in

8    virtually -- I think if I had to hazard a guess, 95 percent

9    of the cases, the typical -- you know, and I was a defense

10   counsel for many years, and I have seen this motion played

11   out a hundred times, I know you have, a thousand times.  You

12   move to dismiss the federal claim, and then once you do

13   that, please dismiss, decline to exercise jurisdiction,

14   supplemental, without -- dismiss without prejudice the state

15   law claims.  I'm sure your Honor has done it many times.

16             Sixth Circuit said that should be the default rule.

17   If you get rid of the federal claims, you get rid of -- you

18   know, you dismiss without prejudice those claims that you

19   only --

20             THE COURT:  I don't think the Sixth Circuit said

21   that's the default rule.  It depends on the stage of the

22   litigation.

23             MR. McGUINNESS:  Well --

24             THE COURT:  That case, the name of which I can't

25   remember decided by Judge Gilman said that you have to

1    really -- you can't do it as a knee-jerk response.  There must

2    be some extensive analysis with respect to all the factors.

3              MR. McGUINNESS:  I agree.  And I agree with that.  I

4    think -- I think what I was thinking, your Honor, is that if

5    it comes right out of the box on a motion to dismiss, meaning

6    the first motion, which we're not here on the first motion,

7    we're a year and-a-half into the case on the second motion.

8              But here they're not seeking -- Mr. Segal was very

9    clear and clarified this.  They are not seeking to get rid of

10   the federal claim at this point.  They have made that shot,

11   they have lost it.  But they want you to get rid of the state

12   claims anyway.

13             They just haven't met those factors.  That's --

14   that's a very different case.

15             They are not really arguing under -- as I have

16   described and cited and discussed, the Gambee case, that -- I

17   mean, Mr. Segal even admitted the jury is going to hear the

18   same evidence on whether these letters are misleading for all

19   the reasons we have articulated.  It's the same under the

20   state and federal statute.  So the evidence is going to be the

21   same.  The issue of willfulness may be different.  There is --

22   you know, you can't just tally up the dollar amounts.

23             It's really -- 1367 is about efficiency.  It's

24   about judicial resources.  It's about, are we going to make

25   litigants split their cases into parallel state and federal

1    cases.  And on all those factors, which they really haven't

2    discussed, it makes sense for this Court to exercise 1367

3    jurisdiction even if it found that it did not have CAFA

4    jurisdiction, which it does have.

5              Your Honor, I think that's it, and I appreciate your

6    attention.

7              THE COURT:  Thank you.

8              Mr. Segal, do you have any rebuttal that you would

9    like to present?

10             MR. SEGAL:  I do, if I may, your Honor.

11             THE COURT:  Go ahead.

12             MS. OLSON:  Your Honor, if I may also reserve a

13   moment after Mr. Segal's presentation.

14             THE COURT:  Why don't you take it now, then, and let

15   Mr. -- I am going to let Mr. Segal wrap it up.

16             MS. OLSON:  Yes.

17             To the extent Mr. McGuinness suggested that the fact

18   that the law firm had not joined in the motion or filed a

19   motion meant some sort of tacit agreement with his arguments

20   or disagreement with Mr. Segal's arguments --

21             THE COURT:  I didn't take it as such.  You have your

22   own position.  You can decide when you file your motions.

23             MS. OLSON:  Okay.  I just wanted to make clear on the

24   record, because my --

25             THE COURT:  I mean within the scope of my scheduling

1    order, you can decide when you file your motions.

2            MS. OLSON:  I understand that, your Honor.  I will

3    reserve the ability to file such a motion if and when it's

4    appropriate.  Thank you, your Honor.

5            THE COURT:  All right.  Go ahead, Mr. Segal.

6            MR. SEGAL:  First of all, with respect to declaratory

7    relief, I don't think the plaintiffs are entitled to

8    declaratory relief.  That's been articulated in our brief.  I

9    don't think it's necessary to address the issues further here,

10   other than to refer the Court to the Pucci case and the Fieger

11   case, both of which are cited in our brief.

12           Jumping to the more pertinent issues, though, your

13   Honor, parallel is not the same as identical.  The FDCPA may

14   be parallel to the RCPA, but it's not identical.

15           Mr. McGuinness talks about Section 1692(e), what

16   things are prohibited to be included in the content of letters

17   that are set -- sent.

18           That's exactly the point I was making, your Honor.

19   There are similar provisions in the FDCPA and the RCPA as

20   to what can and cannot be included in letters, but what's

21   different is exactly what Mr. McGuinness referred to when he

22   said the statutory right is defined by the RCPA.

23           And the statutory right that's defined in the RCPA is

24   the right of a person who suffers injury, loss or damage.  It

25   doesn't say intangible injury, loss or damage.  It says, in

1    45.2571, a person who suffers injury, loss or damage, or from

2    whom money was collected, et cetera, et cetera, may bring an

3    action for damages or other equitable relief.

4           It then says, in an action pursuant to subsection 1.

5    So you have to have subsection 1 before you get to subsection

6    2.

7           THE COURT:  Well, the distinction is subtle,

8    Mr. Segal, but I appreciate your argument, and I think I

9    understand it.

10          MR. SEGAL:  I won't belabor that point, your Honor.

11          THE COURT:  Well, Let me just see if I can articulate

12   it and you can put me back on track if I stray.

13          You're saying that although there is -- there are

14   certain practices that under the state law are declared

15   illegal, in order to enforce that right the individual

16   plaintiff has to fall within the category that's defined by

17   the section of the statute that creates the private right of

18   action.  In order to qualify, they have to suffer injury, loss

19   or damage; is that what you're saying?

20          MR. SEGAL:  For the most part, yes.  Yes, your Honor,

21   other than the word, illegal.  I would say, actionable.

22   Certain --

23          THE COURT:  Fair enough.  All right.

24          MR. SEGAL:  Okay.  Because obviously, all of the

25   actions, all of the things that are actionable can be brought

1    by the Attorney General's Office without showing the

2    requirements of the individual right of action.  So yes, you

3    have got that right.

4            The other point I wanted to address, your Honor,

5    unless you have further questions on that, is CAFA.  Because

6    Mr. McGuinness said something that, quite frankly, caught me

7    by surprise.

8            When Mr. McGuinness asked -- filed a motion for leave

9    to file a surreply, I was preparing a response to that motion

10   before your Honor ruled.  Your Honor ruled shortly after that

11   was filed, before the response time was due.  So I never filed

12   a response.  But Mr. McGuinness said that when he makes an

13   allegation on information and belief -- excuse me, your Honor.

14           THE COURT:  Do you need a drink of water?

15           MR. SEGAL:  I would, your Honor.

16           THE COURT:  Take it from the bottle, not the pitcher.

17   The water pitchers are left over from the Flint case, so you

18   don't want to use that.

19           MR. SEGAL:  So they are safe, relatively speaking.

20           THE COURT:  No, actually, I don't know if you're

21   aware, there is a boil water advisory in effect for the next

22   24 hours here, so.

23           MR. SEGAL:  Yes, I am aware.

24           Back to what I was saying.

25           When Mr. McGuinness says that we should understand

Motion Hearing - March 2, 2017

1    what an allegation on information and belief means, when I got

2    his motion to file a surreply, I went through and I looked.

3    I verified.  There are at least 50, I didn't count them again

4    for today, but there is at least 50 allegations made on

5    information and belief.

6             But the CAFA allegation is not made on information

7    and belief.  If they wanted -- if they want to stand up and

8    argue that Honigman, myself, Mr. Aviv, should know what

9    information and belief means, they should know that the

10   paragraph they are relying on doesn't say that.  So that's

11   just not an argument that should hold water with the Court,

12   your Honor.

13            The second point I want to make is with regard to the

14   burden of proof on CAFA, because really what you have got is

15   Mr. McGuinness saying we didn't address whether the census

16   data satisfies the burden of proof, but we did.

17            We don't think the census data shows -- we don't

18   think it shows that they have diversity jurisdiction.  All we

19   said is that if your Honor accepts that it shows diversity

20   jurisdiction, meaning that if your Honor accepts the figures

21   that they have come up with, that 27,000 people, whatever

22   percentage it was that they based that computation on -- I

23   don't remember, 1.2 percent, then applied to their 250,000 --

24   if your Honor accepts the premise that you can take raw census

25   data and apply it to their case, it goes both ways.  If 27,000

Motion Hearing - March 2, 2017

1    people moved out, 230,000 remained.  And 230,000 over 250,000

2    is 89 percent.  And that triggers the home state exception,

3    which is triggered when you hit two-thirds.

4          THE COURT:  Right.  With respect to the allocation of

5    the burdens, do you agree with the proposition that the party

6    asserting jurisdiction has the burden to establish it, but

7    that the party asserting an exception to jurisdiction or an

8    abstention doctrine has the burden of establishing that?

9          MR. SEGAL:  I do, your Honor.

10         THE COURT:  All right.

11         MR. SEGAL:  And that's really --

12         THE COURT:  I don't know that that's really much of a

13   contest here, but --

14         MR. SEGAL:  No, but that's my point.  If the evidence

15   meets their burden, then it's that same evidence that we are

16   relying on.  So either the evidence meets their burden, and is

17   sufficient to meet our burden, or it doesn't meet either's

18   burden.

19         THE COURT:  All right.

20         MR. SEGAL:  I have nothing further unless your Honor

21   has questions.

22         THE COURT:  No, I don't.

23         I appreciate the presentations, counsel.  The Court

24   will take this motion under advisement, as well.  I'll get you

25   something in writing as soon as I can.  And I can't tell you

Motion Hearing - March 2, 2017

1     when that's going to be, but it will be as soon as I can.

2              MR. SEGAL:  Thank you, your Honor.

3              THE COURT:  Anything further for the record?

4              MR. McGUINNESS:  No, your Honor.  Thank you.

5              THE COURT:  All right.  Enjoy this nice spring

6     weather.  You may recess court.

7              THE CLERK:  All rise.  Court is now in recess.

8              (Proceedings adjourned at 12:16 p.m.)

9                        *      *      *

10

11

12                CERTIFICATE OF COURT REPORTER

13

14         I certify that the foregoing is a correct transcript

15     from the record of proceedings in the above-entitled matter.

16

17     _____s/ Rene L. Twedt_____    ___January 16, 2018__
       RENE L. TWEDT, CSR-2907, CRR, RMR, RDR    Date
18         federal Official Court Reporter

19

20

21

22

23

24

25