UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
Southern Division

Brian J. Martin, et al., individually and on
behalf of all others similarly situated,

Case No. 2:15-cv-12838

v.

Hon. David M. Lawson

Trott Law P.C., et al.,

Mag. Judge David R. Grand

Defendants.

_____/

Andrew J. McGuinness (P42074)
ANDREW J. MCGUINNESS, ESQ.
122 S Main St, Suite 118
P O Box 7711
Ann Arbor, MI  48107
Phone: (734) 274-9374
drewmcg@topclasslaw.com

Andrew N. Friedman (admitted)
Sally M. Handmaker (admitted)
COHEN, MILSTEIN, SELLERS & TOLL PLLC
1100 New York Ave NW, Suite 500
Washington, DC  20005
Phone: (202) 408-4600
afriedman@cohenmilstein.com
shandmaker@cohenmilstein.com

Daniel R. Karon (admitted)
KARON LLC
700 W St Clair Ave, Suite 200
Cleveland, OH  44113
Phone: (216) 622-1851
dkaron@karonllc.com

Counsel for Plaintiffs and the Proposed Class

Kathleen H. Klaus (P67207)
Jesse P. Roth (P78814)
MADDIN, HAUSER, ROTH & HELLER, PC.
28400 Northwestern Hwy, 2nd Floor
Southfield, MI  48034
(248) 359-7520
kklaus@maddinhauser.com
jroth@maddinhauser.com

Charity A. Olson (P68295)
BROCK & SCOTT PLLC
2723 S State St, Suite 150
Ann Arbor, MI  48104
Phone: (734) 222-5179
Charity.Olson@brockandscott.com

Counsel for Trott Law, P.C.

Joseph Aviv (P30014)
Bruce L. Segal (P36703)
HONIGMAN MILLER SCHWARTZ & COHN LLP
39400 Woodward Ave, Suite101
Bloomfield Hills, MI  48304
Phone: (248) 566-8300
javiv@honigman.com
bsegal@honigman.com

Counsel for David A. Trott

_____/

**PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY
APPROVAL OF CLASS SETTLEMENT AND BRIEF IN SUPPORT**

## PLAINTIFFS' UNOPPOSED MOTION FOR
## PRELIMINARY APPROVAL OF CLASS SETTLEMENT

Plaintiffs, through their counsel, without opposition by Defendants, hereby move this Court for entry of an order preliminarily approving a class settlement in this action. The parties, with the assistance of an experienced neutral mediator appointed by the Court, have reached a proposed classwide settlement.

WHEREFORE, Plaintiffs hereby move this honorable Court to enter a preliminary approval order substantially in the form of Exhibit 1-D, attached, that:

- Preliminarily approves the Class Action Settlement Agreement, subject to approval after a final fairness hearing;

- Provisionally certifies the Settlement Class under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3);

- Provisionally appoints Brian Martin, Yahmi Nundley, and Kathleen Cadeau as representatives of the Settlement Class;

- Provisionally appoints Andrew J. McGuinness and Andrew N. Friedman as Class Counsel;

- Appoints Epiq Class Action & Claims Solutions, Inc. ("Epiq") as Claims Administrator;

- Authorizes and approves the promulgation of Class Notice as detailed in the Settlement Agreement, Exhibit 1, attached, including the Publication Notice substantially as set forth in Exhibit 1-E, attached; and

- Schedules a Final Fairness Hearing date and time no less than 100 days from the date of filing of this Motion.

In support of this Motion, Plaintiffs submit the attached Brief in Support.

Dated:        April 20, 2018

Respectfully submitted,

Andrew J. McGuinness (P42074)
ANDREW J. MCGUINNESS, ESQ.
122 S Main St, Suite 118
P O Box 7711
Ann Arbor, MI  48107
Phone: (734) 274-9374
drewmcg@topclasslaw.com

Andrew N. Friedman (admitted)
Sally M. Handmaker (admitted)
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
1100 New York Ave NW, Suite 500
Washington, DC  20005
Phone: (202) 408-4600
afriedman@cohenmilstein.com
shandmaker@cohenmilstein.com

Daniel R. Karon (*admitted*)
KARON LLC
700 W St Clair Ave, Suite 200
Cleveland, OH  44113
Phone: (216) 622-1851
dkaron@karonllc.com

*Counsel for Plaintiffs and the Proposed Class*

**BRIEF IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR
PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

**TABLE OF CONTENTS**

Page

ISSUES PRESENTED ............................................................................. iii

CONTROLLING OR MOST PERTINENT AUTHORITY .................................. iv

I.      INTRODUCTION ........................................................................1

II.     BACKGROUND ...........................................................................3

        A.      The Litigation ................................................................3
        B.      Settlement Discussions ....................................................7
        C.      The Settlement ...............................................................7

III.    ARGUMENT ...............................................................................11

        A.      The Settlement Meets the Standards for Preliminary Approval. ........11
                1.      The Settlement Was Negotiated at Arm's Length. ...................13
                2.      The Settlement Will Provide Prompt Payment to the
                        Class and Avoid the Risks Attendant to Complex
                        Litigation. ...................................................................13
                3.      There Was Sufficient Discovery for Plaintiffs to Have
                        Access to Complete Information. ......................................14
                4.      Success on the Merits Is Not Guaranteed. .........................15
                5.      Class Counsel Believe That the Settlement Is Reasonable
                        Given the Strengths and Weaknesses of the Claims. ..........17
                6.      The Settlement is Fair to Absent Class Members. ...............18
                7.      The Public Interest is Served by the Settlement. ................18

IV.     THE COURT SHOULD APPROVE THE NOTICE PLAN ........................19

V.      THE COURT SHOULD SCHEDULE A FINAL FAIRNESS
        HEARING, WHICH WILL ESTABLISH THE DATES AND
        DEADLINES SET FORTH IN THE SETTLEMENT AGREEMENT…......20

VI.     EPIQ CLASS ACTION & CLAIMS SOLUTIONS, INC. SHOULD
        BE APPOINTED AS SETTLEMENT ADMINISTRATOR......................21

VII.    THE COURT SHOULD CERTIFY A CLASS FOR SETTLEMENT
        PURPOSES...................................................................................................21

        A.      The Settlement Satisfies Rule 23(a)...................................................22
        B.      The Rule 23(b) Factors are Satisfied.................................................25
                1.      Defendants Acted in a Manner Generally Applicable to
                        the Class, Satisfying Rule 23(b)(2)............................................25
                2.      The Predominance and Superiority Requirements of Rule
                        23(b)(3) are Satisfied. .............................................................25

VIII.   CONCLUSION.............................................................................................28

CERTIFICATE OF SERVICE ............................... **Error! Bookmark not defined.**

## ISSUES PRESENTED

1. Should this Court preliminarily approve the submitted Class Action Settlement Agreement?

2. Should this Court conditionally certify a Settlement Class under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) as outlined in the Settlement Agreement?

3. Should this Court appoint Plaintiffs Brian J. Martin, Yahmi Nundley, and Kathleen Cadeau as representatives of the Settlement Class?

4. Should this Court appoint Andrew J. McGuinness and Andrew N. Friedman as Class Counsel for the Settlement Class?

5. Should this Court appoint Epiq Class Action & Claims Solutions, Inc. as Claims Administrator?

6. Should this Court authorize Class Notice as detailed in the Settlement Agreement?

7. Should this Court schedule a Final Fairness Hearing?


Plaintiffs answer "Yes" to each of these questions.

Plaintiffs are informed and believe that Defendants do not oppose this Motion.

## CONTROLLING OR MOST PERTINENT AUTHORITY

Federal Rule of Civil Procedure 23

MANUAL FOR COMPLEX LITIGATION, FOURTH §§ 21.311, § 21.612; 21.
  (Federal Judicial Center, 2004)

NEWBERG ON CLASS ACTIONS §§ 8.32 (4th Ed. 2002)

*Amchem Prods, Inc. v. Windsor*, 521 U.S. 591 (1997)

*Beattie v. CenturyTel., Inc.,* 511 F.3d 554 (6th Cir. 2007).

*Glazer v. Chase Home Fin. Llc*, 704 F.3d 453 (6th Cir. 2013)

*Kistner v. The Law Offices of Michael P. Margelefsky, LLC and Michael P.
Margelefsky,* 518 F.3d 433 (6th Cir. 2008)

*Pelzer v. Vassalle,* 655 Fed. Appx. 352 (6th Cir. 2016)

*Powers v. Hamilton Cnty. Public Defender Com'n*, 501 F.3d 592 (6th Cir. 2007)

*UAW v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007)

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
  722 F.3d 838 (6th Cir. 2013)

*Wright v. Finance Service of Norwalk, Inc.*, 22 F.3d 647 (6th Cir. 1994)

*IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583 (E.D. Mich. 2006)

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003)

*Dallas v. Alcatel-Lucent USA, Inc.*, No. 09–14596, 2013 WL 2197624
  (E.D. Mich. May 20, 2013).

*Gradisher v. Check Enforcement Unit, Inc.*, 203 F.R.D. 271 (W.D. Mich. 2001)

*Geary v. Green Tree Servicing, LLC*, No. 2:14-CV-00522, 2017 WL 2608691
  (S.D. Ohio June 16, 2017)

*Mann v. Acclaim Fin. Servs., Inc.*, 232 F.R.D. 278 (S.D. Ohio 2003)

## BRIEF IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

### I.   Introduction

Plaintiffs, on behalf of themselves and a Settlement Class[1] of similarly situated consumers on whose behalf they have vigorously prosecuted this class action for over two and a half years, seek this Court's preliminary approval of a proposed Class Settlement.

If the Settlement is approved by this Court, Defendants will pay $7.5 million into a Settlement Common Fund for the benefit of the class. In addition, Defendant Trott Law PC ("Trott Law") has agreed to injunctive relief in the form of specific language to be added to its foreclosure ("fair debt") letters to address both the attorney letterhead and overshadowing claims.[2]  The class is an estimated 291,000 members. On a fully-diluted basis, the gross cash consideration represents approximately $26 per class member—more than half of the statutory damages available under the Michigan Regulation of Collection Practices Act for non-willful violations. The claims administrator will mail a two-part postcard notice

---

[1] Capitalized terms used in this brief are defined in the parties' Class Action Settlement ("Settlement Agreement" or "Agreement"), Exhibit 1, attached. Exhibit 1 is signed by counsel for the parties as authorized by their respective clients. Plaintiffs will file with the Court the Class Action Settlement Agreement with client signatures when available.

[2] Trott Law has already ceased using "corporate advance" in its fair debt letters— the basis of Plaintiffs' third category of claims—making it unnecessary to include injunctive relief for these claims.

and return postage prepaid claim form, which class members can tear off, sign, and simply drop in the mail to submit a claim. Claims can also be made online at a settlement website.  Based on historic claims rates, class counsel estimates that those class members submitting a valid claim will receive a payment of between $75 and $150 each. The Settlement also incorporates a robust notice protocol.

By virtually any measure, this represents a strong recovery for the class. The Settlement resulted from intense, repeated arm's length negotiations overseen by a neutral mediator, after class counsel had undertaken substantial, hard-fought discovery and the claims had been vetted by repeated dispositive motion practice.

In short, the Settlement is fair, reasonable, and adequate under the governing standards.  All prerequisites for preliminary approval of the Settlement have been met, and the notice protocol satisfies the requirements of due process and Rule 23. This Court therefore should preliminarily approve the settlement.

## II.    Background

### A.    THE LITIGATION

On August 11, 2015, Plaintiffs Martin and Nundley filed a 41-page, 192-paragraph complaint against Defendants. (ECF #1.) This pleading contained detailed allegations of the firm's operations; the involvement of the individual defendant; and the firm's practices with respect to form foreclosure (fair debt) letters.  On November 25, 2015, Martin and Nundley filed their First Amended

Complaint (FAC), incorporating additional allegations from publicly-available deposition testimony describing the firm's review practices for fair debt letters in another class action lawsuit.[3]  (ECF No. 13.)  On August 8, 2016, Plaintiffs filed their Second Amended Complaint (Corrected) (hereinafter, the "Complaint") adding the "corporate advance" claims and a third Plaintiff, Ms. Cadeau. (ECF No. 40.)  The Complaint alleges that defendants violated the Fair Debt Collection Practices Act ("FDCPA") and the Michigan Regulation of Collection Practices Act ("RCPA") based on certain language contained in form letters sent to Michigan homeowners to initiate non-judicial foreclosure of their mortgages.  Plaintiffs claim in the Complaint that these letters were misleading in the following ways:

First, by suggesting to consumers that the letters were from an attorney when no attorney "meaningfully reviewed" them. Alternatively, Plaintiffs claim that the letters are capable of two reasonable contrary interpretations: that they were, or were not, from an attorney.  These claims comprise the "attorney letterhead" claim. *See Kistner v. Law Offices of Michael P. Margelefsky, LLC,* 518 F.3d 433, 439 (6th Cir. 2008).

Second, Plaintiffs claim that the reference to an impending sheriff's sale in a large subset of the letters containing a solicitation of a request for a reinstatement quote, "overshadowed" the validation rights of the debtor under the FDCPA,

---

[3] *Wilson v. Trott & Trott PC,* Case No. 16-10335, E.D. Mich. (Lawson, J.).

3

triggering also a violation of the RCPA.

Third, the Complaint claims that use of the term "corporate advance" in a subset of the letters is misleading because it is not defined in the underlying mortgage documents, thereby confusing the least sophisticated consumer.

Defendants each moved to dismiss the FAC on December 21, 2015. The Court stayed discovery pending these motions. On July 26, 2016, the Court granted in part and denied in part these motions, preserving the attorney letterhead and overshadowing claims, and granting leave to amend the FAC. Plaintiffs then filed the Complaint (adding the corporate advance claim), and discovery resumed.

Defendants promulgated written discovery and deposed each of the Plaintiffs.  Plaintiffs propounded extensive written discovery and deposed multiple witnesses, including Trott Law Executive Committee member Marcy Ford; Trott Law Fair Debt Committee Member Michelle Clark; the two Trott Law attorneys identified as having "reviewed" the Martin, Nundley, and Cadeau fair debt letters; and the Pre-Sale Unit Manager of Trott Law's non-attorney processors responsible for processing foreclosure referrals and populating the firms' proprietary software with the homeowner-specific information received from firm clients and placed into the form fair debt letters.

Plaintiffs also subpoenaed documents from, resisted motions to quash, and deposed two former firm managers:  Ellen Coon, an equity partner who had run the

foreclosure department and supervised processors for many years before resigning; and Doreen Hoffman, an attorney with a collections law background who briefly served on the firm's Fair Debt Committee and was hired by David Trott to build a deficiency judgment collection practice within the Trott umbrella of companies.

Through these depositions and review of extensive written discovery, class counsel learned many of the facts important to assessing the value of the claims, including the firm's historical and current business practices; its compliance measures; the role of the firm's Fair Debt Committee in approving form fair debt letters; the changes to those letters over the class period; how the firm was managed, including the involvement of David Trott; and possible defenses to the claims. Declaration of Andrew J. McGuinness, Exh. 2, attached ("McGuinness Decl.") at ¶ 9.

David Trott filed a Motion to Dismiss or for Summary Judgment on November 15, 2016, which this Court denied on July 12, 2017. At that time the Court granted in part and denied in part Plaintiffs' motion to strike certain affirmative defenses. Trott Law later filed a Motion to Strike Class Allegations Related to Plaintiffs' Claims Under the RCPA on January 4, 2018, which David Trott joined. The Court *sua sponte* struck that motion in a January 16, 2018, Order, without prejudice to defendants raising their arguments in opposition to class certification.

Defendants produced approximately 22,000 pages of documents, which Plaintiffs' counsel reviewed and analyzed.  McGuinness Decl. ¶ 6.

On December 7, 2017, this Court entered an Order of Referral to Facilitative Mediation, referring the parties to the Hon. Gerald R. Rosen (ret.) of JAMS as facilitator. (ECF # 153.)

B.    SETTLEMENT DISCUSSIONS

The parties participated in three mediation sessions before the Judge Rosen. After the third session the parties agreed in principle to settle all claims.

C.    THE SETTLEMENT

The terms of the Settlement are set forth fully in the Settlement Agreement. The following is a summary of the principal terms:

1.    **Settlement Class Definition:**

All individuals to whom Trott Law PC caused to be sent any version of the Trott PC Foreclosure Letter in connection with mortgages conveyed for residential real property located in Michigan, which was not returned as undeliverable by the U.S. Post Office, dated from August 11, 2009, through the date of entry of the Preliminary Approval Order.

"Trott PC Foreclosure Letter" is defined as it appears in ¶ 71 of the Complaint, and certain standard exclusions are listed. The class is eminently ascertainable.

2.    **Benefits:**    Defendants will pay $7.5 million to establish a common fund for the benefit of the Class ("Settlement Common Fund").  Approved Claimants will be mailed checks for a *pro rata* share of the common fund after

payment of claims administration expenses, attorneys' fee, service awards, and litigation expenses. The estimated range of the payments is between $75 and $150. McGuinness Decl. at ¶ 13.  If any checks remain uncashed after 90 days, half of the uncashed funds will be distributed to the Michigan Advocacy Program, a non-profit organization, and targeted for its Michigan Foreclosure Prevention Project ("MFPP").  The other half will revert to the Defendants.

Trott Law will also include in its fair debt letters for a period of five years the following text:  "An attorney has reviewed information supplied by our client in preparation of this letter."  If Trott Law includes a reference to "reinstatement" in a fair debt letter, the letter will include the following additional text:  "No timing requirement relating to reinstatement alters your rights to dispute the debt or seek validation within the timelines set forth in this letter."

**3.     Notice:**  The claims administrator will send all class members via First Class Mail a short form postcard notice, that will include summary information and publish a settlement website and toll-free phone number through which Class Member can receive information and documents.  The administrator will also implement a publication notice program through banner advertisements on websites designed to achieve eight million impressions in Michigan and an additional four million impressions nationally.  The administrator will also create a settlement website, which will include the Long Form Notice along with other

7

important case documents (e.g., Settlement Agreement, Complaint, and Preliminary Approval Order).  Defendants will bear responsibility for complying with the notification requirements of the CAFA. The postcard notice and long form notice direct class members not to contact the Court.

4.     **Claims:**  Class members may submit a claim via mail using the simple tear away hardcopy claim form included in the postcard notice (Exhibit 1-C, attached), which will be postage prepaid. Alternatively, class members can submit a claim online using a unique identification number provided by the claims administrator or the mortgaged property address, and submit it via the settlement website.  Claims must be submitted at least 90 days after the Notice Date.

5.     **Requests for Exclusion:**  Class members may opt out of the Settlement by mailing a written request in to the claims administrator, postmarked no later than thirty days before the final fairness hearing.  This date will be included in the postcard notice and long form notice.

6.     **Objections:**  Any class member who does not request exclusion from the class may object to the Settlement by filing a written notice of intent to object with the Court and serving copies of any objection on counsel.  The information required for a valid objection is detailed in the long form notice and the Settlement Agreement.  Objections must be postmarked at least 30 days before the final fairness hearing.  Any class member who submits a valid objection to the

8

Settlement may appear at the hearing.

7.     **Service Awards for Class Representatives:**  Class counsel will seek services awards of $5,000 for each of the three named Plaintiffs.

8.     **Attorneys' Fees and Costs:**  Class counsel will apply to the Court by motion for an award of attorneys' fees of up to 33 1/3% of the Settlement Common Fund and for reimbursement of reasonable expenses.

9.     **Releases:**  If approved, the Settlement will release the defendants from liability for all claims asserted or that could have been asserted based upon the facts alleged in the Complaint, including any claim under any federal or state law based upon or relating to lack of attorney meaningful review of Plaintiffs' and Class Members' accounts before prior to the sending of the Trott PC Foreclosure Letters; a contention that language in the Trott PC Foreclosure Letters regarding the timing of reinstatement requests or approvals overshadowed Class Members' validation rights under federal or state law; or that use of the phrase "Corporate Advance" in the Trott PC Foreclosure Letter was misleading, and also including any claim of individual responsibility of David A. Trott for the use by Trott Law PC, of the form template, or form language, in any version of the Trott PC Foreclosure Letter (collectively, the "Released Claims"). Notably, class members will *not* release (i) fair debt claims that are not based on the form letter language (e.g., claims that the individual addressee does not owe the debt, or that the amount

stated is inaccurate); or (ii) any claim against defendants' clients (e.g., the bank or mortgage servicer).

### III.   Argument

A.   THE SETTLEMENT MEETS THE STANDARDS FOR PRELIMINARY APPROVAL.

The discretionary determination of whether to approve a proposed settlement should be exercised in the context of the public policy favoring the pretrial settlement of disputes, including class action lawsuits.  *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007). *See also, IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 593 (E.D. Mich. 2006); *Steiner v. Fruehauf Corp.*, 121 F.R.D. 304, 305 (E.D. Mich. 1988), a*ff'd sub nom Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989) ("case law favors the voluntary settlement of class actions").

At the preliminary approval stage, "the judge makes a preliminary fairness evaluation [including whether the proposed settlement is "within the range of possible approval"].  *See Manual for Complex Litigation, 4th* § 21.632-.633 (Federal Judicial Center 2004).  *See also, Tennessee Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 565-66 (6th Cir. 2001).

"In reviewing [a] Settlement . . . the Court need not, and indeed, should not decide the [merits].  This is because . . . the very point of compromise is to avoid determining contested issues and to avoid the expense and uncertainty of litigation."  *IUE-CWA*, 238 F.R.D. at 595 (internal citation and quotations

omitted).  Instead, the court's "role in passing upon the propriety of a class action settlement is limited to a determination of whether the terms proposed are fair and reasonable to those affected."  *Steiner*, 121 F.R.D. at 305 (citing *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983)).

 "Several factors guide the inquiry:  (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest."  *UAW v. Gen. Motors Corp.*, 497 F.3d at 631.  In considering the seven factors, the district court may choose to "consider only factors that are relevant to the settlement and may weigh particular factors according to the demands of the case."  *IUE-CWA*, 238 F.R.D. at 594-95.

## 1.    The Settlement Was Negotiated at Arm's Length.

Courts presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary.  *IUE-CWA*, 238 F.R.D. at 598.  Courts also consider whether the settlement was reached with the assistance of a mediator.  *See, e.g.*, *Dallas v. Alcatel-Lucent USA, Inc.*, No. 09–14596, 2013 WL 2197624, at *8-9 (E.D. Mich. May 20, 2013). The parties negotiated this Settlement at arm's length with the helpful assistance of retired Chief Judge Rosen.

## 2.    The Settlement Will Provide Prompt Payment to the Class and Avoid the Risks Attendant to Complex Litigation.

"[M]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them," *In re Telectronics Pacing Sys, Inc.*, 137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001). This case is no exception. "For class actions in particular, courts view settlement favorably because it avoids the costs, delays and multitudes of other problems associated with them." *In re Delphia Corp. Sec., Derivative & "ERISA" Litig., 248 F.R.D. 483, 497 (E.D. Mich. 2008)*.

Had the parties not reached the settlement, they would have had to engage in additional discovery, fought many more discovery motions, engaged in more expensive ESI negotiations and productions, and briefed and argued class certification and at least one more summary judgment motion.  McGuinness Decl. ¶ 8.  The settlement provides prompt resolution of class claims years earlier and at a much lower cost than through protracted litigation.

Additionally, defendants vigorously contested the applicability of *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), to the RCPA class claims. While Plaintiffs are confident that this Court properly resolved this issue, defendants likely would appeal any adverse verdict on this or other grounds, thereby further delaying or risking class recovery.

### 3.     There Was Sufficient Discovery for Plaintiffs to Have Access to Complete Information.

Discovery was well underway when the parties settled. Class counsel had access to important discovery to weigh the advantages and risks of continued litigation, and to make informed settlement recommendations to Plaintiffs.  In addition to the depositions of important witnesses, defendants had produced over 22,000 pages of documents including substantial ESI. With respect to ESI, class counsel negotiated a change to the protocol to "front load" review and production of search terms deemed "core," to obtain much of this ESI before mediation.

The discovery conducted satisfies the threshold necessary to demonstrate that class counsel had information sufficient to evaluate the claims.  *See, e.g., IUE-CWA*, 238 F.R.D. at 598 (collecting cases); *Smith v. Prof'l Billing and Mgmt. Servs., Inc.*, No. 06-4453, 2007 WL 4191749, at *2 D.N.J. Nov. 21, 2007).

**4.      Success on the Merits Is Not Guaranteed.**

The fairness of a class action settlement "turns in large part on the bona fides of the parties' legal dispute." *UAW v. Gen. Motors*, 497 F.3d at 631.  In assessing the parties' dispute, the district court's task "is not to decide whether one side is right or even whether one side has the better of these arguments . . . . The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement." *Id*. at 632.  The ultimate question for the court is whether the interests of the class are better served if the litigation is resolved by the settlement rather than continued litigation.  *See IUE-CWA*, 238 F.R.D. at 595.

13

While this factor requires that the Court understand the relative strengths of the claims and defenses somewhat, it need not resolve them. *Id.*

 While Plaintiffs are confident in the merits of this case, defendants contest important allegations made by Plaintiffs and vigorously contend that their actions are consistent with what FDCPA and RCPA.  Importantly, there is relatively little case law applying the requirement for "meaningful review" to foreclosure law firm fair debt letters.  Class counsel's investigation and discovery suggests that Trott Law attorneys perform a brief review of data supplied by its clients that are included in the letters.  While Plaintiffs claim that this does not meet the "meaningful review" threshold, defendants disagree. As to the RCPA claims, the parties do not agree on the appropriate jury instruction for "willful" violation. Under any definition, Plaintiffs' burden would be substantially higher to establish willful violations, reducing the prospects of success on this category of claims.[4] Because class counsel anticipate that these issues are to be resolved by the jury, there is a risk that the class would not prevail at trial on some or all of its claims.

 And David Trott vigorously contests his classification as a "debt collector"

---

[4] Whether "willfulness" could be proven directly impacts the amount of damages recoverable under the RCPA, which provides $50 statutory damages for non-willful violations, and up to an additional $150 for willful violations. Moreover, discovery has suggested that the law firm defendant may not be collectible for most of an enhanced RCPA statutory damages award, further limiting the class' potential recovery if the individual defendant were successful in asserting his individual defenses.  McGuinness Decl. ¶ 10.

under the FDCPA due to an asserted lack of personal involvement in the creation or approval of the fair debt letters, or of the firm policies and procedures relating to their mailing. His success on this argument would diminish markedly the value of the FDCPA class damages claim (reducing it by more than $400,000). Additionally, if successfully applied to the RCPA claims, this defense would markedly reduce the amount of insurance coverage and other financial resources available to satisfy a class verdict for willful violation of the RCPA.

All of these considerations support preliminary approval of the settlement.

### 5.    Class Counsel Believe That the Settlement Is Reasonable Given the Strengths and Weaknesses of the Claims.

Courts given substantial weight to the experience of the attorneys who prosecuted the case and negotiated the settlement. *IUE-CWA*, 238 F.R.D. at 597. S*ee also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 525 (E.D. Mich. 2003) ("in approving a proposed settlement, the court also considers the opinion of experienced counsel as to the merits of the settlement").[5] Here, class counsel, who have extensive class action litigation experience, thoroughly analyzed the facts and the law and have concluded that the settlement is in the best interest of the class. (McGuinness Decl. ¶¶ 4-5, 11.) The class representatives participated actively in the mediation and fully support the settlement.  (*Id*. at ¶ 11.)

### 6.    The Settlement is Fair to Absent Class Members.

_____

[5] McGuinness served as counsel in *In re Cardizem*, albeit for the defendant.

All Approved Claimants will receive a *pro rata* portion of the Net Settlement Fund, estimated to be between $75 and $150. (*Id.* at ¶ 13.) The settlement is even-handed and does not improperly favor the class representatives. *Cf. Pelzer v. Vassalle*, 655 Fed. Appx. 352 (6th Cir. 2016) (approving FDCPA class settlement where release was re-structured not to prevent absent class members from defending collection actions based on fraudulent affidavits). Indeed, Nundley and Cadeau, as named Plaintiffs with FDCPA claims, would each be entitled to statutory damages up to $1,000 if successful. Yet, aside from any service award they may receive, they will receive the same pro-rata recovery as absent members.

### 7.    The Public Interest is Served by the Settlement.

"[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are notoriously difficult and unpredictable and settlement conserves judicial resources." *Cardizem*, 218 F.R.D. at 532. The settlement will not only prevent prolonged litigation and conserve judicial resources, but also will provide ongoing public benefits. The injunctive relief will reduce the prospect of consumer confusion in a very stressful context.[6] By channeling 50% of any uncashed claim checks to the Michigan Advocacy

---

[6] Because Trott Law is regarded as the leading Michigan foreclosure law firm, class counsel anticipates that other major Michigan foreclosure firms are likely to adopt the clarifying language negotiated here, thereby providing a "ripple effect" beneficial to all Michigan homeowners facing foreclosure. McGuinness Decl. ¶ 20.

Projects' Foreclosure Prevention Project, the Settlement may also provide funds to

a worthy *cy pres* recipient whose work will further the aims of Michigan

homeowners facing foreclosure Michigan.[7]

### IV.    THE COURT SHOULD APPROVE THE NOTICE PLAN

Rule 23(e) requires that notice of a proposed settlement inform class

members of the following: (1) the nature of the pending litigation; (2) the general

terms of the proposed settlement, (3) that complete information is available from

court files, and (4) that any class member may appear and be heard at the final

approval hearing.  NEWBERG ON CLASS ACTIONS § 8.32 (4th ed. 2002). *Accord*, *In

re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *5 (E.D.

Mich. Feb. 22, 2011).  The notice must also indicate an opportunity to opt out, that

the judgment will bind all class members who do not opt out, and that any member

who does not opt out may appear through counsel.  Fed. R. Civ. P. 23(c)(2)(B).

The notice should include individual notice to all members who can be identified

with reasonable effort.  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175-76

(1974); *see also Manual for Complex Litigation* § 21.311, n. 882.

Given the age and context of the class member addresses provided by Trott

Law (mostly foreclosed properties), the Settlement provides that prior to the

mailing, each address will be run through the U.S. Post Office change of address

---

[7] Detailed information regarding the Michigan Foreclosure Prevention Project is
attached as Exhibit B to the McGuinness Decl.

service *and* a private, third-party update address service *before* mailing the postcard notices/claim forms. While this protocol is more expensive than most, this combined notice program is estimated by the claims administrator to reach approximately 95% of the class via first class mail, an excellent result. Additionally, internet banner ads will be published to generate at least eight million "impressions" in Michigan, and at least four million more nationally in the hope of reaching the relatively few class members unreachable by mail.  (McGuinness Decl. ¶16.)

For class members who do not receive a postcard, the Epiq will publish internet banner ads substantially in the form of Exhibit 1-E, attached, and implemented a campaign to achieve at least eight million impressions in Michigan and four million additional impressions nationally.  The banner ads will be "clickable" and direct potential class members to the settlement website.

V.      THE COURT SHOULD SCHEDULE A FINAL FAIRNESS
        HEARING, WHICH WILL ESTABLISH THE DATES AND
        DEADLINES SET FORTH IN THE SETTLEMENT AGREEMENT.

Plaintiffs ask that this Court schedule a final fairness hearing at least 100 days from the filing of this Motion.[8] That date will drive the other dates in the Settlement Agreement, and permit the Court to populate the timing schedule set

---

[8] This timeframe is driven by CAFA notice requirements.

forth in the form of Order of Preliminary Approval, Exhibit 1-D, attached.[9]

## VI.   EPIQ CLASS ACTION & CLAIMS SOLUTIONS, INC. SHOULD BE APPOINTED AS SETTLEMENT ADMINISTRATOR

Epiq has been tasked with administration the notice and claims process. (McGuinness Decl. ¶ 17.)  Epiq is well known, experienced and highly regarded in these areas, and has assisted in developing the proposed notice plan.

## VII.   THE COURT SHOULD CERTIFY A CLASS FOR SETTLEMENT PURPOSES

For settlement purposes only, the parties have agreed that the Court may make preliminary findings and enter an order granting provisional certification of the settlement class, and appoint the class representatives and class counsel to represent the Class.  *See Manual for Complex Litigation* (Fourth) § 21.612 (explaining the benefits of settlement classes). Before granting preliminary approval of a class action settlement, the Court should determine that the proposed settlement class is a proper class for settlement purposes.  *Id*. at § 21.632.

Here, Plaintiffs seek certification under Rule 23(b)(2) and (3), which, require

---

[9] By way of illustration only, if this Court were to enter the Preliminary Approval Order as requested on May 1, 2018, and schedule a Final Fairness Hearing on Friday, August 10, 2018 (101 days later), then the following dates would follow: (i) Notice Date, May 31, 2018; (ii) Motions for Final Approval and for Awards of Fees, Expenses and Service Awards due: June 26, 2018; (iii) Opt-out deadline: July 11, 2018; (iv) Objection deadline: July 11, 2018; (v) Supplemental briefs and report of total opt-outs due: July 31, 2018; and (vi) Claims deadline: August 29, 2018;.  *See* Exh. 1-D ¶ 28.

that the defendants acted on grounds that apply generally to the class, such that

final injunctive relief is appropriate respecting the class as a whole; and that

common questions of law or fact predominate, such that maintaining the suit as a

class action is superior to other methods of adjudication.

## A.     The Settlement Satisfies Rule 23(a).

1.     Numerosity Is Established.

The class consists of approximately 291,000 consumers based on written

discovery and representations of counsel for Trott Law. (McGuinness Decl. ¶ 12.)

2.     Class Claims Present A Common Issues of Law or Fact.

The commonality requirement of Rule 23(a)(2) requires that Plaintiffs

demonstrate that "there are questions of law or fact common to the class." A single

common question of law or fact will suffice. *Powers v. Hamilton Cnty. Public

Defender Com'n*, 501 F.3d 592, 619 (6th Cir. 2007); *Reese v. CNH Am. LLC*, 227

F.R.D. 483, 487 (E.D. Mich. 2005). The commonality inquiry "focuses on

whether a class action will generate common answers that are likely to drive

resolution of the lawsuit." *In re Whirlpool Corp. Front-Loading Washer Prods.

Liab. Litig.*, 722 F.3d 838, 852 (6th Cir. 2013).

"In FDCPA cases, where plaintiffs have received similar debt collection

letters . . . courts have found common questions of law or fact sufficient to certify

the class." *Mann v. Acclaim Fin. Servs., Inc.*, 232 F.R.D. 278, 284 (S.D. Ohio

2003) (citations omitted); *Gradisher v. Check Enforcement Unit, Inc.*, 203 F.R.D. 271, 277 (W.D. Mich. 2001) ("The commonality requirement is generally met where the defendant has engaged in standardized conduct towards members of the proposed class by mailing to them allegedly illegal form letters or documents."). This action focuses on form debt collection letters sent by Trott Law as initial communications in foreclosure proceedings, which the Sixth Circuit has held is a form of debt collection. *Glazer v. Chase Home Fin. Llc*, 704 F.3d 453 (6th Cir. 2013). Whether these form letters violate the FDCPA or the RCPA for the reasons alleged present common questions capable of resolution common answers that are likely to drive resolution of the lawsuit.

       3.     Plaintiffs' Claims are Typical of the Class.

      Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." "[A]plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Medical Sys.*, 75 F.3d at 1082 (footnote and quotation omitted). Here, each of the Plaintiffs' individual claims arise out of the form fair debt letters whose receipt define membership in the class. The typicality requirement also focuses on the type of injury suffered by the Class and the interests of Class Members. *Mann*, 232 F.R.D. at 284. In this action, the class

representatives and class members are each seeking solely statutory damages.

    4.    Plaintiffs and Class Counsel are Adequate.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This means that "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter*, 532 F.2d at 525 (citation omitted).

Plaintiffs' interests are consistent with, and not antagonistic to, the interests of the class. Each of them "received the allegedly defective initial communication . . . and all members of the class have an equal interest in preventing [defendants'] alleged illegal acts." *Mann*, 232 F.R.D. at 285.  Plaintiffs' active pursuit of this matter over years of litigation and participation in discovery and mediation demonstrates that they have been and will remain engaged representatives.

Similarly, class counsel, Andrew J. McGuinness and Andrew N. Friedman, have extensive experience in complex class action litigation, McGuinness Decl. ¶¶ 4-5, and have zealously represented Plaintiffs and the putative class.

**B.    The Rule 23(b) Factors are Satisfied.**

    1.    Defendants Acted in a Manner Generally Applicable to the Class, Satisfying Rule 23(b)(2).

Plaintiffs seek certification under Rule 23(b)(2), which permits a class action to be certified where the defendant has acted in a manner generally applicable to

22

the class such that the entry of final injunctive relief is appropriate.  Defendants

acted in a manner generally applicable to the entire class in sending the form Trott

Law PC Foreclosure Letters to all Class Members.  *See Mann*, 232 F.R.D. at 285

(certifying a class of consumers who received letters allegedly in violation of the

FDCPA under Rule 23(b)(2)).  Therefore, certification under Rule 23(b)(2) is

appropriate.

> 2.    The Predominance and Superiority Requirements of Rule
>        23(b)(3) are Satisfied.

Rule 23(b)(3) requires that questions of law or fact predominate over

questions affecting only individuals. "To satisfy the predominance requirement, a

plaintiff must establish that the issues in the class action that are subject to

generalized proof, and thus applicable to the class as a whole, predominate over

those issues that are subject only to individualized proof." *Beattie v. CenturyTel.,*

*Inc.*, 511 F.3d 554, 564 (6th Cir. 2007).  "[T]he fact that a defense may arise and

may affect different class members differently does not compel a finding that

individual issues predominate over common ones. *Id*.

Class members each were sent the Trott Law PC Foreclosure Letter with one

or more of the representations alleged to violate the FDCPA and RCPA, such that

adjudicating the merits of Plaintiffs' case would resolve all of their claims.

Importantly, under *Wright v. Finance Service of Norwalk, Inc.*, 22 F.3d 647 (1994),

at least for the FDCPA claim, class members are limited to one statutory damage

recover per "action." Accordingly, class member with more than one claim (e.g., who fit into more than one class/subclass) would not likely recover more than a class member who fit only one class (e.g., the attorney letterhead claim).

For a Rule 23(b)(3) class to be certified, a class action must be "superior to available methods for fairly and efficiently adjudicating the controversy." Normally courts consider the (i) alternatives to a class action, and whether members have an interest in controlling their own cases; and (ii) whether the case will be manageable as a class. In the settlement context, however, the proponent of the class need not establish manageability, because it is proposed that there be no trial. *Amchem Prods, Inc. v. Windsor, 521 U.S. 591, 620. (1997).*

Here, the damages attributable to defendants' alleged fair debt violations are so small on an individual basis so as to not justify the expense of individual litigation. *Geary*, 2017 WL 2608691 at *10 ("The reality is that few individual plaintiffs would sue or receive any redress at all in individual actions."). Moreover, "[i]n this inquiry, it is also proper for the court to consider the inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." *Id*. Even if individual suits were likely, that 291,000 class members possess the claims demonstrates that it is more efficient for the Court to handle them on a classwide basis. *Id*. ("The alternative to adjudicating this case as a class action is for the

Court to handle thousands, perhaps tens of thousands, of individual cases.").

Finally, class members are likely to have little interest in controlling their individual cases.  As this Court has analyzed the damage issues in connection with David Trott's motion to dismiss challenging Plaintiffs' Article III standing, the types of harms associated with the fair debt violations alleged tend to be intangible, and therefore best suited for statutory damages. This settlement achieves a large percentage of what class members who submit valid claims could have received in individual litigation (perhaps more).[10]

## VIII.  CONCLUSION

For the foregoing reasons, Plaintiffs ask that this Court grant their Unopposed Motion for Preliminary Approval.

Dated**:** April 20, 2018                    Respectfully submitted,

                                   Andrew J. McGuinness (P42074)
                                   ANDREW J. MCGUINNESS, ESQ.
                                   122 S Main St, Suite 118
                                   P O Box 7711
                                   Ann Arbor, MI  48107
                                   Phone: (734) 274-9374
                                   drewmcg@topclasslaw.com

---

[10] Of course, potential class members who believe they suffered actual damages may opt out. Moreover, the release does not cover individual-specific fair debt claims relating, e.g., to specific amounts or identities stated in a fair debt letter, as opposed to claims premised on the Complaint's claims based on the form letters themselves.

Andrew N. Friedman (admitted)
Sally M. Handmaker (admitted)
COHEN, MILSTEIN, SELLERS & TOLL, PLLC
1100 New York Ave NW, Suite 500
Washington, DC  20005
Phone: (202) 408-4600
afriedman@cohenmilstein.com
shandmaker@cohenmilstein.com

Daniel R. Karon (*admitted*)
KARON LLC
700 W St Clair Ave, Suite 200
Cleveland, OH  44113
Phone: (216) 622-1851
dkaron@karonllc.com

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on the above date a copy of the foregoing was filed with the Court using the ECF system, which will send notification of such filing to all parties who have appeared through their attorneys of record.


*/s/   Andrew J. McGuinness*
Andrew J. McGuinness

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
Southern Division

| | |
|---|---|
| Brian J. Martin, Yahmi Nundley, and Kathleen Cadeau, individually and on behalf of all others similarly situated, | Case No. 2:15-cv-12838 |
| | Hon. David M. Lawson |
| v. | CLASS ACTION |
| Trott Law P.C., and David A. Trott, | |
| Defendants. | |
| _____/ | |

## CLASS ACTION SETTLEMENT AGREEMENT

This Class Action Settlement Agreement ("Settlement Agreement" or "Agreement") is entered into, subject to approval of the Court and entry of final judgment, between Plaintiffs Brian J. Martin, Yahmi Nundley, and Kathleen Cadeau (collectively, "Plaintiffs"), individually and as Class Representatives of the Class, as defined below, and Defendants Trott Law PC, f/k/a Trott & Trott, P.C. ("Trott Law PC") and David A. Trott (collectively, "Defendants"). Plaintiffs and Defendants are, at times, individually referred to herein as a "Party" and collectively as the "Parties."

### RECITALS

A.     On August 11, 2015, Plaintiffs Martin and Nundley filed a putative class action complaint against Defendants in the United States District Court for the Eastern District of Michigan, Case No. 2:15-cv-12838 (the "Litigation"). On

November 25, 2015, these two Plaintiffs filed a First Amended Complaint.  On

August 8, 2016, Plaintiffs filed their Second Amended Complaint (Corrected)

(hereinafter, the "Complaint").

B.      This Agreement is to settle the Litigation on behalf of a class of

persons described below and contemplates the conditional certification of a

Settlement Class, as defined below, by the Court. As used in this Agreement,

"Class Counsel" refers to Andrew J. McGuinness and Andrew N. Friedman, each

of whom represent Plaintiffs and seek conditional appointment by the Court as

counsel on behalf of the Settlement Class contemplated hereby.

C.      The Complaint alleges that Defendants violated the Fair Debt

Collection Practices Act ("FDCPA") and the Michigan Regulation of Collection

Practices Act ("RCPA") based on certain standard language contained in letters

sent by Trott Law PC to Michigan homeowners to initiate a non-judicial

foreclosure of their mortgages.  Defendants deny that they committed any

wrongdoing.

D.      The Parties participated in three mediation sessions before the Hon.

Gerald E. Rosen (ret.), on February 16, February 27th, and March 9, 2018.  After

the third session, the Parties executed an agreement in principle to settle the

Litigation on the terms set forth in this Agreement.

NOW, THEREFORE, the Parties, in consideration of the promises,

covenants, and agreements herein described, and for other good and valuable

2

consideration acknowledged by each of them to be satisfactory and adequate, and intending to be legally bound, do hereby mutually agree as follows:

## 1.   RECITALS AND DEFINITIONS

1.1   <u>Recitals</u>.  The recitals set forth above are incorporated by reference and are explicitly made part of this Agreement.

1.2   <u>Definitions</u>.  As used in this Agreement, capitalized terms shall have the meanings provided below and elsewhere in the Agreement:

(a)   "Approved Claim" means a Claim submitted by a Claimant that the Claims Administrator, in its discretion consistent with Paragraph 12 below and subject to review by Plaintiffs' Counsel, determines to be timely, accurate, complete, and in proper form.

(b)   "Approved Claimants" means those Claimants who have submitted an Approved Claim.

(c)   "Claim" means a request for relief pursuant to Paragraph 12.1 of this Settlement Agreement submitted by a Class Member on a Claim Form to the Claims Administrator in accordance with the terms of the Settlement Agreement.

(d)   "Claim Form" means (i) the postcard claim form sent to Class Members and any other hardcopy Claim form to be provided by the Claims Administrator to Class Members, and (ii) the online claim form provided by the Claims Administrator on the Settlement Website.

(e)   "Claim Deadline" means the date by which all Claim Forms must be

3

postmarked or (if submitted online) received by the Claims Administrator to be considered timely. The Claim Deadline shall ninety (90) Days after the Notice Date, except that if that date would fall on a Sunday or federal holiday, it shall be the next day that is not a Sunday or federal holiday. The Claim Deadline shall be stated in the Postcard Notice and in the Long Form Notice.

(f)    "Claimant" means a Class Member who has submitted a Claim by the Claim Deadline.

(g)    "Claims Administrator" means Epiq Class Action & Claims Solutions, Inc.

(h)    "Class Counsel" has the meaning set forth in the Recitals.

(i)    "Class Member" means a member of the Settlement Class.

(j)    "Class Representatives" means Brian Martin, Yahmi Nundley, and Kathleen Cadeau.

(k)    "Days" means calendar days.

(l)    "Effective Date" means the later of:

i.    Thirty-seven (37) Days after the entry of the Judgment, where the time for appeal has expired and no appeal has been filed; or

ii.    If any appeal, petition for rehearing, motion to reconsider, or other review of the Judgment has been filed or sought, thirty-seven (37) Days after the Judgment is affirmed without substantial or material change, or the appeal is dismissed or otherwise disposed of (unless such substantial or material change is

4

accepted by the Parties), and no other appeal, petition for rehearing or other review is pending, and the time for further appeals, petitions, requests for rehearing or other review has expired.

(m)   "Final Approval (Final Fairness) Hearing" means the hearing at which the Court shall:

(i)   determine whether to grant final approval of this Settlement Agreement;

(ii)   consider any objections to this Settlement Agreement and all responses thereto; and

(iii)   consider Class Counsel's requests for an award of attorneys' fees, costs and expenses, and Service Awards.

(n)   "Judgment" shall mean the order finally approving this Settlement Agreement, entering injunctive relief, and dismissing this action, which shall be substantially in the form of Exhibit A attached hereto.

(o)   "Litigation" has the meaning set forth in the Recitals.

(p)   "Long Form Notice" means the Notice of Proposed Settlement of Class Action that will be published on the Settlement Website established by the Claims Administrator and to be mailed to Class Members upon request or otherwise published by the Claims Administrator, substantially in the form attached as Exhibit B.

(q)   "Net Settlement Fund" shall mean the Settlement Common Fund less

5

Court approved (1) Service Awards to each of the Class Representatives; (2)

attorneys' fees plus Class Counsel's expenses incurred in this litigation; and (3)

Notice and Administration Expenses.

(r)     "Notice" shall mean, collectively, the communications by which Class

Members are notified of the Settlement and of the Court's Preliminary Approval of

the Settlement Agreement.

(s)     "Notice and Administration Expenses" means expenses incurred by

the Claims Administrator or Class Counsel in connection with implementation and

administration of the Settlement, including without limitation notice and claims

processing costs.

(t)     The "Notice Date" shall be thirty (30) Days after entry of the

Preliminary Approval Order.  The Claims Administrator shall complete mailing the

Postcard Notice to Class Members to an updated list of addresses as supplied by

Trott Law PC by the Notice Date, or such later date approved by the Court for

good cause shown.

(u)     "Opt Out" means a putative class member who validly submits a

timely Request for Exclusion as provided in this Agreement and in the Long Form

Notice.

(v)     "Party" and "Parties" shall have the meaning set forth in the

introductory paragraph of this Settlement Agreement.

(w)     "Person(s)" shall mean any natural person, individual, corporation,

association, partnership, limited liability company, trust, or any other type of legal entity.

(x)     "Plaintiffs" shall have the meaning set forth in the introductory paragraph of this Settlement Agreement.

(y)     "Postcard Notice" means the postcard notice substantially in the form of Exhibit C attached hereto.  The Claims Administrator will mail the Postcard Notice by United States Mail, First Class postage prepaid, to the last known physical address of all Class Members as updated by the Claims Administrator. The Postcard Notice will include the tear-off hardcopy Claim Form, which will be returnable by Business Reply Mail (no postage required).

(z)     "Preliminary Approval" or "Preliminary Approval Order" shall mean the Court's entry of an order of preliminary approval of this Settlement Agreement, which shall be substantially in the form of Exhibit D attached hereto.

(aa)    "Released Claims" shall have the meaning set forth in Paragraph 13.1 of this Settlement Agreement.

(bb)    "Released Parties" shall mean Trott Law PC and its predecessors and successors, past and present employees, agents, officers, directors, shareholders, insurers and partners and their heirs, and David A. Trott and his heirs and successors.

(cc)    "Releasing Parties" shall mean Plaintiffs, for and on behalf of themselves, and all Class Members.

(dd)   "Request for Exclusion" shall mean a request to be excluded from the Settlement Class, submitted in accordance with the terms and conditions of this Settlement Agreement and the instructions provided in the Notice.

(ee)   "Service Awards" shall mean cash awards to be paid to the Class Representatives.

(ff)   "Settlement Class" shall mean all individuals to whom Trott Law PC caused to be sent any version of the Trott PC Foreclosure Letter (defined below) in connection with mortgages conveyed for residential real property located in Michigan, which was not returned as undelivered by the U.S. Post Office, dated from August 11, 2009, through the date of the entry of the Preliminary Approval Order ("Class Period").  Excluded from the Settlement Class are any person whose name and address is not supplied to the Claims Administrator as a Class Member by Trott Law PC, pursuant to Paragraph 7.2 below; the Court and any member of the Court staff; and any potential Class Member who timely submits a valid Request for Exclusion.

(gg)   "Settlement Common Fund" means the total cash consideration paid on behalf of Defendants as part of the settlement, equal to $7,500,000.00 cash (U.S.) in immediately available funds.

(hh)   "Settlement Website" means the website established by the Claims Administrator to facilitate the Settlement.

(ii)   "Trott PC Foreclosure Letter" means the form of letter defined in

8

Paragraph 71 of the Complaint and is not limited to those form of foreclosure letters attached to the Complaint.

(jj)    "Unused Class Funds" shall mean uncashed checks issued to Approved Claimants past the checks' ninety (90) day stale date.

1.3    <u>Singular and Plural</u>.  Definitions used herein shall apply to the singular and the plural forms of each term defined.

1.4    <u>Gender</u>.  Definitions used herein shall apply to the masculine, feminine, and neuter genders of each term defined.

1.6    <u>Terms of Inclusion</u>.  Whenever the words "include," "includes" or "including" are used in this Settlement Agreement, they shall not be limiting but rather shall be deemed to be followed by the words "without limitation."

## 2.    COOPERATION BY THE PARTIES

2.1    The Parties and their counsel agree to cooperate fully with each other to promptly execute all documents and take all steps necessary to effectuate the terms and conditions of this Settlement Agreement.  The Parties and their counsel further agree to support the final approval of the Settlement Agreement including against any appeal of the Judgment and including any collateral attack on the Settlement Agreement or the Judgment.

## 3.    MONETARY CONSIDERATION TO THE CLASS

3.1    In exchange for the terms and conditions set forth in this Settlement Agreement, including without limitation the releases set forth in Section 13 below,

9

Defendants will provide the following monetary consideration:

      3.1.1  <u>Settlement Common Fund</u>.  Defendants shall cause their insurance carriers to pay the Settlement Common Fund for the benefit of the Settlement Class within ten (10) calendar days of Preliminary Approval of the settlement (the "Payment Date").  When the payment described in this paragraph have been made, the Settlement Common Fund shall be fully funded.

      3.1.2  Pending entry of the Judgment, the Settlement Common Fund shall initially be held in the IOLTA account of Maddin, Hauser, Roth & Heller, PC ("Maddin Hauser").  While the Settlement Common Fund is held in Maddin Hauser's IOLTA account, Maddin Hauser shall pay from the Settlement Common Fund the Claims Administrator's invoices for Notice and Administration Expenses, upon direction from Plaintiffs' Counsel.  Upon the entry of the Final Order and Judgment, the balance of the Settlement Common Fund will be transferred to a Qualified Settlement Fund account established by the Claims Administrator.

3.2     <u>Distribution of the Net Settlement Fund</u>.  This is a common fund settlement to be administered on a claims-made basis to Class Members.  Notice will be provided to Class Members pursuant to Paragraph 8 herein.  Claims Forms will be submitted electronically or by mail and will be administered by the Claims Administrator.  All Class Members will be entitled to make a claim for their *pro rata* share of the Net Settlement Fund.  In order to be entitled to participate in the

Net Settlement Fund, a Class Member must submit a valid Claim to the Claims Administrator on or before the deadline established by the Court.  Any Class Member who does not submit a timely, valid Claim shall not be entitled to share in the Net Settlement Fund, but nonetheless shall be barred and enjoined from asserting any of the Released Claims described herein.  Approved Claimants will receive a check for their *pro rata* share of the Net Settlement Fund as provided in this Agreement.

        3.2.1  Checks mailed to Approved Claimants will be good for ninety (90) days after the date on the check.  The funds represented by checks uncashed after ninety (90) days shall constitute "Unused Class Funds."  Fifty percent (50%) of the Unused Class Funds will revert to the Defendants and fifty percent (50%) will be donated to a non-profit organization designated by Class Counsel and approved by the Court.

## 4. NON-MONETARY CONSIDERATION TO THE CLASS

4.1    In addition to the consideration described in Section 3 above, as part of this settlement, Trott Law PC will also provide the following consideration ("Injunctive Relief"):

        4.1.1  Upon entry of the Judgment, all future Trott PC Foreclosure Letters shall include the following text, which confirms Trott Law PC's past practice: "An attorney has reviewed information supplied by our client in preparation of this letter."

4.1.2  If Trott Law PC includes a reference to "reinstatement" in a Trott PC Foreclosure Letter, the letter will include the following text: "No timing requirement relating to reinstatement alters your rights to dispute the debt or seek validation within the timelines set forth in this letter."

4.1.3  The inclusion of the changes in the Trott PC Foreclosure Letters noted in Paragraphs 4.1.1 and 4.1.2 above will be required for a period of five (5) years beginning with the Effective Date of the settlement.  Trott Law PC may, after reasonable notice to Class Counsel, seek leave of Court to modify the language required by this paragraph to reflect changes in the law or a change in Trott Law PC's business practices.

## 5.    ATTORNEY FEES AND COSTS AND SERVICE AWARDS

5.1    <u>Application for Attorneys' Fees and Expenses and Service Awards for the Plaintiffs</u>.  Pursuant to the common fund doctrine and/or any applicable statutory fee provision and consistent with this Agreement, Class Counsel will apply to the Court by motion for an award of attorneys' fees of up to 33 & 1/3% of the Settlement Common Fund. Additionally, Class Counsel will apply for reimbursement of Plaintiffs' reasonable expenses, Service Awards for the Class Representatives, and Notice and Administration Expenses to be paid from the Settlement Common Fund.  Attorneys' fees and expenses awarded by the Court shall be allocated among Plaintiffs' attorneys in a manner that, in Class Counsel's opinion, fairly compensates them for their respective contributions to the progress

of and results obtained in the Litigation.  Defendants and their agents agree not to oppose the applications for attorneys' fees or expenses, for Service Awards, or Notice and Administration Expenses made in accordance with the term of this Agreement.

5.2    The Parties agree that this Settlement Agreement is not contingent upon the Court's approval or allowance of any specific attorneys' fee award, reimbursement of expenses, or the approval of any specific Service Award.

5.3    <u>Disbursement of Attorneys' Fees and Expenses and Plaintiffs' Service Awards</u>.

5.3.1  Class Counsel's attorneys' fees and expenses, as approved by the Court, or such portion of the attorney's fees and expenses as directed by Class Counsel, shall be paid from the Settlement Common Fund to Class Counsel within ten (10) Days of the date the Court enters its order awarding such fees and expenses.  In the event the Judgment is reversed, vacated or materially modified on motion for reconsideration or on appeal such that the amount of attorneys' fees and expenses are reduced or the settlement is not approved substantially as set forth in this Agreement, Class Counsel shall be liable to refund, in the proportion paid to them, to the Settlement Common Fund the excess award previously paid within ten (10) days of the event that results in the reduction of the award, or to Defendants in the event that the settlement is vacated in its entirety.

5.3.2   Upon approval by the Court and pursuant to written directions from Class Counsel to the Claims Administrator, the Service Awards to each Class Representative shall be paid from the Settlement Common Fund within ten (10) days of the Effective Date. Class Representatives' claims as Class Members shall be processed separately along with other Class Members.

## 6.   PRELIMINARY APPROVAL OF SETTLEMENT AND CONDITIONAL CERTIFICIATION OF SETTLEMENT CLASS

6.1   Class Counsel shall prepare the motion seeking preliminary approval of the settlement and conditional certification of the Settlement Class, which Defendants shall not oppose, as long as it reflects the terms of this Settlement Agreement.

6.2   Without limitation, the Court shall be asked to approve the terms and conditions of this Settlement Agreement, the notice to the Class, the method of Notice, the Claim Forms, the procedure for submitting Claims, and to appoint Class Representatives for the Settlement Class and Class Counsel for the Settlement Class, all as part of preliminary approval.

## 7.   CLAIMS ADMINISTRATOR

7.1   The Claims Administrator will work without limitation to: (i) provide Notice to potential Class Members in the manner set forth in the Preliminary Approval Order; (ii) establish and maintain the Settlement Website; (iii) process

Claim Forms; (iv) confirm the issuance of payments to Approved Claimants; and (v) provide any necessary certifications to the Court concerning the administration and processing of Claims.  The Claims Administrator will be available to respond to inquiries from Class Counsel, counsel for Defendants, and Class Members.

7.2     Trott Law PC shall, within ten (10) Days of entry of the Preliminary Approval Order (if not previously supplied), cause to be provided to the Claims Administrator at its expense an Excel spreadsheet of the names and last known addresses of all individuals to whom Trott Law PC caused to be sent any version of the Trott PC Foreclosure Letter which was not returned as undelivered by the U.S. Post Office during the Class Period, however Trott Law PC is not obligated to undertake any effort to update any Class Member address currently in its data base. Trott Law PC shall separately provide to Class Counsel a list of all Class Members, in the same form as supplied to the Claims Administrator.

7.3     The Claims Administrator shall provide bi-weekly reports to Class Counsel and to counsel for Defendants regarding the status of the claims administration, including the updating of addresses, number of short form notices mailed, number of Requests for Exclusion, number of Claims submitted, number of Approved Claims, number and amounts of distribution checks, and the total dollar amount of cashed and uncashed checks.

7.4   The Claims Administrator shall be paid for the work described in Paragraphs 3, 7.1, and 7.3 above from the Settlement Common Fund.  The Claims

Administrator shall receive payment of its monthly invoices as fees and expenses are incurred, subject to approval by Class Counsel.

7.5    The Claims Administrator shall establish a Qualified Settlement Fund to receive and hold the Settlement Common Fund, to distribute attorneys' fees, expense reimbursements, and Service Awards as authorized by the Court, and to distribute the Net Settlement Fund in accordance with the terms of the Settlement Agreement and the Judgment or other order of the Court.

## 8.    NOTICE OF SETTLEMENT AND ADMINISTRATION OF CLAIMS

8.1    The Claims Administrator shall send to all Class Members via United States Mail, First Class postage prepaid, a copy of the Postcard Notice by the Notice Date.  The Postcard Notice shall include a tear away hardcopy Claim Form (which shall be substantially in the form of Exhibit C, attached) and also direct Class Members to the Settlement Website, where the full Long Form Notice and electronic Claim Form will be available and where Class Members may file a Claim electronically using a unique identification number supplied by the Claims Administrator.  The Postcard Notice shall be sent via United States Mail to the last addresses provided by Trott Law PC, after using commercially reasonable efforts first to locate forwarding or updated addresses as needed.  The Claims Administrator shall use commercially reasonable efforts to complete mailing of the Postcard Notice to Class Members within thirty (30) Days of Preliminary

Approval.

8.2     The Claims Administrator shall also implement, no later than the

Notice Date, a publication notice program through:  banner advertisements on

appropriate websites to be recommended by the Claims Administrator designed to

achieve at least 8 million impressions in Michigan and an additional at least 4

million impressions nationally in the United States, and a 30-day social media and

Google advertising campaign (collectively, "Publication Notice").  The Publication

Notice shall direct potential Class Members to the Settlement Website.  The

Publication Notice shall use banner advertisements substantially in the form of

Exhibit E, attached. The Settlement Website will contain information relating to

the settlement and administration of Claims, will clearly indicate that neither the

Litigation nor the Settlement impacts any pending or past foreclosure sale; permit

Class Members to file claims online, provide contact information for the Claims

Administrator; and post the Long Form Notice, the Preliminary Approval Order,

this Settlement Agreement, the Complaint, and make each such document

available for download in Adobe pdf format.

8.3     Defendants will bear responsibility for notifying the appropriate

federal and state officials of this Settlement Agreement to the extent required by

the Class Action Fairness Act of 2005, 28 U.S.C. § 1715.

8.4     No later than fifteen (15) Days before the Final Approval (Final

Fairness) Hearing, the Claims Administrator shall provide to Class Counsel and

counsel for Defendants the following information:

   (a) The number of Postcard Notices sent to Class Members;

   (b) The approximate number of visits to the Settlement Website from the date of entry of a Preliminary Approval Order;

   (c) The number of Class Members who submitted Approved Claims to date;

   (d) Any information about any Objections to the settlement that the Claims Administrator has not previously forwarded; and

   (e) Any other tracking information reasonably requested by Class Counsel or counsel for Defendants.

   (f) A report stating the total number of Class Members who have submitted timely and valid Requests for Exclusion, including a listing of the names and addresses of such Opt Outs and reporting the number of Requests for Exclusion divided by the number of Class Members (the "Exclusion Percentage").

  8.5 Class Counsel shall file with the Court the list of Opt Outs not later than seven (7) Days before the Final Approval (Final Fairness) Hearing.

## 9. REQUESTS FOR EXCLUSION

  9.1 Potential Class Members who wish to exclude themselves from the Class must submit a written Request for Exclusion.  To be effective, a Request for Exclusion must: (a) identify the full name and address of the potential Class member requesting exclusion; (b) be personally signed (original signatures only)

18

by the potential Class Member requesting exclusion, or by a person documented to be acting under valid power of attorney, guardianship, or other legal authority to sign on behalf of the potential Class member or his estate; and (c) contain a statement that reasonably indicates a desire to be excluded from the settlement. The following statement shall be deemed to meet the requirement of subpart (c) of the preceding sentence: "I want to opt out of the Settlement Class certified in the *Martin v. Trott Law PC* case." Additionally, the request for exclusion must provide EITHER the unique I.D. number on a postcard sent by the Claims Administrator to the potential Settlement Class member, OR the address of the property to which Trott & Trott, PC, or Trott Law PC mailed a Trott PC Foreclosure Letter to the potential Class Member during the Class Period. Requests for Exclusion that do not meet these requirements will not operate to exclude a Class member from the Settlement. Mass or class opt-outs will not be allowed.

9.2    Requests for Exclusion must be submitted via First Class United States Mail, postage pre-paid by the potential Settlement Class member, addressed to the Claims Administrator at the address provided in the Long Form Notice, and postmarked no later than thirty (30) Days before the Final Approval (Final Fairness) Hearing (the "opt-out deadline"). If the opt-out deadline would otherwise fall on a Sunday or federal holiday, the opt-out deadline shall be the next day that is not a Sunday or federal holiday. The opt-out deadline shall be stated in

the Postcard Notice and in the Long Form Notice.

9.3     The Claims Administrator shall promptly log each Request for
Exclusion that is received and shall forward copies of the log and all such Requests
for Exclusion to Class Counsel and counsel for Defendants within fifteen (15)
business days after the opt-out deadline.

9.4     Within seven (7) business days after the opt-out deadline fixed for
potential Class Members to request exclusion from the Class, Class Counsel and
counsel for Defendants shall forward to the Claims Administrator copies of any
Requests for Exclusion received by them.

9.5     If the Exclusion Percentage exceeds the Exclusion Percentage agreed
to by the Parties in the Confidential Supplemental Agreement Regarding Class
Action Settlement Agreement ("Supplemental Agreement"), Defendants, or either
of them, have the option to terminate this Settlement Agreement.  The
Supplemental Agreement will be communicated confidentially to the Court.
Defendants, or either of them, must exercise any option to terminate the settlement
under this paragraph no later than five (5) business days before the Final Approval
(Final Fairness) Hearing, in a written notice to Class Counsel and to the Court.

## 10.    OBJECTIONS

10.1   Class Members who do not request exclusion from the Class may
object to the Settlement.  Class Members who choose to object to the settlement
must file written notices of intent to object with the Court and serve copies of any

such objection on counsel for the Parties, as set forth in more detail in Paragraph 10.2 below.  Any Class Member who submits a valid Objection may appear at the Final Approval (Final Fairness) Hearing in person or by counsel and be heard to the extent permitted under applicable law and allowed by the Court, concerning the fairness, reasonableness and adequacy of the settlement, and on Class Counsel's application for Service Awards, of attorneys' fees, and reimbursement of costs and expenses.  The right to object to the settlement must be exercised individually by a Class Member and, except in the case of a deceased or incapacitated Class Member or where a Class Member is represented by counsel, not by another Person acting or purporting to act in a representative capacity.

10.2   The written Objection and supporting papers must: (1) clearly identify the case name and number "*Martin, et al., v. Trott Law PC, and David A. Trott*," Case No. 2:15-cv-12838; (2) be filed with the Court no later than thirty (30) Days before the Final Approval (Final Fairness) Hearing; (3) postmarked and mailed to Class Counsel and Defendants' Counsel at the addresses listed in the Long Form Notice no later than thirty (30) Days before the Final Approval (Final Fairness) Hearing (unless the Class Member filed an objection via the Court's ECF system, such that copies will be transmitted electronically to these counsel); (4) set forth the full name, current address, and telephone number, and the unique I.D. number assigned by the Claims Administrator of the objecting Class Member; (5) set forth a statement of the position the Class Member wishes to assert, including the factual

and legal grounds for the position; (6) state whether the Class Member intends to appear and requests to be heard, in person or through counsel, at the Final Approval (Final Fairness) Hearing, and set forth the names and a summary of testimony of any witnesses that the Class Member might want to call in connection with the Objection; (7) provide copies of all documents that the Class Member wishes to submit in support of his or her position; (8) provide the name(s), address(es) and phone number(s) of any attorney(s) representing the Class Member; (9) identify by case name, case number and court each class action settlements objected to by the Class Member and his or her counsel (if any) in the last three years; and (10) include the Class Member's signature.

10.3   Any Class Member who does not file a timely and adequate notice of intent to object in accordance with this section waives the right to object or to be heard at the Final Approval (Final Fairness) Hearing and shall be forever barred from making any objection to the settlement.  To the extent any Class Member objects to the settlement, and such objection is overruled in whole or in part, such Class Member will be forever bound by the Judgment of the Court.

10.4   Counsel for the Parties may seek expedited leave from the Court to depose an objector prior to the scheduled Final Approval (Fairness) Hearing if such objector does not voluntarily agree thereto, and may request expedited production of information and things prior to the deposition of any nonprivileged matter that is relevant to the objection and proportionate to the needs of the case.

## 11.    FINAL APPROVAL

11.1    If the Court preliminarily approves the Settlement Agreement, Class Counsel shall submit a motion for final approval of the settlement by the Court, as well as a motion for attorneys' fees, expenses, and Service Awards, at a date set by the Court, but no later than forth-five (45) Days before the Final Approval (Final Fairness) Hearing.  The Parties may submit supplemental memoranda in support of the motions for final settlement approval and for attorneys' fees, expenses, and Service Awards at a date set by the Court, but no later than ten (10) Days before the Final Approval (Final Fairness) Hearing.

11.2    The Notice to the Class shall contain a date, time, and location for the Final Approval (Final Fairness) Hearing to be conducted by the Court, subject to later change by the Court.  The Parties shall jointly request the Court to set a Final Approval (Final Fairness) Hearing ninety (90) Days from the date the Court enters an order granting preliminary approval of the Settlement Agreement, but not before 100 Days after Class Counsel files the Motion for Preliminary Approval of the settlement.

11.3    If the Court finally approves the settlement as fair, reasonable, and adequate, the Parties shall jointly ask the Court to enter a Judgment substantially in the form of Exhibit A, attached, which shall, *inter alia*:

(a)      Grant final approval to the Settlement Agreement as fair, reasonable, and adequate, in good faith and in the best interests of the Class, and

order the Parties to carry out the provisions of this Settlement Agreement;

(b)   Grant the Injunctive Relief set forth in this Settlement

Agreement;

(c)   In all other respects, dismiss, with prejudice, the Litigation

against Defendants;

(d)   Reserve continuing jurisdiction by the Court to preside over any

ongoing proceedings relating to the Claims, this Settlement Agreement, and the

Injunctive Relief contemplated herein.

## 12.   CLAIM PROCESSING AND CASH PAYMENTS

12.1   Class Members must complete and sign the appropriate Claim Form

(either electronic or written) and submit it to the Claims Administrator via an

electronic Claim Form submission process to be established by the Claims

Administrator or by mailing the hardcopy Claim Form via Business Reply Mail

submitted not later than the Claim Deadline.  A Claim Form shall be considered

defective if the Claimant fails to timely submit the Claim Form, provide the

required information on the Claim Form, or to electronically (or in the case of a

hardcopy Claim Form, manually) sign the Claim Form.  The deadline for

submitting a Claim Form set forth herein shall be the "Claim Deadline," as defined

herein.

12.2   Class Members will be limited to one Approved Claim per individual.

All Class Members timely filing valid Claims will be entitled to only one pro-rata

distribution, subject to verification by the Claims Administrator. Each addressee of a Trott PC Foreclosure Letter shall be treated as a Class Member and may submit a separate Claim, Objection, or Request for Exclusion accordingly

12.3   Cash payments made pursuant to Paragraph 3.2 above will be made to Claimants via physical check mailed to the address provided on the Claim Form.

12.4   The Claims Administrator will contact Class Members who have submitted deficient Claim Forms and those Class Members will be given thirty (30) calendar days to cure the deficiency.

12.5   The Claims Administrator shall mail distribution checks to be drawn on the Net Settlement Fund to the Class Members who have submitted Approved Claims no later than 60 days after the Effective Date or 90 days after the Claims Deadline, whichever is later; provided, however, that in no event will such payments be made until the Settlement Common Fund is fully funded by Defendants, pursuant to Paragraph 3.1.1 above, and the appropriate pro-rata distribution amount is determined.

12.6   Other than the Service Awards, the cash payments set forth above shall be the only payments to which any Class Member will be entitled pursuant to this Settlement Agreement, and each Class Member will only be entitled to such cash payment if they submit an Approved Claim.

## 13.    RELEASES

13.1   The Releasing Parties (as defined in Paragraph 1.2(cc) above), upon the Effective Date, hereby release the Released Parties (as defined in Paragraph 1.2(bb) above) from liability for all claims asserted or which could have been asserted based upon the facts alleged in the Complaint, including any claim under any federal or state law based upon or relating to lack of attorney meaningful review of Plaintiffs' and Class Members' accounts prior to the sending of the Trott PC Foreclosure Letters; a contention that language in the Trott PC Foreclosure Letters regarding the timing of reinstatement requests or approvals overshadowed Plaintiffs' or a Class Member's validation rights under federal or state law; or that use of the phrase "Corporate Advance" in the Trott PC Foreclosure Letter was misleading, and also including any claim of individual responsibility of David A. Trott for the use by Trott Law PC, of the form template, or form language, in any version of the Trott PC Foreclosure Letter (collectively, the "Released Claims").

13.2   The Releasing Parties stipulate and agree that upon the Effective Date of the Court's entry of the Judgment, this Litigation shall be dismissed with prejudice, provided, however, that such dismissal shall not operate to diminish or affect the enforceability of the Injunctive Relief contemplated hereby, as reflected in the Judgment.

13.3   The releases by Plaintiffs and Class Members contained herein do not release any claim they may have against any client of the Released Parties.

26

13.4   The Plaintiffs only – and not Class Members – also hereby completely release any all claims they have against the Released Parties and their counsel in this Litigation relating to the Litigation.

13.5   The Released Parties hereby completely release any and all claims and causes of action they have had against the Plaintiffs and Class Counsel relating to the Litigation.  This release is not a release of any debt owed in connection with a mortgage that was the subject of a Trott PC Foreclosure Letter.  Nothing in this settlement impacts the validity of any pending or past foreclosure sale.

## 14.    PUBLICATION OF THE SETTLEMENT AGREEMENT

14.1   Defendants deny any liability to Plaintiffs and Class Members, and the Parties agree that this Settlement Agreement is not, and shall not be represented as, an admission of liability by any Defendant or by the Released Parties, or a concession of any weakness or flaw in Plaintiffs' claims or the validity of any defense.

14.2   The Parties shall agree to the content of a joint press release to be issued publicly concerning this settlement.

14.3   The Parties agree to promote the Settlement Agreement and not to work against it.

## 15.    AMENDMENT

15.1   This Agreement may be modified, amended or supplemented only by written agreement signed by or on behalf of all Parties and, if such modification,

amendment or supplement is to be executed and become effective subsequent to

the entry of the Preliminary Approval Order, only with the approval of the Court.

## 16. AUTOMATIC TERMINATION OF SETTLEMENT AGREEMENT AND TERMINATION RIGHTS

16.1   If, for any reason, this Settlement Agreement does not become final

on terms substantially and materially similar to those submitted, or if such approval

is reversed or substantially or materially altered on appeal, and if each Party does

not agree to any such substantial or material modification:

(a)    Except as expressly stated herein, this Settlement Agreement

and all judicial rulings made pursuant to the provisions of this Settlement

Agreement (including all rulings regarding either Class certification or the Class

Action Fairness Act) shall automatically become null and void and have no further

force or effect, and all proceedings that have taken place with regard to this

Settlement Agreement and the settlement shall be without prejudice to the rights

and contentions of the Parties hereto;

(b)    This Settlement Agreement, all of its provisions (including,

without limitation, any provisions concerning Class certification), and all

negotiations, statements, and proceedings relating to this Settlement Agreement

shall be without prejudice to the rights of any of the Parties, each of whom shall be

restored to their respective positions as of March 23, 2018.

(c)    This Settlement Agreement, any provision of this Settlement

Agreement, and the fact of this Settlement Agreement having been made, shall not be admissible or entered into evidence for any purpose whatsoever in the Litigation except as may be necessary to account for the lapse of time due to the Settlement proceedings.  Information produced or conveyed in the course of mediation shall remain confidential and subject to the confidentiality terms of the Court's mediation orders, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.

This section shall survive any termination of this Settlement Agreement.

## 17.   INCORPORATION OF EXHIBITS

17.1   All exhibits attached hereto are hereby incorporated by reference as though set forth fully herein and are a material part of this Settlement Agreement. Any notice or other exhibit attached hereto that requires approval of the Court must be approved without material alteration from its current form in order for this Settlement Agreement to become effective.

## 18.   GOVERNING LAW AND COMPLIANCE WITH TERMS OF SETTLEMENT AGREEMENT

18.1   All questions with respect to the construction of this Settlement Agreement and the rights and liabilities of the parties hereto shall be governed by the laws of the State of Michigan, without giving effect to its law of conflicts of laws.

## 19.    NO ADMISSION OF WRONGDOING OR THE VALIDITY OF ANY DEFENSE

19.1    This Settlement Agreement is made to terminate controversies and claims for injuries or damages between Defendants and the Plaintiffs.  Neither the execution and delivery of this Settlement Agreement nor compliance with its terms shall constitute an admission of any fault or liability on the part of either of the Defendants, or any of their respective agents, attorneys, representatives or employees.  Neither of the Defendants to this Settlement Agreement admits fault or liability of any sort and, in fact, the Defendants expressly deny fault and liability. Moreover, the Parties agree that this settlement is not, and shall not be represented as, a concession of any weakness or flaw in Plaintiffs' claims or the validity of any defense.

## 20.    PREPARATION OF SETTLEMENT AGREEMENT, SEPARATE COUNSEL, AND AUTHORITY TO ENTER SETTLEMENT AGREEMENT

20.1    The Parties and their counsel have each participated and cooperated in the drafting and preparation of this Settlement Agreement.  Hence, in any construction to be made of this Settlement Agreement, the same shall not be construed against any Party as drafter of the Settlement Agreement.

20.2    The Parties each acknowledge that he, she or it has been represented by counsel of his, her or its own choice throughout all of the negotiations that led to the execution of this Settlement Agreement and in connection with the

preparation and execution of this Settlement Agreement.

20.3   The Parties each represent and warrant that each of the Persons executing this Settlement Agreement is duly empowered and authorized to do so.

## 21.   HEADINGS

21.1   The headings contained in this Settlement Agreement are for reference only and are not to be construed in any way as part of the Settlement Agreement.

## 22.   COUNTERPARTS AND AUTHORIZTION

22.1   This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

22.2    The Parties have authorized their respective counsel to sign this Agreement on behalf of each of the Parties and, in connection with the Motion for Preliminary Approval, to submit this Agreement with their counsels' signatures only as an agreement binding on each of the Parties. The Parties shall each sign the Settlement Agreement prior to any preliminary approval hearing.

## 23.   ENTIRE AGREEMENT

23.1   This Settlement Agreement and the Supplemental Agreement referenced in Paragraph 9.4 above represent the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior contemporaneous oral and written agreements and discussions.  Each of the Parties

covenants that he, she or it has not entered into this Settlement Agreement as a result of any representation, agreement, inducement or coercion, except to the extent specifically provided herein.  Each Party further covenants that the consideration recited herein is the only consideration for entering into this Settlement Agreement and that no promises or representations of another or further consideration have been made by any Person.

## 24.   NOTICE

26.1   All notices, requests, demands, and other communications to the Parties or their counsel required or permitted to be given pursuant to this Settlement Agreement shall be in writing and shall be mailed postage prepaid by First Class U.S. Mail to the following persons at their addresses as set forth as follows:

**Plaintiffs' and Class Counsel**

Andrew J. McGuinness
ANDREW J. MCGUINNESS, ESQ.
P O Box 7711
Ann Arbor, MI  48107-7711

Andrew N. Friedman
Sally M. Handmaker
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Suite 500 East
Washington, DC 20005-3964

**Counsel for Defendant Trott Law, PC**

Kathleen H. Klaus
MADDIN, HAUSER, ROTH & HELLER, PC

28400 Northwestern Hwy, 2nd Floor
Southfield, MI  48034

**Counsel for Defendant David A. Trott**

Bruce L. Segal
HONIGMAN MILLER SCHWARTZ AND COHN LLP
39400 Woodward Ave, Suite101
Bloomfield Hills, MI  48304


WHEREFORE, the undersigned, being duly authorized, have caused this

Settlement Agreement to be executed on the dates shown below and agree that it

shall take effect on the last date of execution by all undersigned representatives of

the Parties.


_____          Date: April 20, 2018
Andrew J. McGuinness
ANDREW J. MCGUINNESS, ESQ.

**Plaintiffs' and Class Counsel**


_____          Date: April 20, 2018
Andrew N. Friedman
COHEN MILSTEIN SELLERS & TOLL PLLC

**Plaintiffs' and Class Counsel**


_____          Date: April 20, 2018
Kathleen H. Klaus
MADDIN, HAUSER, ROTH & HELLER, PC

**Counsel for Trott Law PC**

33

28400 Northwestern Hwy, 2nd Floor
Southfield, MI  48034

**Counsel for Defendant David A. Trott**

Bruce L. Segal
HONIGMAN MILLER SCHWARTZ AND COHN LLP
39400 Woodward Ave, Suite101
Bloomfield Hills, MI  48304

WHEREFORE, the undersigned, being duly authorized, have caused this

Settlement Agreement to be executed on the dates shown below and agree that it

shall take effect on the last date of execution by all undersigned representatives of

the Parties.

_____     Date: April 20, 2018
Andrew J. McGuinness
ANDREW J. MCGUINNESS, ESQ.

**Plaintiffs' and Class Counsel**

_____     Date: April 20, 2018
Andrew N. Friedman
COHEN MILSTEIN SELLERS & TOLL PLLC

**Plaintiffs' and Class Counsel**

_____     Date: April 20, 2018
Kathleen H. Klaus
MADDIN, HAUSER, ROTH & HELLER, PC

**Counsel for Trott Law PC**

Date: April 20, 2018

_____
Bruce L. Segal
HONIGMAN MILLER SCHWARTZ AND COHN LLP

**Counsel for David A. Trott**

## LIST OF EXHIBITS

A.    (Proposed) Judgment

B     Long Form Notice

C     Postcard Notice

D     (Proposed) Preliminary Approval Order

E.    Form of Publication Notice

# EXHIBIT 1-A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
Southern Division

Brian J. Martin, Yahmi Nundley, and
Kathleen Cadeau, individually and on behalf
of all others similarly situated,

      Plaintiffs,

v.

Trott Law, P.C., and David A. Trott,

      Defendants.

_____/

Case No. 2:15-cv-12838

Hon. David M. Lawson

CLASS ACTION

## [PROPOSED] JUDGMENT

The parties having submitted a duly executed Class Action Settlement Agreement (the "Settlement Agreement" or the "Agreement") seeking to settle this action on a class basis; the Court having entered a separate Opinion and Order finally approving certification of this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) ("Opinion and Order"), and the settlement; in order to effectuate the settlement; and being fully advised in the premises,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

1.    This Judgment incorporates the capitalized terms and their definitions

as set forth in the Settlement Agreement, which is attached hereto as Exhibit A and is incorporated herein.

2.      The Court has jurisdiction over the subject matter of this action, the Plaintiffs, individually and as Class Representatives, the Class Members, and Defendants.

3.      The Class Notice constituted the best notice practicable under the circumstances, and fully complied with the requirements of due process, of Federal Rule of Civil Procedure 23, and all applicable statutes and laws.

4.      For the reasons given in the Opinion and Order, the Court finds that the Settlement Agreement is in all respects, fair, reasonable, adequate, and in the best interest of the Class.  Any objections to the settlement have been considered and are hereby overruled.  Accordingly, the settlement is approved.

5.      The Court hereby directs the Parties and their counsel to implement and consummate the settlement in accordance with the terms of the Settlement Agreement and this Court's orders.

6.  Pursuant to Federal Rule of Civil Procedure 23, the Court finally certifies, for settlement purposes only, the Settlement Class defined as follows:

> All individuals to whom Trott Law PC caused to be sent any version of the Trott PC Foreclosure Letter (as defined in the Settlement Agreement) in connection with mortgages conveyed for residential real property located in Michigan, which was not returned as undelivered by the U.S. Post Office, dated from August 11, 2009, through the date of the entry of the Preliminary Approval Order.

Excluded from the Settlement Class are any person whose name and address was not supplied to the Claims Administrator by Trott Law PC, pursuant to Paragraph 7.2 of the Settlement Agreement; the Court and any member of the Court staff; and any putative class member who timely submits a valid Request for Exclusion.

7.     All Persons who are included within the definition of the Settlement Class and who did not properly file Requests for Exclusion are hereby bound by this Judgment and by the settlement. Attached as Exhibit B to this Judgment is a list setting forth the name of each Person who the Court finds has properly submitted a Request for Exclusion from the Class. The Persons so identified shall not be entitled to benefits from the settlement and are not bound by this Judgment.

8.     In the litigation, Plaintiffs claimed that form letters used by Defendant Trott Law PC with regard to non-judicial foreclosures in Michigan (hereinafter, the "Trott PC Foreclosure Letter") implied a level of attorney review or involvement that did not occur and that the text used in such letters that reference an option to reinstate the mortgage "overshadow" homeowners' validation rights under the Fair Debt Collection Practices Act.   Trott Law PC denied these contentions and the Court has not made a determination whether or not Plaintiffs' claims are valid. However, Trott Law PC has agreed to the following injunctive relief as partial consideration for settlement of this action on a class basis. Accordingly, Trott Law, PC shall:

a.     Beginning on the Effective Date and for a period of five years,

include in the Trott PC Foreclosure Letter the following text: "An attorney has reviewed information supplied by our client in preparation of this letter.";

      b.    Beginning on the Effective Date and for a period of five years, include in versions of the Trott PC Foreclosure Letter that include reference to reinstatement of a mortgage, the following text: "No timing requirement relating to reinstatement alters your rights to dispute the debt or seek validation within the timelines set forth in this letter.";

      c.    Trott Law PC shall provide a copy of this Judgment to each member of its Executive Committee, and notify each member of its management with responsibility for formulating or approving the content of the Trott PC Foreclosure Letter of the contents hereof, for a period of five years.; and

      d.    Trott Law PC may, after reasonable notice to Class Counsel, seek leave of Court to modify the language required by this Judgment to reflect changes in the law or a change in Trott Law PC's business practices.

9.    Plaintiffs' and Settlement Class Members' claims against the Defendants are hereby dismissed, with prejudice, without fees or costs to any Party except as provided in the Settlement Agreement and below.  Such dismissal shall not operate to diminish or affect the enforceability of the injunctive relief granted herein. This Court retains jurisdiction to enforce and administer the settlement.

10.    The Court hereby grants Class Counsel's request for attorneys' fees in

the amount of $_____, representing ___% of the Settlement Common Fund. The Court further grants as reasonable Class Counsels' application for reimbursement of costs and expenses in the amount of $_____.  The Court further awards Service Awards to the three Class Representatives in the amount of $_____ each.   The Claims Administrator is hereby directed to pay each of these respective amounts from the Settlement Common Fund as provided in the Settlement Agreement. The reasonable costs of Notice and administration of the settlement will continue to be paid from the Settlement Common Fund.

11.   The Claims Administrator is hereby directed to distribute checks to Approved Claimants in the amount of their pro-rata share of the Net Settlement Fund in accordance with section 12.5 of the Settlement Agreement. The Claims Administrator shall provide to the Parties and to the Court through Class Counsel a report of any Unused Class Funds. Fifty percent of such Unused Class Funds are hereby directed to be paid as a *cy pres* award to the non-profit Michigan Advocacy Program, targeted to its Michigan Foreclosure Prevention Project; and the remaining fifty percent of such Unused Class Funds are to be returned to Defendants.

**IT IS SO ORDERED.**

DATED: _____, 2018      _____
                                Hon. David M. Lawson
                                United States District Judge

# EXHIBIT 1-B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
Southern Division

| | |
|---|---|
| Brian J. Martin, Yahmi Nundley, and Katherine Cadeau, individually and on behalf of all others similarly situated, | Case No. 2:15-cv-12838 |
| | Hon. David M. Lawson |
| v. | CLASS ACTION |
| Trott Law P.C. and David A. Trott, | |
| Defendants. | |
| _____/ | |

**NOTICE OF PROPOSED CLASS ACTION SETTLEMENT,
FAIRNESS HEARING, AND MOTION FOR
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

This notice ("Notice") advises you of the proposed Class Action Settlement (the "Settlement") of the class action lawsuit, *Martin, et al., v Trott Law PC and David A. Trott*, Case No. 2:15-cv-12838 (E.D. Mich.) (the "Lawsuit"). In the Lawsuit the Plaintiffs allege that the Defendants violated certain provisions of the Fair Debt Collection Practices Act ("FDCPA") and the Michigan Regulation of Collection Practices Act ("RCPA"), in connection with letters sent in non-judicial foreclosures in Michigan. Plaintiffs' claims ("Class Claims") are described more fully below. You may have received a postcard notice and Claim Form if Trott Law PC's records reflect that you are a member of the proposed Settlement Class (defined below).

**PLEASE READ THIS NOTICE CAREFULLY.
A FEDERAL COURT AUTHORIZED THIS NOTICE.
THIS IS NOT A SOLICITATION.
YOU HAVE NOT BEEN SUED.**

As described in more detail below, the case concerns allegations in the Second Amended Complaint (Corrected) ("Complaint") that the Defendants violated fair debt laws, specifically the FDCPA and the RCPA, in form foreclosure letters (which they refer to internally as "fair debt letters") that the law firm sent to Michigan homeowners from August 11, 2009, through [Date], 2018.

Defendants maintain that the firm's fair debt letters comply with all federal and state fair debt collection laws, and therefore deny all allegations of wrongdoing. The Court has not determined whether or not the firm's fair debt letters violate the FDCPA or the RCPA.

In exchange for the dismissal of the Lawsuit, the Settlement provides a cash payment by Defendants of $7.5 million (seven million, five hundred thousand dollars) into a Settlement Common Fund, This is estimated to represent an amount equivalent to approximately $26 per class member. However, because the Net Settlement Fund will be distributed only to those Class Members who submit valid claims, the amount you will receive if you submit a valid claim will

likely be significantly higher. For an estimate of the size of the distribution, please see Question 8 below. As part of the Settlement, Trott Law PC will also stipulate to injunctive relief in the form of changes to its fair debt letters for a period of five years.

## THE STATUS AND VALIDITY OF ANY PAST, PENDING, OR FUTURE FORECLOSURE PROCEEDING WILL NOT BE AFFECTED BY THE SETTLEMENT.

**The Settlement resolves all claims against Defendants and applies to all members of the Class who do not exclude themselves from the Class by the opt-out deadline.**

The Court in charge of the case still has to decide whether to approve the Settlement. The payments and other settlement terms described above will be made only if the Court approves the Settlement and that approval is upheld if there are any appeals. This process is explained in greater detail below.

Your legal rights are affected if you are a member of the Settlement Class whether or not you act.

**"Settlement Class" means:** All individuals to whom Trott Law PC caused to be sent any version of the Trott PC Foreclosure Letter in connection with mortgages conveyed for residential real property located in Michigan, which was not returned as undelivered by the U.S. Post Office, dated from August 11, 2009, through [date]. The Settlement Class **excludes**:

    a.    any person whose name and address is not supplied to the Claims Administrator as a Class Member;

    b.    the Court and any member of the Court staff; and

    c.    any potential Class Member who timely submits a request for exclusion.

"Trott PC Foreclosure Letter" is defined in Paragraph 71 of the Complaint and includes any version of Trott Law PC's fair debt letters sent during the Class Period to start the foreclosure by advertisement process, and not just the versions attached to the Complaint.

**Identification of Other Key Terms:** This Notice contains summary information with respect to the Settlement. The terms and conditions of the Settlement are set forth in the Settlement Agreement signed by the parties (the "Settlement Agreement"). The Settlement Agreement, and additional information with respect to the Lawsuit and the Settlement, is available at **www.TrottFairDebtSettlement.com**. If you do not have access to the Internet, you may obtain a copy of the Settlement Agreement by writing to the Claims Administrator at the address below.

**Reasons for the Settlement:** The Settlement resolves all claims in the Lawsuit against the Defendants regarding Trott Law PC's form fair debt letters. The Settlement is not, and should not be construed as, an admission of any fault or liability whatsoever by any of the Defendants, who continue to deny any and all of the allegations of wrongdoing. The Plaintiffs and Class Counsel believe that the proposed Settlement is fair, reasonable, and adequate, and in the best interests of the Settlement Class. The Plaintiffs and Class Counsel believe that the Settlement provides substantial benefits to all Settlement Class Members as compared to the risks, significant litigation costs, and delays of proceeding with the Lawsuit.

**Identification of Claims Administrator and Class Counsel:** The Settlement Administrator is Epiq Class Action & Claims Solutions, Inc. You should first try to answer any questions you may have about the Settlement or the Lawsuit by reviewing the information available on the website

2

for this Settlement, www.TrottFairDebtSettlement.com, or by calling 1-888-XXX-XXX. You can also write to the Claims Administrator at the following address:

> Trott Class Action Settlement Administrator
> P O Box XXX
> Portland, OR XXXXX-XXXX

The Court has provisionally appointed the following attorneys as Class Counsel: Andrew J. McGuinness, Esq., of Ann Arbor, Michigan; and Andrew N. Friedman, Cohen Milstein Sellers & Toll, PLLC, of Washington, DC. **Please do not contact the Court and do not contact Trott Law, P.C. about this settlement;** its personnel will not be able to answer your questions.

**PLEASE READ THIS NOTICE CAREFULLY. IF YOU ARE A MEMBER OF THE SETTLEMENT CLASS TO WHOM THE POST CARD NOTICE WAS ADDRESSED, THE SETTLEMENT WILL AFFECT YOUR RIGHTS. YOU ARE NOT BEING SUED IN THIS MATTER. YOU DO NOT HAVE TO APPEAR IN COURT, AND YOU DO NOT HAVE TO HIRE AN ATTORNEY. IF YOU ARE IN FAVOR OF THE SETTLEMENT, YOU NEED NOT DO ANYTHING, UNLESS YOU WISH TO FILE A CLAIM FOR CASH PAYMENT. IF YOU DISAPPROVE, YOU MAY OBJECT TO THE SETTLEMENT PURSUANT TO THE PROCEDURES DESCRIBED BELOW.**

| ACTIONS YOU MAY TAKE IN THE SETTLEMENT | |
|---|---|
| NO ACTION IS NECESSARY. | If you do not wish to object to the Settlement or to submit a claim, you do not need to do anything. |
| YOU CAN SUBMIT A CLAIM FORM BY RETURN POST CARD OR ONLINE NO LATER THAN [Date], 2018. | If you received a post card notice indicating that you are a Settlement Class Member, you must fill out and sign the Claim Form and mail it before the deadline to receive a cash payment. **Alternatively**, you may submit a claim online at www.TrottFairDebtSettlement.com using the unique code found on your postcard Claim Form. Different individuals at the same address may each submit a claim if they received separate postcards with unique I.D. numbers. |
| YOU CAN OPT OUT by [Date], 2018. | If you do not want to be part of the Settlement Class or to participate in the Settlement, you can exclude yourself ("opt out") by following the instructions below. You must opt out by the deadline in order to preserves claims you may have against Defendants that are being released or resolved as part of the Settlement. *If you and another individual at your address each received separate postcards, you must each exercise your Class Member rights, including opt-out rights, individually.* |

3

| CLASS MEMBERS CAN OBJECT NO LATER THAN [Date], 2018]. | If do not opt out, and if you wish to object to any part of the Settlement, you can write to the Court and explain why you do not like the Settlement. |
|---|---|
| CLASS MEMBERS CAN GO TO THE HEARING ON [Date] 2018, BY FILING A NOTICE OF INTENTION TO APPEAR NO LATER THAN [Date], 2018. | If you have not opted out and have submitted a written objection to the Court, you can ask to speak in Court about the fairness of the Settlement. You may enter your appearance in Court through an attorney if you so desire. |

## WHAT THIS NOTICE CONTAINS

**Summary of Settlement** ................................................................................ **5**

**Basic Information** ......................................................................................... **6**

    1. Why did I get the postcard notice and Claim Form ...................................... 6

    2. What is the lawsuit about? What has happened so far? ................................ 7

    3. Why is this case a class action? ................................................................ 8

    4. Why is there a Settlement? ...................................................................... 8

**Who Is In The Settlement** ............................................................................ **8**

    5. How do I know whether I am part of the Settlement? ................................. 8

**The Settlement Benefits – What you Get** ..................................................... **9**

    6. What does the Settlement provide? ........................................................... 9

    7. How will the Settlement be distributed? ................................................... 9

    8. How much will my payment be? ............................................................. 10

    9. When will I Receive my payment? .......................................................... 10

    10. What rights am I giving up in the Settlement? ......................................... 10

**The Lawyers Representing You** ................................................................. **11**

    11. Do I have a lawyer in the case? ............................................................. 10

    12. How will the lawyers be paid? .............................................................. 10

**Excluding Yourself From the Settlement** .................................................. **11**

    13. Can I exclude myself from the Settlement? ............................................. 11

    14. If I do not exclude myself from the Class, can I sue the Defendants for the same thing Later? ..................................................................................................... 11

    15. If I exclude myself, can I get money from this Settlement? ....................... 12

**Objecting to the Settlement** ...................................................................... **12**

    16. How do I tell the Court if I don't like the Settlement? ............................. 12

    17. What is the difference between objecting and requesting Exclusion? ......... 13

**The Court's Fairness Hearing** ................................................................. **14**

    18. When and where will the Court decide whether to approve the Settlement? ............ 14

4

19. Do I have to come to the hearing? ................................................................. 14

20. May I speak at the hearing? ......................................................................... 14

**If You Do Nothing** ..................................................................................................... **14**

21. What happens if I do nothing at all? ............................................................ 15

**Getting More Information** ......................................................................................... **15**

22.  How do I get more information? .................................................................. 15

As discussed more fully below, the Lawsuit was filed in federal district court in Detroit, Michigan, against the law firm Trott Law PC, formerly known as Trott & Trott PC, and David A. Trott (collectively, "Defendants"). The named plaintiffs ("Named Plaintiffs" or "Class Representatives") are Brian Martin, Yahmi Nundley, and Kathleen Cadeau. Named Plaintiffs and Defendants collectively are referred to herein as the "Parties."

A copy of the Complaint and other documents relevant to this Settlement are available at www.TrottFairDebtSettlement.com.

**SUMMARY OF SETTLEMENT**

The Settlement Class is defined above, and generally consist of all Michigan residential homeowners (as opposed to commercial property owners) who were mailed a Trott PC Foreclosure Letter, as defined above and in Paragraph 71 of the Complaint, from August 11, 2009, to [Date], 2018. The Settlement provides specific monetary and non-monetary benefits to the Settlement Class, including a $7.5 million payment to a Settlement Common Fund and changes to the wording of the Trott PC Foreclosure Letter.

Class Counsel believe the Settlement provides substantial benefits to the Class. In particular, the maximum class recovery in a class action under the FDCPA is $500,000; the statute of limitations is one year from the violation; and several courts have held that injunctive relief is not available under that statute. And while class damages under the RCPA are not capped and injunctive relief is available under that statute, there are relatively few class actions certified in cases alleging claims under the RCPA. The total Settlement Common Fund (before deductions for attorneys' fees, costs, and service awards) represents a per-class-member consideration of approximately $25.77, slightly more than 50% of the potential RCPA statutory damages of $50 per class member for violations not found to be willful. However, because the Net Settlement Fund will be distributed only to those Class Members who submit valid claims, the amount you will receive if you submit a valid claim will likely be significantly higher.  For an estimate of the size of the distribution, please see Question 8 below.

As with any litigation, the Parties would face an uncertain outcome if the case were to continue. Continued litigation of this case against the Defendants may result in a judgment or verdict greater or less than the recovery under the Settlement Agreement or result in no recovery at all. Throughout the Lawsuit, Plaintiff and Defendants have disagreed on both liability and damages. Defendants, maintain that the Trott PC Foreclosure Letters comply fully with federal and state fair debt law, and that the RCPA claims cannot properly be pursued in this class action. Plaintiffs disagree.

5

Class Counsel represent that, among other things (1) they have conducted an extensive investigation into the facts, circumstances, and legal issues associated with the allegations made in this case; (2) believe, based on the risks of litigation, the time necessary to achieve a complete resolution through litigation, the complexity of the claims set forth in the Complaint, and the benefit accruing to Class Members under the Settlement, that the Settlement will provide a substantial benefit to the Settlement Class, and that, when that benefit is weighed against the risks of continuing the prosecution of the Lawsuit, the Settlement represents a reasonable, fair, and adequate resolution of the claims presented; and (3) believe that the Settlement will provide the Settlement Class with much of the benefits and protections they would have received if the case had been litigated to a conclusion and Plaintiffs had prevailed.

Defendants have denied, and continue to deny, the validity of any and all claims asserted in the Complaint. The Settlement is not evidence of liability of any type. Plaintiffs, on the other hand, continue to deny the validity of all defenses asserted by Defendants. Nevertheless, the Parties have taken into account the uncertainty and risks inherent in the Lawsuit and have concluded that it is desirable that the Lawsuit be fully and finally settled on the terms and conditions set forth in the Settlement Agreement, solely to avoid further risk, significant cost, expense, and time associated with litigation.

## BASIC INFORMATION

### 1. Why did I get the postcard notice and Claim Form associated with this Notice?

If you received a postcard Claim Form or learned of one addressed to you associated with this class action, then according to Trott Law PC's records you were sent a Trott PC Foreclosure Letter during the Class Period and are a member of the Settlement Class. The Trott PC Foreclosure Letters were typically sent to the address of the property that the firm was initiating foreclosure upon. Members of your household may have received more than one postcard notice and Claim Form (each with a unique identification number). In that case, each person to whom a postcard was addressed is entitled to file a claim, and must exercise his or her rights separately.

The Court has directed that the postcard notice(s) and Claim Form(s) be sent to you, and that this Class Notice be made available to you, because as a potential member of the Settlement Class you have a right to know about the proposed Settlement before the Court decides whether to approve it. If the Court approves the Settlement, and all related objections and appeals are favorably resolved, the Defendants will provide the specified monetary and non-monetary relief to the Class described in this Class Notice and detailed in the Settlement Agreement.  This includes the aggregate contribution of $7.5 million to the Settlement Common Fund as well as other specific non-monetary relief as described in Section 6 below.

This Notice explains generally the case, the Settlement, and your legal rights. An additional purpose of this the postcard notice and this Notice is to inform you of a hearing (the "Final Fairness Hearing") to be held by the Court to consider the fairness, reasonableness, and adequacy of the proposed Settlement, and to consider the application of Class Counsel for their attorneys' fees and reimbursement of litigation expenses, as well as an application for service awards for the Class Representatives.

The Final Fairness Hearing will be held at [____ p.m. on Date], 2018, before the Honorable David M. Lawson, Courtroom 716, in the United States District Court for the Eastern District of

Michigan, Theodore Levin U.S. Courthouse, 231, W. Lafayette Blvd., Detroit, Michigan, to determine:

    (a) Whether the Settlement Agreement is fair, reasonable, and adequate and should be approved by the Court;

    (b) Whether final judgment approving the Settlement Agreement should be entered;

    (c) Whether the Settlement Class should be certified as a class meeting the applicable requirements for a settlement class imposed by Federal Rules of Civil Procedure 23(b)(2) and (b)(3);

    (d) Whether the requirements of Federal Rule of Civil Procedure 23 and due process have been satisfied in connection with notice to members of the Settlement Class;

    (e) Whether the requirements of the Class Action Fairness Act have been satisfied;

    (f) Whether to grant Service Awards to the Named Plaintiffs, and, if so, the amounts; and

    (g) Whether to award attorneys' fees and litigation expenses to counsel who represent members of the Settlement Class and, if so, the amounts.

The issuance of this Notice is not an expression of the Court's opinion on the merits of any claim in this case, and the Court still has to decide whether to approve the Settlement. If the Court approves the Settlement, the payments by Defendants described above will be made after all related appeals, if any, are favorably resolved. It is always uncertain whether such appeals can be favorably resolved, and resolving them can take time, perhaps more than a year.

**2.  What is the lawsuit about? What has happened so far?**

On August 11, 2015, a putative class action complaint was filed in the United States District Court for the Eastern District of Michigan against Trott Law PC, and David A. Trott, Case No. 2:15-cv-12838, alleging violations of federal and state fair debt collection laws. The original complaint was superseded by a Second Amended Complaint (Corrected) ("Complaint"), filed on August 8, 2016.  Specifically, the Complaint alleges that the form Trott PC Foreclosure Letters violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*; and the Michigan Regulation of Collection Practices Act, Michigan Complied Laws § 445.251, *et seq*. The Complaint alleges that the Trott PC Foreclosure Letter (which Defendants refer to as "fair debt letters"), violate both statutes in each of three ways: (i) by misleadingly suggesting that they were from an attorney when no attorney had engaged in a "meaningfully review" of homeowners' accounts before the letters were sent; (ii) by "overshadowing," in a subset of the letters mentioning possible reinstatement of the mortgage, the federal validation rights of homeowners (e.g., the right to dispute or seek certain information about the debt within 30 days); and (iii) by use of the misleading undefined phrase "Corporate Advances" in a subset of the letters.

Defendants have maintained throughout the case that the Trott PC Foreclosure Letter complies with federal and state fair debt laws in all respects and deny any wrongdoing.

The Parties have been actively engaged in litigation for the past two and a half years. Defendants have filed multiple motions to dismiss the claims or some of them. Plaintiffs filed a motion to strike numerous defenses. The Court has dismissed certain claims and denied motions to dismiss the claims being settled in this Settlement. The Court also struck certain defenses and declined to dismiss others. The Class Representatives have each been deposed and have supplied requested

documents to Defendants. Counsel for the Parties have attempted to resolve numerous discovery disputes, and Class Counsel filed and obtained partial relief in a motion to compel documents requested of Trott Law PC. Class Counsel also subpoenaed and obtained documents from former employees of Trott Law PC. Class Counsel has deposed multiple employees of Trott Law PC and two former employees of the firm, and have received thousands of pages of documents produced in discovery by Defendants and non-parties. Trott Law PC has, at substantial expense, engaged in extensive compilation and review of potentially relevant electronically stored information (ESI) and has produced tens of thousands of pages of same to Class Counsel.

The Parties agreed to engage in settlement negotiations late in 2017, as encouraged by the Court. Settlement negotiations were facilitated by a neutral, third-party mediator in the late winter of 2017-18. On February 16, 2018, February 27, 2018 and March 9, 2018, the Parties participated in mediation sessions with the mediator, followed by ongoing negotiations by telephone and email over the course of several weeks. This process led to a Settlement Agreement signed by the Parties on [Date], 2018.

The Settlement is the product of intensive, arm's length negotiations between Class Counsel and Defendants' Counsel, with the assistance of an experienced third-party mediator.

### 3.  Why is this case a class action?

In a class action, one or more plaintiffs, called "named plaintiffs," or (where a class is certified) "class representatives," sue on behalf of people who have similar claims. The Court has certified the Settlement Class, subject to approval after the final fairness hearing. The Class Representatives (Named Plaintiffs) are seeking relief on behalf of the Settlement Class. All of the individuals on whose behalf the Class Representatives are suing are "Class members," and they are also referred to in this Notice as members of the Settlement Class. The Court resolves the issues for all Class members. The Honorable David M. Lawson, United States District Judge, is presiding over this Lawsuit.

In this case, the Named Plaintiffs are Brian Martin, Yahmi Nundley, and Kathleen Cadeau. The Court has appointed each as Class Representatives for purposes of this Settlement.

### 4.  Why is there a Settlement?

Under the proposed Settlement, the Court will not decide the merits of the case in favor of either the Plaintiffs or the Defendants. By agreeing to a Settlement, both the Plaintiffs and the Defendants avoid the significant costs, risks, and delays of litigating the Lawsuit.

This Settlement is the product of extensive arm's length negotiations between Class Counsel and the Defendants' Counsel, including utilizing the services of an experienced mediator. Class Counsel believes that the proposed Settlement is fair, reasonable, and adequate, and in the best interest of the Class.

## WHO IS IN THE SETTLEMENT

### 5. How do I know whether I am part of the Settlement?

The Court has certified this case as a class action for settlement purposes only. You are a member of the Settlement Class if you were sent a Trott PC Foreclosure Letter dated between August 11, 2009, and [Date], 2018. You should have received a postcard with Claim Form from the Claims Administrator if you are a member of the Settlement Class. Different individuals in the same household may each have received a separate postcard. In that case, each such individual is a Class Member according to Trott Law PC's records. If you believe you may be a member of the Settlement Class but did not receive a postcard, immediately contact the Claims Administrator by mail or phone and request that a claims package be sent to your current address. Please include the address of the property that was the subject of your Trott PC Foreclosure Letter.  If you did not receive a postcard, but request a claims package, the Claims Administrator will first have to confirm from a review of the applicable records whether or not you are Settlement Class member.

### THE SETTLEMENT BENEFITS – WHAT YOU GET

### 6. What does the Settlement provide?

The Settlement provides specific monetary and non-monetary benefits to the Settlement Class.

The Settlement requires that Defendants make a $7,500,000 cash payment to a Settlement Common Fund, to be held initially in the trust account of the law firm representing Trott Law PC, and then transferred to an account to be established by the Claims Administrator upon final approval of the Settlement. This payment will fully satisfy the monetary requirements of this Settlement. Trott Law PC has also agreed to an injunction requiring certain negotiated changes to its fair debt letters for a period of five years.

Specifically, Trott Law PC will include the following sentence in its future fair debt letters: "An attorney has reviewed information supplied by our client in preparation of this letter." Trott Law PC represents that this is consistent with its past practices.  Additionally, if a Trott PC Foreclosure Letter mentions reinstatement, Trott Law PC will include the following sentence:  "No timing requirement relating to reinstatement alters the homeowner's rights under the FDCPA to dispute the debt or seek validation within the time provided by that statute."  After the Settlement becomes final, and during the injunctive relief period, Trott Law PC may, after reasonable notice to Class Counsel, seek leave of Court to modify the language required by the Settlement to reflect changes in the law or a change in Trott Law PC's business practices

Once the Settlement becomes effective, pro-rata cash payments from the Net Settlement Fund (the $7.5 million minus service awards, attorneys' fees and expenses awarded by the Court and notice and claims administration expenses), will be mailed to Class members who timely submit valid claims. Checks not cashed after ninety days will revert 50% to the Michigan Foreclosure Prevention Project, of the non-profit organization the Michigan Advocacy Fund; and 50% to Defendants.

The above description of the Settlement is only a summary. The governing provisions are set forth in the Settlement Agreement, which is available at www.TrottFairDebtSettlement.com.

**7. How will the Settlement be distributed?**

Each Class member who timely submits a valid claim, via return postcard or website claim form with a valid unique I.D. number, will be mailed a check for their pro-rata share of the Net Settlement Fund after the "Effective Date." The Effective Date is thirty-seven (37) days after the Court enters its Final Order approving the Settlement and the time to appeal has expired.

One pro-rata distribution will be made for each unique I.D. associated with a timely claim. If different members of your household each received a postcard Claim Form—each with a different unique I.D. number—this means that according to Trott Law PC's records each recipient is a Class Member. If this is the case each Class Member may submit a separate claim, or otherwise exercise his or her rights. You may not act on behalf of another Class Member unless you have been appointed legal guardian or other legal representative.

The Settlement also provides significant non-monetary injunctive relief as described in this Notice, which will become effective on the Effective Date as identified in the Settlement Agreement.

**8. How much will my payment be?**

You will receive a pro rata share of the Net Settlement Fund if you timely file a valid claim. Your share of the Net Settlement Fund will depend upon how many valid claims are timely filed While the precise amount of your check is unknown at this time, Class Counsel estimate that each valid claim will be in the range of $75-$150. The actual distribution amount could be lower or higher than this range.

**9. When will I Receive my Payment?**

The Court will hold a hearing on [Date], 2018, to decide whether to approve the Settlement. If the Court approves the Settlement, there may be appeals. It is always uncertain how these appeals will be resolved, and resolving them can take time, perhaps more than a year. After any approval by the Court and assuming that any appeals are decided favorably, it may take several months for the Claims Administrator to pay the ultimate distribution amounts.

**10. What rights am I giving up in the Settlement?**

If the Settlement is approved, the Court will enter a judgment, which will have the effect of releasing certain claims you may have. To "release" a claim means to give up the right to sue on it. This judgment, when it becomes effective, will fully, finally, and forever release all claims asserted or which could have been asserted by Class members against Trott Law PC and its predecessors and successors, past and present employees, agents, officers, directors, shareholders, insurers and partners, and David A. Trott and his heirs and successors (the "Released Parties") based upon the facts alleged in the Complaint, including any claim under any federal or state law based upon or relating to lack of attorney meaningful review of Class member accounts prior to the sending of the Trott PC Foreclosure Letter, a contention that language in the Trott PC Foreclosure Letters regarding the timing of reinstatement requests or approvals overshadowed Class member's validation rights under federal or state law; or that use of the phrase "Corporate Advance" in the Trott PC Foreclosure Letter was misleading; and also including any claim of individual responsibility of David A. Trott for use by Trott Law PC of the form template, or form language, in any version of the Trott PC Foreclosure Letters. These claims described above are referred to as the "Released Claims." See Section 13 of the Settlement Agreement, available at www.TrottFairDebtSettlement.com.

## THE LAWYERS REPRESENTING YOU

### 11.  Do I have a lawyer in the case?

Andrew J. McGuinness, of Andrew J. McGuinness, Esq., and Andrew N. Friedman, of Cohen Milstein Sellers & Toll PLLC, represent Plaintiffs and the Settlement Class ("Class Counsel"). You will not be charged by any lawyers.  If you want to be represented by your own lawyer, you may hire one at your own expense.

### 12.  How will the lawyers be paid?

At the Final Fairness Hearing, Class Counsel will apply for an award of attorneys' fees, expenses, and service awards of $5,000 to each of the Class Representatives. The application for attorneys' fees will not exceed $2,500,000 (33 & ⅓ % of the Settlement Common Fund). These applications are subject to approval by the Court, which may award an amount less that the amount requested. Any approved fees, expenses, service awards, and claims administration costs will be paid from the Settlement Common Fund.

To date, Class Counsel have not received any payment for their services in prosecuting this case on behalf of the Settlement Class, nor have Class Counsel been reimbursed for their out-of-pocket expenses.  The fees requested by Class Counsel would compensate them for their efforts in achieving the Settlement for the benefit of the Settlement Class and for their risk in undertaking this representation on a contingency basis, meaning that they would only receive payment to compensate them for their years of work and expense in this class action if it resulted in a benefit to you.  The Court will determine the actual amount of the attorneys' fees and expenses to be awarded.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

### 13.  Can I exclude myself from the Settlement?

Yes. If you exclude yourself ("opt out"), you will not be eligible to receive any cash payment and will not be bound by any judgment or release of claims against the Defendants under the Settlement.

To opt out Settlement Class members must send by U.S. Mail, First Class postage prepaid, a request for exclusion to the Claims Administrator postmarked no later than [Date], 2018. The request for exclusion must: (a) identify the full name and address of the potential Settlement Class member requesting exclusion; (b) be personally signed (original signatures only) by the potential Settlement Class member requesting exclusion, or by a person documented to be acting under valid power of attorney, guardianship, or other legal authority to sign on behalf of the potential Settlement Class member or his estate; and (c) contain a statement that reasonably indicates a desire to be excluded from the Settlement. The following statement shall be deemed to meet the requirement of subpart (c) of the preceding sentence: "I want to opt out of the Settlement Class certified in the *Martin v. Trott Law PC* case."  Additionally, the request for exclusion must provide EITHER the unique I.D. number on a postcard sent by the Claims Administrator to the potential Settlement Class member, OR the address of the property to which Trott & Trott, PC, or Trott Law PC mailed the foreclosure/fair debt letter(s) to the potential Settlement Class member during the Settlement Class Period.  Requests for exclusion that do not meet these requirements will not operate to exclude a Class member from the Settlement. Mass or class opt-outs will not be allowed.

11

Please mail requests for exclusion to:

> Trott Class Action Settlement Administrator
> P O Box XXX
> Portland, OR XXXXX-XXXX

Only Class members who do not opt out may object to the Settlement, as set forth below.

**14. If I do not exclude myself from the Class, can I sue the Defendants for the same thing later?**

No.  Unless you exclude yourself from the Class by filing a timely and valid Request for Exclusion as detailed above, you give up any rights to bring a lawsuit or claim in any forum asserting any of the Released Claims against the Released Parties.

**15. If I exclude myself, can I get money from this Settlement?**

No.  You will, however, retain any right you may have to bring a lawsuit, to continue to pursue an existing lawsuit, or to be part of a different lawsuit asserting a Released Claim against a Released Party.

## OBJECTING TO THE SETTLEMENT

**16. How do I tell the Court if I don't like the Settlement?**

Any member of the Settlement Class who wishes to object to the fairness, reasonableness, or adequacy of the Settlement, to any term of the Settlement Agreement, to the application for payment of attorneys' fees and expenses, or to the application for service awards for the Class Representatives, may file an "Objection" in writing.  If you wish to file an Objection, the written Objection and supporting papers must: (1) clearly identify the case name and number "*Martin, et al., v. Trott Law PC, and David A. Trott*, Case No. 2:15-cv-12838; (2) be filed with the Court; and (3) postmarked and mailed, or faxed, to Class Counsel and Defendants' Counsel at the addresses below no later than thirty (30) days before the Final Fairness Hearing (unless you file an objection via the Court's ECF system by that date, such that copies will be transmitted electronically to these counsel); (4) set forth your full name, current address, and telephone number; (5) set forth a statement of the position you wish to assert, including the factual and legal grounds for the position; (6) set forth the names and a summary of testimony of any witnesses that you might want to call in connection with the Objection; (7) provide copies of all documents that you wish to submit in support of your position; (8) provide the name(s), address(es) and phone number(s) of any attorney(s) representing you; (9) identify by case name, case number and court each class action settlement objected to by you or your attorney (if any) in the last three years; and (10) include your signature. The right to object to the Settlement must be exercised individually by a Class member and, except in the case of a deceased or incapacitated Class member or where a Class member is represented by counsel, not by another Person acting or purporting to act in a representative capacity.

The addresses for filing Objections with the Court and service on counsel are listed below.  **Your written Objection must be filed with the Court, and mailed to the counsel listed below, postmarked (or sent via fax or served via the Court's ECF system to counsel) by no later than [Date], 2018:**

**Questions? Visit www.TrottFairDebtSettlement.com or call 1-888-XXX-XXXX.**
**DO NOT CALL THE COURT as they cannot answer your questions.**

FILE WITH THE CLERK OF COURT:

>Clerk's Office
>Theodore Levin U.S. Courthouse
>231 W. Lafayette Blvd., Room 564
>Detroit, MI 48226

**And, by the same date, serve copies of all such papers by mail or fax/ECF to each of the following:**

PLAINTIFFS' and CLASS COUNSEL:

>Andrew J. McGuinness
>ANDREW J. McGUINNESS, ESQ.
>P O Box 7711
>Ann Arbor, MI 48107
>Fax: (734) 786-9935

>Andrew N. Friedman
>Sally Handmaker
>COHEN MILSTEIN SELLERS & TOLL PLLC
>1100 New York Avenue, N.W. Suite 500
>Washington, D.C. 20005
>Fax: (202) 408-4699

COUNSEL FOR TROTT LAW, PC:

>Kathleen H. Klaus
>MADDIN, HAUSER, ROTH & HELLER PC
>28400 Northwestern Hwy, 2nd Floor
>Southfield, MI 48034
>Fax: (248) 359-7560

COUNSEL FOR DAVID A. TROTT:

>Bruce L. Segal
>HONIGMAN MILLER SCHWARTZ AND COHN LLP
>39400 Woodward Ave, Suite101
>Bloomfield Hills, MI 48304
>Fax: (248) 566-8483

**UNLESS OTHERWISE ORDERED BY THE COURT, ANY MEMBER OF THE SETTLEMENT CLASS WHO DOES NOT OBJECT IN THE MANNER DESCRIBED HEREIN WILL BE DEEMED TO HAVE WAIVED ANY OBJECTION AND SHALL BE FOREVER FORECLOSED FROM MAKING ANY OBJECTION TO THE PROPOSED SETTLEMENT AND THE APPLICATION FOR ATTORNEYS' FEES AND EXPENSES AND SERVICE AWARDS TO THE NAMED PLAINTIFFS.**

**17.  What is the difference between objecting and requesting Exclusion?**

Objecting is simply telling the Court that you do not like something about the proposed Settlement.  Objecting does not prevent you from participating and recovering money in the Settlement.  However, you can object only if you stay in the Settlement Class.  Excluding yourself is telling the Court that you do not want to be part of the Settlement Class.  If you exclude yourself, you have no basis to object because the Settlement no longer affects you.

**THE COURT'S FAIRNESS HEARING**

**18.       When and where will the Court decide whether to approve the Settlement?**

The Court will hold a Final Fairness Hearing at [Time, on Date], 2018, at the United States District Court for the Eastern District of Michigan, 231 W. Lafayette Blvd., Detroit, Michigan, Courtroom No. 716.

**<u>YOU DO NOT NEED TO ATTEND THE FINAL FAIRNESS HEARING.</u>**

At the hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them.  After the Final Fairness Hearing, the Court will decide whether to approve the Settlement.  The Court will also rule on the motions for attorneys' fees and expenses and service awards to the Named Plaintiffs.  We do not know how long the hearing or these decisions will take.

**19.  Do I have to come to the hearing?**

No.  Class Counsel will answer any questions Judge Lawson may have.  You are welcome to come at your own expense.  If you send an Objection, you do not have to come to Court to talk about it. As long as you mailed your written Objection on time, it will be before the Court when the Court considers whether to approve the Settlement as fair, reasonable, and adequate.  At your own expense, you may also have your own lawyer attend the Final Fairness Hearing, but such attendance is not necessary.

**20.  May I speak at the hearing?**

If you are a member of the Settlement Class and you have filed a timely Objection, you may ask the Court for permission to speak at the Final Fairness Hearing.  To do so, you must file with the Court a letter or other paper called a "Notice of Intention to Appear at Fairness Hearing in *Martin, et al., v. Trott Law PC and David A. Trott*, Case No. 2:15-cv-12838."  Be sure to include your name, address, telephone number, and your signature.  Your Notice of Intention to Appear must be served on the attorneys listed in Paragraph 13, above, postmarked or sent via facsimile no later than [Date] 2018, and must also be filed with the Clerk of the Court, postmarked no later than [Date], 2018.

The Final Fairness Hearing may be delayed by the Court without further notice to the Class.  If you wish to attend the hearing you should confirm the date and time on the settlement website or check with Class Counsel.

14

## IF YOU DO NOTHING

**21.  What happens if I do nothing at all?**

If you do nothing and you are a Class member, your claims against the Trott Law PC and David A. Trott will be released if the Settlement is approved. Remember, you can only obtain your Settlement benefit by completing and timely submitting the claim form.

## GETTING MORE INFORMATION

22**.  How do I get more information?**

This Notice summarizes the proposed Settlement.  Full details of the Settlement are set forth in the Settlement Agreement.  You may read or download a copy of the Settlement Agreement at the Settlement website at the URL provided in this Notice, or by calling the listed toll-free number, or by making a written request to the Claims Administrator.  Copies of the Settlement Agreement, as well as the motion seeking preliminary approval of the Settlement and the Preliminary Approval Order, may be viewed at www.TrottFairDebtSettlement.com. Do not call Trott Law PC with questions about the settlement.


DATED:        [Date], 2018                          By Order of the Court
                                                    Hon. David M.  Lawson
                                                    United State District Judge


15

# EXHIBIT 1-C

Trott Settlement Claims Administrator
PO Box _____
[City], [State] [Zip]

PRESORTED
FIRST-CLASS
MAIL
US POSTAGE
**PAID**
CITY, ST
PERMIT #000

Important Notice About a Class Action Settlement

<<BARCODE>>

<<First1>> <<Last1>>
<<CO>>
<<Addr2>>
<<Addr1>>
<<CITY, ST, ZIP>>
<<COUNTRY>>

■                                                                    ■

www.TrottFairDebtSettlement.com          1-888-XXX-XXX

## Cash Payment Claim Form

To make a Claim for a cash payment from the Settlement Common Fund, the person to whom this card is addressed <u>must</u> fill out, sign and return this card and mail it by **[Date],** OR you can submit your claim online by 11:59 p.m. EDT on [same **Date**] at www.TrottFairDebtSettlement.com by inputting this unique identification number:  <<CLAIM ID>>

First Name                          MI          Last Name

| | | | | | | |     | |     | | | | | | | | | | | |

Current Address

| | | | | | | | | | | | | | | | | | | | | | | |

City                                                State          Zip Code

| | | | | | | | | | | |                          | |     | | | | |

Signature                                           Date (MM/DD/YY)

| _____ |          | | | - | | | - | | |

<<BARCODE>>

Legal Notice

Legal Notice

**If You Received a Foreclosure Letter from Trott & Trott PC or Trott Law PC,**
**You May Be Eligible for a Payment from a Class Action Settlement.**

A $7,500,000 Settlement has been reached in a class action lawsuit about foreclosure letters sent to Michigan homeowners alleging violations of federal and state fair debt collection laws. Defendants deny that there was anything wrong with the letters. The Defendants are Trott Law, PC, and David A. Trott. The Court has not decided who is right. **This lawsuit does not challenge or impact the outcome of any current or past foreclosure proceeding.**

**Who's Included?** The Class includes Michigan homeowners with mortgages held or serviced by a client of Trott Law PC, f/k/a Trott & Trott PC, to whom the firm sent its foreclosure ("fair debt") letters from August 11, 2009, to [**Date**, 2018]. *Records show that the person(s) to whom this postcard is addressed is (are) a member(s) of the Class.*

**What Are the Settlement Terms?** Defendants have agreed to pay $7,500,000 into a Settlement Common Fund. This fund will be used to pay costs, expenses, service awards to the Class Representatives, attorneys' fees, and valid claims. Trott Law PC has also agreed to certain language changes to clarify its fair debt letters.

**How Can I Get a Payment?** To get a payment, you must submit a valid Claim Form (attached) by U.S. mail, or submit a claim online, before the deadline. Class members may fill out, sign, and mail the attached postage-prepaid Claim Form, or submit a claim online using the unique identification number found on the Claim Form. The deadline to submit a claim is 11:59 p.m. EDT on **[date]**. There is a limit of one claim per Class Member. **Note: Two individuals at one address may receive separate postcards, with different ID numbers.** Each such individual is a Class Member and must *separately* complete a claim form or otherwise exercise his or her rights under the Settlement. Whereas the Settlement amount represents a per-Class Member value of approximately $26, once the Settlement is approved, those who timely submit a valid claim will be sent checks for the pro-rata amount of the Settlement Common Fund remaining after deducting costs, expenses, service awards, and attorneys' fees authorized by the Court. The precise amount of your check is unknown at this time and will depend upon the number of valid claims submitted, but **it is estimated to be in a range of approximately $75-$150**.

**Your Rights May Be Affected.** If you do not want to be bound by the Settlement you must exclude yourself by **[Date, 2018]**. If you do not exclude yourself you will release claims you may have against Defendants as more fully described in the Settlement Agreement. Visit, www.TrottFairDebtSettlement.com to read the Settlement Agreement and full Notice or call the listed phone number to request these documents. **Do not call the Court or Trott Law, P.C. about the settlement.** If you stay in the Class you may object to the Settlement by **[Date, 2018].** The full Notice explains how to exclude yourself from the Class or object to the Settlement. The Court will hold a hearing on **[Date, 2018]** to consider whether to approve the Settlement and a request for attorneys' fees of up to 33 & 1/3% of the Settlement Common Fund, plus costs, and Class Representative service awards of $5,000. You may appear at the hearing, either yourself or through an attorney hired by you, but you don't have to. *For more information, call 1-888-xxx-xxxx or visit www.TrottFairDebtSettlement.com.*

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

Trott Settlement Claims Administrator
PO Box _____
[City], [State]  [Zip]

[bar code]

# EXHIBIT 1-D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
Southern Division

Brian J. Martin, Yahmi Nundley, and Kathleen
Cadeau, individually and on behalf of all others
similarly situated,

   Plaintiffs,

v.

Trott Law P.C., and David A. Trott,

   Defendants.

_____/

Case No. 2:15-cv-12838

Hon. David M. Lawson

CLASS ACTION

## [PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF CONDITIONAL CLASS ACTION SETTLEMENT AND DIRECTING CLASS NOTICE

WHEREAS, Plaintiffs Brian J. Martin, Yahmi Nundley, and Kathleen

Cadeau (collectively, "Plaintiffs"), and Defendants Trott Law P.C., and David A.

Trott (collectively, "Defendants," and collectively with Plaintiffs, the "Parties")

have entered into a Class Action Settlement Agreement ("Settlement Agreement"

or "Agreement"), subject to the final approval of this Court;

WHEREAS, it appears to the Court that the Settlement Agreement and the

settlement described therein was the result of extensive settlement negotiations

among the Parties with a neutral mediator approved by the Court, pursuant to an

order for facilitative mediation entered by the Court;

WHEREAS, Plaintiffs have moved, without opposition by Defendants, for

preliminary approval of the settlement on a class basis under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), conditioned upon this Court's final approval of the settlement substantially on the terms proposed and without material alteration by the Court;

WHEREAS, Plaintiffs ask this Court to conditionally certify the class as defined below for settlement purposes, to appoint them as class representatives, and to appoint class counsel; and

WHEREAS, Plaintiffs ask that this Court appoint Epiq Class Action and Claims Solutions, Inc. ("Epiq"), as Claims Administrator, to authorize class notice as detailed in the moving papers and below, to set a Final Fairness Hearing date, and to otherwise authorize the Parties and the Claims Administrator to take steps to implement the settlement, subject to final approval and certification of a settlement class;

NOW THEREFORE, the Court hereby ORDERS as follows:

1.      The motion is GRANTED.

2.      The Court finds preliminarily, subject to final determination following notice and a final fairness hearing, that the settlement likely complies with Federal Rule of Civil Procedure 23, and that it is sufficiently fair, reasonable, and adequate to provisionally certify a settlement class, appoint class counsel, and to authorize dissemination of class notice.  Accordingly, the Settlement Agreement is

preliminarily approved. Unless otherwise provided herein, the terms defined in the

Settlement Agreement shall have the same meanings in this Order.

     3.     The Class provisionally certified by this Order is as follows:

> All individuals to whom Trott Law PC caused to be sent any version of the Trott PC Foreclosure Letter as defined in the Settlement Agreement, in connection with mortgages conveyed for residential real property located in Michigan, which was not returned as undelivered by the U.S. Post Office, dated from August 11, 2009, through the date of the entry of this Order. Excluded from the Class is any person whose name and address is not supplied to the Claims Administrator as a Class Member by Trott Law PC; the Court and any member of the Court staff; and any putative class member who timely submits a valid request for exclusion.

     4.     The Court hereby appoints Brian J. Martin, Yahmi Nundley, and

Kathleen Cadeau provisionally as Class Representatives.

     5.     The Court hereby appoints Andrew J. McGuinness and Andrew N.

Friedman as interim Class Counsel.

     6.     The Court hereby approves the retention of Epiq to serve as Claims

Administrator.  Epiq will work under the direction of Class Counsel and in

accordance with Court orders to provide Notices, respond to inquiries from

potential Class Members, receive Requests for Exclusion, and to receive and

process Class Member Claims. The invoices of Epiq for its reasonable services and

expenses in connection with administering the settlement shall be paid when due

from the Settlement Common Fund, subject to review by Class Counsel.

     7.     The Claims Administrator shall disseminate Notice to the potential

Class Members by the following means: by first class mail of the Postcard Notice and Claim Form; by posting and making available for download the Long Form Notice on a Settlement Website to be established by the Claims Administrator to be referenced in the Postcard Notice; through Publication Notice, consisting of publicizing the settlement and the Settlement Website through the placement of internet advertisements substantially in the form of Exhibit E to the Settlement Agreement, sufficient to achieve at least eight million impressions in Michigan and at least another four million impressions nationally; and by the Claims Administrator establishing and publicizing a toll-free number through which Class Members may request that a Long Form Notice and Claim Form be mailed to them.  The Claims Administrator shall update the list of addresses of Class Members provided by Trott Law PC prior to mailing the Postcard notice, using both U.S. Postal Service update services and third-party services.

8.     The Claims Administrator shall mail the Postcard Notices within thirty (30) days following entry of this Order (Notice Date), unless a later date is approved by the Court for good cause shown. The Postcard Notice shall publish the URL for the Settlement Website, and contain a Claim Form, and be in substantially the form contained in Exhibit C of the Settlement Agreement submitted to the Court.

9.     The Claims Deadline shall be ninety (90) days after the Notice Date.

The Claims Administrator may use commercially reasonable judgment and efforts in seeking to correct deficient Claims, provided that any deficient claim be corrected no later than thirty (30) days after a Class Member is notified of the deficiency.

10.     The Settlement Website shall provide Class Members access to the Long Form Notice, this Order, the Settlement Agreement, and the Second Amended Class Complaint (Corrected). The Settlement Website shall also provide a means for Class Members to submit a claim online using either the unique identification number provided by Claims Administrator and included in the Postcard Notice, or by providing the property address of the property that was the subject of the Trott PC Foreclosure Letter asserted as the basis for the Claim.

11.     The Court finds that the dissemination of the Notices in the manner set forth in this Order constitutes reasonable notice and the best notice practicable under the circumstances, and is consistent with Federal Rule of Civil Procedure 23 and the Due Process Clause of the United States Constitution.

12.     Potential Class Members who elect to be excluded from the Class (Opt Outs) shall mail a written Request for Exclusion to the Claims Administrator at the address provided in the Postcard Notice or Long Form Notice, via First Class U.S. Mail, postage prepaid by the potential Class Member, postmarked no later than thirty (30) days before the Final Fairness Hearing. Requests for Exclusion

must identify the full name and address of the potential Class Member requesting exclusion; (b) be personally signed (original signatures only) by the potential Class Member requesting exclusion, or by a person documented to be acting under valid power of attorney, guardianship, or other legal authority to sign on behalf of the potential Class Member or his estate; and (c) contain a statement that reasonably indicates a desire to be excluded from the settlement. The following statement shall be deemed to meet the requirement of subpart (c) of the preceding sentence: "I want to opt out of the Settlement Class certified in the *Martin v. Trott Law PC* case."  Additionally, the request for exclusion must provide EITHER the unique I.D. number on a postcard sent by the Claims Administrator to the putative class member, OR the address of the property to which Trott & Trott, PC, or Trott Law, PC, mailed the foreclosure letter(s) to the potential Class Member during the Settlement Class Period.  Requests for exclusion that do not meet these requirements will not operate to exclude a potential Class Member from the settlement. Mass or class opt-outs are not allowed.

13. A potential Class Member who submits a valid Request for Exclusion by the opt-out deadline shall not be deemed a Class Member nor bound by the settlement, and shall not be entitled to submit a Claim or to object to the Settlement. The Claims Administrator shall log each Request for Exclusion and provide copies of the log to Class Counsel and counsel for Defendants on a bi-

weekly basis.

14.     No later than fifteen (15) Days before the Final Fairness Hearing, the Claims Administrator shall provide to Class Counsel and counsel for Defendants report stating the total number of Class Members who have submitted timely and valid Requests for Exclusion, including a listing of the names and addresses of such Opt Outs, and reporting the number of Requests for Exclusion divided by the number of Class Members in the Settlement Class (the "Exclusion Percentage").

15.     To effectuate the settlement, the Claims Administrator shall be responsible for the receipt and processing of all Requests for Exclusion and Claim Forms.  Class Members who submit timely and valid Claims shall each be limited to one pro-rata share of the distribution of the Net Settlement Fund. The Claims Administrator shall preserve (on paper or transferred in to electronic format) all Requests for Exclusion, Claim Forms, and any and all other written communications from Class Members in response to the Notices for a period of one year, or pursuant to further order of the Court.  All written communications received by the Claims Administrator from Class Members relating to the Settlement Agreement shall be available at all reasonable times for inspection and copying by Class Counsel and counsel for Defendants, including prior to payments being sent to each Class Member.

16.     Class Members who have not requested exclusion from the Class may

object to the settlement no later than thirty (30) days before the Final Fairness

Hearing.  Objectors must file written notices of intent to object with the Court and

serve copies of any such objection on counsel for the Parties.  Any Class Member

who submits a valid Objection may appear at the Final Fairness Hearing in person

or by counsel and be heard to the extent allowed by the Court, concerning the

fairness, reasonableness and adequacy of the settlement, and on Class Counsel's

application for Service Awards, of attorneys' fees, and reimbursement of costs and

expenses.  The right to object to the settlement must be exercised individually by a

Class Member and, except in the case of a deceased or incapacitated Class Member

or where a Class Member is represented by counsel, not by another Person acting

or purporting to act in a representative capacity.

17.    To be effective an objection must:

(a)    identify in the caption the name of the action and the case

number substantially as follows:  *Martin v. Trott Law PC*, Case No. 2:15-cv-

12838;

(b)    be filed with the Court no later than thirty (30) days before the

Final Fairness Hearing;

(c)    be postmarked and mailed to Class Counsel and Defendants'

counsel at the addresses listed in the Long Form Notice no later than thirty

(30) Days before the Final Fairness Hearing (unless the Class Member filed

an objection via the Court's ECF system, such that copies will be transmitted electronically to these counsel);

(d) set forth the full name, current address, telephone number, and the unique I.D. number assigned by the Claims Administrator of the objecting Class Member;

(e) set forth a statement of the position the Class Member wishes to assert, including the factual and legal grounds for the position;

(f) state whether the Class Member intends to appear and request to be heard, in person or through counsel, at the Final Fairness Hearing, and set forth the names and a summary of testimony of any witnesses that the Class Member might want to call in connection with the objection;

(g) provide copies of all documents that the Class Member wishes to submit in support of his or her position;

(h) provide the name(s), address(es) and phone number(s) of any attorney(s) representing the Class Member in connection with the objection;

(i) identify by case name, case number and court each class action settlements objected to by the Class Member or by his or her counsel (if any) in the last three years; and

(j) include the Class Member's signature.

18.   Any Class Member who does not timely file and serve an objection in

accordance with this Order waives the right to object or to be heard at the Final

Fairness Hearing and shall be forever barred from making any objection to the

settlement.  To the extent any Class Member objects to the settlement and such

objection is overruled in whole or in part, such Class Member will be bound by

any order or judgment approving the settlement.

19.     Counsel for the Parties may seek expedited leave from the Court to

depose an objector prior to the scheduled Final Fairness Hearing if such objector

does not voluntarily agree thereto, and may request expedited production prior to

the deposition of any nonprivileged matter that is relevant to the objection and

proportionate to the needs of the case.

20.     In order to be entitled to participate in the Settlement Class, a Class

Member must submit a valid Claim on or before ninety (90) days after the Notice

Date.  Any Class Member of the Class who does not timely submit a valid Claim

shall not be entitled to share in the Net Settlement Fund, but nonetheless shall be

bound by any order or judgment approving the settlement.

21.     The Final Fairness Hearing will be held before this Court, in

Courtroom 716, at the United States District Court of the Eastern District of

Michigan, 231 W. Lafayette Blvd., Detroit, Michigan at __:__ p.m. on [date],

2018, or such other place, time and date set by the Court.

22.     Class Counsel shall submit a motion for final approval of the

settlement by the Court, as well as a motion for attorneys' fees, expenses, and Service Awards, and any memoranda, declarations, or other statements and materials in support of same, no later than forty-five (45) days prior to the Final Fairness Hearing.

23.    At the Final Fairness Hearing the Court will consider, *inter alia*: (a) the fairness, reasonableness, and adequacy of the settlement, and whether to approve it; (b) whether to grant the Injunctive Relief set forth in the Settlement Agreement; (c) whether to retain jurisdiction to enforce the Settlement, and otherwise to dismiss, with prejudice, the action; (d) and whether to grant Class Counsel's application for attorneys' fees, expenses, and Service Awards for the Class Representatives.

24.    No later than fifteen (15) days before the Final Fairness Hearing, the Claims Administrator shall provide to Class Counsel and counsel for Defendants the following information:

(a)    The number of Postcard Notices sent to Class Members;

(b)    The approximate number of visits to the Settlement Website from the date of entry of a Preliminary Approval Order;

(c)    The number of Class Members who have to date submitted Approved Claims; and

(d)    The names and addresses of putative class members who have

timely requested exclusion from the settlement in compliance with this Order, together with any information about any objections that the Claims Administrator has not previously circulated.

25.     No later than ten (10) days before the Final Fairness Hearing, Class Counsel shall file a report with the total number of putative class members who have submitted timely and valid Requests for Exclusion and the names of such putative class members.

26.     The Parties shall file any supplemental papers in support of final approval and for attorneys' fees, expenses, and Service Awards no later than ten (10) days before the Final Fairness Hearing.

27.     In the event that the Settlement Agreement is terminated in accordance with the provisions of the Settlement Agreement, the settlement and all proceedings had in connection therewith shall be null and void, except insofar as expressly provided in the Settlement Agreement, and without prejudice to the *status quo ante* rights of Plaintiffs and Defendants.

28.     The following chart contains a summary of Dates and Deadlines:

| Event | Date |
|---|---|
| Deadline for Defendants to fund the Settlement Common Fund | Ten (10) Days from the date of this Order. |
| Deadline to disseminate Notice to the Class ("Notice Date") | Thirty (30) days from the date of this Order, unless otherwise ordered. |
| Last day to file (1) Motion for Final Approval and (2) Fee and Cost Application | Forty-five (45) days prior to Final Approval (Final Fairness) Hearing. |

| | |
|---|---|
| Last day for objections to settlement or opposition to Motion for Final Approval and/or Application for Fees, Costs, and Service Awards | Thirty (30) days prior to Final Fairness Hearing. |
| Last day for potential Class Members to file Requests for Exclusion | Thirty (30) days prior to Final Fairness Hearing. |
| Deadline for Claim Administrator to provide Class Counsel and Counsel for Defendants a report of the number of (1) Notices mailed/sent to Class Members, and (2) timely Requests for Exclusion | Seven (7) Days after the opt-out deadline. |
| Last day for the Parties to file supplemental papers in support of Motion for Final Approval and/or Fee Cost, and Service Award Applications | Ten (10) Days prior to Final Fairness Hearing. |
| Deadline for Class Counsel to file report regarding Requests for Exclusion | Ten (10) days prior to Final Fairness Hearing. |
| Final Fairness Hearing | [Date] [approximately 90 days from date of this Order, but not less than 100 days from date of submission of Motion for Preliminary Approval] |
| Deadline for Trott Law, PC to transfer Settlement Common Fund to Claims Administrator/Qualified Settlement Fund account | Promptly upon entry of order finally approving settlement. |
| Deadline for Class Members to cure deficient Claim Forms | Thirty (30) days from the date of the deficiency notice. |
| Claim Deadline | Ninety (90) days from the Notice Date. |
| Deadline for Claims Administrator to pay Class Counsel approved fees and expenses out of the Settlement Common Fund | Ten (10) Days from entry of an order or judgment awarding same. |
| Deadline for Claims Administrator to Distribute Checks | Sixty (60) days after the Effective Date or Thirty (30) days after the Claims Deadline, whichever is later. |

**IT IS SO ORDERED.**

DATED: _____, 2018        _____

Hon. David M. Lawson
United States District Judge

# EXHIBIT 1-E

*Martin v Trott*
# Banner Advertisement

**728x90 Online Display Banner for *Google Display Network* –**
Frame 1: Visible for 10 seconds.



Frame 2: Visible for 5 seconds.



**Desktop Right Column Banner for *Facebook* –**
Static Ad

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
Southern Division

Brian J. Martin, et al., individually and on
behalf of all others similarly situated,

Case No. 2:15-cv-12838

v.

Hon. David M. Lawson

Trott Law P.C., et al.,

Mag. Judge David R. Grand

     Defendants.

_____/

**DECLARATION OF ANDREW J. McGUINNESS IN
SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

I, Andrew J. McGuinness, hereby declare:

1.     I am an attorney in good standing admitted to practice in Michigan

and in United States District Court for the Eastern District of Michigan. I am lead

counsel of record in the above-captioned action.  I have practiced law since 1988,

and have been litigating class actions since approximately 1989.

2.     I make this declaration in support of Plaintiffs' Unopposed Motion

for Preliminary Approval of Class Action Settlement (the "Motion").

3.     The parties negotiated the Settlement Agreement (Exhibit 1 to the

Motion) after three separate mediation sessions, after more than two and a half

years of litigation.  These sessions were conducted by well-respected mediator, the

Honorable Gerald E. Rosen (ret.) All parties were represented by highly

experienced counsel. Andrew N. Friedman and the Plaintiffs participated directly

1

in the mediation sessions.

4.      I have practiced law since 1988, and have been litigating class actions since approximately 1989. Among the areas I have extensive class action litigation experience in are consumer, financial services, antitrust, products, and securities. I have represented both defendants and plaintiffs in class actions over the years. I was lead counsel for Ford Motor Company in the second-largest automobile recall multi-district litigation, *In re. Speed Control Deactivation Switch*, MDL 1718 (E.D. Mich.) (Friedman, J.). Other class action clients have included Best Buy, T-Mobile, Federal Mogul, Honeywell, Aventis Pharmaceuticals, and Abbott Laboratories. I served as head of the class action defense practice of the Dykema firm for approximately 5 years. I have served as class counsel in consumer actions against Apple Computer, UPS, Lumber Liquidators, GAF, and others. For the past nine years I have served as Planning Committee Member for the ABA Section of Litigation Annual National Institute on Class Actions, where co-teach a course I developed called "Class Actions 101," and have moderated numerous panel discussion on class action, including class action trials. I am the co-founder and committee member of the ABA's Annual Regional Class Action Program in San Francisco, CA. I regularly publish on class action matters.  I am the author of the ABA Antitrust Section's Antitrust Class Action Handbook's chapter on Class Certification, and editor of the chapter on Class Action Experts.  I am the author of the ABA Section of Litigation Class Action and Derivative Suits Committee

2

"Class Action Strategy" book, where I co-authored the chapter on Class Action Strategy and Trial Plans, and contributed to the editing of the Settlements chapter. More information about my background is available at www.topclasslaw.com/andrew-j-mcguinness-esq/.

5.       Attached as Exhibit A hereto is a firm resumes of Andrew N. Friedman of Cohen Milstein Sellers & Toll PLLC.

6.       At the time of settlement:  the parties had exchanged over 22,000 pages of documents and conducted ten fact depositions.

7.       Class counsel conducted an extensive investigation into the claims before filing the original complaint, consisting of voluminous searches of PACER files, review of publicly-available SEC reports, review of media, and witness interviews.

8.       Counsel for David Trott has repeatedly asserted that he intends to file a summary judgment on behalf of his client at the close of discovery.

9.       Over the course of the litigation and mediation, class counsel has gained extensive knowledge regarding the merits, strengths, and weaknesses of the claims and defenses asserted. Through depositions and review of extensive written discovery, class counsel learned many of the facts important to assessing the value of the claims, including the firm's historical and current business practices; its compliance measures; the role of the firm's Fair Debt Committee in approving form fair debt letters; the changes to those letters over the class period; how the

firm was managed, including the involvement of David Trott; and possible defenses to the claims.

10.    In the assessment of class counsel, defendant Trott Law PC is uncollectible for the maximum amount of potential class statutory damages under the RCPA for one or more willful violations of that statute.

11.    Co-counsel Andrew N. Friedman and I believe that the benefits conferred by the settlement are substantial, and represent a very good result for the class in light of the risks, costs, and delays attendant to further litigation. We each believe that the settlement is fair, reasonable, and adequate, and recommend its approval as such. The class representatives participated in the mediation and fully support the settlement.

12.    Based upon my own research and discovery obtained from Trott Law PC, I believe the class comprises approximately 291,000 members.

13.    Based on historical claims rates using the type of pre-paid postcard claim forms and similar notice programs, as assessed by Epiq, and the projected claims administration costs, litigation expenses, service awards, and possible attorneys' fees, class counsel estimate that class members who file a valid claim will receive a payout of approximately $75-$150, although the amount could be higher or lower.

14.    The proposed Postcard Notice for this case, including the proposed tear away hardcopy Claim Form, will be substantially in the form of Exhibit C to

the Settlement Agreement.  The Postcard Notice will provide key information, but in a clear and concise form that will reduce the risk of the postcards being thrown away without being reviewed in full.  The Postcard Notice will also direct Class Members to the Settlement Website, where the full Long Form Notice (which shall be substantially in the form of Exhibit B to the Settlement Agreement) and electronic Claim Form will be available.

15.    On the Settlement Website, Class Members will also be able file a Claim electronically using a unique identification number supplied by the Claims Administrator or the foreclosed property address.

16.    In addition, the Claims Administrator will implement an internet advertising campaign designed to achieve at least 8 million impressions in Michigan and another 4 million impressions nationally.

17.    Epiq Class Action & Claims Solutions, Inc. ("Epiq") is an experienced, qualified, and highly regarded service provider in the area of class action administration and class notice. Epiq has assisted in developing the proposed notice program in this action.

19.    I have investigated the proposed *cy pres* recipient, the non-profit Michigan Advocacy Program's (MAP) Michigan Foreclosure Prevention Project (MFPP), and learn that it provides comprehensive mortgage and tax foreclosure assistance to low- and moderate-income homeowners through its foreclosure specialist attorneys, which are housed in legal services programs in most regions of

5

the state. Attached as Exhibit B to this Declaration is a January 31, 2018, MFPP

Grant Report for the fourth quarter of 2017.

20.     Based on my pre-suit investigation and work in this action, I believe

that the injunctive relief we have negotiated as part of the settlement will be proved

a meaningful benefit to Michigan homeowners, and will be copied by Michigan

foreclosure law firms who view Trott Law PC as an industry leader.

* * *

I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.


Executed on April 20, 2018.


_____

Andrew J. McGuinness

# EXHIBIT 2-A

## COHEN  MILSTEIN  SELLERS  &  TOLL  PLLC

For decades, Cohen Milstein Sellers & Toll PLLC has represented individuals, small businesses, institutional investors, and employees in many of the major class action cases litigated in the United States for violations of the antitrust, securities, consumer protection, civil rights/discrimination, ERISA, employment, and human rights laws. Cohen Milstein is also at the forefront of numerous innovative legal actions that are expanding the quality and availability of legal recourse for aggrieved individuals and businesses both domestic and international.  Over its history, Cohen Milstein has obtained many landmark judgments and settlements for individuals and businesses in the United States and abroad. The firm's most significant past and present cases include:

- HEMT MBS Litigation (No. 1:08-cv-05653, U.S. District Court for the Southern District of New York). On May 10, 2016, U.S. District Judge Paul A. Crotty finally approved a $110 million settlement in the mortgage-backed securities class action brought by investors against Credit Suisse AG and its affiliates. This settlement ends claims brought by the New Jersey Carpenters Health Fund and other investors who claimed that the offering documents for the mortgage-backed securities at issue violated the Securities Act as they contained false and misleading misstatements concerning compliance with underwriting standards.

- In re Urethane Antitrust Litigation (Polyether Polyol Cases) (D. Kan.). Cohen Milstein serves as co-lead counsel on behalf of a class of direct purchasers of chemicals used to make many everyday products, from mattress foam to carpet cushion, who were overcharged as a result of a nationwide price-fixing conspiracy. On February 25, 2016, Cohen Milstein reached an agreement with The Dow Chemical Company to settle the case against Dow for $835 million. Combined with earlier settlements obtained from Bayer, Huntsman, and BASF, the Dow settlement pushed the total settlements in the case to $974 million. The settlement was approved on July 29, 2016.

- RALI MBS Litigation (Civ. No. 08-8781, U.S. District Court for the Southern District of New York). On July 31, 2015, Judge Katherine Failla gave final approval to a $235 million settlement with underwriters Citigroup Global Markets Inc., Goldman Sachs & Co., and UBS Securities LLC. She also approved a plan for distribution to investors of those funds as well as the previously approved $100 million settlement with RALI, its affiliates, and the individual Defendants that was reached in in 2013. This global settlement marks an end to a long and complicated class action over MBS offerings that RALI and certain of its affiliates issued and sold to the New Jersey Carpenters Health Fund and other investors from 2006 through 2007. The case took seven years of intense litigation to resolve.

- In re: Bear Stearns Mortgage Pass-Through Certificates Litigation (No. 08-08093, U.S. District Court for the Southern District of New York). On May 27, 2015, U.S. District Judge Laura Taylor Swain finally approved a class action settlement with JPMorgan Chase & Co., which agreed to pay $500 million and up to an additional $5 million in litigation-related expenses to resolve claims arising from the sale of $27.2 billion of mortgage-backed securities issued by Bear Stearns & Co. during 2006 and 2007 in 22 separate public offerings.

- Harborview MBS Litigation (No. 08-5093, U.S. District Court for the Southern District of New York). In February 2014, Cohen Milstein reached a settlement with the Royal Bank of Scotland (RBS) in the Harborview MBS Litigation, resolving claims that RBS duped investors into buying securities backed by shoddy home loans.  The $275 million settlement is the fifth largest class action settlement in a federal MBS case.  This case is one of eight significant MBS actions that Cohen Milstein has been named lead or co-lead counsel by courts and one of three that were nearly thrown out by the court, only to be revived in 2012.

- In Re Electronic Books Antitrust Litigation (No. 11-md-02293, U.S. District Court for the Southern District of New York). In August 2014, a New York federal judge approved a $400 million antitrust settlement in the hotly contested ebooks price-fixing suit against Apple Inc.  Combined with $166 million in previous settlements with

five defendant publishing companies, consumers could receive more than $560 million. The settlement resolves damages claims brought by a class of ebook purchasers and attorneys general from 33 U.S. states and territories.

- <u>Countrywide MBS Litigation</u> (2:10-cv-00302, U.S. District Court in the Central District of California). In April 2013, Plaintiffs in the landmark mortgage-backed securities (MBS) class action litigation against Countrywide Financial Corporation and others, led by Lead Plaintiff, the Iowa Public Employees' Retirement System (IPERS), agreed to a $500 million settlement. It is the nation's largest MBS-federal securities class action settlement. The settlement was approved in December 2013 and brings to a close the consolidated class action lawsuit brought in 2010 by multiple retirement funds against Countrywide and other defendants for securities violations involving the packaging and sale of MBS. The settlement is also one of the largest (top 20) class action securities settlements of all time.

- <u>In re Beacon Associates Litigation</u> (No. 09-cv-0777, United States District Court for the Southern District of New York). Class action settlement of $219 million for trustees and participants in ERISA-covered employee benefit plans whose assets were lost through investments made on their behalf by Beacon Associates LLC I & II in the investment schemes of Bernard Madoff.

- <u>In re Plasma-Derivative Protein Therapies Antitrust Litigation</u> (No. 09 C 7666, United States District Court for the Northern District of Illinois). After four years of litigation, in October of 2013, CSL Limited, CSL Behring LLC, CSL Plasma, Inc. (collectively, "CSL"), and the Plasma Protein Therapeutics Association ("PPTA") agreed to pay $64 million dollars to settle a lawsuit brought by the University of Utah Hospital and other health care providers alleging that CSL, the PPTA, and Baxter agreed between 2003-2009 to restrict the supply of immunoglobulin and albumin, and thereby increase the prices of those therapies. Two months later, Baxter International Inc. and Baxter Healthcare Corp. (collectively "Baxter") agreed to pay an additional $64 million to settle these claims – bringing the total recovery to the class to $128 million.

- <u>Keepseagle v. Vilsack</u> Civil Action No. 1:99CV03119 (D.D.C.). A class of Native American farmers and ranchers allege that they have been systematically denied the same opportunities to obtain farm loans and loan servicing that have been routinely afforded white farmers by the USDA. A class was certified in 2001 by Judge Emmet Sullivan, District Judge for the U.S. District Court for the District of Columbia, and the D.C. Circuit declined USDA's request to review that decision. On October 19, 2010, the case reached a historic settlement, with the USDA agreeing to pay $680 million in damages to thousands of Native American farmers and ranchers and forgive up to $80 million worth of outstanding farm loan debt.

- <u>In re Parmalat Securities Litigation</u> No. 04 MD 1653 (S.D.N.Y.). In this securities litigation case, Cohen Milstein has successfully negotiated two partial settlements totaling approximately $90 million. At the second partial settlement hearing, Judge Lewis A. Kaplan remarked that plaintiffs counsel "did a wonderful job here for the class and were in all respects totally professional and totally prepared. I wish I had counsel this good in front of me in every case." Our clients, four large European institutional investors, were appointed as co-lead plaintiffs and we were appointed as co-lead counsel. Most notably, this case allowed us the opportunity to demonstrate our expertise in the bankruptcy area. During the litigation, the company subsequently emerged from bankruptcy and we added "New Parmalat" as a defendant because of the egregious fraud committed by the now-bankrupt old Parmalat. New Parmalat strenuously objected and Judge Kaplan of the Southern District of New York ruled in the class plaintiffs' favor, a ruling which was affirmed on appeal. This innovative approach of adding New Parmalat enabled the class to obtain an important additional source of compensation, as we subsequently settled with New Parmalat.

- <u>Dukes v. Wal-Mart Stores, Inc.</u> No. C-01-2252 (N.D. Cal.). Cohen Milstein is co-lead counsel in this sex discrimination case. In 2004, the U.S. District Court certified a nationwide class action lawsuit for all female employees of Wal-Mart who worked in U.S. stores anytime after December 26, 1998. This was the largest civil

rights class action ever certified against a private employer, including approximately 1.5 million current and former female employees.  That ruling was appealed, and while affirmed by the Ninth Circuit, was reversed by the Supreme Court in June 2011. Cohen Milstein argued the case for the plaintiffs-respondents in the Supreme Court.   Since then, the *Dukes* action has been amended to address only the Wal-Mart regions that include stores in California, and other regional class cases have been or are soon to be filed.  This litigation to resolve the merits of the claims – whether Wal-Mart discriminates against its female retail employees in pay and promotions – continues.

- <u>Rubin v. MF Global, Ltd.</u> (08-CV-02233, S.D.N.Y.).  Acting as co-lead counsel in this class action, the Firm represented the Central States, Southeast and Southwest Areas Pension Fund which was one of the co- lead plaintiffs in the case.   In September 2010, as a result of Plaintiffs' decision to appeal, the U.S. Second Circuit Court of Appeals vacated in part the lower court's dismissal of the case and remanded the case for further proceedings. In overturning the District Court decision, the Second Circuit issued a decision which differentiated between a forecast or a forward looking statement accompanied by cautionary language -- which the Appellate Court said would be insulated from liability under the bespeaks caution doctrine -- from a factual statement, or non-forward-looking statement, for which liability may exist.  Importantly, the Second Circuit accepted Plaintiffs' position that where a statement is mixed, the court can sever the forward-looking aspect of the statement from the non-forward looking aspect.  The Court further stated that statements or omissions as to existing operations (and present intentions as to future operations) are not protected by the bespeaks caution doctrine. Mediation followed this decision and resulted in a settlement comprised of $90 million in cash.

- <u>Hughes v. Huron Consulting Group</u> (09-CV-04734, N.D. Ill.).  Cohen Milstein represented lead plaintiffs the Public School Teachers' Pension & Retirement Fund of Chicago and the Arkansas Public Employees Retirement System ("APERS") in this case against Huron Consulting Group, founded by former Arthur Anderson personnel following its collapse in the wake of the Enron scandal.   In August 2010, the District Court for the Northern District of Illinois denied defendants' motions to dismiss <u>in their entirety</u> and upheld plaintiffs' allegations that defendants intentionally improperly accounted for acquisition- related payments, which allowed plaintiffs to move forward with discovery.  The case was settled for $40 million, comprised of $27 million in cash and 474,547 shares in Huron common stock, with an aggregate value at the time of final approval in 2011 of approximately $13 million.

- <u>In re Lucent Technologies Securities Litigation</u> Civ. Action No. 00-621 (JAP) (D.N.J.).  A settlement in this massive securities fraud class action was reached in late March 2003.  The class portion of the settlement amounts to over $500 million in cash, stock and warrants and ranks as the second largest securities class action settlement ever completed.  Cohen Milstein represented one of the co-lead plaintiffs in this action, a private mutual fund.

- <u>Nate Pease, et al. v. Jasper Wyman & Son, Inc., et al.</u> Civil Action No. 00-015 (Knox County Superior Court, Me.).  In 2004, a state court jury from Maine found three blueberry processing companies liable for participating in a four-year price-fixing and non-solicitation conspiracy that artificially lowered the prices  defendants  paid  to approximately 800 growers for wild blueberries.   The jury ordered defendants Cherryfield Foods, Inc., Jasper Wyman & Son, Inc., and Allen's Blueberry Freezer, Inc. to pay $18.68 million in damages, the amount which the growers would have been paid absent the defendants' conspiracy.  After a mandatory trebling of this damage figure under Maine antitrust law, the total amount of the verdict for the plaintiffs is just over $56 million.  The Firm served as co-lead counsel.

- <u>In re StarLink Corn Products, Liability Litigation</u> MDL No. 1403. (N.D. Ill.).   Cohen Milstein successfully represented U.S. corn farmers in a national class action against Aventis CropScience USA Holding and Garst Seed Company, the manufacturer and primary distributor of StarLink corn seeds.  StarLink is a genetically modified corn variety that the United States government permitted for sale as animal feed and for industrial purposes, but never approved for human consumption.   However, StarLink was found in corn products sold in grocery stores across the country and was traced to widespread contamination of the U.S. commodity corn supply.   The

Firm, as co-lead counsel, achieved a final settlement providing more than $110 million for U.S. corn farmers, which was approved by a federal district court in April 2003.  This settlement was the first successful resolution of tort claims brought by farmers against the manufacturers of genetically modified seeds.

- <u>Snyder v. Nationwide Mutual Insurance Company</u> No. 97/0633 (Sup. Ct. N.Y. Onondaga Cty.).  Cohen Milstein served as one of plaintiffs' principal counsel in this case on behalf of persons who held life insurance policies issued by Nationwide through its captive agency force.  The action alleged consumer fraud and misrepresentations.  Plaintiffs obtained a settlement valued at more than $85 million.  The judge praised the efforts of Cohen Milstein and its co-counsel for having done "a very, very good job for all the people."  He complimented "not only the manner" in which the result was arrived at, but also the "time … in which it was done."

- <u>Oncology & Radiation Associates, P.A. v. Bristol Myers Squibb Co., et al.</u> No. 1:01CV02313 (D.D.C.).  Cohen Milstein has been co-lead counsel in this case since its inception in 2001. Plaintiffs alleged that Bristol-Myers Squibb unlawfully monopolized the United States market for paclitaxel, a cancer drug discovered and developed by the United States government, which Bristol sells under the brand name Taxol. Bristol's scheme included a conspiracy with American BioScience, Inc., a generic manufacturer, to block generic competition. Cohen Milstein's investigation and prosecution of this litigation on behalf of direct purchasers of Taxol led to a settlement of $65,815,000 that was finally approved by U.S. District Judge Emmet G. Sullivan on August 14, 2003 and preceded numerous Taxol-related litigations brought by the Federal Trade Commission and State Attorneys General offices.

- <u>Kruman v. Christie's International PLC, et al.</u> Docket No. 01-7309.  A $40 million settlement on behalf of all persons who bought or sold items through Christie's or Sotheby's auction houses in non-internet actions was approved in this action.  Cohen Milstein served as one of three leading counsel on behalf of foreign plaintiffs.  The Court noted that approval of the settlement was particularly appropriate, given the significant obstacles that faced plaintiffs and plaintiffs' counsel in the litigation.   The settlement marked the first time that claims on behalf of foreign plaintiffs under U.S. antitrust laws have been resolved in a U.S. court, a milestone in U.S. antitrust jurisprudence.

- <u>Roberts v. Texaco, Inc.</u> 94-Civ. 2015 (S.D.N.Y.).   Cohen Milstein represented a class of African-American employees in this landmark litigation that resulted in the then-largest race discrimination settlement in history ($176 million in cash, salary increases and equitable relief).  The Court hailed the work of class counsel for, *inter alia,* "framing an imaginative settlement, that may well have important ameliorative impact not only at Texaco but in the corporate context as a whole …".

- <u>Trotter v. Perdue Farms, Inc.</u> Case No. 99-893 (RRM) (JJF) (MPT), D. Del.  This suit on behalf of hourly workers at Perdue's chicken processing facilities – which employ approximately 15,000 people – forced Perdue to pay employees for time spent "donning and doffing," that is, obtaining, putting on, sanitizing and removing protective equipment that they must use both for their own safety and to comply with USDA regulations for the safety of the food supply.  The suit alleged that Perdue's practice of not counting donning and doffing time as hours worked violated the Fair Labor Standards Act and state law.      In a separate settlement with the Department of Labor, Perdue agreed to change its pay practices.  In addition, Perdue is required to issue retroactive credit under one of its retirement plans for "donning and doffing" work if the credit would improve employees' or former employees' eligibility for pension benefits.  Cohen Milstein was co-lead counsel.

## Awards & Recognition

- In 2018, Lawdragon named seven Cohen Milstein attorneys to the 2018 **"Lawdragon 500,"** an annual list of the **500 Leading Lawyers in America**.
- In 2018, Theodore J. Leopold was recognized as an **"Energy and Environmental Trailblazer"** by *The National Law Journal.*
- In 2018, *Law360* named Cohen Milstein a **"Practice Group of the Year: Privacy."**
- In 2017, *Law360* named Steven J. Toll a **Class Action MVP**, recognizing his leadership role in many of the country's most significant class actions for the year.
- In 2017, the *Daily Business Review (DBR)*, South Florida's leading legal industry publication, named Theodore J. Leopold *DBR's* **"Most Effective Lawyer of 2017: Class Action**."
- In 2017, Joel Laitman and Christopher Lometti, members of Cohen Milstein's Securities Litigation & Investor Protection practice group, and Betsy Miller and Victoria Nugent, co-chairs of the firm's Public Client practice group, were named **The National Law Journal's "Plaintiffs' Lawyers Trailblazers**."
- In 2017, **The Best Lawyers in America 2018© recognized seven Cohen Milstein partners,** including Judge Martha A. Geer, Karen L. Handorf, Leslie M. Kroeger, Stephan A. LeClainche, Theodore J. Leopold, Joseph M. Sellers, and Christine E. Webber for their respective practices of law.
- In 2017, Law360 named Cohen Milstein partners, S. Douglas Bunch and Kalpana Kotagal as **"Rising Stars."**
- In 2017, The Legal 500 named Cohen Milstein a **Leading Firm** in "Antitrust: Civil Litigation / Class Actions" and "Dispute Resolution: Securities Litigation – Plaintiff."
- In 2017, The Legal 500 named Richard A. Koffman, Co-Chair of Cohen Milstein's Antitrust Practice to its **"Legal 500 Hall of Fame."**
- In 2017, Legal 500 named Sharon K. Robertson and Brent W. Johnson as **"Legal 500 Next Generation Lawyer"** in the area of Antitrust: Civil Litigation/Class Actions.
- In 2017, Super Lawyers named Brent W. Johnson as a "Rising Star" and a **"Top Rated Antitrust Litigation Attorney in Washington, DC."**
- In 2017, Super Lawyers named Leslie M. Kroeger, Stephan A. Le Clainche, and Theodore J. Leopold "Florida Super Lawyers" and Nicholas C. Johnson and Adam J. Langino "Florida Rising Stars."
- In 2017, Super Lawyers' names Christopher Cormier a 2017 "Rising Star" and **"Top Rated Antitrust Litigation Attorney in Denver, CO."**
- In 2017, the Coalition for Independent Living Options Inc. presented Michael Dolce a Special Acknowledgment Award for his Commitment to Ending Sex Crimes against People with Disabilities
- In 2017, Adam J. Langino was Elected American Association for Justice's Newsletter Chair for the Product Liability Section
- In 2017, Florida Trend Named Manuel J. Dominguez a **"Legal Elite."**
- In 2017, Nicholas C. Johnson was elected President of the F. Malcolm Cunningham, Sr. Bar Association.
- In 2017, Leslie M. Kroeger was elected Treasurer to the Florida Justice Association.
- In 2017, Nicholas C. Johnson was reappointed Director the Palm Beach County Bar Association's North County Section Board of Directors until June 2019.
- In 2017, Law360 selected Cohen Milstein as a **"Competition Practice Group of the Year"** and a **"Class Action Practice Group of the Year."**
- In 2017, South Florida Legal Guide Names Theodore J. Leopold as a **"Top Lawyer",** and Diana L. Martin and Adam Langino a **"Top Up and Comer".**
- In 2016, Women in Wealth Awards selects Carol V. Gilden Selected as "Best in Securities Litigation Law - Illinois & Excellence Award for Investor Protection Law"
- In 2016, Law360 named Cohen Milstein's Richard A. Koffman a Competition Law MVP.
- In 2016, Cohen Milstein Partner Martha Geer was selected as a 2016 North Carolina Leaders in the Law Honoree.

- In 2016, the Washington Lawyers' Committee for Civil Rights and Urban Affairs named Cohen Milstein Sellers & Toll a recipient of its 2016 Outstanding Achievement Award.
- In 2016, for the eighth consecutive year, Cohen Milstein was recognized by The Legal 500 as one of the leading plaintiff class action antitrust firms in the United States.

- In 2016, Agnieszka Fryszman, Joel Laitman, Chris Lometti, Kit Pierson, Joe Sellers and Steve Toll were named to the **2016 Lawdragon 500 Leading Lawyers in America.**
- In 2016, Law360 named Cohen Milstein Partner Julie Goldsmith Reiser one of the **"25 Most Influential Women in Securities Law."**
- In 2016, Cohen Milstein is named to the **National Law Journal's "Plaintiffs Hot List"** for the fifth time in six years.
- In 2016, Law360 names Cohen Milstein as one of the top firms for female attorneys.
- In 2015, Law360 selects Cohen Milstein as the sole plaintiff firm to be selected in two **"Practice Groups of the Year"** categories and one of only five class action firms recognized.
- In 2015, Cohen Milstein was named an **Elite Trial Lawyer Firm by the National Law Journal** for the second year in a row.
- In 2015, Cohen Milstein Partner Steven J. Toll named a **Law360 MVP in Securities Law.**
- In 2015, Cohen Milstein is selected as a **"Most Feared Plaintiffs Firm" by Law360** for the third year in a row.
- In 2015, Richard Koffman was named, for the fifth consecutive year, in the Legal 500 United States **"Leading Lawyers" in "Litigation - Mass Tort and Class Action: Plaintiff Representation - Antitrust".**
- In 2015, Cohen Milstein's Denver office was named **"Antitrust Law Firm of the Year – Colorado"** by Global Law Experts.
- In 2015, Partners Theodore J. Leopold and Leslie M. Kroeger and Of Counsel Attorney Stephan A. LeClainche were selected "Florida Super Lawyers" and Adam J. Langino was selected "Florida Rising Star."
- In 2015, Cohen Milstein attorneys Andrew Friedman, Agnieszka Fryszman, Karen Handorf, Kit A. Pierson, Julie Reiser, Joseph M. Sellers, Daniel A. Small, Daniel S. Sommers, Steven J. Toll and Christine E. Webber were selected as **Washington DC Super Lawyers.**
- In 2015, Cohen Milstein attorneys Laura Alexander, Monya Bunch, S. Douglas Bunch, Johanna Hickman, Kalpana Kotagal, Emmy Levens, and David Young were selected as **Washington DC Rising Stars** by Super Lawyers.
- In 2015, for the fourth time in five years, Cohen Milstein was selected to the *National Law Journal* **Plaintiffs' Hot List**
- In 2015, Cohen Milstein Partner Carol V. Gilden was selected as **"Pension Funds Litigation Attorney of the Year in Illinois"** for the second year in a row by the Corporate INTL Legal Awards.
- In 2014, Cohen Milstein's Antitrust Practice was selected as a **Practice Group of the Year by Law360.** In 2014, Cohen Milstein Partner Kit Pierson was selected as an MVP by Law360.
- In 2014, Cohen Milstein was named a **"Most Feared Plaintiffs Firm"** by Law360 for the second year in a row. In 2014, Cohen Milstein was selected as an **Elite Trial Lawyer** firm by the National Law Journal.
- Cohen Milstein Partners Steven J. Toll, Joseph M. Sellers, Kit A. Pierson, and Agnieszka M. Fryszman Selected to the **2014 Lawdragon 500**.
- Joseph M. Sellers, Theodore J. Leopold, and Leslie M. Kroeger Make "**Best Lawyers**' List" for 2015.
- Released in 2014, the 2013 SCAS 50 Report on Total Securities Class Action Settlements once again ranked Cohen Milstein as a top firm.
- In 2014, Theodore J. Leopold, a partner at Cohen Milstein, was been selected to the Top 100 Miami Florida Super Lawyers list.  Partner Leslie M. Kroeger was selected to the **2014 Florida Super Lawyers** list and Diana L. Martin was selected to the **Florida Rising Stars** list.
- In 2014, Cohen Milstein attorneys Leslie M. Kroeger and Adam J. Langino were both recognized in the 2014 edition of **Florida Trend's Florida Legal Elite**™.  Kroeger is recognized as Legal Elite and Langino is listed as an Up-and-Comer.
- In 2014, Cohen Milstein was selected to the selected to the **National Law Journal's Midsize Hot List**.
- In 2014, Cohen Milstein was recognized as a "**Highly Recommended Washington, DC Litigation Firm**" by

- Benchmark Plaintiff: The Definitive Guide to America's Leading Plaintiff Firms and Attorneys.
- In 2014, Cohen Milstein was ranked as a **Leading Plaintiff Class Action Antitrust Firm in the United States by the Legal 500** for the sixth year in a row.

- In 2014, Partner Richard Koffman was named, for the fourth consecutive year, in the Legal 500 United States "**Leading Lawyers**" list under the category of "Litigation - Mass Tort and Class Action: Plaintiff Representation - Antitrust".
- In 2014, Cohen Milstein attorneys Christopher Cormier, Agnieszka Fryszman, Julie Goldsmith Reiser, Joseph Sellers, Daniel Sommers, and Steven Toll were recognized **as Local Litigation Stars** by Benchmark Plaintiff: The Definitive Guide to America's Leading Plaintiff Firms and Attorneys.
- In 2014, Cohen Milstein attorneys R. Joseph Barton, Andrew Friedman, Agnieszka Fryszman, Karen Handorf, Kit A. Pierson, Julie Reiser, Joseph M. Sellers, Daniel A. Small, Daniel S. Sommers, Steven J. Toll and Christine E. Webber were selected as **Washington DC Super Lawyers**.
- In 2014, Cohen Milstein attorneys Laura Alexander, Monya Bunch, S. Douglas Bunch, Jeffrey Dubner, Johanna Hickman, Joshua Kolsky, Kalpana Kotagal, Emmy Levens, Michelle Yau and David Young were selected as **Washington DC Rising Stars** by Super Lawyers.
- In 2014, Cohen Milstein Partner Carol V. Gilden was selected as the Illinois Pension Fund Attorney of the Year.
- In 2014, Best Lawyers named Cohen Milstein Partner Joseph Sellers D.C. Litigation - Labor & Employment Lawyer of the Year.
- In 2013, for the third-year in a row, Cohen Milstein was selected to the *National Law Journal* **Plaintiffs' Hot List**.
- In 2013, Cohen Milstein was named a "**Most Feared Plaintiffs Firm**" by Law360.
- In 2013, Cohen Milstein was ranked as a Leading Plaintiff Class Action Antitrust Firm in the United States by the Legal 500 for the fifth year in a row.
- In 2013, Cohen Milstein attorneys Joseph Barton, Andrew Friedman, Agnieszka Fryszman, Karen Handorf, Kit A. Pierson, Julie G. Reiser, Joseph M. Sellers, Daniel A. Small, Daniel S. Sommers, Steven J. Toll, and Christine E. Webber were selected as **Washington DC Super Lawyers**.
- In 2013, Cohen Milstein attorney Michelle Yau was selected as **Washington DC Rising Stars** by Super Lawyers. In 2013, Cohen Milstein Partner Carol V. Gilden was selected as a **2013 Illinois Super Lawyer**. She has been selected every year since 2005.
- In 2012, for the second-year in a row, Cohen Milstein was selected to the *National Law Journal* **Plaintiffs' Hot List**.
- In 2012, Cohen Milstein was the recipient of the Judith M. Conti Pro Bono Law Firm of the Year Award from the Employment Justice Center.
- In 2012, Cohen Milstein was recognized as a "Highly Recommended Washington, DC Litigation Firm" by
- Benchmark Plaintiff: The Definitive Guide to America's Leading Plaintiff Firms and Attorneys.
- In 2012, Cohen Milstein was ranked as a top firm by the 2011 SCAS Report on Total Securities Class Action Settlements.
- In 2012, Cohen Milstein was ranked as a Leading Plaintiff Class Action Antitrust Firm in the United States by the Legal 500 for the fourth year in a row.
- In 2012, Partner Joseph M. Sellers was selected as a **Washington DC Super Lawyer**.   Mr. Sellers was also selected for this prestigious award in 2007, 2008, 2009, 2010, and 2012.
- In 2012, Partner Steven J. Toll was selected as a **Washington DC Super Lawyer**.  Mr. Toll was also selected for this prestigious award in 2007, 2009, 2010, and 2011.
- In 2012, Partner Daniel S. Sommers was selected as a **Washington DC Super Lawyer**.  Mr. Sommers was also selected for this prestigious award in 2011.
- In 2012, Partner Christine E. Webber was selected as a **Washington DC Super Lawyer**.  Ms. Webber was also selected for this prestigious award in 2007.
- In 2012, Partner Agnieszka M. Fryszman was selected as a **Washington DC Super Lawyer**. In 2012, Partner Kit A. Pierson was selected as a **Washington DC Super Lawyer**.

- In 2012, Partner Carol V. Gilden was selected as an **Illinois Super Lawyer**.  Ms. Gilden was also selected for this prestigious award in 2005, 2006, 2007, 2008, 2009, 2010, and 2011.
- In 2011, Cohen Milstein was selected to the *National Law Journal* **Plaintiffs' Hot List**.
- In 2011, Partner Joseph M. Sellers was selected as a **"Visionary"** by The *National Law Journal.*

- In 2011, Partner J. Douglas Richards, Of Counsel Joel Laitman, and Of Counsel Christoper Lometti were selected as **New York - Metro Super Lawyers**.
- In 2011, Partner Joseph M. Sellers and the *Keepseagle v. Vilsack* team were selected as a finalist for the **2011**
- **Trial Lawyer of the Year Award** from the Public Justice Foundation.
- In 2011, **Cohen Milstein was ranked as a Leading Plaintiff Class Action Antitrust Firm in the United States** by the Legal 500 for the third year in a row.
- In 2011, Partners Steven Toll, Joseph Sellers, and Daniel Sommers were selected as **Washington DC Super Lawyers**.  Partner J. Douglas Richards, Of Counsel Joel Laitman and Christoper Lometti were selected as **New York - Metro Super Lawyers**. Partner Carol Gilden was selected as an **Illinois Super Lawyer**.
- In 2011, Cohen Milstein was a recipient of The *National Law Journal's* **Pro Bono Award**.  The Firm was named one of the "six firms that best reflect the pro bono tradition."
- In 2010, Partner Joseph M. Sellers was selected as one of "**The Decade's Most Influential Lawyers**" by *The National Law Journal*.
- In 2010, Partner Steven J. Toll was named one of Law360's "**Most Admired Attorneys**". In 2010, Partner Andrew N. Friedman was selected as a **Washington DC Super Lawyer**.
- In 2010, Partner Agnieszka M. Fryszman was selected as a finalist for the **Trial Lawyer of the Year Award** from the Public Justice Foundation.
- In 2010, Partners Joseph M. Sellers and Agnieszka M. Fryszman were both selected as one of the **Lawdragon 500 Leading Lawyers in America**.
- In 2010, Cohen Milstein was once again ranked as a **Leading Plaintiff Class Action Antitrust Firm in the United States** by the Legal 500.
- In 2009, Partner Steven J. Toll was named a **Top Attorney in Corporate Litigation for Securities Litigation** by Super Lawyers.
- In 2009, Partners Joseph M. Sellers and Christine E. Webber were named as **Top Washington Lawyers** by the Washingtonian Magazine.
- In 2009, Cohen Milstein was recognized as **one of the top 50 law offices in Washington D.C. for diversity efforts**.
- In 2009, Cohen Milstein was nominated for the prestigious **Class Action Law Firm of the Year** award by Global Pensions magazine for the third year in a row.
- Cohen Milstein ranked as a **2009 Leading Plaintiff Class Action Antitrust Firm in the United States** by *The Legal500*.
- The **2008 SCAS Report on Total Securities Class Action Settlements** ranked Cohen Milstein as a top firm for the second year in a row.
- In 2008, Cohen Milstein was nominated for the prestigious **Class Action Law Firm of the Year** award by Global Pensions magazine for the second year in a row.
- In 2008, Managing Partner Steven J. Toll was named one of Lawdragon's **100 Lawyers You Need to Know in Securities Litigation.**

## Attorney Profiles – Partners

**Steven J. Toll**

Steven J. Toll is Managing Partner at Cohen Milstein, a member of the Executive Committee, and Co-Chair of the firm's Securities Fraud & Investor Protection practice group. In this role, Mr. Toll guides the firm's mediation efforts and strategy, and has been lead or principal counsel on some of the most high-profile stock fraud lawsuits in the past 30 years, arguing important matters before the highest courts in the land.

Mr. Toll has built a distinguished career and reputation as a fierce advocate of the rights of shareholders and has guided mediation efforts on the firm's largest and most important matters (both securities fraud and other consumer type cases), a role in which he has earned the trust of mediators, as well as the respect of defense counsel. Mr. Toll has been involved in settling some of the most important mortgage-backed securities (MBS) class-action lawsuits in the aftermath of the financial crisis, including: Countrywide Financial Corp., which settled for $500 million in 2013; Residential Accredited Loans Inc. (RALI), which settled for $335 million in 2014; and the Harborview MBS suit, which settled for $275 million. He also negotiated a $90 million settlement of a suit against MF Global.

Among Mr. Toll's current matters is the Harman class action suit, where Mr. Toll argued and won an important ruling from the U.S. Court of Appeals for the District of Columbia Circuit. The Circuit Court reinstated the suit against electronics maker Harman International Industries; the ruling is significant in that it places limits on the protection allowed by the safe harbor rule for forward-looking statements.

Currently, Mr. Toll is also co-lead counsel in the BP Securities class action securities fraud lawsuit that arose from the devastating Deepwater oil spill in the Gulf of Mexico. The Fifth Circuit Court of Appeals recently affirmed the certification of the class of investors alleged to have been injured by BP's misrepresenting the amount of oil spilling into the Gulf of Mexico, and thus minimizing the extent of the cost and financial impact to BP of the clean up and resulting damages.

Mr. Toll is co-lead counsel in the consumer class action suit against Lumber Liquidators, a lawsuit that alleges the nationwide retailer sold Chinese-made laminate flooring containing hazardous levels of the carcinogen formaldehyde while falsely labeling their products as meeting or exceeding California emissions standards, a story that was profiled twice on 60 Minutes in 2015.

Mr. Toll is also leading Cohen Milstein's efforts in a $400 million derivative shareholder suit brought against the directors and officers of Bank Leumi, an Israeli bank, asserting that bank officers violated their fiduciary duties in conspiring to aid American taxpayers in hiding income from the IRS.

Mr. Toll has provided a great deal of pro bono legal work during a career at Cohen Milstein that spans more than three decades. In addition, he has been an active supporter of Children's Hospital National Medical Center for decades, setting up an endowment in his daughter's name to help the Hospital's leukemia patients and their families (his daughter passed away from leukemia in 1987), plus more recently establishing regular programs for music and laughter for the children during their hospital stays. He and his family also founded Lolly's Locks, a nonprofit organization that provides high-quality wigs to women cancer patients suffering from hair loss as a side effect of chemotherapy. Lolly's Locks was established in memory of Mr. Toll's late wife, Lolly, who passed away in 2012, after a 15-month battle with cancer.

Mr. Toll is a graduate of the Wharton School of the University of Pennsylvania, earning a B.S. cum laude, and received his J.D. from Georgetown University Law Center, where he was Special Project Editor of The Tax Lawyer. His name has appeared regularly on Law360's annual lists of MVP's, Leading Attorneys, and Most Admired Attorneys.

**Joseph M. Sellers**

Joseph M. Sellers is a Partner at Cohen Milstein, Chair of the firm's Executive Committee and Chair of the Civil Rights & Employment Practice Group, a practice he founded. In a career spanning nearly four decades, Mr. Sellers has represented victims of discrimination and other illegal employment practices individually and through class actions. He brings to his practice a deep commitment and broad background in fighting discrimination in all its forms. That experience includes decades of representing clients in litigation to enforce their civil rights, participating in drafting and efforts to pass landmark civil rights legislation, testifying before Congress on various civil rights issues, training government lawyers on the trial of civil rights cases, teaching civil rights law at various law schools and lecturing extensively on civil rights and employment matters.

Mr. Sellers, who joined the firm in 1997, has been practicing civil rights law for more than 35 years, during which time he has represented individuals and classes of people who have been victims of civil rights violations or denied other rights in the workplace. He has tried to judgment before courts and juries several civil rights class actions and a number of individual cases and has argued more than 30 appeals in the federal and state appellate courts, including the United States Supreme Court. He has served as class counsel, and typically lead counsel, in more than 75 civil rights and employment class actions.

His clients have included persons denied the rights and opportunities of employment because of race, national origin, religion, age, disability and sex, including sexual orientation and identity. He has represented victims of race discrimination in the denial of equal access to credit, in the rates charged for insurance and in the equal access to health clubs, retail stores, restaurants and other public places. He has challenged housing discrimination on the basis of race and the denial of housing and public accommodations to people with disabilities.

Some of the noteworthy matters he has handled include: Walmart v. Dukes (U.S. S.Ct.), delivered argument on behalf of class of women who alleged sex discrimination in pay and promotions in case establishing new rules governing class certification; Randolph v. Greentree Financial (U.S. S.Ct.), delivered argument on behalf of consumer challenging enforcement of arbitration agreement in case establishing rules governing the enforceability of arbitration agreements; Beck. v. Boeing Company (W.D. Wash.), co-lead counsel on behalf of class of more than 28,000 women employees alleging sex discrimination in pay and overtime decisions; Conway, et al. v. Deutsch (E.D. Va.), co-lead counsel on behalf of class of female covert case officers at the CIA alleging sex discrimination in promotions and job assignments; Johnson, et al. v. Freeh (D.D.C.), co- lead counsel on behalf of class of African-American FBI special agents alleging racial discrimination in promotion and job assignments; Keepseagle v. Veneman (D.D.C.), lead counsel on behalf of class of Native American farmers and ranchers alleging denial of equal access to credit by USDA; Neal v. Director, D.C Dept. of Corrections (D.D.C.), co-lead counsel in which he tried first sexual harassment class action to a jury, on behalf of a class of women correctional employees and women and men subject to retaliation;Doe v. D.C. Fire Department (D.D.C.), in which he established after trial that an applicant with HIV could properly serve as a firefighter; Floyd-Mayers v. American Cab Co. (D.D.C.), in which he represented persons who alleged they were denied taxi service because of their race and the race of the residents at the location to which they asked to be driven; and Trotter, et al. v. Perdue Farms (D. Del.), lead counsel on behalf of chicken processing workers alleging violations of federal wage and hour and employee benefits law.

Prior to joining Cohen Milstein, Mr. Sellers served for over 15 years as the Director of the Employment Discrimination Project of the Washington Lawyers' Committee for Civil Rights and Urban Affairs, an organization providing pro bono representation in a broad range of civil rights and related poverty issues. He was a member of the transition teams of Obama/Biden in 2008 and Clinton/Gore in 1992 and 1993, and served as a Co-Chair of the Special Committee on Race and Ethnicity of the D.C. Circuit Task Force on Gender, Race and Ethnic Bias to which he was appointed by the judges of the D.C. Circuit Court of Appeals and the U.S. District Court for the District of Columbia.

Throughout his career, Mr. Sellers has also been active in legislative matters. He helped to draft and worked for the passage of the Civil Rights Act of 1991, the Americans with Disabilities Act of 1990 and the Lily Ledbetter Fair Pay

Restoration Act of 2009. He has testified more than 20 times before Committees of the United States Senate and House of Representatives on various civil rights and employment matters.

A teacher and mentor, Mr. Sellers has trained lawyers at the U.S. Equal Employment Opportunity Commission and the U.S. Department of Justice on the trial of civil rights cases, and was an Adjunct Professor at the Washington College of Law at American University, where he taught Employment Discrimination law, and at the Georgetown University Law Center, where he taught Professional Responsibility. In addition, he has lectured extensively throughout the country on various civil rights and employment topics.

Mr. Sellers has been recognized as one of the top lawyers in Washington and as one of the top plaintiffs' employment lawyers in the U.S. In 2010, The National Law Journal named him one of "The Decade's Most Influential Lawyers," in 2011 The Legal Times named him a "Legal Visionary," and in 2012 the Washington Lawyers' Committee for Civil Rights and Urban Affairs awarded him the Wiley Branton Award for leadership in civil rights.  He is a professionally trained mediator and has served as the President of the Washington Council of Lawyers.

Mr. Sellers received his B.A. in American History and Literature from Brown University, and earned his J.D. from Case Western Reserve School of Law, where he served as Research Editor of the Case Western Reserve Law Review.

**Andrew N. Friedman**

Andrew N. Friedman is a Partner at Cohen Milstein, and is Co-Chair of the firm's Consumer Protection practice group. Practicing in the class action field since 1985, Mr. Friedman specializes in litigating complex, multi-state class action lawsuits against manufacturers and consumer service providers such as banks, insurers, credit card companies and others.  He is widely recognized as a leader in enforcing consumer rights and known as a hands-on lawyer who is ready to take litigation all the way through trial.

Over the years, Mr. Friedman has been lead or co-lead counsel in numerous important cases, bringing relief to millions of consumers and recovering hundreds of millions of dollars in class actions. He was one of the principal counsel in cases against Nationwide and Country Life, which asserted sales marketing abuses in the marketing of so-called "vanishing premium policies," where insurance agents sold insurance policies to unsuspecting consumers promising that after a relatively short time the dividends generated from the policy would be so high as to be able to fully pay the premiums. In fact, the calculations of the policies were based on unrealistic interest rate projections and, therefore, the premiums never "vanished." The Nationwide case resulted in a settlement valued at between $85 million and $103 million, while a settlement with Country Life made $44 million in benefits available to policyholders.

Mr. Friedman was co-lead counsel in Keithly v. Intelius, Inc. (W.D. Wash.), where he negotiated two nationwide settlements with Intelius, Inc., relating to negative option programs and improper post-transaction marketing.  The combined settlements made $12 million in cash and a total of $3.5 million in vouchers available to the Class.

Mr. Friedman has also litigated important consumer product lawsuits, including one against Thomson Consumer Electronics, which resulted in a settlement that made up to $100 million available for persons who paid for unreimbursed repairs to defective televisions. In addition, Mr. Friedman was one of the principal counsel in the Dex-Cool Litigation, a nationwide lawsuit alleging that General Motors sold millions of cars with defective coolant that gummed up and caused corrosion to engines.  GM settled ahead of trial, offering relief of cash payments of up to $800 per repair.

More recently, Mr. Friedman litigated a lawsuit against Symantec, Corp., and Digital River, Inc., a four-year long nationwide class action battle regarding the marketing of a re-download service in conjunction with the sale of Norton software. The case settled in a $60 million all-cash deal one month before the case was about to go to trial – one of the most significant consumer settlements in years.

Prior to his current role as Co-Chair and member of the Consumer Protection group, Mr. Friedman was a member of the Securities Litigation & Investor Protection practice, litigating many important matters, including the Globalstar Securities Litigation in which he served as one of the lead trial counsel. The case settled for $20 million during the second week of the trial. In addition, Mr. Friedman served as one of co-lead or principal counsel in Norman Frank et al. v. David L. Paul (a recovery of over $18 million); In re Jiffy Lube Securities Litigation (D. Md.) (a recovery of over $12 million); and In re Immunex Securities Litigation (W.D. Wash.) (a recovery of $14 million).

Currently, Mr. Friedman is litigating such notable matters as:

- Anthem Data Breach Litigation: Mr. Friedman is co-lead counsel in a high-profile class action lawsuit against Anthem Inc. over its massive data breach that compromised the personal identification (including social security numbers, date of birth, medical ID number, etc.) and health information of 80 million insured customers. The lawsuit alleges Anthem, the second- largest insurance company in the nation, failed to ensure its data systems were protected, failed to prevent and stop the breach from happening and failed to disclose to its customers material facts regarding the breach. Mr. Friedman is involved in all aspects of the litigation.
- Sallie Mae Litigation: Cohen Milstein is co-lead counsel in a series of cases alleging that Sallie Mae charged usurious interest rates and improper late fees to California students. Mr. Friedman is overseeing all aspects of the litigation.
- Home Depot Data Breach Litigation: Mr. Friedman is a member of the Plaintiffs' Steering Committee representing financial institutions and heads the expert committee in a class action lawsuit arising out of the Home Depot data breach, a cyber attack that affected hundreds of financial institutions and more than 40 million consumers.

Mr. Friedman is a noted speaker who has appeared on numerous panels for legal education seminars and institutional investor conferences on the issues of consumer and securities class actions. In 2011, LawDragon named him one of the Leading Plaintiffs' Lawyers. His work has been cited in the media and he was profiled in the April 14, 2000, Washington Business Journal.

Prior to joining Cohen Milstein, Mr. Friedman served as an attorney with the U.S. Patent and Trademark Office.

Mr. Friedman attended Tufts University, graduating magna cum laude and was elected Phi Beta Kappa, with a B.A. in Psychology. He earned his J.D. from the National Law Center, George Washington University.

**Daniel S. Sommers**

Daniel S. Sommers is a Partner at Cohen Milstein, a member of the firm's Executive Committee and Co-Chair of the Securities Litigation & Investor Protection practice group.  During his nearly three decade career at Cohen Milstein, Mr. Sommers has taken leadership roles in litigating large, complex and significant securities cases.  He provides litigation counsel to the firm's institutional investor clients, including for example, the New York State Common Retirement Fund, the Ohio Public Employees Retirement System, the State Teachers Retirement System of Ohio, the Arkansas Public Employees Retirement System and numerous Taft-Hartley pension funds. Many of his cases have resulted in important rulings and legal precedents, as well as in significant recoveries for investors totaling hundreds of millions of dollars. Some of his notable matters include:

- Bear Stearns Mortgage Pass Through Securities Litigation: Co-lead counsel in a $505 million landmark settlement (including a $5 million expense fund) of a securities class action suit alleging that Bear Stearns violated securities laws in the sale of mortgage backed securities to investors. This case represents the largest recovery ever obtained in a securities class action on behalf of investors in mortgage-backed securities.
- Converium/Scor Securities Litigation (Netherlands): Co-lead counsel in a groundbreaking $58.4 million securities class action recovery, in which the Amsterdam Court of Appeal declared binding a world- wide class action settlement of claims of non-U.S. investors who purchased Converium shares outside of the United States.  The

ruling was a major victory for worldwide investors because it successfully implemented the Dutch Collective Settlement Statute even though the underlying transactions had limited contact with the Netherlands.

- Fannie Mae Securities Litigation: Played a significant role in a high profile securities class action against Fannie Mae, several of its former executives and KPMG involving allegations of falsified financial statements. The $153 million settlement amount represents the largest recovery in a securities fraud class action ever obtained in the United States District Court for the District of Columbia.
- CP Ships Ltd. Securities Litigation: Co-lead counsel in a class action lawsuit alleging that CP Ships, a
- Canadian company headquartered in England but with substantial operations in Tampa, Florida, issued false financial statements. Mr. Sommers argued an appeal in the U.S. Court of Appeals for the Eleventh Circuit, successfully opposing objections to a settlement that provided non-U.S. investors with the protections of the federal securities laws.


Mr. Sommers has obtained significant recoveries for investors in numerous other securities class action cases in federal courts throughout the United States including: Steiner v. Southmark Corporation (N.D. Tex.) (over $70 million recovery); In re PictureTel Inc. Securities Litigation (D. Mass.) ($12 million recovery); In re Physician Corporation of America Securities Litigation (S.D. Fla.) ($10.2 million recovery); In re Gilat Satellite Securities Litigation (E.D.N.Y.) ($20 million recovery); In re Pozen Inc. Securities Litigation (M.D.N.C.) ($11.2 million recovery); In re Nextel Communications Securities Litigation (D.N.J.) (up to $27 million recovery); In re PSINet Inc. Securities Litigation (E.D. Va.) ($17.8 million recovery); In re Cascade International Inc. Securities Litigation, (S.D. Fla.) (global recovery of approximately $10 million); In re GT Solar Securities Litigation (D.N.H.) (recovery of $10.5 million);Mulligan v. Impax Laboratories, Inc. (E.D. Va.) (recovery of $8 million); Plumbers & Pipefitters National Pension Fund v. Orthofix, N.V. (S.D.N.Y) (recovery of $11 million) and In re ECI Telecom Securities Ltd. Litigation (E.D. Va.) ($21.75 million recovery).  He has also handled significant appellate matters including arguing before the United States Court of Appeals for the Ninth Circuit in Hemmer Group v. Southwest Water Company, where he obtained a reversal of the district court's order dismissing investors' claims under the Securities Act of 1933.  In addition, he was co-lead counsel for investors before the United States Supreme Court in Broudo v. Dura Pharmaceuticals, Inc., 544 U.S. 336 (2005) (addressing the standards for pleading loss causation).

Mr. Sommers is also experienced in non-class action litigation.  He represented TBG Inc., a multi-billion dollar privately-held overseas corporation, in a multi-party, complex action alleging fraud in a corporate acquisition and represented individuals in connection with investigations brought by the United States Securities and Exchange Commission.  He also has represented publicly traded corporations in the prosecution and defense of claims.  Mr. Sommers has litigated cases covering a wide-range of industries including the financial services, computer software, pharmaceutical, insurance, real estate and telecommunications industries among others. In addition, he has substantial experience in cases presenting complex accounting and auditing issues.

Mr. Sommers is recognized as a thought leader on the subjects of securities and class action litigation and is a frequent speaker on those topics both to other lawyers and institutional investors. He has been quoted on these  topics  in  a  variety  of  publications,  such as The  Wall  Street  Journal, The  Washington Post, BNA/Bloomberg, and Law360.  Mr. Sommers is a member of the advisory board of the Bloomberg/BNA Securities Litigation & Law Report and served on Law360's Securities Editorial Advisory Board. Benchmark Plaintiff has recognized him as a litigation star in multiple years. He has been named a Washington, D.C. Super Lawyer each year from 2011 through 2016, and has been awarded Martindale-Hubbell's highest rating of AV Preeminent®. He served as Chairman and Vice-Chairman of the Investor Rights Committee of the Corporation, Finance and Securities Law Section, District of Columbia Bar, and through the years has been a guest lecturer at Columbus School of Law at the Catholic University of America; Georgetown Law Center; and George Washington University Law School.

Mr. Sommers attended Union College, where he earned a B.A. magna cum laude in Political Science, and graduated from George Washington University Law School.

**Daniel A. Small**

Daniel A. Small has been a Partner at Cohen Milstein for more than 20 years and chaired or co-chaired the firm's Antitrust practice group from 2008 to 2014. He is a member of the firm's Executive Committee.

When he arrived at Cohen Milstein 26 years ago, Mr. Small was assigned to work on securities fraud cases. One year later, he received an assignment in an antitrust case and has worked virtually full time on antitrust cases ever since. He has represented plaintiff classes as lead or co-lead counsel numerous times and has tried cases before juries and has argued cases in several appellate courts, including the United States Supreme Court. He also has defended unions against antitrust claims and represented a key duplication machine manufacturer on its monopolization claims against the dominant competitor.

Mr. Small has obtained favorable settlements and judgments totaling hundreds of millions of dollars and has been involved with a broad array of markets, everything from computer software and hardware to wild blueberries and hospital nurses. He has developed a sophisticated understanding of how conspiracies and monopolies operate in a range of complex markets. He has spent years studying the economic issues that underpin his cases, and the challenges of using antitrust litigation to achieve just compensation for victims, and to encourage and facilitate freer and more open markets in this country.

His work in complex civil litigation has made him one of the most respected and feared litigants in the class action antitrust space: The Legal 500 has recognized Mr. Small and Cohen Milstein as a "Leading Plaintiffs Antitrust Class Action Lawyer/Firm" annually since 2009; Benchmark Plaintiff has repeatedly awarded him "National Litigation Star – Antitrust"; and in 2014, he was named a "Leading Competition Lawyer" by the International Who's Who of Competition Lawyers & Economists.

Currently, Mr. Small is litigating the following notable matters, among others:

- VFX/Animation Workers Litigation: Cohen Milstein is one of three court-appointed co-lead firms in litigation alleging that the major animation studios conspired to suppress the pay of special effects and animation workers. The litigation has survived a motion to dismiss and the plaintiffs recently filed a motion for class certification.
- Prime Healthcare Services Litigation: Cohen Milstein is defending the Service Employees International Union (SEIU) in an antitrust conspiracy action brought by Prime Healthcare Services, a hospital chain in Southern California, alleging that SEIU conspired with Kaiser Permanente to drive Prime and certain other hospitals out of the market. Cohen Milstein led the successful effort to have the complaint and amended complaint dismissed in the Southern District of California. The case is on appeal in the Ninth Circuit where Mr. Small recently argued on behalf of the SEIU and its local union, UHW.
- Google Wi-Fi Litigation: Cohen Milstein is co-lead counsel in a nationwide class action lawsuit alleging Google violated the Wiretap Act when its Street View vehicles collected payload data from unencrypted Wi-Fi networks, including the home networks of individuals. The litigation survived a motion to dismiss, which was affirmed on an interlocutory appeal to the Ninth Circuit. Currently, the firm is in the midst of jurisdictional discovery.
- Michigan Blue Cross Litigation: Cohen Milstein is co-lead counsel in this class action challenging Michigan Blue Cross's use of most favored nation provisions in its provider agreements with hospitals in Michigan. The class plaintiffs secured a $30 million settlement, which was approved by the United States District Court for the Eastern District of Michigan. Mr. Small defended the settlement on appeal, arguing recently before the Sixth Circuit Court of Appeals.

Past successes include:

- In re Buspirone Antitrust Litigation: $90 million settlement. Cohen Milstein served as co-lead counsel in a class action lawsuit alleging that Bristol Myers-Squibb Co., the manufacturer of the prescription drug Buspar, conspired to keep generic versions of the drug out of the market.
- Pease v. Jasper Wyman & Son, et al.: $56 million judgment. Cohen Milstein was lead counsel representing a class of wild blueberry growers in Maine who sued four blueberry processors for conspiring to depress blueberry prices. The litigation was tried before a jury in Maine state court, where Mr. Small was co-lead trial counsel. The jury found the processors liable for 100% of the damages estimated by the plaintiffs' expert and awarded the growers $18.68 million in damages, which was trebled under Maine antitrust law.

Mr. Small attended Colgate University, where he graduated with a B.A., cum laude, in History. He earned his J.D. at American University's Washington College of Law. Following law school, Mr. Small clerked for the Honorable Judge Roger Vinson, United States District Court for the Northern District of Florida, from 1986 to 1988. He serves on the Advisory Board of the American Antitrust Institute and is chair of the selection committee for the annual Jerry S. Cohen Memorial Writing Award for Antitrust Scholarship.

**Christine E. Webber**

Christine E. Webber is a Partner at Cohen Milstein, and a member of the Civil Rights & Employment practice group. In that role, Ms. Webber represents victims of discrimination and other illegal employment practices in class and collective actions. She has participated during her career in litigating groundbreaking sex discrimination lawsuits.  Ms. Webber is a hands-on litigator, known for her ability to work closely with economic and statistical expert witnesses and to identify the types of sophisticated statistical analyses that will be most helpful to her clients' claims.

Ms. Webber is a tenacious and resourceful litigator with a fierce commitment to fighting discrimination and protecting workers. In the face of adversity she continues to find new ways to protect her clients' rights. Following the Supreme Court's ruling decertifying the class in Dukes v. Wal-Mart—a case brought on behalf of a nationwide class of women suing Wal-Mart for sex discrimination in pay and promotion—Ms. Webber has been counsel in several regional class cases pursuing these claims for former Dukes class members. Ms. Webber was co-lead counsel in Rindfleisch v. Gentiva Health Services (N.D. Ga.) in which nurses and other home health care providers were held to be non-exempt because they were not paid on a bona fide salaried or fee basis. Following this successful summary judgment ruling, the case was decertified, and Ms. Webber continues to represent individuals seeking their unpaid overtime.  In Tomkins v. Amedisys, Inc., a lawsuit challenging similar practices as the Gentiva litigation, Ms. Webber represented approximately 2,000 nurses, physical therapists and occupational therapists pursuing wage and hour claims against Amedisys; the case settled recently for $8 million.

Ms. Webber's past successes include In re Tyson Foods FLSA MDL (M.D. Ga.), a collective action involving Fair Labor Standards Act (FLSA) claims at over 40 Tyson chicken processing plants, which ultimately resolved the claims of 17,000 chicken processing workers who had been denied compensation for donning and doffing required safety and sanitary equipment. In Hnot v. Willis Group Insurance (S.D.N.Y.), Ms. Webber represented a class of women vice presidents in Willis' Northeast region, who complained of discrimination with respect to their salary and bonuses.  This "glass ceiling" case settled in 2007 for $8.5 million plus attorneys' fees, an average payment of $50,000 per woman.  A subsequent case, Cronas v. Willis Group, pursued similar claims for a later time period with similar success. Ms. Webber was also counsel to the plaintiff class in Keepseagle v. Vilsack, a historic settlement between Native American farmers and the United States Department of Agriculture (USDA). The Keepseagle settlement agreement required the USDA to pay $680 million in damages to thousands of Native Americans, to forgive up to $80 million in outstanding farm loan debt and to improve the farm loan services the USDA provides to Native Americans. Ms. Webber was part of the team recognized by Public Justice as finalists for their Trial Lawyer of the Year award in 2011 for the work done in Keepseagle.

Prior to joining Cohen Milstein in 1997, Ms. Webber received a Women's Law and Public Policy fellowship which funded the first of her four years at the Washington Lawyers' Committee for Civil Rights and Urban Affairs in their Equal Employment Opportunity Project. There, she worked on employment discrimination cases, focusing in particular on

the sexual harassment class action Neal v. Director, D.C. Department of Corrections, et al. Ms. Webber participated in the trial of this groundbreaking sexual harassment class action in 1995. Ms. Webber also tried the race discrimination case Cooper v. Paychex (E.D. Va.), and successfully defended the plaintiffs' verdict before the Fourth Circuit.

Ms. Webber is co-chair of the National Employment Lawyers' Association's Class Action Committee, a position she has held since 1999. She speaks and writes frequently on employment discrimination, wage and hour issues, and class actions.

Ms. Webber attended Harvard University, graduating *magna cum laude*, with an A.B. in Government, and earned her J.D., *magna cum laude*, Order of the Coif, at the University of Michigan Law School. Following law school, she clerked for the Honorable Hubert L. Will, United States District Judge for the Northern District of Illinois.

**Richard A. Koffman**

Richard A. Koffman is a Partner at Cohen Milstein and Co-Chair of the Antitrust practice group. He litigates antitrust cases on behalf of the victims of corporations engaged in price-fixing, market monopolization, and other unlawful conduct. Mr. Koffman joined Cohen Milstein after serving as Senior Trial Attorney in the U.S. Department of Justice's Antitrust and Civil Rights Divisions. He views his role in litigating antitrust suits as an extension of the public interest work he pursued at the DOJ in promoting competition and fighting discrimination.

Mr. Koffman has served as lead or co-lead counsel in many landmark antitrust class actions, including:

- Urethanes (Polyether Polyols) Antitrust Litigation: Co-lead counsel for plaintiffs in an antitrust class action alleging a conspiracy to fix the prices of chemicals used to make polyurethane foam. Four defendants settled pre-trial for a total of $139 million. After a four-week trial, the jury returned a $400 million verdict for plaintiffs against the final defendant, The Dow Chemical Co., which the district court trebled to more than $1 billion. Dow ultimately settled for $835 million while the case was on appeal, bringing the total recovery to $974 million – nearly 250% of the damages found by the jury.
- Plasma-Derivative Protein Therapies Antitrust Litigation: Co-lead counsel for plaintiffs alleging a conspiracy to reduce the supply and increase prices of IVIG and Albumin – life-saving therapies derived from blood plasma. Mr. Koffman and his team obtained settlements totaling $128 million to compensate customers who were overcharged for these vital therapies.
- Polyester Staple Antitrust Litigation: Co-lead counsel for plaintiffs alleging a conspiracy to fix prices for polyester staple fiber; the case settled for $46 million.

Current cases include:

- Dental Supplies Antitrust Litigation: Cohen Milstein was recently appointed interim co-lead counsel for a proposed class of dental practices and dental laboratories. The case alleges that Defendants Henry Schein, Inc., Patterson Companies, Inc., and Benco Dental Supply Company – the three largest dental supply and dental equipment distributors in the United States – fixed price margins on dental equipment, jointly pressured manufacturers to squeeze out competitors, and agreed not to "poach" each other's employees, in violation of federal antitrust law. As a result of the alleged conspiracy, dental practices and dental laboratories may have paid artificially inflated prices for many kinds of dental supplies and dental equipment, from consumables like gauze and cement to big-ticket equipment like chairs and x-rays.
- Sports Broadcasting Antitrust Litigation: Counsel for plaintiffs in class actions alleging that the system of geographical broadcasting territories employed by Major League Baseball and the National Hockey League amount to unlawful market allocation under Section 1 of the Sherman Act.
- Mixed Martial Arts (MMA) Antitrust Litigation: Co-lead counsel in a class action on behalf of elite MMA fighters alleging that Zuffa LLC – commonly known as the Ultimate Fighting Championship – has unlawfully monopolized

17

the markets for promoting live professional MMA bouts and for purchasing the services of elite professional MMA fighters. The district court denied defendant's motion to dismiss the case in September 2015.

- People of the State of California v. American Express: Counsel for the City of San Francisco in litigation alleging that American Express, by prohibiting its participating merchants from encouraging consumers' use of less costly payment methods (including debit cards and cash), is responsible for unlawful overcharges borne by retailers and, indirectly, all California consumers.

The Legal 500 has recognized Mr. Koffman as a Leading Lawyer for "Litigation - Mass Tort and Class Action: Plaintiff Representation - Antitrust" for five years in a row, describing him as a "strong brief writer and an excellent oral advocate."   Mr. Koffman was also named as one of the world's leading competition lawyers by Global Competition Review in the U.S. Plaintiffs section of Who's Who Legal: Competition 2016.

Mr. Koffman attended Wesleyan University, where he received a B.A. with honors, and is a graduate of Yale Law School, where he was Senior Editor of the Yale Law Journal.  After law school, Mr. Koffman served as a law clerk to two Federal Judges: James B. McMillan, of the U.S. District Court for the Western District of North Carolina and Anthony J. Scirica of the U.S. Court of Appeals for the Third Circuit.

**Agnieszka Fryszman**

Agnieszka Fryszman is a Partner at Cohen Milstein, and is Chair of the firm's Human Rights practice group.  She has been recognized as leading one of the best private international human rights practices in the world.

Ms. Fryzman represents individuals who have been victims of torture, human trafficking, forced and slave labor and other violations of international law.  A recognized expert and leader in the field of human rights law, Ms. Fryszman regularly litigates cases against corporate giants. She was a member of the legal team that successfully represented survivors of Nazi-era forced and slave labor against the German and Austrian companies that allegedly profited from their labor.  These cases were resolved by international negotiations that resulted in multi-billion dollar settlements. She also represented, pro bono, Holocaust survivors suing Swiss banks that collaborated with the Nazi regime during World War II.  This litigation led academics to revise their assessment of Switzerland's relationship with Nazi Germany and exposed the extent of business participation in the Holocaust.

Ms. Fryszman earned the National Law Journal Pro Bono Award for efforts on behalf of Nepali laborers injured or killed at U.S. military bases in Iraq and Afghanistan.  Her team obtained several judgments and significant settlements on behalf of the families.

In addition, she currently represents victims of a human trafficking ring that allegedly lured men from Nepal with the promise of employment at luxury hotels, but instead took them against their will to work for U.S. military contractors in Iraq.  Ms. Fryszman investigated and initiated suit against military contractor KBR, filing one of the first complaints under the Trafficking Victims Protection Act.  She has also represented men and women who were trafficked by diplomats, in the fishing industry, and to work cleaning houses in Northern Virginia.  In one recent case, after Ms. Fryszman obtained a full recovery for her client in a civil suit, the Department of Justice brought criminal charges, resulting in guilty pleas by the perpetrators.  Her work on behalf of the former "comfort women," women and girls trafficked into sexual slavery by the government of Japan during World War II, was recognized with the "Fierce Sister" award from the National Asian Pacific American Women's Forum.

Ms. Fryszman represented, pro bono, victims of the September 11 attack on the Pentagon and obtained one of the highest awards for an injured survivor from the Victim's Compensation Fund.  Ms. Fryszman also represented,  pro bono, two individuals detained by the United States at Guantanamo Bay who were ultimately cleared without charge.

Prior to joining Cohen Milstein in 1998, Ms. Fryszman served as counsel to the United States House of Representatives Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, and before that counsel to Representative Henry Waxman, Ranking Member on the House Government Reform and Oversight Committee. Earlier in her career, she was legislative director to U.S. Representative Jack Reed. Ms. Fryszman has received some of the legal profession's highest honors. Since 2009, LawDragon 500 has named her perennially to its list of Leading Lawyers in America. Benchmark Plaintiff has named her a Leading Star Plaintiffs' Litigator and one of the Top 150 Women in Litigation. For her pro bono work, she was awarded the Beacon of Justice Award by the National Legal Aid and Defender Association and the Frederick Douglass Human Rights Award from the Southern Center for Human Rights. She was also a finalist for the Public Justice Foundation's Trial Lawyer of the Year Award for her work on Wiwa v. Royal Dutch Shell. Ms. Fryszman joined the legal team in that case to prepare it for trial, resulting in a multi-million dollar settlement on the morning of jury selection.

Ms. Fryszman graduated from Brown University with an A.B. in International Relations, and earned her law degree from Georgetown University, graduating magna cum laude, Order of the Coif. At law school, she was a Public Interest Law Scholar.

**Julie Goldsmith Reiser**

Julie Goldsmith Reiser is a Partner at Cohen Milstein, and a member of the Securities Litigation Investor Protection Practice Group. Ms. Reiser's practice focuses on representing public pension plans and other institutional investors in high-stakes securities litigation.

Known for her hands-on approach, strong advocacy and critical thinking, Ms. Reiser has led successful litigation teams in several complex actions, including a $500 million settlement related to Countrywide's issuance of mortgage-backed securities ("MBS") and the recent Fifth Circuit affirmation of an investor class in the BP securities fraud litigation stemming from the 2010 Deepwater Horizon oil spill. In those cases, Ms. Reiser's clients have benefited from her oral and written advocacy, her judgment, and her ability to work tirelessly and collegially as a member of a litigation team. Over the years, Ms. Reiser has become a recognized leader in the securities plaintiffs' bar, demonstrating a keen understanding of complex financial and economic issues and using her intuition and strategic thinking to develop strong legal theories that align with the evidence.

Currently, Ms. Reiser is litigating the following notable matters:

- In re BP Securities Litigation: Ms. Reiser represents the New York State Common Retirement Fund as co-lead plaintiff in a securities class action filed in 2010, alleging that BP injured investors by intentionally downplaying the severity of the Deepwater Horizon oil spill and preventing investors from learning the magnitude of the disaster. Ms. Reiser has taken the lead in all aspects of this litigation: case development, motion practice, oversight and implementation of discovery strategies, depositions, expert discovery and argument. After successfully arguing for class certification to the district court, Ms. Reiser presented plaintiffs' defense of that court's decision to the Fifth Circuit U.S. Court of Appeals, which affirmed the class. Trial in this matter is set for July 2016.
- Countrywide Mortgage Backed Securities Litigation: Ms. Reiser represented the Iowa, Oregon and Orange County public retirement systems in class action litigation related to Countrywide's issuance of mortgage-backed securities, which culminated in a landmark $500 million settlement. Over the course of the litigation, Ms. Reiser argued on investors' behalf at the motion to dismiss stage. She also handled various arguments related to discovery disputes, and oversaw merits and expert discovery. She took a majority of the fact depositions and was recognized for having teased a number of salient points from witnesses during the depositions. Ms. Reiser also took the lead in working with experts to maximize damages. The case is ongoing.

Ms. Reiser's successes include:

- Policemen's Annuity and Benefit Fund of the City of Chicago, et al. v. Bank of America, NA, et al.: Ms. Reiser developed and litigated this novel class action, challenging trustee inaction in preventing investor losses. She represented the Arkansas Public Employees Retirement System, IPERS and Chicago Laborers in the case, which settled for $69 million. Ms. Reiser worked with plaintiffs' statistician to develop a sampling methodology for testing whether mortgages were underwritten properly and with plaintiffs' economist in the bid for class certification and approach to damages.   At the final hearing, Judge Katherine B. Forrest commended the investors' legal team: "This is a very, very good result for the plaintiffs … [and] is something of which plaintiff counsel can be proud."

- In re SCOR Holding (Switzerland) Securities Litigation: Ms. Reiser served as co-lead counsel in this landmark ruling, which was the first trans-Atlantic resolution of a U.S. securities class action in a Dutch court. The ruling made it easier for U.S. and European investors to use Dutch law in the future to protect their interests.   Ms. Reiser helped secure a $140 million settlement.

- In re Parmalat Securities Litigation: Ms. Reiser acted as co-lead counsel representing investors in the largest fraud in European corporate history. Ms. Reiser secured a $90 million settlement.

In addition, Ms. Reiser has represented plaintiffs in employment cases. In Wade v. Kroger (W.D. Ky.), she represented African American employees who received a $16 million settlement to resolve claims that the retailer Kroger had discriminated against them in pay and promotions. She was also involved in Beck v. The Boeing Co. (W. D. Wash.), a case alleging sex discrimination in compensation and promotions that settled for $72.5 million.

Ms. Reiser is a noted speaker, often called on to discuss important issues such as the class standing doctrine. Ms. Reiser is the author of "Pre-Dispute Arbitration Clauses: Taking the Alternative Out of Dispute Resolution," Bloomberg BNA, Class Action Litigation Report, December 11, 2015. After its publication, Paul Bland, Executive Director of Public Justice, wrote: "This is invaluable advocacy that takes industry-side advocacy and exposes its flaws and failings. I'm very glad to see this kind of very high quality advocacy and critical thinking."

Ms. Reiser also is the co-author of "Omnicare: Negligence is the New Strict Liability When Pleading Omissions Under the Securities Act," Bloomberg BNA, Corporate Law & Accountability Report, April 10, 2015; the author of "Dodd Frank's Protections for Senior Citizens: An Important, Yet Insufficient Step," University of Cincinnati Law Review, Volume 81, Issue 2, May 30, 2013; "Why Courts Should Favor Certification of MBS Actions," ABA Securities Litigation Journal, Volume 22, Number 1, Fall 2011; and the co-author of "The Misapplication of American Pipe Tolling Principles," ABA Securities Litigation Journal, Volume 21, Number 2, Winter 2011. She also co-authored Opt-Outs: Making Private Enforcement of the Securities Laws Even Better, featured in the Winter/Spring 2008 edition of the ABA's Class Action and Derivative Suit Committee Newsletter and Companies in the Cross Hairs: When Plaintiffs Lawyers Choose Their Targets, They Look for These Employment Practices, The Legal Times, February 21, 2005.

Ms. Reiser attended Vassar College, graduating with honors, and earned her J.D. at the University of Virginia School of Law. She has served as a board member at Seattle Works and the Pacific Northwest Ballet.

**Theodore J. Leopold**

Theodore J. Leopold is a Partner at Cohen Milstein, and a member of the firm's Executive Committee. Mr. Leopold, who joined the Firm in 2014, is Chair of the Catastrophic Injury & Wrongful Death, Managed Care Abuse, and Unsafe & Defective Products practices and Co-Chair of the Consumer Protection practice.

Mr. Leopold's practice is devoted solely to trial work, with a focus on complex product liability, managed care abuse, consumer class actions and catastrophic injury and wrongful death litigation.  Mr. Leopold has tried cases throughout the country and has recovered multi-million dollar verdicts, including jury verdicts in the eight-figure and nine-figure amounts.

In his role, Mr. Leopold litigates high-stakes, complex lawsuits on behalf of consumer safety issues, particularly as it relates to product defects, automobile safety and managed care matters. In 2010, he obtained a $131 million jury verdict against the Ford Motor Company, the ninth-largest verdict against an automobile company in U.S. history.

Mr. Leopold was on the steering committee in the National Managed Care Class Action and the Plaintiffs' settlement committee for the Ford/Firestone National Class Action. Currently, he serves on the Plaintiffs' trial team in the Rail Freight Fuel Surcharge Antitrust Litigation, as lead counsel in the HCA Class Action and as co- lead counsel in the Red Light Class Action.

Currently, Mr. Leopold is litigating the following notable matters:

- HCA: Mr. Leopold is lead counsel in a class action lawsuit alleging that two Florida women and others like them were billed inflated and exorbitant fees for emergency radiology services covered in part by their Florida Personal Injury Protection (PIP) insurance. Mr. Leopold is lead attorney in the litigation charging HCA hospitals with gouging patients with PIP coverage. The case is ongoing.
- United States of America, et al. v. AIDS Healthcare Foundation, Inc.: Mr. Leopold represents relators in a Qui Tam matter involving the anti-kickback statute.  The lawsuit alleges that the AIDS Healthcare Foundation, the nation's largest provider of HIV/AIDS medical care, improperly payed illegal kickbacks for patient referrals, and then fraudulently billed government healthcare programs.  The case is ongoing.
- Carrier v. Trinity: Mr. Leopold represents the Carrier family in this wrongful death matter.  The death occurred as a result of the guardrail safety device failing.  Instead of protecting the driver, the guardrail intruded into the passenger compartment of the vehicle and impaling the driver, causing her death. The case is ongoing.

Examples of some of Mr. Leopold's litigation successes are:

- Mincey v. Takata: Mr. Leopold was the lead attorney in a lawsuit brought on behalf of Patricia Mincey and her family, a Florida woman who sustained catastrophic injuries that rendered her a quadriplegic when the driver's side airbag deployed too aggressively during a vehicle collision. Patricia Mincey passed away in early 2016 due to complications from her quadriplegia. The suit charged that the Takata Corporation, the manufacturer of the airbag system, knew of the airbag defect and hid the problem from consumers.  Evidence uncovered by Mr. Leopold showed that Takata concealed the defective nature of the airbag system for more than a decade. The case was resolved in July 2016.
- Caterpillar Antitrust Litigation:  Mr.  Leopold was co-lead counsel in a class action lawsuit alleging Caterpillar sold diesel engines with defective exhaust emissions system that resulted in power losses and shutdowns. Mr. Leopold developed the case and led all aspects of the litigation.
- Cole v. Ford Co.: Mr. Leopold was co-trial attorney for the family of former New York Mets infielder Brian Cole who was killed when the Ford Explorer he was in rolled over and he was ejected from his seat. The lawsuit charged that the defective seat belt in his Ford Explorer failed to keep him in his seat. Following a trial jury the jury found for the Cole family in the amount of $131 million.
- Quinlan v. Toyota Motor Corporation: Mr. Leopold was lead counsel in a product liability case filed against Toyota Motor, alleging that manufacturing defects in the defendant's car caused the car being driven by the plaintiff Quinlan to suddenly accelerate and go out of control, resulting in catastrophic injuries that left him a quadriplegic. The defendant entered into a settlement, which is confidential.
- Chipps v. Humana: Mr. Leopold tried one of the first managed care cases in the country.  The case involved the wrongful denial of physical and occupational therapy for a 6 year old child with cerebral palsy.  The jury returned the largest punitive damage award on behalf of an individual in Florida history.
- Salvato v. Marion County Sherriff: Mr. Leopold represented the Salvato family in the wrongful death case of Joshua Salvato, an unarmed 21-year-old, who was shot and killed by two Marion County Sherriff's deputies in 2014. The jury verdict returned restitution in the amount of $2.3 million, charging one deputy with excess force and the other for willfully inflicting suffering on Mr. Salvato.

Mr. Leopold is the past president of Public Justice, a national organization headquartered in Washington, D.C. that fights for justice through precedent-setting and socially significant individual and class action litigation. He is consistently recognized by leading publications such as Super Lawyers and The Best Lawyers in America. In addition, he has been nominated for "Trial Lawyer of the Year" by the Public Justice Foundation for his ground breaking litigation involving the managed care industry, and his work has been featured in the National Law Journal's "Top Verdicts of the Year."

Mr. Leopold lectures frequently at professional gatherings on such issues as personal injury, product liability, class action litigation, trial tactics and consumer justice. He is also author and co-author of several legal publications, including Florida Insurance Law and Practice (Thomson/West). Additionally, Mr. Leopold has earned the Florida Bar Civil Trial Certification, the highest level of recognition by the Florida Bar for competency and experience within civil trial law.

Mr. Leopold is a graduate of University of Miami, where he received a B.A., and earned his J.D. from Cumberland School of Law, Samford University.

**Carol V. Gilden**

Carol V. Gilden is a Partner in the Securities Litigation & Investor Protection Practice Group at Cohen Milstein. She represents public pension funds, Taft-Hartley pension and health and welfare funds, and other institutional investors in securities class actions, transaction and derivative litigation, and individual actions, as well as in foreign securities litigation. She also litigates other types of complex litigation matters and class action cases in state and federal courts nationwide.

Ms. Gilden began her career at the Securities and Exchange Commission (SEC), in the Enforcement Division, spending five years investigating and litigating cases involving securities fraud. Prior to joining Cohen Milstein in 2007, Ms. Gilden served as the head of the securities class action practice at a prominent mid-sized Chicago law firm and the vice chair of its class action department. Ms. Gilden's guiding principle is that those who commit fraud on the financial markets should be held accountable. She is a strong advocate for investors and pension funds who have been defrauded by deceptive practices that permeate the financial markets. Her special focus is on complex litigation calling for strategic thinking, tenacity and the ability to persevere through the many stages of litigation. Over the course of her 30-year career in the profession, she has successfully litigated and worked on cases that have resulted in aggregate recoveries in excess of several billion dollars for investors.

Ms. Gilden is an accomplished litigator, with extensive experience handling all phases in a case, including investigative, motion practice (lead plaintiff motions, motions to dismiss, class certification and summary judgment), discovery (fact and expert), oral argument, appeal, and settlement negotiations. She has been lead and co-lead counsel in many notable matters, including the MF Global litigation ($90 million settlement), a precedent–setting case in which the U.S. Court of Appeals for the Second Circuit sided with the plaintiffs and held that companies cannot make false or misleading statements in their offering documents, and then hide behind risk disclosures related to those facts in their attempt to escape liability. The National Law Journal singled out Ms. Gilden's work on the case in connection with its selection of Cohen Milstein as a Hot Plaintiffs' Firm for that year.

Another notable case in which Ms. Gilden served as lead counsel, the IntraLinks Litigation, was one of the first securities class actions to be certified following the Supreme Court's decision in Halliburton II. That case was successfully resolved for $14 million. Other recent cases that she has led and which have been successfully resolved, include the Huron Securities Litigation ($40 million settlement, the ITT Securities Litigation ($16.96 million settlement) and In re RehabCare Group, Inc. Shareholders Litigation, where Ms. Gilden was co-lead counsel and settled the case for a cash payment to shareholders and significant deal reforms including enhanced disclosures and an amended merger agreement.

Ms. Gilden has been on the Executive Committee of other high-profile cases, including the Global Crossing Securities Litigation (settlements of $448 million) and the Merrill Lynch Analyst cases ($125 million settlement), as well as

on the litigation team of the Waste Management Litigation ($220 million settlement). Under her leadership, her former firm was an active member of the litigation teams in the AOL Time Warner Securities   litigation ($2.5   billion settlement), CMS   Securities   Litigation ($200   million   settlement)   and the Salomon Analyst Litigation/In re AT&T ($75 million settlement). Further, Ms. Gilden was lead counsel in an opt-out securities litigation action in connection with the McKesson/HBOC merger, Pacha, et al. v. McKesson Corporation, et al., which settled for a substantial, confidential sum.

Ms. Gilden has earned the trust of her clients who know she will go to the mat for them, from start to finish in their cases. She draws respect from colleagues as well as adversaries who perennially have placed her in the highest ranks of the profession, including being named an Illinois Super Lawyer repeatedly over the last 10 years, "Pension Fund Attorney of the Year, Illinois" by the Global Corporate International Magazine in 2014 and 2015 and being recognized for Excellence in Law by the Worldwide Registry.  She has been featured on the cover of the Chicago Lawyer in connection with a feature article on securities class actions. She is a much sought-after speaker at legal and pension fund conferences and has been frequently quoted in the national media on market scandals, recent developments and trends in securities law and high profile securities fraud cases.

Ms. Gilden is currently representing the Chicago Public School Teachers' Pension Fund, along with other institutions, in a high profile lawsuit charging 12 Wall Street banks with conspiring to engineer and maintain a collusive and anti-competitive stranglehold over the market for interest rate swaps in violation of the antitrust laws—an action that harms investors in one of the world's biggest financial markets.  She also is representing the Cleveland Bakers and Teamsters Pension and Health and Welfare Funds and other institutions in another, high profile antitrust action alleging that two dozen financial institutions with an inside role at the auction for United States Treasuries conspired to manipulate yields and prices to their own benefit.

In addition, Ms. Gilden serves as co-lead counsel in City of Chicago v. Hotels.com, et al, a high-profile and much-watched lawsuit in Cook County Circuit Court, alleging that online travel companies, Expedia, Hotels.com, Orbitz, Priceline and Travelocity failed to properly remit hotel taxes to the City of Chicago for hotel bookings. Ms. Gilden has argued and won numerous motions at the trial level on behalf of the City of Chicago, including the parties' cross motions for summary judgment, which involved six days of argument on liability and another half day of argument on damages. Settlements have been obtained from three of the four defendant groups.  A judgment has been entered in the case on behalf of the City of Chicago for approximately $29 million against the remaining defendant group, Expedia. The case is currently on appeal.

Ms. Gilden served as the first (and to this day, only) woman President of the National Association of Shareholder and Consumer Attorneys, the preeminent trade association for securities class action attorneys, as well as the organization's first woman Treasurer.  As President of NASCAT, Ms. Gilden made repeated visits to Capitol Hill advocating for strong investor protection. .  She also engaged in outreach to the institutional investor community on needed reforms to reverse the erosion of investor rights.  Under Ms. Gilden's leadership, NASCAT also filed amicus briefs in connection with major securities cases before the Supreme Court and other courts.   Prior to becoming President, she served as the President-Elect.  She continues to serve on NASCAT's Executive Committee.

Ms. Gilden was selected to serve on the Corporate Governance and Markets Advisory Councils to the Board of Directors for the Council for Institutional Investors (CII) during 2013-2015. CII is a nonprofit association of pension and other employee benefits funds, endowments and foundations and a voice for effective corporate governance and strong shareholder rights.

Ms. Gilden regularly lectures at legal conferences around the country on securities litigation and class action law, and is a frequent speaker at institutional investor conferences and symposiums regarding securities law developments, shareholder rights and regulatory reform. She has authored and co-authored numerous scholarly articles and course materials on securities fraud cases, class actions, derivative litigation and related topics.

Ms. Gilden attended the University of Illinois, earning a B.S. in Business Administration, and received her J.D. from Chicago-Kent College of Law, where she graduated with honors and was a member of the Chicago-Kent Law Review.

**Kit A. Pierson**

Kit A. Pierson is a Partner at Cohen Milstein and Co-chair of the firm's Antitrust Practice Group, as well as Co- Chair of the Pro Bono Committee. Under his leadership, the Legal 500 has recognized Cohen Milstein as a Leading Plaintiff Class Action Firm for seven years in a row and Law360 selected the Antitrust Practice Group as a Competition Law Practice Group of the Year in 2013 and 2014.

Mr. Pierson has served as lead or co-lead counsel in many antitrust cases on behalf of the victims of corporations engaged in price-fixing, market monopolization and other unlawful conduct. Prior to joining Cohen Milstein in 2009, Mr. Pierson spent more than 20 years primarily representing defendants in a broad range of complex matters. Some of the companies he represented included Microsoft Corp., 3M Corp. and other major corporations, national associations and individuals in class actions and other antitrust litigation. As a result of his experience as a defense lawyer, Mr. Pierson possesses deep insight into defense strategies, understands the dynamics of the other side and is someone who has earned the respect and credibility of opposing counsel.

Mr. Pierson is a hands-on litigator who has litigated and tried antitrust lawsuits and other complex civil cases in many jurisdictions, helping to win settlements and judgments cumulatively totaling more than $1.5 billion in the past several years. Currently, he is lead or co-lead counsel in many antitrust cases at the firm. Some of his current cases include:

- Domestic Drywall Litigation: Cohen Milstein is co-lead counsel in an antitrust litigation alleging that the seven major U.S. manufacturers of drywall conspired to manipulate prices. Mr. Pierson is running the case for Cohen Milstein and in 2015 took the lead for the direct purchaser plaintiffs in arguing against the defendants' summary judgment motions (which were denied by the Court for four of the five defendants). Settlements for $45 million were also reached with two other defendants. The case is ongoing.
- Ductile Iron Pipe Fittings Litigation: Cohen Milstein, as co-lead counsel, represents a putative class of direct purchaser plaintiffs in a price-fixing case against the three largest manufacturers of ductile iron pipe fittings— McWane Inc., Sigma Corporation and Star Pipe Products—and a monopolization case against McWane for excluding significant competition in the domestic ductile iron pipe fittings market. Settlements of $9 million have been reached with two of the defendants, Sigma and Star. Currently, Mr. Pierson is directing the team of attorneys that is now taking and completing fact depositions. The litigation is ongoing.
- Cast Iron Soil Pipe & Fittings Litigation: Cohen Milstein, as co-lead counsel, represents a putative class of direct purchaser plaintiffs against the two largest soil pipe and fittings manufacturers in the country (McWane Inc. and Charlotte Pipe & Foundry) and the trade association they control (Cast Iron Soil Pipe Institute) in a lawsuit alleging that the defendants engaged in a nationwide price-fixing conspiracy and other anticompetitive actions. Mr. Pierson is directing the litigation team, which is currently concluding fact discovery. The litigation is ongoing. Mr. Pierson's successes include:
- Urethanes (Polyether Polyols) Antitrust Litigation: Cohen Milstein is co-lead counsel for direct purchaser plaintiffs in an antitrust class action alleging a nationwide conspiracy to fix the prices of chemicals used to make polyurethane foam.  Four defendants—Bayer, BASF, Huntsman and Lyondell— settled for a total of $139.5 million, while the case against the fifth manufacturer, Dow Chemical, went to trial. After a four-week jury trial, in which Mr. Pierson was one of the trial lawyers for the class, the jury returned a $400 million verdict for the plaintiffs, which is trebled under federal antitrust law to more than $1 billion, the largest verdict in the country in 2013, as reported by the National Law Journal. The U.S. Court of Appeals for the Tenth Circuit affirmed the judgment, and the case against Dow Chemical was settled for $835 while the matter was pending before the United States Supreme Court (resulting in a total recovery of $974.5 million in the case).
- Community Health Care System Litigation: Cohen Milstein is co-counsel representing an emergency room doctor and nurse in a whistleblower lawsuit alleging Community Health Care System defrauded the federal government in connection with health care bills. Cohen Milstein was co-counsel representing an emergency room doctor and

24

nurse who brought claims against CHC under the False Claims Act. Mr. Pierson led Cohen Milstein's team in the case, which was brought under the False Claims Act. The case was resolved for $94 million.

- Electronic Books Antitrust Litigation: Cohen Milstein is co-lead counsel in a class action lawsuit alleging that Apple and five of the leading U.S. publishers conspired to raise the retail prices of e-books. Mr. Pierson led the Cohen Milstein team, which secured class certification, defeated motions to exclude the class expert, and successfully moved for exclusion of most of Apple's expert testimony. The five publishing defendants settled for $166 million and a settlement was reached with Apple shortly before trial for an additional $450 million.
- Guantanamo Litigation: Mr. Pierson represented Alla Ali Bin Ali Ahmed, a young man who had been arrested with many others while residing in a house in Pakistan and was then incarcerated in Guantanamo without a judicial hearing for more than seven years. After filing a habeas corpus petition, Mr. Pierson represented Mr. Ahmed at a multi-day evidentiary hearing before a United States District Court judge. At the conclusion of the hearing, the District Court ruled that the evidentiary record did not support Mr. Ahmed's detention and ordered that he be released from Guantanamo and returned to his home country.

Mr. Pierson was named one of the 500 leading lawyers in the United States in 2013 and 2014 by LawDragon 500 and was one of six lawyers selected by Law360 in 2014 as an MVP in the field of competition law. A champion for civil rights, he is a member of the Board of Trustees for the Lawyers' Committee for Civil Rights Under the Law, a national organization, and a Member of the ACLU of Maryland's Committee on Litigation and Legal Priorities. Mr. Pierson attended Macalester College, earning a B.A., magna cum laude, in Economics and Political Science, and graduated from the University of Michigan Law School, magna cum laude, where he was a Note Editor of the Michigan Law Review and a member of the Order of the Coif. Following law school, he served as a Law Clerk for the Honorable Harry T. Edwards, United States Court of Appeals for the District of Columbia Circuit, from 1983-1984 and as a law clerk for the Honorable Chief Judge John Feikens, United States District Court for the Eastern District of Michigan, from 1984-1985.

### J. Douglas Richards

J. Douglas Richards is a Partner in the Antitrust practice group, having joined the firm in 2009. Mr. Richards has had a long, extensive and eclectic career, litigating on behalf of defendants for 16 years, serving as a government regulator at the Commodity Futures Trading Commission ("CFTC") and representing plaintiffs for the past 16 years. As a result, he brings a global understanding of antitrust litigation.

Mr. Richards' extensive experience litigating both Commodity Exchange Act and Sherman Act claims and his expertise in the antitrust class action field is widely recognized. He was named one of twenty-two antitrust "Litigation Stars" nationally, as one of the world's leading competition lawyers by The International Who's Who of Competition Lawyers and Economists (2014), and has received the highest available peer ranking for many years from Martindale-Hubbell. Mr. Richards has been appointed co-lead counsel in numerous large antitrust class actions in the Southern District of New York (SDNY) and nationally. Mr. Richards has argued dozens of appeals, among them a number of antitrust matters that have helped shape the landscape of antitrust law, including Bell Atlantic v. Twombly, 550 U.S. 544 (2007) before both the Second Circuit and the United States Supreme Court, and Second Circuit cases like In re Tamoxifen Citrate Antitrust Litig., 429 F.3d 370 (2d Cir. 2005), cert. denied, 127 S.Ct. 3001 (2007), and Kruman v. Christie's Int'l PLC, 284 F.3d 384 (2d Cir. 2002).

Mr. Richards possesses extensive experience in the Commodity Exchange Act field, having served as Deputy General Counsel of the Commodity Futures Trading Commission ("CFTC") from 1997 to 2000. During that time, Mr. Richards assumed responsibility for all litigation by and against the CFTC (including personally arguing numerous appeals on behalf of the CFTC), and for two of those years simultaneously managed the CFTC's adjudicatory functions. In 1999, the Commission awarded Mr. Richards a Special Service Award for performing those two roles at the same time and successfully eliminating a long-standing backlog of Commission adjudicatory matters.

Mr. Richards is a leading lawyer nationwide in pharmaceutical antitrust litigation, a specialization that requires a deep understanding of the drug industry, patent law, FDA regulation and trade regulation. Starting in 2000 with the Cipro

litigation, Mr. Richards was co-lead counsel on several antitrust lawsuits challenging the pharmaceutical industry's practice known as pay-for-delay, or reverse payments. Many of those cases hit a roadblock in the courts, when the courts adopted a scope of patent rule. Following the Supreme Court's decision in Actavis in 2012, the Supreme Court overruled the legal standards that had been adopted in the lower courts of appeals and opened the door for further litigation. In the wake of Actavis, Mr. Richards leads a team of litigators that have filed new pay-for-delay reverse payments cases.

Mr. Richards graduated with honors from the University of Chicago, majoring in Economics, and earned his J.D. from Harvard Law School. Prior to joining Cohen Milstein, Mr. Richards served as head of the antitrust class action group at two major plaintiffs firms and, before that and his government service at the CFTC, Mr. Richards  served  as  a  litigation partner  in  a  boutique  law  firm.   He is a noted speaker at professional conferences, discussing the trends in commodities and pharmaceuticals antitrust law. He has written extensively about antitrust laws, including chapters for books edited by the American Antitrust Institute covering issues of class action practice, law reviews, and other scholarly publications.

### Karen L. Handorf

Karen L. Handorf is a Partner at Cohen Milstein, and chair of the Firm's Employee Benefits (ERISA) Practice Group. She joined the Firm in 2007, following a distinguished career in government service, litigating ERISA cases in federal appellate and district courts. In her role as head of the Employee Benefits Practice, Ms. Handorf represents the interests of employees, retirees, plan participants and beneficiaries in ERISA cases in the district courts and on appeal.

Ms. Handorf is involved in litigation and appeals involving a broad range of employee benefits issues including church plans. In Kaplan v. St. Peter's Healthcare System, she represents a class of 2,800 participants in an alleged church plan, a case in which the Court of Appeals upheld the rights of St. Peter's pension fund participants to a fully funded pension plan.  In addition, she currently leads a team of litigators in a series of church plan lawsuits alleging that health care systems wrongfully claim their benefit plans are exempt from ERISA's protection. Ms. Handorf is overseeing and developing these cases.

Prior to joining Cohen Milstein, Ms. Handorf was an attorney for the U.S. Department of Labor (DOL), where she litigated ERISA cases in federal appellate and district courts for 25 years.  While at the DOL, she played a major role in formulating the Government's position on ERISA issues expressed in amicus briefs filed by the Solicitor General in the United States Supreme Court.

She began her ERISA career as a trial attorney in the Plan Benefits Security Division (PBSD), where she litigated actions brought by the Secretary of Labor for violations of the fiduciary standards of ERISA and handled appellate matters. In 1989, she was appointed Counsel for Decentralized and Special Litigation responsible for supervising the DOL's ERISA appellate litigation, district court litigation brought by regional offices of the Solicitor of Labor and administrative litigation involving the civil penalty provisions of ERISA.  At the DOL, Ms. Handorf established and supervised PBSD's amicus brief writing program, which addressed a wide range of novel and difficult ERISA issues in both state and federal court.  In 2001, she was appointed Deputy Associate Solicitor of PBSD.  As the Deputy Associate Solicitor, she was responsible for overseeing litigation brought by the Secretary of Labor and legal advice provided to the Employee Benefit Security Administration, which administers Title I of ERISA.  In 2005, she returned to her position as supervisor of the ERISA appellate and amicus brief writing program, serving as Counsel for Appellate and Special Litigation.

Currently, Ms. Handorf is litigating a series of church plan cases, including:

- Saint Peter's Healthcare System Church Plan Litigation: Cohen Milstein is co-lead counsel in Kaplan v. St.  Peter's Healthcare System alleging that the defendants wrongfully claim their pension plan is exempt from ERISA protection.  Ms. Handorf argued the case before the U.S. Court of Appeals for the Third Circuit, which unanimously ruled that St, Peter's pension plan does not qualify as a "church plan." The Third Circuit further

noted that as of 2012, religiously affiliated hospitals accounted for seven of the nation's 10 largest nonprofit healthcare systems and that to construe the church plan exemption to apply to such hospitals would defeat the purpose of ERISA.  The ruling is likely to set the tone for other church plan litigation.

Her past successes include:

- Goodyear Litigation: Ms. Handorf represented a class of 30,000 Goodyear union retirees in Redington v. Goodyear (N.D. Ohio), in which Cohen Milstein obtained approval of a class action settlement between the retirees, Goodyear and the United Steel Workers, resulting in the establishment of a $1 billion trust through which retiree health care benefits will be provided in the future.

Ms. Handorf is a recipient of the Department of Labor Distinguished Career Service Award, and received Exceptional Achievement Awards for her work on ERISA 401(k) plan remedies, the amicus brief in the Enron litigation, retiree health care, the amicus program in general, the appellate brief in the Department's Tower litigation, termination annuities litigation and multiple employer welfare arrangement (MEWAs) litigation.

Ms. Handorf has been recognized for her expertise by her colleagues in the ERISA bar, who named her a Fellow of the American College of Employee Benefits Counsel.  She is a frequent speaker on ERISA issues for the ABA, various bar associations and private seminars, and serves as plaintiffs' co-chair of preemption subcommittee of the Employee Benefits Committee of the ABA's Labor Section. In 2016, she was named to the Best Lawyers in America.

Ms. Handorf attended the University of Wisconsin-River Falls, where she received a B.S. in Speech and History, and earned her law degree from the University of Wisconsin Law School.

**Martha Geer**

Judge Martha Geer is a Partner at Cohen Milstein and will be head of the firm's new Raleigh, North Carolina office.  She joined the firm in May 2016 after a distinguished career on the North Carolina Court of Appeals. Judge Geer's background – almost two decades as a respected litigator and appellate advocate handling complex civil litigation followed by more than 13 years as a rarely-reversed appellate judge – is a composite of experience few attorneys have. Her combined litigation and judicial experience gives her a unique perspective and insight that will benefit her clients at the trial level and on appeal.  In returning to private practice, Judge Geer will practice across all of the firm's areas of expertise, working at both the trial and the appellate levels.

Judge Geer was first elected to the North Carolina Court of Appeals in 2002, receiving more than a million votes statewide.  In 2010, because of her reputation as a fair and impartial judge, she garnered bipartisan support that resulted in her winning re-election by a 20-point margin.  During her tenure on the Court, Judge Geer has heard more than 3,800 appeals, authored more than 1,350 opinions, and had her opinions reversed less than 2% of the time.  As one of the most experienced Court of Appeals judges, Judge Geer has been responsible for hearing and deciding appeals on a wide variety of issues involving almost every area of law. She also served on the Court's Executive Committee, which works with the Chief Judge in administration of the Court.  During her service on the Court, she was named Outstanding Appellate Judge by the North Carolina Advocates for Justice.

Judge Geer's time on the bench has enhanced her ability to understand what judges – trial and appellate – need and want to know in order for clients to prevail at both the trial and appellate levels. Because of the similarity of intermediate appellate courts across jurisdictions, her experience and knowledge gained in North Carolina is valuable in litigation and appeals pending in all jurisdictions including the federal courts, making her a unique resource for clients. In addition, Judge Geer's reputation as an intelligent, practical, fair, and unbiased judge increases her credibility when arguing before other judges whether at the trial level or on appeal.

27

Illustrating the diversity of practice areas involved in her opinions, in Boyd v. Robeson County, Judge Geer wrote an opinion holding in a case of first impression for North Carolina that the office of a county sheriff is a "person" that may be sued under 42 U.S.C. § 1983, allowing an inmate to sue for violation of her Eighth Amendment rights when a jail failed to provide medical treatment after her appendix burst.  In another opinion authored by Judge Geer, Diggs v. Novant Health Inc., the Court held, again in a case of first impression, that a hospital could be liable under an apparent agency theory for the negligence of independent contractor anesthesiologists.  In Mason v. Dwinnell, Judge Geer's opinion held that a trial court had authority, under the federal constitution, to award custody of a child, including visitation, to a same-sex domestic partner who was not a legal parent of the child.   Judge Geer's opinion in Blinson v. State upheld the constitutionality, under the federal and state constitutions, of economic tax incentives granted to corporations in order to bring jobs to the State.

Prior to going on the bench, Judge Geer was a partner with two leading North Carolina plaintiffs' firms and was one of the founders of the second firm.  She was a highly respected trial and appellate litigator known for obtaining cutting-edge and precedent-setting victories in a diverse set of practice areas, including among others, securities litigation, labor and employment law, ERISA, antitrust and trade regulation, commercial litigation, consumer protection, and constitutional and civil rights litigation (including suits against the State, sheriffs, counties, and municipalities).   She was selected for inclusion in Best Lawyers in America, and recognized by the journal Business North Carolina as one of North Carolina's "Legal Elite" – a list of the top 200 lawyers in the State.

Judge Geer began her legal career with Paul Weiss Rifkind Wharton & Garrison where she was taught that a bright, hardworking lawyer, willing to learn, can handle any type of litigation – a philosophy that led to her eclectic practice upon leaving Paul Weiss.  While at Paul Weiss, she had the privilege of working with nationally-respected litigators, including legal icons such as Arthur Liman, on high profile cases including the litigation arising out of the attempt to corner the silver market in 1979-1980.  She also gained experience defending shareholder derivative and corporate takeover litigation.  Judge Geer did substantial pro bono work, including being part of a team that obtained a stay of execution on behalf of a mentally retarded man on death row who was subsequently shown to be innocent by DNA testing, once such testing finally became available.  That work led to her being one of the recipients of the 2004 Dybwad Humanitarian Award, the highest honor of the American Association on Intellectual and Developmental Disabilities.

As both a judge and a lawyer, Judge Geer has worked to improve the quality of legal representation through service on the Appellate Specialization Committee of the North Carolina State Bar, the Appellate Rules Committee of the North Carolina Bar Association, the Board of Governors of the North Carolina Advocates for Justice, and various committees of the American Bar Association and other bar association groups.  She is also a highly sought after teacher of continuing education programs for both other judges and lawyers.

Judge Geer received her B.A. summa cum laude from Bryn Mawr College and her J.D. with high honors from the University of North Carolina School of Law where she was a Morehead Fellow and served as Managing Editor of the North Carolina Law Review.

**Geoffrey Graber**

Geoffrey Graber is a Partner at Cohen Milstein and a member of the Consumer Protection practice group. In this role, Mr. Graber specializes in complex litigation aimed at protecting consumers deceived and harmed by consumer service providers such as banks, insurance and health care companies. In addition, he is a member of the Commercial Contingency practice and also represents whistleblowers under the False Claims Act.

Currently, Mr. Graber is litigating the high-profile lawsuit arising out of the massive data breach at Anthem Inc. that compromised the personal identification and health information of more than 80 million customers of the health care company. The lawsuit alleges the company failed to take adequate measures to ensure its data systems were protected, failed to take available steps to prevent and stop the breach from happening, and failed to disclose to its customers the

material facts that it did not have adequate computer systems and security practices to safeguard customers' financial accounts and personal data. Mr. Graber is involved in all aspects of the litigation.

Prior to joining the firm in 2015, Mr. Graber served as Deputy Associate Attorney General and Director of the Residential Mortgage-Backed Securities (RMBS) Working Group at the United States Department of Justice (DOJ).

As Director of the RMBS Working Group, Mr. Graber oversaw the DOJ's nationwide investigation into the packaging and sale of mortgage-backed securities leading up to the financial crisis.   He supervised and coordinated the efforts of over 100 prosecutors, lawyers, investigators and analysts from the DOJ.  Mr. Graber also worked closely with senior officials from the United States Securities & Exchange Commission, the Department of  Housing  and  Urban  Development, the Inspector  General's Office  for  the Federal  Finance Agency and the offices of more than 10 state attorneys general.

The investigations overseen by Mr. Graber ultimately recovered more than $36 billion.  These recoveries include the record-breaking $16.65 billion settlement reached in August 2014 with Bank of America – the largest settlement with a single entity in U.S. history – as well as settlements with Citigroup ($7 billion) and JP Morgan ($13 billion).

Earlier in his tenure at the DOJ, Mr. Graber served as Counsel in the Civil Division, where he proposed and then led the three-year investigation of Standard & Poor's and its ratings of structured finance products from 2004 to 2007.  As the lead lawyer overseeing the investigation, he supervised a team of over 50 prosecutors, DOJ lawyers, investigators and analysts.   The investigation, which made groundbreaking use of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), resulted in the largest enforcement action filed by the United States concerning the financial crisis (United States v. Standard & Poor's).

Before joining the Department of Justice, Mr. Graber was an associate at a top-tier defense firm, where he defended Fortune 500 companies and their officers and directors in securities and derivative suits, consumer class actions and government investigations.   Mr. Graber also devoted substantial time to pro bono representation of indigent individuals and families in civil rights actions against local law enforcement.

In 2014, Mr. Graber received the Attorney General's Distinguished Service Award for his work relating to the $13 billion settlement with JP Morgan – including, at the time, the largest FIRREA penalty recovered by the Department of Justice. In October 2015, he again received the Attorney General's Distinguished Service Award for his work on the successful investigation of and litigation against S&P.

Mr. Graber received his undergraduate degree in Philosophy from Vassar College, and earned his law degree from the University of Southern California Law School, where he served as the Managing Articles Editor on Southern California Law Review.

**Leslie M. Kroeger**

Leslie M. Kroeger is a Partner at Cohen Milstein, and a member of the firm's Catastrophic Injury & Wrongful Death, Managed Care Abuse, and Unsafe & Defective Products practice groups. Ms. Kroeger joined Cohen Milstein in January 2014 and is based in the firm's Florida office.  She specializes in complex, high-profile product liability, wrongful death, and managed care abuse litigation.

Ms. Kroeger is a highly accomplished civil trial attorney who began her legal career in the courtroom as an Assistant Public Defender and later became an Assistant State Attorney in Miami-Dade County, Florida. She then moved into private practice where she continues to handle a variety of complex civil litigation matters both in the state of Florida and nationwide.

Currently, Ms. Kroeger is litigating the following notable matters:

- HCA: Cohen Milstein is co-lead counsel in a class action lawsuit alleging that two Florida women and others like them were billed inflated and exorbitant fees for emergency radiology services covered in part by their Florida Personal Injury Protection (PIP) insurance. Ms. Kroeger is involved in all aspect of the litigation charging HCA hospitals with gouging patients with PIP coverage. The case is ongoing.
- United States of America, et al. v. AIDS Healthcare Foundation, Inc.: Cohen Milstein represents three former managers of the AHF in a Federal and Florida State Whistleblower Act claims against the nation's largest provider of HIV/AIDS medical care for illegal patient referral kickbacks. Ms. Kroeger has been involved in all aspects of the litigation. The case is ongoing.

Ms. Kroeger has successfully litigated the following lawsuits:

- Mincey v. Takata: Cohen Milstein was lead counsel in a lawsuit brought on behalf of Patricia Mincey and her family, a Florida woman who sustained catastrophic injuries that rendered her a quadriplegic in 2014 when the driver's side airbag in her Honda Civic deployed too aggressively during a collision due to a product defect. Patricia Mincey passed away in early 2016 due to complications from her quadriplegia casued by the problematic airbag. The suit charged that Takata, the manufacturer of the airbag system, knew of the airbag defect and hid the problem from consumers. Evidence uncovered by the firm showed that Takata concealed the defective nature of the airbag system for more than a decade. The case was resolved in July 2016
- Quinlan v. Toyota Motor Corporation: Cohen Milstein was lead counsel in a product liability case filed against Toyota Motor, alleging that manufacturing defects in the defendant's car caused the car being driven by the plaintiff Quinlan to suddenly accelerate and go out of control, resulting in catastrophic injuries that left him a quadriplegic. The defendant entered into a settlement, which is confidential. Ms. Kroeger was engaged in all aspects of the litigation.
- Love v. Walmart: Ms. Kroeger represented individual female Walmart employees in a lawsuit alleging that the company discriminated against them on the basis of their sex. The defendant reached a confidential settlement with the plaintiffs.
- Caterpillar Antitrust Litigation: Cohen Milstein was co-lead counsel in a nationwide product liability class action lawsuit alleging Caterpillar sold diesel engines with defective exhaust emissions system that resulted in power losses and shutdowns. Ms. Kroeger was involved all aspects of the litigation.

Ms. Kroeger has achieved an AV rating from Martindale-Hubbell, and has been recognized by Best Lawyers in the field of Product Liability Litigation – Plaintiffs. She was recently named to Law360's Product Liability Editorial Advisory Board. She speaks frequently on strategies and tactics for addressing the standards for expert witness testimony in light of the Supreme Court's Daubert ruling.

Ms. Kroeger currently serves as the Secretary on the Executive Committee of the Florida Justice Association and is past Chair of the Women's Caucus.  She serves on the Florida Bar Professional Ethics Committee. She is Past President of the Martin County Chapter of the Florida Association for Women Lawyers and is on the Board of Directors of Guardians for New Futures; as well as serving as an active member of The Florida Bar, the American Association for Justice, the Palm Beach County Bar Association, the Martin County Bar Association, the Palm Beach County Justice Association, and the Florida Association for Women Lawyers, Martin County Chapter.

Ms. Kroeger graduated with high honors from the University of Tennessee at Knoxville, and obtained her law degree from the Cumberland School of Law, Samford University. Following law school, she served in a trial clerkship in Miami.

**Victoria S. Nugent**

Victoria S. Nugent is a Partner at Cohen Milstein and Co-Chair of the Public Client practice group. She has been with the Firm since 2000 and her work has focused on consumer protection and public health and safety.

Ms. Nugent began at Cohen Milstein in the Firm's Consumer Protection & Unsafe Products Practice, where she focused on consumer protection and public health litigation.  Past cases include In re StarLink Product Liability Litigation, in which she represented farmers suing Aventis CropScience after an unapproved variety of genetically modified corn was detected in the U.S. corn supply and drove down prices for all U.S. corn exports. More than $100 million was recovered for the class in a landmark settlement.  In 2009 and 2010, Ms. Nugent filed suit on behalf of consumers challenging the post-transaction marketing practices (also sometimes called "negative option marketing") and in two significant rulings persuaded federal courts in California and Washington that these practices run afoul of state consumer protection laws. Ms. Nugent has argued cases before the high courts of Georgia, Nebraska and the District of Columbia, as well as the federal D.C. Circuit Court of Appeals.

Ms. Nugent joined the Firm's Public Client Practice Group in 2011, where she is currently, representing several states in investigations into Medicaid and consumer fraud by numerous for-profit nursing home chains that promised, but failed to provide, basic care to their elderly residents. Ms. Nugent has been overseeing all aspects of these investigations.

Ms. Nugent has represented public clients on other matters involving consumer and financial fraud.  Some of her successes include:

- Represented the states of Arizona and Nevada in litigation against Bank of America for deceptive conduct in connection with servicing approximately 500,000 mortgages; resulting in financial payments to consumers  and the states, commitments to mortgage modifications and other equitable relief valued at nearly $1 billion.
- Represented the state of Nevada in investigations into the conduct of Deutsche Bank and the Royal Bank of Scotland, two of the investment banks that encouraged and enabled the predatory lending practices of retail lenders.  Ms. Nugent helped develop the State's legal theories and claims and handled numerous aspects of these investigations.

Prior to joining the Firm, Ms. Nugent worked for seven years at Public Citizen, a national consumer advocacy organization. There, she worked on many legislative and regulatory campaigns addressing issues that ranged from automobile safety to international trade policy.  After graduating from law school in 1998, Ms. Nugent received a two-year fellowship sponsored by the National Association for Public Interest Law (NAPIL).  As a NAPIL Fellow, she worked at Trial Lawyers for Public Justice, where she helped develop and prosecute impact litigation in the areas of arbitration, banking, credit and insurance.

Ms. Nugent has served on the D.C. Bar Committee on the Rules of Professional Conduct since 2012.

**Benjamin D. Brown**

Benjamin D. Brown is a Partner at Cohen Milstein, and a member of the Antitrust Practice Group, having joined the firm in 2005. Mr. Brown, who previously served in the Antitrust Division of the United States Department of Justice, brings to his role extensive experience leading complex litigation, particularly antitrust class actions.

Mr. Brown has been appointed by federal courts to serve as co-lead counsel or on steering committees for plaintiffs  in numerous important matters, such as In re Plasma-Derivative Protein Therapies Antitrust Litigation (N.D. Ill.); Allen, et al. v. Dairy Farmers of America, Inc. (D. Vt.); and In re Puerto Rican Cabotage Antitrust Litig. (E.D. Ca.). He has led cases through trial and argued appeals and stands ready to take cases through to the finish line.

Mr. Brown is also a leader in the area of takings cases, claims that are brought under the Fifth Amendment of the U.S. Constitution for the unconstitutional taking of property without compensation. He also represents individuals or groups in litigations and confidential arbitrations involving complex commercial disputes, particularly those involving regulated markets.

Currently, Mr. Brown is litigating a number of large, complex antitrust lawsuits, where he plays a prominent role and leads all aspects of the litigation, from deciding on the claims to be brought, the strategy to be pursued and charting the course of the case. Notable matters include:

- Mixed Martial Arts (MMA) Antitrust Litigation: Cohen Milstein is co-lead counsel in a class action on behalf of elite MMA fighters alleging that Zuffa LLC – commonly known as the Ultimate Fighting Championship or "UFC" – has unlawfully monopolized the markets for promoting live professional MMA bouts and for purchasing the services of elite professional MMA fighters.  The district court denied the defendant's motion to dismiss the case in September 2015 and discovery is ongoing.  Mr. Brown is co-lead in the class action lawsuit.
- Northeastern Dairy Antitrust Litigation: Cohen Milstein is co-lead counsel in a class action lawsuit on behalf of Northeast dairy farmers against Dairy Farmers of America (DFA) and Dean Foods Company charging a conspiracy to reduce competition for raw milk and that DFA monopolized the milk market in the Northeast, forcing dairy farmers to market their milk through DFA or its affiliate Dairy Marketing Services (DMS). Dean has settled its liability and the case against DFA is ongoing.
- People of the State of California v. American Express Unfair Competition Litigation: Cohen Milstein is counsel for the City of San Francisco in litigation alleging that American Express, by prohibiting merchants from steering consumers to less costly payment methods (including debit cards and cash), is responsible for unlawful overcharges borne by retailers and, indirectly, all California consumers. Mr. Brown is lead outside counsel to the city in the ongoing litigation.

Mr. Brown is also currently litigating a number of takings lawsuits, including the following notable matters:

- Ideker Farms, et al. v. the United States of America: Cohen Milstein represents Ideker Farms and more than 400 other plaintiffs located in six states along the Missouri River in a mass action lawsuit in the U.S. Court of Federal Claims alleging that the federal government took land and flooding easements over lands owned by farmers without any compensation in violation of the takings clause of the Fifth Amendment. Mr. Brown has been directing and leading all aspects of the litigation for the Cohen Milstein team. The case is set to go to trial in 2017.
- Big Oak Farms, Inc., et al. v. the United States of America: Cohen Milstein represents a group of farmers along the Mississippi River in a Fifth Amendment takings case alleging that the U.S. Army Corps of Engineers intentionally flooded plaintiffs' land without providing just compensation. Mr. Brown has been directing and leading all aspects of the litigation.

Mr. Brown also represents classes or individual corporations in the following commercial disputes:

- DairyAmerica Antitrust  Litigation: Cohen Milstein is  sole  lead  counsel of  a  putative  class  of  dairy farmers who allege that defendants fraudulently misreported nonfat dry milk prices to the National Agricultural Statistics service, resulting in artificially depressed raw milk prices and unfairly depriving American dairy farmers of tens or hundreds of millions of dollars. Mr. Brown directs and leads all aspects of the litigation.
- Inmate Calling Services Provider Litigation: Cohen Milstein is on the executive committee in several nationwide class action lawsuits alleging that the providers of inmate calling services have charged inmates and their families unjust and unreasonable rates in violation of the Federal Communications Act and various state laws. Mr. Brown leads the Cohen Milstein team on these class action lawsuits. The litigation is ongoing.
- College Media Commercial Litigation:  Cohen Milstein represents an e-commerce business in a breach of contract action against a former partner business.  Mr. Brown leads that litigation, which is now pending in federal bankruptcy court.

The Legal 500 has recognized Mr. Brown as one of the nation's leading class action antitrust attorneys and he has been listed as one of Washington D.C.'s "Leading Star" Plaintiffs' Litigators by Benchmark Litigation, recognizing his writing, his depositions and his arguments in court. He is a frequent panelist at legal industry gatherings and is a recognized expert on antitrust litigation whose opinions on the newest developments and trends in antitrust litigation are often quoted in

the media. Mr. Brown is a contributing author of the ABA's Antitrust Class Actions Handbook, and has served as a state editor for the ABA's Survey of State Class Action Law. He authored several chapters on private antitrust recovery actions for the Global Competition Review's Antitrust Review of the Americas, and co-authored with fellow partner Douglas Richards, "Predominance of Common Questions – Common Mistakes in Applying the Class Action Standard," Rutgers Law Journal (Vol. 41).

Mr. Brown joined Cohen Milstein's Antitrust Practice following four years as a trial attorney with the Antitrust Division of the United States Department of Justice. At the Department of Justice, Mr. Brown led and assisted in numerous investigations, litigations and trials involving antitrust activity and mergers. Mr. Brown also served as a Special Assistant United States Attorney in the Eastern District of Virginia, where he prosecuted criminal cases. Prior to serving in the U.S. Department of Justice, Mr. Brown was in private practice, where he counseled defendants in antitrust litigation matters. This experience has provided him with insights into defense strategies and has earned him the respect of defendants' counsel.

Mr. Brown attended the University of Wisconsin – Madison, where he graduated Phi Beta Kappa, majoring in Philosophy, and earned his J.D, from Harvard Law School, graduating cum laude. He served as Law Clerk to the Hon. Chief Judge Juan R. Torruella, U.S. Court of Appeals for the First Circuit. The United States District Court for the District of Columbia has honored Mr. Brown for his outstanding commitment to pro bono litigation.

**Manuel J. Dominguez**

Manuel J. ("John") Dominguez is a Partner at Cohen Milstein, and a member of the Antitrust practice group. Mr. Dominguez specializes in complex, multi-district antitrust litigation, representing individuals and businesses that have been harmed by anticompetitive business practices. Mr. Dominguez, in addition, plays a significant role in the practice group identifying and investigating potential antitrust violations.

Mr. Dominguez has been litigating complex antitrust and consumer cases for more than 20 years, and has served as lead counsel and handled numerous high-profile, high-stakes cases during that time. His efforts have enabled aggrieved businesses and consumers to recover hundreds of millions of dollars. He litigated and resolved cutting-edge litigation against AOL for allegedly unlawfully collecting the Internet search data of millions of users and making their private information available for downloading by the general public. Earlier in his career, Mr. Dominguez litigated a highly significant securities matter that settled for hundreds of millions of dollars involving Symbol Technologies Inc., a barcode technology maker that intentionally overstated its revenues through premature revenue recognition, improper consignments arrangements and channel stuffing.

Mr. Dominguez, who joined Cohen Milstein in 2011, has assisted the firm in developing its investigatory and case development groups. He is a hands-on litigator who is currently representing plaintiffs in antitrust litigation involving alleged price-fixing and anticompetitive monopolistic practices in various industries including truck transmissions, medical products, auto industry and finance, among others. Although Mr. Dominguez's practice is focused on antitrust litigation, he continues to be involved in securities and consumer matters.

Mr. Dominguez is currently representing direct purchasers in a series of Auto Parts antitrust class action lawsuits being litigated in the Eastern District of Michigan in Detroit. These cases stem from the largest antitrust investigation in the history of the U.S. Department of Justice, with over $1 billion in fines and multiple criminal indictments. Two of the cases, Wire Harnesses and Bearings, are scheduled to be the first cases to be considered for certification by the court. In these cases, Mr. Dominguez has significant responsibilities, including leading discovery efforts against defendants and assisting experts.

Mr. Dominguez is also co-lead counsel in the Truck Transmissions Antitrust Litigation alleging that Eaton Corp., the largest manufacturer of truck transmissions, and the four major truck manufacturers conspired to create a monopoly for transmissions used in heavy-duty trucks. Mr. Dominguez responsibilities include arguing all the major motions and

deposing and defending nearly all the expert depositions in this matter.  The case is currently up on appeal in the Third Circuit.

Mr. Dominguez began his career as an Assistant Attorney General serving in the Attorney General of the State of Florida's Department of Economic Crimes.  In that role, he represented the state of Florida in prosecuting corporations and business entities for alleged violations of Florida's RICO, antitrust and Unfair and Deceptive Trade Practices Act statutes.  Following his service as an Assistant Attorney General, Mr. Dominguez entered private practice, litigating and trying numerous cases involving unfair trade practices and other alleged violations of state and federal consumer protection statutes.  In 2000, he joined a premier class action firm focused on antitrust and securities litigation; there, he rose to the head of the firm's antitrust and consumer practice groups.  Mr. Dominguez recently won a significant motion to dismiss in a non-class action antitrust action brought on behalf of Doctors and practice groups against a major insurance company and hospital in Florida in Omni Healthcare, Inc. v. Health First, Inc. The issues presented and argued were issues of first impression for the middle district of Florida.

Mr. Dominguez is also nationally recognized for his knowledge of managing the discovery process in today's increasingly technologically complex business environment.  He has made presentations on topics such as the impact of the new e-discovery amendments to the Federal Rules of Civil Procedure, and has also participated in The Sedona Conference® Working Group 1, an organization at the vanguard of developing standards for electronic discovery.

Mr. Dominguez formerly served as the Chair for the Antitrust, Franchise & Trade Regulation Committee of the Florida Bar's Business Law Section. Mr. Dominguez previously served as the Vice Chair of this committee and was a member of the Executive Council of Florida Bar's Business Law Section.  He is also co-author of an article that appeared in the Florida Bar Journal, "The Plausibility Standard as a Double Edge Sword:  The application of Twombly and Iqbal to Affirmative Defenses" (Vol. 84, No. 6).

Mr. Dominguez received a B.A. from Florida International University, and earned his J.D. from the Florida State University Law School, graduating with honors. In law school, he was a member of the Transnational Journal of Law and Policy.

**Brent W. Johnson**

Brent W. Johnson is a Partner at Cohen Milstein and a member of the Antitrust practice group. Along with Daniel Small, Mr. Johnson leads the group's new case investigations.

Mr. Johnson has considerable expertise in complex antitrust litigation and class actions, representing businesses and individuals as plaintiffs in federal and state civil actions with a focus on multi-district class actions. His  class  action experience spans multiple industries, such as motion pictures, dairy,  building materials, chemicals, automotive parts, processed foods, private equity, adhesives and others. His practice encompasses a broad variety of antitrust claims, including Sherman Act Section 1 restraints of trade and Section 2 monopoly and monopsony claims.  He has argued before federal district courts and state trial and appellate courts and brought cases to trial.

Mr. Johnson's recent successes include the following notable antitrust class actions:

- Northeast Dairy: In Allen vs. Dairy Farmers of America (D. Vt.), Mr. Johnson serves as lead counsel for one of two certified subclasses of Northeast dairy farmers against Dairy Farmers of America and Dairy Marketing Services who fixed the price of raw milk, allocated markets and agreed not to solicit dairy farmers to supply raw milk. Defendant Dean Foods Company settled for $30 million, and the Court has preliminarily approved a $50 million settlement with the remaining defendants, DFA and DMS.
- Bulk Bleach: In Grand Strand v. Oltrin (D. S.C.) Mr. Johnson was personally appointed co-lead Class Counsel and led the CMST team in representing a class of direct purchasers of bulk bleach, including municipal water authorities and others, against that product's manufacturers who engaged in an illegal market allocation

agreement. The Court approved a settlement worth nearly all of the class's single damages and remarked that the case had been "skillfully handled."

- Urethanes (Polyether Polyols): Mr. Johnson serves as co-lead counsel in In re Urethane Antitrust Litigation (D. Kan.), on behalf of a certified class of direct purchasers of several types of chemicals who were overcharged as a result of a nationwide price-fixing and market allocation conspiracy. In the litigation, multiple defendants collectively settled for over $130 million, and a jury verdict of $1.1 billion was secured against Dow Chemical, the final defendant, in 2013. Dow ultimately settled for $835 million while the case was on appeal before the Supreme Court, bringing the total recovery to $974 million – nearly 250% of the damages found by the jury.
- Blue Cross Blue Shield of Michigan: Mr. Johnson serves as co-lead counsel in The Shane Group, Inc. v. Blue Cross Blue Shield of Michigan (E.D. Mich.), representing a class of purchasers of hospital services against Blue Cross Blue Shield of Michigan for agreeing to MFN provisions in its contracts with hospitals throughout Michigan that required those hospitals to charge other insurers as much or considerably more for services provided to class members. The Court has finally approved a settlement with BCBSM for nearly $30 million.

Currently, Mr. Johnson is litigating the following antitrust class actions:

- VFX/Animation Workers: In In re Animation Workers Antitrust Litigation (N.D. Cal.), Mr. Johnson serves as co-lead counsel representing a class of animation and visual effects workers in a lawsuit alleging that the defendants, who include Pixar, Lucasfilm Ltd. and DreamWorks Animation, secretly agreed not to solicit class members and to coordinate on compensation.
- Drywall: Mr. Johnson serves as co-lead counsel in In re Domestic Drywall Antitrust Litigation (E.D. Pa.), representing a class of direct purchasers of drywall against drywall manufacturers for price-fixing. The Court has preliminarily approved a settlement of $40 million with a major defendant, and denied summary judgment to four defendants. The case is ongoing.
- Automotive Parts: In In re Automotive Parts Antitrust Litigation (E.D. Mich.), Mr. Johnson represents direct purchasers of wire harnesses, bearings and other automotive parts who were overcharged as a result of price-fixing and bid-rigging conspiracies by various sets of defendants throughout the automotive parts industry.

Prior to joining Cohen Milstein in 2009, Mr. Johnson practiced at one of the world's premier full-service global law firms, where he focused on antitrust litigation. Some of Mr. Johnson's matters included:

- Feesers, Inc. v. Michael Foods, Inc. and Sodexho, Inc. (M.D. Pa.): Mr. Johnson was a member of the successful trial team that represented Michael Foods, a manufacturer of processed egg products and refrigerated potato products, in a three week trial of a Robinson-Patman Act action brought by a broad-line distributor of food products.
- Dahl, et al. v. Bain Capital, et al. (D. Mass.): Mr. Johnson represented The Carlyle Group in a class action where plaintiffs alleged collusion among certain private equity firms and investment banks in specific going-private transactions in violation of Section 1 of the Sherman Act.
- In re Aftermarket Filters Antitrust Litigation (N.D. Ill.): Mr. Johnson represented Champion Laboratories, a manufacturer of aftermarket automotive filters, in a class action where plaintiffs alleged a conspiracy among manufacturers to fix prices in violation of Section 1 of the Sherman Act.
- National Laser Technology, Inc. v. Biolase Technology, Inc. (S.D. Indiana): Mr. Johnson represented Biolase, the country's largest manufacturer of lasers for dental applications, against Sherman Act claims brought by a competitor aftermarket dental laser support company. The matter resulted in a favorable settlement for the client.

Mr. Johnson also advised clients in the insurance, commodities exchange, chemical and energy industries in obtaining clearance of mergers, acquisitions and joint ventures from the Federal Trade Commission and the Antitrust Division of the Department of Justice in connection with premerger notification proceedings under the Hart-Scott-Rodino Antitrust Improvements Act.

Mr. Johnson has significant experience in other complex civil litigation, including mass torts and government contracts.

Mr. Johnson graduated magna cum laude from Duke University, with a B.A. in Political Science and Spanish, and attended Stanford Law School, where he earned his law degree. He is a member of the ABA Section of Antitrust Law. Along with Emmy Levens, he recently published an article on ascertainability in the Spring 2016 issue of the ABA's Antitrust magazine. In his pro bono work, he has represented Covenant House Washington, D.C., Habitat for Humanity International Inc. and the Cystic Fibrosis Foundation.

**Betsy A. Miller**

Betsy A. Miller is a Partner at Cohen Milstein and Co-Chair of the Public Client practice group. Ms. Miller represents state Attorneys General and municipalities in civil law enforcement investigations and enforcement actions involving consumer fraud and false claims. She joined the firm in 2009, helping to launch the Public Client practice and bringing with her a broad legal background that includes government service, private- sector litigation, complex dispute-resolution skills and teaching experience. An accomplished litigator, the National Law Journal named Ms. Miller to its prestigious list of Rising Stars in 2009, an honor bestowed on only 40 attorneys under the age of 40 in Washington, D.C.

Prior to joining Cohen Milstein, Ms. Miller served as the Chief of Staff and Senior Counsel to the Attorney General for the District of Columbia. In that capacity, Ms. Miller managed high-profile legal issues and policy initiatives for the Attorney General, serving as the chief liaison to multiple agencies and members of the D.C. Council. Ms. Miller also served as the Mayor's lead labor and employment lawyer during the historic transition of the D.C. Public Schools from an independent agency to one operating under governmental supervision.

Ms. Miller previously served in the federal government as Counsel on the U.S. Senate Committee on the Judiciary, where she worked for Chairman Patrick J. Leahy (D-VT). Ms. Miller was responsible for handling presidential nominations to the federal judiciary, the Department of Justice, the Federal Bureau of Investigation and to U.S. Attorney's Offices.

Ms. Miller also spent eight years as a litigator for two premier defense firms, where she represented some of the nation's largest companies and individuals in matters including First Amendment issues, complex contract disputes, collective bargaining negotiations and arbitration, employment class actions and challenges to independent contractor classification. Her civil defense experience adds to Ms. Miller's deep and balanced litigation skillset.

Currently, Ms. Miller represents public clients in the following high-profile matters:

- The state of Mississippi's litigation against Moody's for misrepresenting its analytical services related to structured finance securities (such as CDOs, RMBS, and various mortgage-backed securities) as independent and objective. The lawsuit alleges that Moody's deceived the government and citizens of Mississippi because these analytical services were tainted by motives for increased profits and market share at the expense of independence and objectivity.
- A different state in its confidential investigation of a rating agency for misrepresenting its structured finance securities business model as independent and objective.
- The state of Hawaii in its litigation against Living Essentials, Inc., the creator of 5-Hour ENERGY, for misrepresenting the benefits of drinking its so-called "liquid energy shot."

Ms. Miller's investigation and litigation successes include matters in the financial, health care and employment law sectors. Recent examples include:

- Representing the state of Mississippi, a Lead State on the Executive Committee, in the landmark consumer fraud lawsuit against McGraw Hill Financial (a/k/a Standard & Poor's), over the misrepresentation of its structured finance securities business as independent and objective; resulting in a global resolution for 19 states, the District of Columbia and the United States Department of Justice in the amount of $1.375 billion.

- Representing the states of Arizona and Nevada in litigation against Bank of America for deceptive conduct in connection with servicing approximately 500,000 mortgages; resulting in financial payments to consumers and the states, commitments to mortgage modifications and other equitable relief valued at nearly $1 billion.
- Representing the state of Montana in an investigation of a Fortune 100 company regarding alleged misclassification of employees as independent contractors; resulting in a multi-million dollar resolution for the state.
- Representing other state attorneys general and municipalities in numerous confidential investigations and settlements.

Earlier in her career, Ms. Miller was a full-time mediator and negotiation consultant. She also was engaged by the Kennedy School of Government to evaluate mediation and arbitration programs across Central America, after which she contributed to a book on the same subject.

Ms. Miller has been a longstanding member of Georgetown University Law Center's adjunct faculty, which she joined in 2001. There, she teaches courses on mediation advocacy and negotiation strategy. She has taught intensive negotiation courses for practitioners attending Harvard Law School's Negotiation Institute (formerly Harvard's Program of Instruction for Lawyers), as well as for a variety of federal and state government agencies, law firms, corporations and non-profit organizations.

Ms. Miller has authored several articles, including her most recent publication, "Untapped Potential: Creating a Systematic Model for Mediation Preparation," which appears as Chapter 13 in the AAA Handbook on Mediation – Third Edition (2016).

Ms. Miller received her undergraduate degree in Comparative Literature from Dartmouth College, graduating magna cum laude and Phi Beta Kappa, and earned her law degree from Harvard Law School, where she was an editor on the Harvard Human Rights Journal and the Harvard Latino Law Review. She is the recipient of Harvard Law School's post-graduate Heyman Fellowship for government service and academic excellence and Harvard Law School's Kaufman Fellowship for public service. Following law school, she clerked for the Honorable Thomas Penfield Jackson in the U.S. District Court for the District of Columbia.

**Gary L. Azorsky**

Gary L. Azorsky is a Partner at Cohen Milstein, and Co-chair of the Firm's Whistleblower/False Claims Act Practice. Mr. Azorsky joined Cohen Milstein in 2012, establishing the practice. In his role, Mr. Azorsky pursues whistleblower cases under the federal and state false claims act statutes in the health care, pharmaceutical, banking and defense contractor industries and other industries that conduct business with the government. Mr. Azorsky specializes in the complex, highly detailed process for filing and pursuing these cases. In his practice, he has helped right wrongs and to recover nearly $2.5 billion in defrauded funds for federal and state governments, including hundreds of millions of dollars for whistleblower clients.

Most recently, Mr. Azorsky served as co-lead counsel in the qui tam action against the pharmaceutical company Wyeth pending in the District of Massachusetts, in which more states joined to intervene along with the government of the United States than had ever before intervened in a qui tam action. (United States of America et al., ex rel. Lauren Kieff, v. Wyeth, No.1:03-CV-12366-DPW [D.Mass.].) The $784.6 million settlement was the seventh-largest False Claims Act recovery on record and the second-largest recovery in history involving a single class of drugs. Mr. Azorsky worked alongside Department of Justice attorneys and states Attorneys General throughout the 12-year pendency of the case.

Mr. Azorsky was actively involved in precedent-setting cases, such as the series of Ven-A-Care cases, which were among the first large FCA multi-state cases and laid the groundwork for much of the false claims act litigation that goes on today. He has also represented whistleblowers in False Claims Act cases involving defense contractors, off-label marketing and misbranding by pharmaceutical companies and fraud in connection with the banking industry, for-profit

colleges and student loan programs. In addition, Mr. Azorsky represents whistleblowers in tax fraud claims against large and small corporations through the IRS Whistleblower Office, as well as whistleblowers alleging violations of the Foreign Corrupt Practices Act and violations of the federal securities laws filed with the SEC Whistleblower Office.

Mr. Azorsky served as co-counsel for the whistleblower on the following representative matters:

- United States of America ex rel. Ven-a-Care of the Florida Keys Inc. v. Dey Laboratories, et al., Civil Action No. 05-11084 (D. Mass) ($280 Million settlement in December 2010)
- United States of America ex rel. Ven-A-Care of the Florida Keys Inc. v. Boehringer Ingelheim Corp, et al., Civil Action No. 07-10248 (D. Mass.) ($280 Million settlement in December, 2010)
- Florida ex rel. Ven-A-Care of the Florida Keys Inc. v. Boehringer Ingelheim Corp, et al., Civil Action No. 98-3-32A (Leon Cty., Fla.) ($6.5 Million settlement with Dey Laboratories, Inc. in March 2010)
- Florida ex rel. Ven-A-Care of the Florida Keys Inc. v. Boehringer Ingelheim Corp, et al., Civil Action No. 98-3-32A (Leon Cty., Fla.) ($9.57 Million settlement with Schering-Plough in December 2009)
- Florida ex rel. Ven-A-Care of the Florida Keys Inc. v. Boehringer Ingelheim Corp, et al., Civil Action No. 98-3-32A (Leon Cty., Fla.) ($8.5 Million settlement with Boehringer Ingelheim in December 2009)
- Texas ex rel. Ven-A-Care of the Florida Keys Inc. v. Roxane Laboratories, Inc., Boehringer Ingelheim Pharmaceuticals, Inc., Ben Venue Laboratories, Inc. and Boehringer Ingelheim Corporation, Civil Action No. GV3-03079 (Travis Cty., Tex.) ($10 Million settlement with Boehringer Ingelheim in November 2005)
- Texas ex rel. Ven-A-Care of the Florida Keys Inc. v. Warrick Pharmaceuticals Corporation, Schering Plough Corporation, Schering Corporation, Civil Action No. GV002327 (Travis Cty., Tex.) ($27 Million settlement with Schering-Plough in May 2004)
- Texas ex rel. Ven-A-Care of the Florida Keys Inc. v. Dey, Inc., Dey, L.P., Civil Action No. GV002327 (Travis Cty., Tex.) ($18.5 Million settlement with Dey Laboratories, Inc. in June 2003)

Mr. Azorsky is recognized for his expertise. He has served as an expert witness in a legal malpractice case concerning qui tam practice. He has provided expert guidance on the False Claims Act in congressional hearings, as well as before the Vermont Senate Judiciary Committee in support of the passage of a False Claims Act for the state. In addition, he regularly speaks before professional audiences regarding the federal and state False Claims Acts.

Mr. Azorsky is a member of Taxpayers Against Fraud, a nonprofit, public interest organization dedicated to combating fraud against the Federal Government through the promotion and use of the Federal False Claims Act and its qui tam provisions. Prior to joining Cohen Milstein, in addition to his Whistleblower/False Claims Act practice, he was actively involved in groundbreaking civil rights, commercial and intellectual property litigation, including Internet and software industry-related litigation.

Mr. Azorsky is a graduate of the University of Pennsylvania, with a B.A. in English, and received his law degree from Cornell University Law School.

**Jeanne A. Markey**

Jeanne A. Markey, is a Partner at Cohen Milstein and Co-Chair of the firm's Whistleblower/False Claims Act practice group. She has successfully represented whistleblowers in federal and state cases across the country. Ms. Markey has extensive experience in Qui Tam litigation in the health care, defense and education industries, and has represented whistleblower clients in the public housing sector.

Ms. Markey is co-lead counsel in United States of America et al., ex rel. Lauren Kieff, v. Wyeth, a high-profile whistleblower case against pharmaceutical giant Wyeth (recently acquired by Pfizer). The lawsuit alleges that Medicaid, the healthcare program for the poor which is jointly funded by the federal and state governments, was defrauded when Wyeth falsely inflated the price of the acid suppression drug Protonix Oral from 2001 through 2006. Thirty-six states and

the District of Columbia have joined with the United States to intervene in the Wyeth case – more states than have ever intervened in any other U.S. Qui Tam case.

She also served as the primary attorney representing the putative class in Benzman v. Whitman, a class action in Manhattan and Brooklyn against the U.S. Environmental Protection Agency. The claims were based on class members' exposure to contaminants contained in World Trade Center interior dust resulting from the 9/11 attacks.

Ms. Markey is admitted to practice law in the Commonwealth of Pennsylvania, the Eastern District of Pennsylvania and to the First Circuit Court of Appeals, Second Circuit Court of Appeals, and Eleventh Circuit Court of Appeals.  She is a member of Taxpayers Against Fraud, a nonprofit, public interest organization dedicated to combating fraud against the Federal Government through the promotion and use of the Federal False Claims Act and its Qui Tam provisions, the Association of Qui Tam Attorneys, and frequently speaks about developments in the Qui Tam field. She received her B.A. (cum laude) from Colgate University and her J.D. from Cornell University Law School.

**Christopher J. Cormier**

Christopher J. Cormier is a Partner at Cohen Milstein and a member of the Antitrust practice group. In this role, he has tried cases and obtained settlements and judgments for his clients in excess of $1 billion. He is a member of the Antitrust practice group's New Case Committee as well as a member of the group's Client Committee.

Currently, Mr. Cormier is litigating the following notable matters:

- Anadarko Basin Oil and Gas Lease Antitrust Litigation: Co-lead counsel for plaintiffs in class actions alleging that Chesapeake Energy, SandRidge Energy and a former executive of both companies conspired to rig bids for leases of land held by private landowners in parts of Oklahoma and Kansas. This litigation follows the U.S. Department of Justice's early 2016 indictment of a co-founder and former CEO of Chesapeake Energy for allegedly participating in this bid-rigging conspiracy.  Plaintiffs allege that Defendants illegally conspired to stabilize and depress the price of royalty and bonus payments paid to landowners in the Anadarko Basin oil and gas province — a massive geological formation holding natural gas and oil deposits that includes large parts of Oklahoma and Kansas. Pursuant to this conspiracy, Plaintiffs allege that Defendants communicated about and agreed on prices, allocated particular geographic areas between themselves, and rigged bids for leases of land, lowering acquisition prices across the region and thereby harming the proposed class of landowners.
- Dental Supplies Antitrust Litigation: Cohen Milstein was recently appointed interim co-lead counsel for a proposed class of dental practices and dental laboratories. The case alleges that Defendants Henry Schein, Inc., Patterson Companies, Inc., and Benco Dental Supply Company — the three largest dental supply  and  dental equipment distributors in the United States — fixed price margins on dental equipment, jointly pressured manufacturers to squeeze out competitors, and agreed not to "poach" each other's employees, in violation of federal antitrust law.  As a result of the alleged conspiracy, dental practices and dental laboratories may have paid artificially inflated prices for many kinds of dental supplies and dental equipment, from consumables like gauze and cement to big-ticket equipment like chairs and x-rays.  Mr. Cormier is one of the members of the Cohen Milstein team co- leading this case.
- Ductile Iron Pipe Fittings Antitrust Litigation:  Cohen Milstein, as co-lead counsel, represents a putative class of direct purchaser plaintiffs in a price-fixing case against the three largest manufacturers of ductile iron pipe fittings — McWane Inc., Sigma Corporation, and Star Pipe Products — and a monopolization case against McWane for excluding significant competition in the domestic ductile iron pipe fittings market. Settlements of $9 million have been reached with two of the defendants, Sigma and Star. Currently, Mr. Cormier and his team are in the midst of fact discovery and taking depositions of numerous party and non-party witnesses across the country.
- Cast Iron Soil Pipe & Fittings Antitrust Litigation: Cohen Milstein, as co-lead counsel, represents a putative class of direct purchaser plaintiffs against the two largest soil pipe and fittings manufacturers in the country (McWane Inc. and Charlotte Pipe & Foundry) and the trade association they control (Cast Iron Soil Pipe Institute) in a

lawsuit alleging that the defendants engaged in a nationwide price- fixing conspiracy. Mr. Cormier and his team are concluding fact discovery, and have taken a significant number of depositions of party and non-party witnesses across the country.

His successes include:

- Urethanes (Polyether Polyols) Antitrust Litigation: Cohen Milstein is co-lead counsel for direct purchaser plaintiffs in an antitrust class action alleging a nationwide conspiracy to fix the prices of chemicals used to make polyurethane foam, a basic component of ubiquitous everyday products such as bed mattresses, car seat cushioning and furniture cushioning.  Four defendants — Bayer, BASF, Huntsman, and Lyondell — settled for a total of $139.5 million, while the case against the fifth manufacturer, Dow Chemical, went to trial. After a four-week jury trial, in which Mr. Cormier was a member of the trial team, the jury returned a $400 million verdict for the plaintiffs, which the district court trebled under federal antitrust law to more than $1 billion.  This was the largest verdict in the country in 2013, as reported by the National Law Journal.  The U.S. Court of Appeals for the Tenth Circuit affirmed the judgment, which is currently on appeal before the United States Supreme Court.
- Plasma-Derivative Protein Therapies Antitrust Litigation: Cohen Milstein was co-lead counsel for direct purchaser plaintiffs alleging a conspiracy to reduce the supply and increase prices of IVIG and Albumin— life-saving therapies derived from blood plasma. Mr. Cormier and his colleagues at Cohen Milstein represented named plaintiff The University of Utah Health Systems as well as the remaining class members in this matter. The defendants were CSL Ltd., CSL Behring, Baxter Healthcare and the Plasma Protein Therapeutics Association (the trade association the manufacturer defendants controlled).  Mr. Cormier played an integral role in the investigation and filing of the first complaint in the country in this matter. Following numerous depositions across the globe and the filing of plaintiffs' opening class certification motion and expert report, Mr. Cormier and his team obtained settlements with all defendants totaling $128 million.

Mr. Cormier earned a B.A. at the University of Virginia and attended American University Washington College of Law, graduating magna cum laude. He interned with the Hon. Judge Deborah K. Chasanow, U.S. District Court for the District of Maryland, and with the U.S. Department of Justice, National Criminal Enforcement Section, Antitrust Division.  He is the author of numerous scholarly articles on antitrust law.  Benchmark Plaintiff has named him an Antitrust Litigation Star three consecutive years, from 2013 to 2015 and Super Lawyers named him a "Rising Star" in 2016.

**Michael B. Eisenkraft**

Michael B. Eisenkraft is a Partner at Cohen Milstein and takes a leading role in prosecuting cases relating to the protection of commodity and financial markets for the firm and currently represents investors in the Natural Gas, KOSPI 200, LIBOR, Treasuries, and Interest Rate Swaps markets.  He has also helped  investors recover hundreds of millions of dollars in the Firm's mortgage-backed securities cases.  Mr. Eisenkraft serves as the Administrative Partner for Cohen Milstein's New York office and chairs the firm's new business development committee.

His notable successes at Cohen Milstein include:

- HEMT MBS Litigation: $110 million settlement on behalf of investors in mortgage-backed securities issued and underwritten by Credit Suisse (final approval pending) after more than seven years of litigation, which included the first written decision certifying a Securities Act class of mortgage-backed securities in the country.
- RALI MBS Litigation: $335 million in settlements on behalf of investors in mortgage-backed securities issued by Residential Capital and underwritten by various investment banks after seven years of litigation.
- Harborview MBS Litigation: $275 million settlement on behalf of investors in mortgage-backed securities issued and underwritten by the Royal Bank of Scotland and its subsidiaries after more than six years of litigation.
- Dynex: $7.5 million settlement on eve of trial on behalf of investors in asset-backed securities.  The decision certifying the class in the case was the first decision within the Second Circuit certifying a class of asset-backed bond purchasers under the 1934 Act.

- China MediaExpress: $12 million settlement with auditor defendant in case involving alleged fraud at Chinese reverse merger company China MediaExpress.  One of the largest settlements with an auditor defendant in a case involving a Chinese reverse merger company.

Mr. Eisenkraft's current cases include:

- Total Gas & Power Antitrust and Commodities Litigation:  Represents putative class in action against the  energy company Total in case alleging antitrust violations and violations of the  Commodity Exchange Act in connection with manipulation of the market for natural gas.
- NovaStar MBS Litigation: Securities Act litigation involving billions of dollars of mortgage-backed securities underwritten by the Royal Bank of Scotland, Wachovia and Deutsche Bank.
- Tower Research Capital: Commodity Exchange Act class action against a high frequency trading firm alleging manipulation of the market for KOSPI 200 futures contracts (the representative stock market index of South Korea) using spoofing or faked trades.
- LIBOR (Exchange Traded Class): Commodity Exchange Act and antitrust class action representing investors in Eurodollar futures injured by manipulation of LIBOR by world's largest banks.
- Interest Rate Swaps: Represents Public School Teachers' Pension and Retirement Fund of Chicago and putative class in action alleging that major investment banks conspired to prevent an exchange-traded market for interest rate swaps from developing.

Mr. Eisenkraft served as a law clerk to the Honorable Judge Barrington D. Parker of the United States Court of Appeals for the Second Circuit. He is the author or co-author of numerous articles on legal issues in the securities and antitrust fields among other subjects.  Mr. Eisenkraft attended Brown University, where he received a B.A., magna cum laude and Phi Beta Kappa, and graduated cum laude from Harvard Law School.

**Michelle C. Yau**

Michelle C. Yau is a Partner at Cohen Milstein, and a member of the Firm's Employee Benefits (ERISA) Practice Group. In her role, Ms. Yau represents the interests of employees, retirees, plan participants or beneficiaries in ERISA cases. Her practice specializes in ERISA cases involving complex financial transactions or actuarial issues. Ms.  Yau  brings to  her practice government experience enforcing  labor statutes  and a  grasp of  complex financial instruments gained from her training as a financial analyst. Drawing on those experiences, she is able to fulfill her passion for protecting pension plan participants.

Ms. Yau litigated some of the most significant ERISA lawsuits to emerge from the Madoff Ponzi scheme. In re Beacon Assoc. Litig., she represented a multi-plan class of participants, beneficiaries and fiduciaries, which settled along with other consolidated cases for $219 million in 2013, representing 70% of the Class members' out-of-pocket losses. The judge praised the settlement, describing the outcome as "extraordinary" and the praising the "hard work" done by plaintiffs' counsel, including Cohen Milstein. In re Austin Capital Mgmt. Litig., which was settled by the Department of Labor on the ERISA class on very favorable terms, Ms. Yau alleged that Madoff's returns, based on his advertised investment strategy, were mathematically impossible, a fact Austin Capital ought to have recognized well before the fraud was revealed.

Prior to joining Cohen Milstein in 2007, Ms. Yau was an Honors Program Attorney at the Department of Labor where she enforced and administered of a variety of labor statutes.  Before law school, she worked as a financial analyst  at Goldman, Sachs & Co. in the Financial Institutions Group of the Investment Banking Division.

Ms. Yau is presently litigating a series of church plan lawsuits alleging that health care systems wrongfully claim their benefit plans are exempt from ERISA's protection. She oversees the day-to-day management of these cases, including coordinating all the aspects of the litigation.

Currently, Ms. Yau is representing clients in the following notable matters:

- St. Peter's Health care System Church Plan Litigation: Cohen Milstein is counsel to a class of defined benefit participants in Kaplan v. St. Peter's Healthcare System, which allege that the hospital's plan is not a church plan and thus the class is entitled to ERISA's protections.  In district court, Cohen Milstein succeeded in showing that only a church may establish a church plan and thus St. Peter's Healthcare System is not entitled to exemption from ERISA.  Cohen Milstein then prevailed in the Third Circuit, which affirmed the district court's holdings.
- St. Anthony Medical Center Church Plan Litigation: Cohen Milstein is counsel to a class of defined benefit participants in Owens et al. v. St. Anthony Medical Center et al., which allege that the Medical Center violated numerous provisions of ERISA by improperly operating the plan as exempt from ERISA's protections.  As a result the class of participants suffered cutbacks as much as 40% of their promised benefits.
- Trinity Church Plan Litigation: Cohen Milstein is counsel to a class of defined benefit participants in Lann et al. v. Trinity Health, which allege that the hospital's plan is not a church plan and thus the class is entitled to ERISA's protections,
- Advocate Health Care Church Plan Litigation: Cohen Milstein, along with Keller Rohrback, is counsel to a class of defined benefit participants in Stapleton et al. v. Advocate Health Care Network and Facilities et al., which allege that the hospital's plan is not a church plan and thus the class is entitled to ERISA's protections.  In district court, counsel succeeded in showing that only a church may establish a church plan and thus Advocate is not entitled to exemption from ERISA.  Plaintiffs then prevailed in the Seventh Circuit, which affirmed the district court's holdings.
- U.S. Bancorp Pension Plan Litigation: Cohen Milstein is counsel to a class of pension plan participants alleging that the plan's managers engaged in a risky, imprudent investment strategy by investing 100% of its assets in stocks, thus causing the plan to lose more than $1 billion during the collapse of the equities market in 2008. Ms. Yau developed the litigation and is overseeing all aspects of the litigation.

Ms. Yau has litigated the following case successfully:

- Merrill Lynch ERISA Litigation: Cohen Milstein served as interim co-lead counsel in a class action alleging that fiduciaries of the Merrill Lynch retirement plans imprudently purchased and held inflated Merrill employer stock for the retirement accounts of the Companies' employees. The litigation was resolved for $75 million. Ms. Yau was engaged in all aspects of the litigation.
- Madoff Ponzi Scheme Litigation: Cohen Milstein represented a multi-plan class of participants, beneficiaries and fiduciaries in re Beacon Assoc. Litig. The $219 million settlement in 2013 represented 70% of the Class members' out-of-pocket losses. Ms. Yau was engaged in all aspects of the litigation.
- Weyerhauser Pension Plan Litigation: Cohen Milstein was lead counsel in a lawsuit alleging that the Weyerhaeuser Company caused its Defined Benefit Retirement Plans to engage in a risky investment strategy involving alternative investments and derivatives, causing the Plans' master trust to become underfunded. A settlement was reached for injunctive relief on behalf of Plans' participants and beneficiaries. Ms. Yau was engaged in all aspects of the litigation.

Ms. Yau received her law degree from Harvard Law School in 2003, where she was awarded several public interest fellowships, including the Heyman Fellowship for academic excellence and a demonstrated commitment to federal public service. Ms. Yau graduated Phi Beta Kappa with a B.A. in Mathematics from the University of Virginia.  Ms. Yau was also selected as an Echols Scholar and awarded the Student Council Scholarship for leadership, academic achievement and community service.  Law360 named Ms. Yau a Rising Star Under 40.

**George F. Farah**

George F. Farah is a Partner at Cohen Milstein, and a member of the Antitrust and Human Rights practice groups. In this role, Mr. Farah represents consumers, farmers, unions and businesses that were injured by antitrust abuses in complex multi-district class action lawsuits.

He has experience in litigating all aspects of cases, from arguing motions in court to engaging in settlement negotiations to obtaining jury trial verdicts. In addition, Mr. Farah facilitates the development of new antitrust cases by investigating potential matters and securing clients to serve as class representatives.

Since joining the Firm in 2005, Mr. Farah has represented small businesses that were overcharged due to price-fixing conspiracies; unions and consumers in actions against pharmaceutical companies that thwarted generic competition; and farmers in lawsuits against processors that artificially depressed their wages. Mr. Farah has also advocated for victims of other tortious conduct. He represented the city of Milwaukee in a public nuisance case against lead paint manufacturers; survivors of the Holocaust in actions against companies who profited from Nazi-era slave labor; and political asylum applicants who were tortured in Nepal.

In addition to litigating, Mr. Farah has worked on electoral reform and income inequality issues.  He founded the nonprofit Open Debates to improve the presidential debate process.  He served as general counsel of The Living Wage Campaign to raise wages in Virginia.   He reported on the harms of media concentration and the IMF's austerity programs at The Center for the Study of Responsive Law.

Currently, Mr. Farah is litigating the following notable matters:

- DairyAmerica Antitrust Litigation: Cohen Milstein is co-lead counsel in in Carlin v. Dairy America, Inc.(E.D. Cal.), accusing the largest marketer of nonfat dry milk in the U.S. and the California-based milk processing firm of inflating their profits at the expense of U.S. dairy farmers by misreporting data used by the U.S. government to set the price of raw milk. Mr. Farah is managing all aspects of the case. The case is ongoing.
- Treasury Securities Litigation: Cohen Milstein is co-lead counsel in a class action lawsuit alleging that major banks and brokerages conspired to drive up futures prices for Treasury securities ahead of announced auctions and then colluded to deflate prices at auction. Mr. Farah is involved in all aspects of the case.
- In re Nexium Antitrust Litigation (D. Mass.): Cohen Milstein is co-lead counsel in a pay-for-delay litigation alleging that AstraZeneca PLC, the brand manufacturer of Nexium, paid generics manufacturers to delay the introduction of a generic version of the drug, thus harming consumers. The case is on appeal.
- In re Lidoderm Antitrust Litigation (N.D. Cal.): Cohen Milstein is co-lead counsel in a class action lawsuit alleging that Endo and Teikoku, the manufacturers of the Lidoderm pain patch, paid Watson Pharmaceuticals to delay its generic launch. The case is ongoing.

Some of his successes include:

- OSB Antitrust Litigation: $120 million settlement. Cohen Milstein was co-lead counsel in a case alleging that the nine producers of oriented standard board conspired to reduce the supply of OSB so as to increase prices. Mr. Farah was involved in all aspects of the litigation.
- Hydrogen Peroxide Litigation: $100 million settlement. Cohen Milstein was co-lead counsel in In re Hydrogen Peroxide Antitrust Litigation (E.D. Pa.) representing a class of direct purchasers of hydrogen peroxide in alleging a price-rigging conspiracy by manufacturers. The U.S. Third Circuit Court of Appeals opinion in Hydrogen Peroxide has proved important in clarifying the role of expert testimony in Rule 23 analysis. Mr. Farah was engaged in all aspects of the litigation.
- Northeast Dairy Litigation: In Allen vs. Dairy Farmers of America (D. Vt.), Cohen Milstein serves as lead counsel for one of two certified subclasses of Northeast dairy farmers against Dairy Farmers of America and Dairy Marketing Services in a raw milk price-fixing case. Defendant Dean Foods Co. settled for $30 million, and the Court has preliminarily approved a $50 million settlement with DFA and DMS.
- Nepali Nurse Political Asylum Litigation (Pro Bono): Mr. Farah acted as lead counsel in successfully securing political asylum in the U.S. for a Nepali nurse who had been persecuted and tortured for her religious beliefs in Nepal.

43

Mr. Farah is the author of the book "No Debate: How the Republican and Democratic Parties Secretly Control the Presidential Debates" (Seven Stories Press). His articles on legal and electoral issues have appeared in The Washington Post, The Boston Globe, The Philadelphia Inquirer, Antitrust Magazine and other publications.

Mr. Farah has appeared on over 50 television programs to discuss political, electoral and legal matters, including Nightline, NOW with Bill Moyers, 20/20, CBS Evening News, NBC Nightly News, FOX and Friends, Lester Holt Live and CNN's Market Call.  He has been interviewed on over 100 radio shows and has hosted numerous televised press conferences. He has given several talks on the political process and electoral reform issues at colleges and universities.

Mr. Farah attended Princeton University, graduating with a B.A. from the Woodrow Wilson School of Public and International Affairs, and earned a J.D. at Harvard Law School. Mr. Farah was the recipient of a Paul and Daisy Soros Fellowship.

**Kalpana Kotagal**

Kalpana Kotagal is a Partner at Cohen Milstein, a member of the firm's Civil Rights & Employment practice group, and Chair of the firm's Hiring and Diversity Committee.  Ms. Kotagal also plays an active role in the investigation and development of new potential matters for the Civil Rights & Employment practice group.

Ms. Kotagal has represented victims of discrimination in the workplace and in other settings.  Ms. Kotagal also practiced as a member of the firm's Antitrust practice group. A noted speaker, Ms. Kotagal often is called on to address issues of opportunities and impediments to women's leadership, the ethics of multi-party and class cases, and class arbitration. She also speaks regularly to law students and new lawyers about their career paths.

Ms. Kotagal represents a class of approximately 44,000 female sales employees nationwide in a Title VII and Equal Pay Act case against one of the nation's largest jewelry chains in Jock, et al. v Sterling Jewelers Inc.  Her clients have alleged a pattern of sex discrimination in compensation and promotions.  This case presents cutting-edge issues regarding the certification of nationwide classes and litigating in arbitration.  Ms. Kotagal also represents transgender beneficiaries of federal health insurance who have challenged the denial of transition-related care as discriminatory.

Ms. Kotagal's past successes include:

- U.S. Postal Service Disabled Veterans Litigation: Ms. Kotagal represented a class of disabled veteran applicants in Hill, et. al v. Donohue, United States Postal Service, alleging illegal pre-offer medical inquiries during the application process against the United States Postal Service. The case, which settled for $9.58 million, resulted in USPS's agreement implement changes in its practices to prevent similar violations in the future.
- Pilgrim's Pride Corporation: Ms. Kotagal represented 8,000 workers in 11 states in a wage and hour lawsuit in Aaron v.  Pilgrim's Pride Corp., seeking redress for unpaid overtime.  The $10 million settlement allowed class members to recover about 85% of the back pay owed them.
- Nurse Wages Matters: Cohen Milstein represented nurses in an antitrust case in a case contending that hospitals conspired to suppress and fix wages of nurses.

Ms. Kotagal is a member of the Center for Worklife Law's Working Group on Pregnancy Accommodation of the National Employment Lawyers Association (NELA). She is also the co-author of "Innovation, Economics and the Law: The Health Care Industry's Exposure to Antitrust Liability," published by the ABA Antitrust Law Section in 2007.

Ms. Kotagal brings to her litigation practice her experience as an organizer, having previously served as field organizer with Green Corps, an Assistant National Field Director of the United States Public Interest Research Group, and as an advisor to a Congressional candidate in 2006.  Ms. Kotagal also served as an honorary chair of the National Finance Committee of Young Lawyers for Obama in 2008.

While in law school, Ms. Kotagal served as law clerk in the Chambers of the Honorable J. Curtis Joyner, Eastern District of Pennsylvania. She served as an Articles Editor of the University of Pennsylvania Law Review.

Prior to joining Cohen Milstein, she served as a law clerk to the Honorable Betty Binns Fletcher of United States Court of Appeals for the Ninth Circuit.

Ms. Kotagal attended Stanford University, where she was a Morris K. Udall Scholar, and graduated with honors with an A.B.B.S.  She earned her J.D. cum laude from the University of Pennsylvania, where she was a James Wilson Fellow.

**Sharon K. Robertson**

Sharon Robertson is a Partner at the firm and a member of the Antitrust practice group. Ms. Robertson Co- chairs the firm's Professional Development and Mentoring Committee and serves on the firm's Diversity Committee. Ms. Robertson also currently serves as a member of the Executive Committee for the Antitrust Section of the New York State Bar Association.

Ms. Robertson, who joined Cohen Milstein in 2006, has extensive experience in complex antitrust litigation at the pre-trial, trial and appellate levels and has been consistently recognized as a leading and highly regarded attorney. Within a span of two years, Ms. Robertson was a trial team member in two of the largest antitrust cases to be tried to verdict. In 2013, she was a member of the trial team in the Urethanes matter, where the jury returned a $400 million verdict, which was trebled by the Court, as required by antitrust law, to $1.06 billion. The judgment, one of the largest known antitrust verdicts to date, was cited by The Legal 500 in ranking Cohen Milstein a leading class action plaintiff firm in 2015. The following year, Ms. Robertson was a member of the trial team in the Nexium matter, the first pharmaceutical antitrust case to go to trial following the Supreme Court's landmark decision in FTC v. Actavis, 570 U.S. 756 (2013). Currently, Ms. Robertson leads a series of pay-for-delay pharmaceutical antitrust cases, alleging that the defendant brand manufacturer entered into non-competition agreements with generic pharmaceutical manufacturers in order to delay market entry of generic versions of certain drug products.

Ms. Robertson represents End-Payor Plaintiffs in the following pay-for-delay pharmaceutical antitrust cases in which the firm serves as Co-Lead Counsel:

- In re Nexium Antitrust Litigation (D.  Mass.):  Plaintiffs allege that AstraZeneca PLC,  the  brand manufacturer of Nexium, paid generics manufacturers to delay the introduction of a generic version of the drug, thus harming consumers and other end-payors. The case is on appeal.
- In  re  Lipitor  Antitrust  Litigation  (D.N.J.):  Plaintiffs  allege  that  Pfizer,  the  manufacturer  of  Lipitor,  conspired with  Ranbaxy,  the  generic  manufacturer, to  delay  its  introduction  of  a  generic  Lipitor  product. The  case  is on appeal.
- In re Loestrin Antitrust Litigation (D.R.I.): Plaintiffs allege that Warner Chilcott PLC and three others entered into an agreement to delay the introduction of a generic version of the contraceptive drug Loestrin.  Following a dismissal by the District Court, the First Circuit recently revived all of Plaintiffs' claims and remanded the case for further proceedings consistent with its opinion.
- In re Lidoderm Antitrust Litigation (N.D. Cal.): Plaintiffs allege that Endo and Teikoku, manufacturers of the Lidoderm patch, paid Watson Pharmaceuticals to delay its generic launch. The case is ongoing.

In addition, Ms. Robertson serves as a member of the executive committee in similar pay-for-delay cases in which Cohen Milstein plays a significant role, including: Niaspan (In re Niaspan Antitrust Litigation [E.D. Pa.]), Suboxone (In re Suboxone Antitrust Litigation [E.D. Pa.]), ACTOS (In re ACTOS Antitrust Litigation [S.D.N.Y.]), Aggrenox (In re Aggrenox Antitrust Litigation [D. Conn.]) and Solodyn (In re Solodyn Antitrust Litigation [D. Mass.]).

Ms. Robertson has successfully litigated the following notable matters:

45

- Urethanes (Polyether Polyols) Antitrust Litigation: Cohen Milstein is Co-Lead Counsel in an antitrust class action alleging a nationwide conspiracy to fix the prices of polyether polyols. Ms. Robertson played a leading role in helping obtain settlements with several defendants for $139 million and was a member of the trial team that obtained a $400 million jury verdict (trebled to more than $1 billion), which was affirmed on appeal by the 10th Circuit. The case against Dow ultimately settled for $835 million while Dow's petition for certiorari was pending before the Supreme Court.
- Albany and Detroit Nurses Litigation: Cohen Milstein represented registered nurses employed by hospitals in Albany and Detroit in class actions alleging a wage-fixing conspiracy. Ms. Robertson obtained settlements with five Albany Defendants totaling over $14 million. In the Detroit case, Ms. Robertson helped obtain $98 million in settlements with eight Defendants.
- Indonesian Villagers Litigation: Ms. Robertson represented Indonesian villagers in a lawsuit against Exxon Mobil over torture and extrajudicial killings allegedly committed by the Defendant's security forces (a unit of the Indonesian military).

Ms. Robertson attended the State University of New York at Binghamton, where she graduated magna cum laude with a B.A. in Philosophy, Politics and Law. She earned her J.D. from the Benjamin N. Cardozo School of Law, where she served as Notes Editor of the Cardozo Public Law, Policy and Ethics Journal.

Ms. Robertson has authored "Comparing the U.S. Class Action Mechanism and the Proposed U.K. System: Which Strikes the Right Balance Between Safeguards and Justice," Competition Policy International Antitrust Chronicle. In addition, she assisted the Trial Practice Committee of the American Bar Association in revising the 2005 Edition of the Model Jury Instructions handbook.

Prior to attending law school, Ms. Robertson worked on the campaign committee of Councilman John Liu, the first Asian American to be elected to New York City's City Council. During law school, she was an intern in the Litigation Bureau of the Office of the New York State Attorney General and the United States Court of Appeals for the Second Circuit. Additionally, in law school, Ms. Robertson was selected as an Alexander Fellow and spent a semester serving as a full-time Judicial Intern to the Hon. Shira A. Scheindlin, U.S. District Court for the Southern District of New York.

**S. Douglas Bunch**

S. Douglas Bunch, is a Partner at Cohen Milstein and a litigator in the firm's Securities Fraud & Investor Protection Practice Group.

Mr. Bunch represents individual and institutional investors in cases brought in violation of state and federal securities laws, including the Securities Act of 1933 and the Securities Exchange Act of 1934. Currently, Mr. Bunch is part of the Cohen Milstein team litigating a class action suit against Harman International Industries, Inc., in which Cohen Milstein was successful in obtaining a ruling by the Court of Appeals for the D.C. Circuit reversing the dismissal of the case and remanding it to the U.S. District Court for further proceedings. The ruling protects investors by limiting the scope of protection afforded by the so-called "safe-harbor" for forward-looking statements in the Private Securities Litigation Reform Act of 1995. Mr. Bunch also recently played a key role in the litigation and settlement of securities class actions against ITT Educational Services, Inc. and Orthofix International N.V., in which the U.S. District Court for the Southern District of New York denied defendants' motions to dismiss.

Mr. Bunch played an important role in successfully litigating the suits that followed in the wake of the 2008 financial crisis. He was instrumental in the $90 million settlement, following an appeal to the U.S. Court of Appeals for the Second Circuit, of Rubin v. MF Global, Ltd. in 2011. The complaint asserted that although MF Global had assured investors in its IPO that the Company had a rigorous, robust system of risk controls in place capable of monitoring risk on a continuous "real time" basis, MF Global in fact had deactivated trading and margin controls on brokers' computers to speed up transaction times. He was also a member of the litigation team that persevered in the $335 million global settlement of

46

a class action lawsuit on behalf of purchasers of mortgage-backed securities (MBS) issued by Residential Accredit Loans, Inc. (RALI), the $275 million settlement of a class action lawsuit on behalf of purchasers of MBS issued by Harborview Mortgage Loan Trusts, and the $500 million settlement of a class action lawsuit on behalf of purchasers of MBS issued by Bear Stearns & Co. Inc., among other MBS cases.

A member of Phi Beta Kappa, Mr. Bunch graduated with a B.A., summa cum laude, from the College of William & Mary, earned an Ed. M. from Harvard University, and received his J.D. from William & Mary Law School, where he was a recipient of the Benjamin Rush Medal in 2006. In 2011, he was awarded William & Mary's inaugural W. Taylor Reveley III award, recognizing alumni who have demonstrated a sustained commitment to public service. Mr. Bunch is co-founder and chairman of Global Playground, Inc., a nonprofit that builds schools in the developing world, and serves or has served on the boards of the Northeast Conference on the Teaching of Foreign Languages, Ascanius: The Youth Classics Institute, and Virginia21.

**David Young**

David A. Young is a Partner at Cohen Milstein and is a member of the Antitrust Practice Group, having joined the Firm in 2010. Mr. Young has extensive experience in complex antitrust litigation, class actions, appeals and litigating cases under the federal False Claims Act.

In his role, Mr. Young represents businesses and individuals in federal and state civil actions, with a focus on multi-district class actions and federal False Claims Act litigation. He has worked on antitrust issues in numerous industries, including pharmaceuticals, financial services, financial derivatives and PC microprocessors. Mr. Young also represents qui tam relators in federal False Claims Act litigation.

Prior to joining Cohen Milstein, Mr. Young practiced at two other firms where his litigation practice focused on antitrust, trademark, business, and False Claims Act litigation. He represented the relator in U.S. ex rel. Loughren v. UnumProvident Corp. (D. Mass), where a jury found that UnumProvident violated the False Claims Act by causing the submission of false claims for Social Security disability benefits. Mr. Young also represented U.S. trademark holders suing to prevent the illegal importation of products bearing their marks in federal court and administrative actions.

Currently, Mr. Young is litigating the following notable matters:

- Automotive Parts Antitrust Litigation: In In re Automotive Parts Antitrust Litigation (E.D. Mich.), Cohen Milstein represents direct purchasers of wire harnesses, bearings and other automotive parts, who were overcharged as a result of price-fixing and bid-rigging conspiracies by various sets of defendants throughout the automotive parts industry for more than a decade. The litigation follows upon a U.S. Department of Justice price-fixing case against auto parts manufacturers.
- Domestic Drywall Antitrust Litigation: Cohen Milstein is co-lead counsel in antitrust litigation alleging that the seven major U.S. manufacturers of drywall conspired to manipulate prices and restrain price competition. To date, settlements for $44.5 million have been reached with two of the defendants. Mr. Young has been a core member of the team, involved in all aspects of the litigation. Defendants' motions for summary judgment were recently denied for all but one defendant, and the case is ongoing.
- Google Wiretap Antitrust Litigation: Cohen Milstein is co-lead counsel in a nationwide class action lawsuit alleging Google violated the Wiretap Act when its StreetView vehicles collected data from unencrypted Wi-Fi networks, including the home networks of individuals. The litigation has survived a motion to dismiss, which Google unsuccessfully appealed on an interlocutory basis in the Ninth Circuit. Currently, the firm is in the midst of jurisdictional discovery. The case is ongoing.

His successes include:

- Community Health Care System Litigation: Cohen Milstein was co-counsel representing an emergency room doctor and nurses in a whistleblower lawsuit under the False Claims Act alleging Community Health Care System defrauded the federal government in connection with health care bills. The case was resolved for $94 million.
- Hy-Ko Products Antitrust Litigation: Cohen Milstein represented Hy-Ko Products Co., a manufacturer of replacement keys and key replacement machines, in an antitrust litigation alleging that its competitors, the manufacturer of replacement keys and the manufacturer of key replacement machines, had acted to restrain competition and to monopolize the market. The litigation was resolved to the client's satisfaction.

Mr. Young attended Bridgewater College, where he graduated with a B.A. in Physics, and earned his J.D. from Harvard Law School, where he served as an Executive Editor for the Harvard Civil Rights-Civil Liberties Law Review. While still in law school, he represented clients in disability and discrimination cases as a member of Harvard's clinical programs, worked as a research assistant for Professor Christine Jolls and volunteered as a summer legal intern at the Whitman-Walker Clinic, a community-based center providing a range of health care services in Washington, D.C.

Mr. Young is a member of the ABA Section of Antitrust Law. He has represented pro bono clients in discrimination actions before the D.C. Circuit and D.C. District courts, including successfully arguing for reversal of the district court's dismissal of his client's case in Miller v. Hersman, 594 F.3d 8 (D.C. Cir. 2010).

**Laura Alexander**

Laura Alexander is a Partner in the Antitrust practice at Cohen Milstein. Ms. Alexander joined the firm in 2012, bringing with her extensive experience in complex antitrust litigation, class actions and appeals. Prior to joining Cohen Milstein, Ms. Alexander also was a member of the trial team that successfully represented Charter Communications in what was, at the time, the largest litigated bankruptcy in U.S. history and successfully represented several clients before the United States Supreme Court.

Currently, Ms. Alexander is litigating the following notable matters:

- Ideker Farms, et al. v. the United States of America: Cohen Milstein represents Ideker Farms and another 350 plaintiffs located in six states along the Missouri River in a mass action lawsuit in the U.S. Court of Federal Claims alleging that the federal government took land and flooding easements over lands owned by farmers, violating the takings clause of the Fifth Amendment. Ms. Alexander has been involved in all aspects of the litigation. The case is set to go to trial in 2017.
- Sutter Health Antitrust Litigation: Cohen Milstein is co-lead in a monopolization case alleging Sutter Health, a large hospital chain in Northern California, has used anticompetitive contract terms and contracting practices to drive out competition and raise prices to insurers, self-insured employers and individual consumers to supracompetitive levels. Ms. Alexander has been involved in all aspects of the litigation.
- Big Oak Farms, Inc. v. the United States of America: Cohen Milstein represents a group of farmers along the Mississippi River in a Fifth Amendment takings case alleging that the U.S. Army Corps of Engineers intentionally flooded plaintiffs' land, without providing just compensation. Ms. Alexander has been involved in all aspects of the litigation.

Ms. Alexander's past successes include:

- Urethanes (Polyether Polyols) Antitrust Litigation: Cohen Milstein is co-lead counsel for direct purchaser plaintiffs in an antitrust class action alleging a nationwide conspiracy to fix the prices of chemicals used to make polyurethane foam. Four defendants—Bayer, BASF, Huntsman, and Lyondell—settled for a total of $139.5 million, while the case against the fifth manufacturer, Dow Chemical, went to trial. After a four-week jury trial, the jury returned a $400 million verdict for the plaintiffs, which the district court trebled under federal antitrust law to more than $1 billion. Ms. Alexander was a member of the trial team and had significant brief writing and

48

witness preparation responsibilities. The U.S. Court of Appeals for the Tenth Circuit affirmed the judgment.  Dow has petitioned the United States Supreme Court for review, and that petition is currently pending.

Ms. Alexander attended Reed College, earning a B.A. in Mathematics, and earned her J.D. magna cum laude from Georgetown University Law Center. Following law school, she served as a law clerk to the Honorable Judge M. Margaret McKeown on the United States Court of Appeals for the Ninth Circuit. She has authored or co-authored scholarly articles, including Prominent Market Definition Issues in Pharmaceutical Antitrust Cases, which recently appeared in Antitrust, an American Bar Association publication.

**Emmy Levens**

Emmy L. Levens, a Partner in the Firm's Washington, D.C. office, is a member of the Antitrust Practice Group. With nearly a decade of experience, Ms. Levens has particular expertise in complex antitrust litigation, class actions, and appellate litigation.  Ms. Levens plays a central role in helping the antitrust group evaluate potential cases and chairs the Firm's Summer Associate Committee.

Currently, Ms. Levens is litigating the following notable matters:

- Flint Water Crisis: Ms. Levens represents a group of residents and businesses in Flint, Michigan, in a suit for damages sustained as a result of their exposure to toxic levels of lead and other bacteria.  This important case is ongoing in the Eastern District of Michigan.
- Resistors Antitrust Litigation: Cohen Milstein serves as interim co-lead counsel in a proposed class action accusing the world's largest manufacturers of resistors of fixing prices.    As a critical member of the team of lawyers representing the proposed class of direct purchasers, Ms. Levens has been involved in every aspect of the case from investigation to prosecution of the class's case which is currently ongoing in the Northern District of California.
- Truck Transmissions Antitrust Litigation: Cohen Milstein serves as co-lead counsel in a putative class action alleging Eaton – the largest manufacturer of Class 8 Transmissions in the United States – conspired with manufacturers of Class 8 Trucks to exclude a rival transmission manufacturer from the market.  Ms. Levens has played an important role on the case from the beginning and has recently returned to the case to assist with the appeal.
- Northeast Dairy: In Allen vs. Dairy Farmers of America (D. Vt.), Cohen Milstein serves as lead counsel for one of two subclasses of dairy farmers challenging anticompetitive conduct in the Northeast which resulted in lower prices paid to farmers. Ms. Levens has served as one of the principle attorneys litigating this matter since its inception.  To date, the case has recovered a historic settlement with former defendant Dean Foods Company and another settlement for $50 million in addition to industry- changing equitable relief has recently been preliminarily approved by the Court.

Some of her past successes include:

- Plasma-Derivative Protein Therapies Antitrust Litigation: Cohen Milstein served as co-lead counsel for plaintiffs alleging that  the two  largest manufacturers of  IVIG and  Albumin – life-saving therapies derived from blood plasma – conspired to reduce the supply, and increase the prices, of these therapies.  Ms. Levens played an active role in the litigation, helping to obtain settlements totaling $128 million for hospitals and other direct purchasers.
- Bulk Bleach Litigation: Ms. Levens served as one of the key attorneys at Cohen Milstein representing a class of municipalities and other direct purchasers of bulk bleach in a case alleging that the two dominant manufacturers of bulk bleach in the Carolina's engaged in an illegal market allocation agreement. After successfully defeating multiple motions to dismiss, class counsel obtained a settlement that satisfied nearly all of the class's damages. In approving the settlement, Judge Gergel complimented counsel, stating that the, "whole case has been, I think, very professionally handled, skillfully handled."

49

- Asylum Appeal: Ms. Levens agreed to represent pro bono a Nepalese woman after her initial application for asylum was denied.  The woman had previously advocated for democratic reforms in Nepal but was forced to leave her home country to escape Communist militias.  Ms. Levens appealed the matter through two rounds of briefing to the Board of Immigration Appeals and up to the Fourth Circuit Court of Appeals.  After successfully obtaining a new asylum hearing for her client, Ms. Levens negotiated an agreement that allowed her client to remain safely in the United States.

Ms. Levens was also a member of the Apple price-fixing litigation team recognized as "Legal Lions" by Law360. In addition to her work at the Firm, Ms. Levens has served as an adjunct Professor at Georgetown School of Law and is a Board member and Secretary of Global Playground, a nonprofit that builds schools in the developing world.  She recently co-authored an article entitled, "Heightened Ascertainability Requirement Disregards Rule 23's Plain Language," which appeared in the Spring, 2016 issue of Antitrust magazine.

Prior to joining the firm, Ms. Levens worked as a staff law clerk at the U.S. Court of Appeals for the Seventh Circuit.

Ms. Levens attended the University of Kansas, graduating with honors, and earned her J.D. at UCLA Law School, graduating Order of the Coif.  While at law school, Ms. Levens served as the Managing Editor for the UCLA Journal of Environmental Law and Policy, Director of the Downtown Legal Housing Clinic, and President of Moot Court.

**Laura H. Posner**

Laura H. Posner is a Partner at Cohen Milstein and a member of the firm's Securities Litigation & Investor Protection Practice Group.

Prior to joining the firm, Ms. Posner was appointed by the New Jersey Attorney General to serve as the Bureau Chief for the New Jersey Bureau of Securities – the top Securities Regulator for the State of New Jersey.  In that capacity, Ms. Posner was responsible for administrating and enforcing the New Jersey Uniform Securities Law and regulations thereunder, as well as managing and overseeing the employees who staff the Bureau of Securities.  Cases prosecuted under Ms. Posner's direction as Bureau Chief resulted in hundreds of millions of dollars in recoveries for New Jersey residents, as well as more than 20 criminal convictions.  As Bureau Chief, Ms. Posner collaborated extensively with the Securities and Exchange Commission, the Department of Justice, and other state Attorneys General and securities regulators.

Previous to her appointment as Bureau Chief, Ms. Posner prosecuted securities fraud class actions and derivative actions on behalf of public pension funds, institutional investors, and unions nationwide, successfully recovering billions on behalf of defrauded investors, a role  that she will continue at Cohen Milstein. Her notable successes include:

- In re Schering-Plough Corp./ENHANCE Securities Litigation and In re Merck & Co., Inc. Vytorin/Zetia Securities Litigation: Obtained $688 million for investors on the eve of trial, the third largest recovery ever achieved in the Third Circuit and District of New Jersey, the second largest securities fraud settlement ever against a pharmaceutical company and among the top 25 securities fraud settlements of all time.
- In re The Mills Corporation Securities Litigation: Obtained $202.75 million for investors, the largest recovery ever achieved in a securities class action in Virginia, and the second largest recovery ever in the Fourth Circuit.
- In re WellCare Health Plans, Inc. Securities Litigation: Obtained $200 million for investors, the largest recovery ever achieved in a securities class action in Florida, and the second largest recovery in the Eleventh Circuit.

Ms. Posner is the former Chairwoman of the North American Securities Administrators Association (NASAA) Enforcement Section Committee, and previously served on NASAA's Multi-Jurisdictional Action Committee, Technology Committee and State Legislation Committee.  She also has served as a member of multiple committees of the Association of the Bar of the City of New York, including currently serving as a member of the Securities Litigation Committee, and previously serving as a member of the Securities Regulation and Consumer Affairs Committees.

Ms. Posner has regularly been named by Super Lawyers as a Rising Star and a Top Woman Attorney.  She regularly speaks at conferences throughout the country, including for events sponsored by PIABA, FINRA, SIFMA, NASAA, SEC, the New York, New Jersey and Philadelphia Bar Associations and the ABA. Ms. Posner has been quoted in The New York Times, The Wall Street Journal, the Star-Ledger, NewJersey.com, Asbury Park Press, the New Jersey Herald, and The Record, and interviews with her appear on various cable news channels and in various publications.

Ms. Posner graduated with a B.A. in Political Science, magna cum laude, from the University of California, Los Angeles in 2001. She received her law degree at Harvard Law School in 2004, where she served on the Executive Editorial Committee for the Harvard Women's Law Journal.

## Attorney Profiles – Associates

**Sally M. Handmaker**

Sally M. Handmaker is an Associate at Cohen Milstein and a member of the firm's Consumer Protection practice group. In that role, Ms. Handmaker litigates actions to enforce consumer rights under federal and state laws.

Prior to joining Cohen Milstein in 2014, Ms. Handmaker was a Litigation Associate at a top-tier defense firm, working on complex commercial and general litigation matters in federal and state courts covering a variety of subject matters, including antitrust, securities litigation, sports, intellectual property and employment. She also maintained an active pro bono practice and, in particular, was recognized for her work with the Lawyers Committee for Civil Rights Under Law's Voting Rights Project.

Ms. Handmaker is currently litigating the following notable matters:

- Parker, et al. v. America Traffic Solutions, et al.: Ms. Handmaker is Lead Associate on the case team that is litigating claims against Florida municipalities and red light camera vendors alleging improper delegation power to enforce red light camera violations and improper collection of fines regarding same.
- In re: Lumber Liquidators Chinese-Manufactured Flooring Products, Sales Practice and Product Liabilities Litigation:  Ms.  Handmaker is Lead Associate on the case team litigating claims  against Lumber Liquidators alleging fraudulent sale of composite flooring that contains excessive and unlawful levels of formaldehyde, a carcinogen.
- Ubaldi v. SLM Corporation: Ms. Handmaker is Lead Associate on case team litigating claims against Sallie Mae Inc. alleging usurious loan practices. Some of her past successes include:
- Symantec Corp. Litigation: Ms. Handmaker was Lead Associate on the case team that succeeded in gaining final approval of a $60 million settlement. The case against Symantec and Digital River alleged misrepresentations regarding the companies' Extended Download Service. Ms. Handmaker was heavily engaged in the trial preparation for the lawsuit, which settled on the eve of the trial.
- Caterpillar Litigation: Ms. Handmaker was Lead Associate in a nationwide product liability class action against Caterpillar, Inc. alleging that engine exhaust system defects resulted in power losses and shutdowns that prevented or impeded their vehicles from transporting goods or passengers.

Ms. Handmaker attended the University of Southern California, graduating summa cum laude with a B.A. in Psychology and a B.A. in Political Science.  Her undergraduate honors thesis was published in the American Psychological Association journal Law and Human Behavior under the title "'How Did You Feel?': Increasing Child Sexual Abuse Witnesses' Production of Evaluative Information."

Ms. Handmaker received her J.D. from the University of Virginia School of Law. While in law school, Ms. Handmaker served as an  intern  at  the  U.S.  Department of Justice's Criminal  Division  focusing  on  cases involving child sexual abuse. She also served on the board of The Virginia Innocence Project, the University of Virginia's arm of the national litigation and public policy organization dedicated to exonerating wrongfully convicted people through DNA testing and reforming the criminal justice system. Ms. Handmaker also participated in the University of Virginia School of Law's Moot Court program and served on the Editorial Board of the Journal of Law & Politics.

# EXHIBIT 2-B

To:          Michigan State Bar Foundation

From:        Michigan Foreclosure Prevention Project

Re:          MFPP Grant Report: Q4 2017

Date:        January 31, 2018

**Staffing and services:** The Michigan Foreclosure Prevention Project (MFPP) attorneys continue to litigate cases on behalf of homeowners to avoid foreclosure and save their homes. Many cases in litigation involve issues around enforcing a loan modification or ensuring that the servicers properly review homeowners for loan modifications, although attorneys have also been representing tenants of foreclosed homes with more frequency. In addition to the Detroit area, advocates in other counties are handling more cases involving tax foreclosures. There is also an increase in land contract cases. We continue to monitor significant appellate decisions which impact our state and federal court cases. The MFPP partners continue to provide support to housing counselors by responding to questions on the list serve, taking regular calls and referrals from housing counselors, and educating the housing counselors about new developments in foreclosure at the quarterly task force meetings and other periodic trainings.

**Q4 statistical reports:** These are attached. In 2017, the MFPP opened 4,023 cases for new clients and closed 4,127 cases. Of the 4,127 cases closed so far this year, clients in 3,016 cases received full representation—the other 1,111 cases were either referred to housing counselors after being given legal advice (267 cases) or declined, either because of lack of a viable legal claim (524 cases) or because the partner program lacked the resources to provide full representation services (320 cases). Of the 3,016 cases that were resolved legally, the MFPP partners provided some benefit to the client (i.e., obtained a positive legal outcome) in over 99% of the cases. At the end of December, 612 foreclosure cases remained open. 77 of these cases are in active litigation in court; the remaining cases are being analyzed for appropriate legal strategy or attorneys are seeking other resolutions for clients, such as gathering resources to purchase a home at tax auction or negotiating a loan modification, extended occupancy, or cash for keys.

In 2017, the MFPP partners closed 2119 cases where clients were assisted with non-foreclosure cases ancillary to the foreclosure. 2133 new cases of this type were opened in all four quarters of 2017. The biggest category of both closed and new open cases is administrative hearings to assist homeowners to reduce the amount of property taxes owed and save homes from property tax foreclosure. Other case areas included bankruptcy, stopping or reducing a debt collection action or garnishment, and family law (e.g., child support cases to obtain income for a homeowner).

These numbers reflect the typical pattern of casework that the MFPP has been reporting for many years. It is clear that 2018 will be a year in which the need for foreclosure prevention work continues to be great.

MFPP partner programs closed a total of 6,304 foreclosure and foreclosure risk cases in 2017, each one representing a household. There were a total of 12,502 people in these households whose foreclosure cases were resolved. Of this number, there were 4,036 children, 235 households that contained a veteran, and 1,285 households that contained a senior citizen (60 or older).

**Training:** The MFPP held its quarterly Foreclosure Task Force meeting in November for housing counselors and legal services attorneys doing foreclosure prevention work.  The Task Force meeting included an overview of student loans, a discussion about cases and issues; updates to Step Forward; and a brief update regarding Legislative efforts involving Land Installment Contracts. The task force meeting also provided an opportunity for housing counselors and attorneys to discuss recent difficult and/or interesting cases.

The MFPP attorneys continue to hold their quarterly strategic litigation planning phone conferences.

**Technology:**  MPLP continues to provide technology support to the MFPP, including:

- Monitoring list serve traffic

- Adding people to and removing people from the MFPP list serves

- Posting of training materials to MFPP website

- Ongoing content management on MFPP website

- Setting up meeting webinars, recording trainings, then formatting and posting trainings on the MFPP website to make them available to MFPP members

**Conclusion:**  We are very pleased with the progress of the program.  There is a great deal of active participation from partner programs; successful relationships with counselor agencies are proving to be helpful to all involved; the trainings and task forces are well attended and well-reviewed; client demand has far exceeded our projections; and the policy impact of the new program has been remarkable.  Additionally, the state-wide service delivery model which is the basis of the project has proven to be a success, which can be seen from the active use of the list serves, and the number of pleadings and orders that have been shared on the list serves and through the brief bank, and the tremendous success the project has had on behalf of homeowners in Michigan.

Thank you for funding this successful and important work. We would be very happy to meet at your convenience to discuss the program or to answer any questions about this report.

| MICHIGAN FORECLOSURE PROJECT | | | | YTD |
|---|---|---|---|---|
| **OPEN CASE REPORT** | | | **Period Ending:** | 12/31/2017 |
| | A | B | C | D |
| | Cases open at beginning of year (Jan. 1) | New cases opened from Jan.1 through this quarter end | Cases remaining open at this quarter end | Calculated YTD Cases Closed A+B-C |
| Not Pred. Lending | 138 | 706 | 106 | 738 |
| Pred. Lending | 56 | 94 | 40 | 110 |
| Prop. Tax | 513 | 3099 | 461 | 3151 |
| Landlord Tenant | 5 | 116 | 3 | 118 |
| Deficiency Suits | 4 | 8 | 2 | 10 |
| **TOTALS** | 716 | 4023 | 612 | 4127 |
| | | | | |
| Other Foreclosure Risk | 101 | 2133 | 115 | 2119 |

| **CLOSED CASE REPORT - Foreclosure Cases** | | | | | | | **Foreclosure Cases Closed YTD** | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Counsel & Advice | Limited Action | Negot. Settlement (w/o Lit.) | Negot. Settlement (w/ Lit.) | Admin. Agency Decision | Court Decision-Uncontested | Court Decision-Contested | Court Decision-Appeal | Closed after Other Service | Extensive Service | TOTAL |
| **TOTAL MFPP** | | | | | | | | | | | |
| Not Pred. Lending | 464 | 82 | 27 | 72 | 3 | 15 | 20 | 2 | 3 | 50 | 738 |
| Pred. Lending | 15 | 9 | 27 | 40 | 0 | 0 | 15 | 0 | 1 | 3 | 110 |
| Prop. Tax | 710 | 1078 | 30 | 11 | 1293 | 4 | 5 | 0 | 2 | 18 | 3151 |
| Landlord Tenant | 60 | 5 | 2 | 29 | 0 | 0 | 22 | 0 | 0 | 0 | 118 |
| Deficiency suits | 5 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 10 |
| **TOTALS** | 1254 | 1175 | 86 | 155 | 1296 | 19 | 62 | 2 | 6 | 72 | 4127 |

| **CLOSED CASE REPORT - Other Foreclosure Risk** | | | | | | | **Other Foreclosure Risk Cases closed YTD** | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Counsel & Advice | Limited Action | Negot. Settlement (w/o Lit.) | Negot. Settlement (w/ Lit.) | Admin. Agency Decision | Court Decision-Uncontested | Court Decision-Contested | Court Decision-Appeal | Closed after Other Service | Extensive Service | TOTAL |
| **TOTAL MFPP** | | | | | | | | | | | |
| Consumer | 23 | 6 | 1 | 8 | 0 | 2 | 13 | 0 | 1 | 5 | 59 |
| Education | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Employment | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Family | 14 | 2 | 0 | 11 | 0 | 2 | 8 | 0 | 0 | 1 | 38 |
| Juvenile | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Health | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Housing | 687 | 380 | 2 | 6 | 896 | 3 | 2 | 0 | 2 | 9 | 1987 |
| Income Maintenance | 12 | 2 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 2 | 19 |
| Individual Rights | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Miscellaneous | 7 | 3 | 0 | 0 | 0 | 3 | 1 | 0 | 0 | 0 | 14 |
| **TOTALS** | 743 | 394 | 3 | 27 | 898 | 10 | 24 | 0 | 3 | 17 | 2119 |

## OUTCOMES FOR FORECLOSURE CASES

| Outcomes for foreclosure cases closed YTD | |
|---|---|
| Positive Outcomes | 3003 |
| Unsuccessful Outcomes | 13 |
| Insuf. Resources | 320 |
| Advice on Foreclosure/referred to counselor | 267 |
| No meritorious legal claim | 524 |
| **TOTAL** | 4127 |

| Detailed positive outcomes for foreclosure cases closed YTD | |
|---|---|
| Saved Home | 2149 |
| Saved Home - loan modification | 17 |
| Home Sale to prevent foreclosure | 7 |
| Bankruptcy to Save Home or Extended Occupancy | 11 |
| Extended Occupancy to Obtain Alt. Housing | 762 |
| "Cash for Keys" or other | 6 |
| Reduced/Eliminated Amt. owed in Deficiency Suit | 9 |
| Prevented Eviction | 44 |
| **TOTAL** | 3005 |

| **YTD CASE OUTCOME PERCENTAGES** | |
|---|---|
| Positive outcomes in full representation cases | 100% |
| Cases found to have merit after first interview | 87% |
| Cases closed with a referral to housing counselor | 6% |
| Cases turned away for lack of resources | 8% |

| **Detailed information about people served YTD** | |
|---|---|
| Number of foreclosure and foreclosure risk | 6304 |
| Number of all people in these households | 12502 |
| Number of children in these households | 4036 |
| Number of these households which include a veteran | 235 |
| Number of these households which include a senior (60+) | 1285 |

| Outcomes for other foreclosure risk cases closed YTD | |
|---|---:|
| 001 Advice/brief service will permit client to resolve the case | 734 |
| 002 Insufficient resources to fully represent or assist client | 19 |
| 009 Enforced rights against predatory lending | 0 |
| 010 Obtained federal bankruptcy protection | 2 |
| 011 Stopped/reduced debt collection, garnishment, repossession | 22 |
| 012 Overcame UDAP including enforced contract & warranty rights | 0 |
| 013 Prevented utility shut off or restored utility service | 0 |
| 014 Unsuccessful in achieving client goal in a consumer matter | 7 |
| 100 Improved child's access to education | 0 |
| 101 Unsuccessful in achieving client goal in education matter | 0 |
| 200 Enforced wage claim | 0 |
| 201 Protected client against employment discrimination | 0 |
| 202 Enforced other employment rights (non-wages) | 1 |
| 203 Unsuccessful in achieving client goal in employment matter | 0 |
| 204 Obtained tax benefits/prevented tax consequences | 1268 |
| 300 Obtained a divorce, custody and child support for a dv victim | 6 |
| 301 Obtained/maintained custody and/or parenting time | 0 |
| 302 Obtained divorce, legal separation, or annulment | 8 |
| 303 Obtained/preserved PPO/other protective order for DV victim | 1 |
| 304 Maintained/improved family economic stability | 1 |
| 305 Reunited/maintained parent/child relationship in guardianship | 1 |
| 306 Unsuccessful in achieving client goal in domestic matter | 2 |
| 308 Obtained Delegation of Parental Powers (POA) to protect child | 0 |
| 500 Obtained a Medical POA/living will/health proxy | 0 |
| 501 Prevented nursing home eviction | 0 |
| 502 Obtained/Maintained or increased Medicaid/Medicare coverage | 4 |
| 503 Obtained access to health insurance | 0 |
| 504 Unsuccessful in achieving client goal in health matter | 0 |
| 600 Prevented eviction/threat to possession(non-subsidized housing) | 6 |
| 601 Prevented eviction/threat to possession (subsidized housing) | 0 |
| 602 Avoided mortgage or property tax foreclosure or other loss of | 5 |
| 603 Obtained reduction in property taxes | 1 |
| 604 Obtained time to find alternate housing for evicted client | 4 |
| 605 Obtained/enforced tenant's right to repairs | 0 |
| 606 Enforced other tenant rights(under lease, state, & local law) | 1 |
| 607 Regained or protected possession in a lock out case | 0 |
| 608 Restored/prevented utility shut off by landlord | 0 |
| 609 Preserved right to possession in land contract or mobile home | 11 |
| 610 Assisted client in gaining admission to housing | 0 |
| 611 Unsuccessful in achieving client goal in housing matter | 0 |
| 612 Successfully transferred property right | 9 |
| 700 Client/family obtained/maintained/increased benefits | 2 |
| 701 Unsuccessful in achieving client goal in income maintenance | 4 |
| 801 Immigration status clarified or improved | 0 |
| 802 Obtained U.S. Citizenship | 0 |
| 803 Enforced rights for an immigrant crime victim | 0 |
| 804 Enforced rights for a disabled individual | 0 |
| 805 Enforced/Protected individual rights | 0 |
| 806 Unsuccessful in achieving client goal in individual rights matter | 0 |
| 900 Obtained a Will | 0 |
| 901 Successfully defended a Tort action | 0 |
| 902 Obtained driver's license restoration | 0 |
| 903 Obtained expungement of criminal record | 0 |
| 904 Obtained Financial POA | 0 |
| 905 Nonprofit received legal assistance/representation | 0 |
| 906 Unsuccessful in achieving client goal in a miscellaneous matter | 0 |
| TOTAL | 2119 |