UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN J. MARTIN, YAHMI NUNDLEY,
and KATHLEEN CADEAU, on behalf of
themselves and persons similarly situated,

        Plaintiffs,                             Case Number 15-12838
v.                                                   Honorable David M. Lawson

TROTT LAW, P.C. and DAVID A. TROTT,

        Defendants.
_____/

## ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT AND PLAN OF ALLOCATION, IMPOSING INJUNCTIVE RELIEF, GRANTING MOTION FOR ATTORNEY FEES, AND DISMISSING CASE

      The Court conducted a fairness hearing on September 27, 2018 to determine whether a settlement agreement should be given final approval on behalf of the certified settlement class in this case. The Federal Rules of Civil Procedure require court approval of settlements in class actions, Fed. R. Civ. P. 23(e)(2), and if the settlement would determine the rights of and bind absent class members, "the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate," *ibid.* The September 27 hearing was the second step in the settlement approval process. *See* Manual for Complex Litigation § 23.632-.633 (4th ed.); *see also Tennessee Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 565 (6th Cir. 2001). On June 29, 2018, the Court granted preliminary approval of the settlement agreement under Federal Rule of Civil Procedure 23(e) as the first step in the process. The Court directed that written notice to the class be given by July 20, 2018 via first-class mail augmented by other media. Plaintiffs' counsel retained Epiq Class Action & Claims Solutions, Inc. as the agent of the named plaintiffs and class counsel to give notice in the manner approved by the Court, and ultimately to administer the

settlement, process claims, and make distributions. The Court approved the retention of Epiq as the settlement administrator.

I.

The proposed settlement addresses the plaintiffs' claims under the federal Fair Debt Collection Practices Act (FDCPA) and Michigan's Regulation of Collection Practices Act (RCPA), alleging that the defendants' mass-produced dunning letters violated those statutes principally by (1) giving the appearance of communications sent by an attorney, when in fact no attorney was involved in any meaningful way in producing or reviewing them, (2) including language that a reasonable consumer could perceive as abrogating or "overshadowing" their rights to request verification of the debt and to be assured that any foreclosure proceeding would be put on hold until a responsive verification was produced, and (3) using the term "Corporate Advance" in the letters to describe a category of amounts owed, which the plaintiffs alleged was misleading because the term was not defined in the underlying mortgage documents.

The Court previously certified the following class, which the Court conditionally certified in an order granting in part the plaintiffs' first class motion:

> All persons to whom Trott Law PC caused to be sent any version of the Trott PC Foreclosure Letter, as defined in the proposed settlement agreement, in connection with mortgages conveyed for residential real property located in Michigan, which was not returned as undelivered by the U.S. Post Office, dated from August 11, 2009, through June 29, 2018.

Order Granting Prelim. Approval of Class Settlement [R. 171] at 13 (Pg ID 4334). The Court also granted preliminary approval of the revised settlement.

II.

Under the proposed settlement, the defendants agreed to pay $7.5 million into a common fund for payment of claims, attorney fees, and expenses, and they made the required deposits to the common fund account by July 20, 2018.

The defendant's also agreed to entry of an injunction requiring defendant Trott Law, P.C., commencing from the entry of judgment for a period of five years, to: (1) include in foreclosure letters sent by the firm the following text: "An attorney has reviewed information supplied by our client in preparation of this letter."; (2) include in versions of the foreclosure letters that include references to reinstatement of a mortgage, the following text: "No timing requirement relating to reinstatement alters your rights to dispute the debt or seek validation within the timelines set forth in this letter."; and (3) provide a copy of this judgment to each member of the firm's executive committee, and notify each member of its management with responsibility for formulating or approving the content of foreclosure letters of the contents of the judgment.

The agreement calls for payments from the fund to be allocated as follows. First, to cover the costs for the settlement fund administrator, and any other administrative expenses associated with the settlement; second, to pay out awards of attorneys' fees and costs according to hours and reasonable hourly rates approved by the Court; third, to pay $5,000 as an incentive award to each of the three named plaintiffs (a total of $15,000); and finally to pay to each class member who submitted a timely claim form *pro rata* share of the balance of the fund, estimated to be approximately $82.10, but which could increase slightly if the settlement administrator does not incur the full amount of the projected expenses to complete the disbursement of the settlement funds. Those payments are projected fully to exhaust the settlement common fund. However, the parties also agreed that if any checks disbursed to claimants remain uncashed after 90 days, then those checks will be canceled and the resulting funds from uncashed checks sent to claimants would be divided with half the remainder deposited into a *cy pres* trust for the benefit Michigan Advocacy Program, a non-profit organization, targeted for its Michigan Foreclosure Prevention Project (MFPP), and the other half being returned to the defendants.

III.

Under the schedule set by the Court, the period for filing claims, objections, and opt-out notices ran from July 20, 2018 to September 3, 2018. The settlement administrator sent notices to 248,686 class members who were identified from the defendants' records, by first-class mail, consisting of a postcard, with a tear-away claim form with pre-paid postage applied, so that class members could simply fill in their current name and address, sign the form, and drop it in any mailbox. Class members who used the uniquely numbered postcard claim forms were not required to supply proof of class membership. The claims administrator also processed each class member's mailing address through the U.S. Post Office change of address service, and then through a second, third-party address updated service, before mailing out the postcard notices. The claims administrator represents that it was able through that process to "achieve a 93.4% success rate" for the mailed notices.

The claims administrator has averred that it also published internet banner notices and implemented a campaign to achieve at least eight million impressions in Michigan and four million additional impressions nationally through internet media. The banner notices were clickable and directed potential class members to the settlement website. Those internet advertisements generated approximately 15.8 million impressions in Michigan and approximately 9 million impressions nationally. The claims administrator also established a settlement website that provided additional information about the settlement and which allowed claimants to submit a claim electronically. Finally, the claims administrator also acquired sponsored search listings that were geotargeted throughout Michigan, to boost the visibility of the settlement website. The sponsored search listings were displayed 2,337 times, resulting in 1,270 clicks that displayed the

settlement website. As of September 5, 2018, there had been 35,719 unique visitors to the settlement website and 125,172 website page views.

As of September 4, 2018, as a result of all those notices efforts, the administrator received a total of 54,445 claims from absent class members.

In their motion for final approval of the settlement, the plaintiffs identified 71 individuals who submitted opt-out notices to the claims administrator. Two class members objected to the settlement. Lisa Marie Conklin filed an objection through counsel in which she asserted that (1) the hourly rates that class counsel relied on for their lodestar calculation are excessive, and, based on rates that Ms. Conklin asserts are more typical for the sort of work performed, a reasonable total attorney fee would be around 60% of the amount requested by class counsel; and (2) the settlement "would be more fair if all unclaimed funds were provided to the designated charity, rather than revert funds back to the defendants." Terees Williams filed an objection asserting that the settlement is inadequate to compensate the plaintiffs for the defendants' willful misconduct, and she insists that in order to be fair the terms should include $1,000,000 in actual damages payable to Ms. Williams personally to compensate her for injuries suffered as a result of alleged illegalities in the foreclosure of her home and resulting eviction.

IV.

Federal Rule of Civil Procedure 23(e) imposes certain "rules for the settlement, dismissal, or compromise of class claims." *Whitlock v. FSL Management, LLC*, 843 F.3d 1084, 1093 (6th Cir. 2016). "It requires that class-action claims 'may be settled, voluntarily dismissed, or compromised only with the court's approval.'" *Ibid.* (quoting Fed. R. Civ. P. 23(e)). "Approval is only warranted where the court determines, inter alia, that the proposed class settlement would be 'fair, reasonable, and adequate.'" *Ibid.*

As an initial matter, it appears that the absent class members will receive approximately 60% of the settlement fund proceeds, and that they could receive individual payments of around $82 each, which the plaintiffs assert "splits the difference" between the statutory damages that could be available if the plaintiffs prevailed at trial ranging from a baseline of $50 for each non-willful violation and $200 if willful misconduct by the defendants is proved.

The plaintiffs have established that the proposed settlement is adequate, reasonable, and fair to the class. "Factors that guide [the assessment by the Court of a proposed class settlement] include: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Whitlock*, 843 F.3d at 1093 (quoting *UAW v. GMC*, 497 F.3d 615, 631 (6th Cir. 2007)).

*First*, the risk of fraud and collusion is low. The parties litigated the merits of the claims over nearly three years, through two rounds of vigorously contested dispositive motions. Both sides sought and secured some victories (and suffered some defeats) in those battles. The parties also engaged in a lengthy mediation presided over by an experienced professional mediator, over the course of three days. At the end of those negotiations they achieved consensus on a settlement that addresses the claims and defenses of all parties.

*Second*, the litigation is complex, and the expenses and duration already have been substantial, and would grow more so if the case proceeded to trial. The cumulative 113 pages of the Court's two opinions on the parties' dispositive motions is ample testament to the multiplicity and complexity of the legal issues presented by the litigation, and that was without the Court

having occasion to dive deeply into any disputes over the parties' Sisyphean discovery ordeal, and an inevitable round of summary judgment motions.

*Third*, the parties have engaged in extensive formal discovery throughout the pendency of this litigation to explore the basis of the plaintiffs' claims. Depositions of all the named plaintiffs and defendant Trott Law, P.C.'s principals and some of its attorneys were completed. The parties also substantially progressed toward the production of millions of pages of electronic discovery, at tremendous expense to both sides. All indications are that completion of that process could involve a total span of time and costs of production and discovery review that would approach or even exceed the total contemplated class recovery agreed to in the settlement.

*Fourth*, the plaintiffs' prospects for success on the merits appear good, but not certain. The plaintiffs repelled motions to dismiss on some of their claims, but other claims were dismissed either as untimely or without merit. The defendants, similarly, had some affirmative defenses stricken, but were allowed to proceed with others. The core questions in the case turn on an assessment by the jury of how a reasonable consumer would understand the language of the letters in question, and the import of that language is open to debate. A jury readily could find that the letters were deceptive, or that they were not. Moreover, a jury also would have to assess circumstances such as whether any attorney was meaningfully involved in review of the letters before they were sent, and the defendants consistently have held to the position that the letters sent on attorney letterhead were not deceptive because their attorneys were so involved.

*Fifth*, class counsel and the named plaintiffs who actively participated in the litigation and the mediation express their strong endorsements of the settlement.

*Sixth*, the absent class members who received notice and who have responded in any way nearly unanimously favor the settlement. More than 54,000 absent class members filed claim

forms indicating their willingness to participate in the settlement, and only 70 out of the more than 248,000 identified class members elected to opt out. Two class members filed objections, but neither of those raise any serious doubt about the fairness or adequacy of the settlement.

Ms. Conklin's objection that the settlement would be "more fair" if any unclaimed funds reverted solely to the designated charity rather than half going back to the defendants does not provide any basis for rejection of a settlement that is fair and reasonable for all of the reasons noted above, and that will result in a substantial recovery for the class. Class settlements including a reverter clause such as the one at issue here routinely are approved as fair and reasonable by federal courts, *e.g.*, *Fager v. CenturyLink Commc'ns, LLC*, 854 F.3d 1167 (10th Cir. 2016), and Ms. Conklin has not cited any contrary authority holding that the presence of a reverter provision renders a class settlement *per se* unreasonable. Conklin's objection to the fee request by class counsel is discussed further below.

Ms. Williams objects that the settlement is unfair because it does not provide for payment of $1,000,000 in actual damages personally sustained by her. But, as her papers demonstrate, and as she explained at the hearing, her damages claim stems not from the FDCPA and RCPA technical violations identified in the class complaint; rather, they were caused by her individual foreclosure ordeal. The claims in this litigation never have embraced any alleged actual damages by any class members, and the claims were based entirely on purely formal defects in several form dunning letters used by the plaintiffs. This litigation never has embraced any claims for actual damages resulting from wrongful conduct in any foreclosure or eviction proceedings, and the plaintiffs never have pursued, on behalf of themselves or absent class members, any recovery for any actual damages resulting from the loss of their homes. Ms. Williams has not suggested any other basis for objecting to the settlement except her claim that it does not include an award of damages to her

personally based on claims that never were within the scope of this litigation. Ms. Williams's remedy here is to opt out of the settlement class s she can pursue her individual claims that might be tied to the issues resolved by the settlement. She elected to do that at the hearing, and the Cour will permit her to opt out.

The Court also received and docketed a letter from James and Bonnie McClung (R. 197). However, that letter does not set forth any discernible objection to the terms of the settlement, and it appears to consist mainly of complaints that the McClung's have about the conduct of their mortgage lender, Chase Bank (which is not a defendant), in the course of a foreclosure of their home. That correspondence does not supply any basis to question fairness of the settlement involving the parties before the Court.

*Seventh*, the public interest favors resolution of the matter by way of a settlement that will secure a substantial recovery for the class members while avoiding the waste of considerable time and effort by the parties and the Court, likely to reach more or less the same end.

The named plaintiffs submitted declarations attesting to the many hours that each of them spent participating in this litigation including sitting for multiple interviews with counsel, answering written discovery, appearing for depositions, meeting with plaintiffs' counsel, and attending the mediation. Lead Plaintiff Brian Martin devoted 130 hours of his time, missed work without pay, and attended two mediation sessions, including the second extended session that ran for more than 12 hours. Plaintiff Yahmi Nundley spent 100 hours on similar activities, and Kathleen Cadeau, who joined the litigation later than the other two named plaintiffs, devoted 45 hours of her time. The Court is satisfied that the requested incentive payments of $5,000 each for the class representatives "are not in fact a bounty," *see Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 311 (6th Cir. 2016), but instead represent just compensation for the

time and effort spent on bringing this action to a successful conclusion. These incentive awards may be paid as expenses of administration.

V.

As noted in the order preliminarily approving the settlement class, "[a]ny class certification must satisfy Rule 23(a)'s requirement of numerosity, commonality, typicality, and adequate representation." *Clemons v. Norton Healthcare Inc. Retirement Plan*, 890 F.3d 254, 278 (6th Cir. 2018). "Further, a class action must fit under at least one of the categories identified in Rule 23(b)." *Ibid.* "The district court must conduct 'a rigorous analysis' as to all the requirements of Rule 23." *Id.* at 278-79 (quoting *Pipefitters Local 636 Insurance Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 630 (6th Cir. 2011)).

That "rigorous analysis" was performed when the Court conditionally certified the settlement class. The evidence presented by the parties in their motion for final settlement approval fortifies the previous findings. *First*, the conditionally certified class comprising approximately 248,000 current or former Michigan homeowners who received dunning letters from the defendants during the class period certainly meets the requirement of being so numerous that joinder of all those persons as individual plaintiffs would be impracticable.

*Second*, there are prominent common questions of law and fact affecting all of the class members that are pertinent to the defendants' liability. The core question in this case is whether the language used in several specific iterations of the defendants' form letters would be misleading to such an extent that a reasonable consumer receiving them would be misled as to the extent of his or her rights to contest a foreclosure and how long he or she might have to do so. In order to decide that question, a jury would have to consider the perspective of a hypothetical reasonable consumer receiving the letters, without regard to any actual perception by any of the hundreds of

thousands of plaintiff class members. That central common issue would govern the defendants' liability on all of the FDCPA and RCPA claims.

*Third*, because the claims and defenses of the parties principally would concern the propriety of the defendants' systematic actions and application of their policies, they are sufficiently typical of all class members to be addressed in common. Since the plaintiffs sought statutory damages only in their complaint and never have alleged any actual damages, no assessment of the individual circumstances of any class members would be required. Either all of the plaintiffs are entitled to relief or none of them are; and whatever relief they should receive would be common to them all in the form of a statutory damage award per occurrence of the unlawful conduct. For the same reasons, the common questions in this case entirely predominate over any individualized issues, since there are no issues that would implicate the individual circumstances of class members.

*Fourth*, the named individual plaintiffs and class representatives adequately are positioned to represent the class, and their interests sufficiently are aligned, since they all were homeowners who received foreclosure letters that contained the challenged language, and they seek to recover damages suffered under the same allegedly unlawful system.

The plaintiffs also have established that the membership of the proposed class is sufficiently ascertainable for certification under Rule 23(b)(3), as shown by the identification of approximately 248,000 class members from the defendants' records. The class administrator attested that it succeeded in mailing notices of the settlement to more than 93% of those identified absent class members, and internet outreach efforts resulted in several additional contacts with potential claimants.

The Court will certify the settlement class unconditionally.

VI.

Class counsel have filed a motion asking the Court to authorize payments of $2,499,750 for attorney fees and reimbursement of $109,014.79 in litigation expenses. Counsel represent that the fee award was calculated as 33-1/3 percent of the settlement common fund, according to the terms of the settlement agreement. "'When awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved.'" *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 279 (6th Cir. 2016) (quoting *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)). "These two measures of the fairness of an attorney's award — work done and results achieved — can be in tension with each other." *Ibid.* "The lodestar method of calculating fees better accounts for the amount of work done, whereas the percentage of the fund method more accurately reflects the results achieved." *Ibid.* (citations and quotations omitted in this and following citations except as otherwise noted). "To determine the lodestar figure, the court multiplies the number of hours 'reasonably expended' on the litigation by a reasonable hourly rate." *Ibid.* "The court may then, within limits, adjust the lodestar to reflect relevant considerations peculiar to the subject litigation." *Ibid.* "In contrast, to employ the percentage of the fund method, the court determines a percentage of the settlement to award to class counsel." *Ibid.*

"As the two methods measure the fairness of the fee with respect to different desired outcomes, it is necessary that district courts be permitted to select the more appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them." *Ibid.* The Court also may elect to "employ[] the lodestar method to determine the fairness of the fee, then . . . cross-check it with the percentage-of-the-fund calculation." *Id.* at 280. However, regardless of the method chosen, the

VI.

Class counsel have filed a motion asking the Court to authorize payments of $2,499,750 for attorney fees and reimbursement of $109,014.79 in litigation expenses. Counsel represent that the fee award was calculated as 33-1/3 percent of the settlement common fund, according to the terms of the settlement agreement. "'When awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved.'" *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 279 (6th Cir. 2016) (quoting *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)). "These two measures of the fairness of an attorney's award — work done and results achieved — can be in tension with each other." *Ibid.* "The lodestar method of calculating fees better accounts for the amount of work done, whereas the percentage of the fund method more accurately reflects the results achieved." *Ibid.* (citations and quotations omitted in this and following citations except as otherwise noted). "To determine the lodestar figure, the court multiplies the number of hours 'reasonably expended' on the litigation by a reasonable hourly rate." *Ibid.* "The court may then, within limits, adjust the lodestar to reflect relevant considerations peculiar to the subject litigation." *Ibid.* "In contrast, to employ the percentage of the fund method, the court determines a percentage of the settlement to award to class counsel." *Ibid.*

"As the two methods measure the fairness of the fee with respect to different desired outcomes, it is necessary that district courts be permitted to select the more appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them." *Ibid.* The Court also may elect to "employ[] the lodestar method to determine the fairness of the fee, then . . . cross-check it with the percentage-of-the-fund calculation." *Id.* at 280. However, regardless of the method chosen, the

VI.

Class counsel have filed a motion asking the Court to authorize payments of $2,499,750 for attorney fees and reimbursement of $109,014.79 in litigation expenses. Counsel represent that the fee award was calculated as 33-1/3 percent of the settlement common fund, according to the terms of the settlement agreement. "'When awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved.'" *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 279 (6th Cir. 2016) (quoting *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)). "These two measures of the fairness of an attorney's award — work done and results achieved — can be in tension with each other." *Ibid.* "The lodestar method of calculating fees better accounts for the amount of work done, whereas the percentage of the fund method more accurately reflects the results achieved." *Ibid.* (citations and quotations omitted in this and following citations except as otherwise noted). "To determine the lodestar figure, the court multiplies the number of hours 'reasonably expended' on the litigation by a reasonable hourly rate." *Ibid.* "The court may then, within limits, adjust the lodestar to reflect relevant considerations peculiar to the subject litigation." *Ibid.* "In contrast, to employ the percentage of the fund method, the court determines a percentage of the settlement to award to class counsel." *Ibid.*

"As the two methods measure the fairness of the fee with respect to different desired outcomes, it is necessary that district courts be permitted to select the more appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them." *Ibid.* The Court also may elect to "employ[] the lodestar method to determine the fairness of the fee, then . . . cross-check it with the percentage-of-the-fund calculation." *Id.* at 280. However, regardless of the method chosen, the

Court's decision must include "a clear statement of the reasoning used in adopting a particular methodology and the factors considered in arriving at the fee in order to allow effective appellate review for abuse of discretion." *Id.* at 279. "District courts have the discretion to select the particular method of calculation, but must articulate the 'reasons for adopting a particular methodology and the factors considered in arriving at the fee.'" *Ibid.* (quoting *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009)). "*Moulton* set out the germane factors," which include, "'(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides.'" *Ibid.* (quoting 581 F.3d at 352).

The Court finds that the percentage of the fund method is appropriate here for evaluating the reasonableness of the attorney fee since the result achieved for the class in terms of the cash payments to be made from the fund was substantial, and class counsel undertook the representation on a contingent fee basis and advanced significant labor and expenses to litigate the case, particularly during the discovery process. And the percentage award requested is appropriate to compensate class counsel adequately for the risk inherent in that contingent fee representation. *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 747 (2018) ("Under the percentage-of-recovery method, the requested fee was equal to 25% of the settlement fund [which] was commensurate with the risk posed by the action and the time and skill required to secure a successful result for the class, given that class counsel faced three motions to dismiss and participated in extensive settlement negotiations."); *see also Rawlings v. Prudential-Bache*

*Properties, Inc.*, 9 F.3d 513, 515 (6th Cir. 1993) (noting the "trend towards adoption of a percentage of the fund method in [common fund] cases.").

"When conducting a percentage of the fund analysis, courts must calculate the ratio between attorney's fees and benefit to the class." *Gascho*, 822 F.3d at 282. "Attorney's fees are the numerator and the denominator is the dollar amount of the Total Benefit to the class." *Ibid.* However, when determining the total benefit to class members, the *Gascho* court, in a parenthetical remark, included "the attorney's fees and . . . costs of administration," in addition to the payout to class members. *Ibid.* That calculation method departs from traditional norms in non-class-action contingent fee cases, where the fee is determined by a percentage of the *net* recovery. *See Hunt v. Hadden*, No. 14-10713, 2015 WL 3473680, at *8 (E.D. Mich. June 2, 2015), *order vacated in part on reconsideration,* No. 14-10713, 2015 WL 13048812 (E.D. Mich. July 17, 2015). But in class cases, considerable amounts of litigation expenses must be advances by class counsel on behalf of absent potential plaintiffs too numerous to consult. Therefore, whereas in individual cases, a client can agree to share in the risk of litigation by agreeing to pay a share of the expenses from a potential recovery — or perhaps all of them if there is no recovery — class counsel does not have that option and must bear the costs alone on behalf of the class in general. Those advancement of costs therefore truly benefit the class and sensible are part of the "Total Benefit."

The expenses of administering a settlement may be viewed differently, however, because those expenses are not incurred until recovery is virtually assured. And this Court has held that settlement administration expenses can, at times, be netted out of the denominator when calculating the attorney's fee percentage. *Beattie v. CenturyTel, Inc.*, No. 02-10277, 2010 WL 11545032, at *4 (E.D. Mich. July 9, 2010). The rationale for doing so is that

> the cost of settlement administration is an item over which absent class members
> have no control. Class counsel is in the better position to evaluate the necessity and

reasonableness of the charges by the settlement administrator. However, if the attorney's fees are calculated on the basis of a fund total that is unaffected by the settlement administrative charges, class counsel has no incentive to continue monitoring those continuing litigation expenses.

*Ibid.* *Beattie* did not suggest a hard-and-fast rule to be applied in every case, however. In this case, the notification task was daunting, mainly because of the nature of the case. The absent class members were identified by the defendants' records, but the names were associated with addresses of houses that had been through foreclosure and eviction proceedings. In many — probably most — cases, the class member had to be tracked down at a new location. The claims administrators' efforts were extraordinary and achieved remarkable results, where over 93% of the 248,686 class members were notified of the settlement. It is safe to say that without those efforts, the response rate of nearly 22% would not have been achieved, and the benefits of the settlement would not have been distributed so widely. Under these circumstances, it is sensible to include the expenses of settlement administration in the Total Benefit to the class.

In this case, there is no reverter authorized by the settlement agreement; all of the net common fund will be distributed to claimants on a *pro rata* basis. The only exception is for uncashed check, an amount that likely will be negligible. And the settlement also includes an injunction that requires the defendants to modify their collection practices, which is difficult to value, but has value nonetheless. Therefore, the Total Benefit to class members is the full amount of the common fund, or $7.5 million. The requested attorney's fee is $2,499,750. The attorney's fee thus represents 33.3% of that denominator, which is within the range of percentage fees that have been approved in complex consumer class actions. *E.g.*, *Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017) ("Although 38% is on the high end of the typical range, we cannot say that it is unreasonable when compared to other awards within this circuit." (approving fee petition in class action by borrowers against mortgage loan servicer)); *Gascho*, 822 F.3d at 275 (affirming

award of $2.39 million in attorney fees and costs premised on a percentage of the fund assessed by the district court at 21% of the monetary benefit available to the class); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1294 (11th Cir. 1999) (noting that the "majority of common fund fee awards fall between 20% to 30% of the fund"); *Simpson v. Citizens Bank*, No. 12-10267, 2014 WL 12738263, at *6 (E.D. Mich. Jan. 31, 2014) ("Class Counsel's request for 33% of the common fund created by their efforts is well within the benchmark range and in line with what is often awarded in this Circuit."); *In re Packaged Ice Antitrust Litig.*, No. 08-MDL-01952, 2011 WL 6209188, at *19 (E.D. Mich. Dec. 13, 2011) ("[T]he requested award of close to 30% appears to be a fairly well-accepted ratio in cases of this type and generally in complex class actions." (surveying cases awarding up to 33-1/3% of the common fund)); *In re Delphi Corp. Sec., Derivative & ERISA Litig.*, 248 F.R.D. 483, 505 (E.D. Mich. 2008) (approving attorney award of 18% of settlement fund); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 532 (E.D. Mich. 2003) ("The requested 17% fee is well within the 20-30% range of reasonable attorneys' fees generally awarded in this Circuit."). The Court finds that 33-1/3% is both a reasonable and appropriate attorneys' share of the common fund in this case, especially in light of the representation by class counsel, which the Court accepts as genuine, that the settlement amount of $7.5 million is "unprecedented" in the history of consumer class actions by home owners against law firms engaged in the business of foreclosing residential mortgage loans. The approval of the total fee requested is not problematic here on a percentage of the fund basis.

Based on the affidavits filed by plaintiffs' counsel, attorneys for the class expended 4,256.45 hours on this litigation, and 120 of those hours are characterized as potentially duplications of effort. That would yield a lodestar of $2,428,877 based on a blended hourly rate of approximately $570. Considering the complexity of the case, the experience of the several

attorneys who worked on the case, and the relevant market data from the State Bar of Michigan, the Court finds that the adjusted rate is reasonable. The requested attorney is approximately 3% above the lodestar, which cross-checks within a reasonable range of the requested fee determined by the percentage of the fund method.

The Court also finds that the *Moulton* factors favor approval of the fee. The value of the benefit rendered by plaintiffs' counsel is substantial and evidently will result in payments of around $82 to more than 54,000 class members, which represents a respectable middle ground within the range of statutory damages that they could have hoped to secure through a favorable verdict. The value of the services was high, since able counsel secured decisive victories for their clients at every crucial stage of the proceedings, culminating in a very favorable settlement including damages and injunctive relief. Class counsel was retained on a contingent basis and assumed the risk of advancing substantial costs and expenses of the litigation throughout its tortuous course, particularly with respect to the herculean efforts of the parties during the electronic discovery process. As noted above, the litigation was complex, and the proceedings hotly contested. Every indication in the record is that counsel for the plaintiffs fought ably and hard to vindicate their clients' interests, and society would do well to reward those attorneys who engage in such practice to defend the rights of the many thousands of Michigan homeowners who face the potential loss of their homes through foreclosures. Finally, the attorneys are experienced and well regarded consumer class action counsel, deserving of the contingent fee compensation for which they have applied.

Objector Lisa Marie Conklin asserts that her proposed lodestar calculation that leads to a lower total amount would result in a more appropriate fee award in this case, but she has not cited any legal authority contrary to the decisions noted above which have held that awarding a

percentage of the fund is an appropriate method for assessing a reasonable attorney fee in a case such as this, and the Court finds that the proposed lodestar calculation does not raise any serious doubt about the reasonability of the requested 33 1/3 percent fee in this case.

VII.

For the reasons stated, the Court unconditionally certifies the settlement class, approves the settlement, and grants the motions for attorney's fees.

Accordingly, it is **ORDERED** that the plaintiffs' motion for final approval of the class settlement and plan of allocation [R. 191] is **GRANTED**.

It is further **ORDERED** that the objections to the settlement are **OVERRULED** for the reasons stated here and on the record.

It is further **ORDERED** that the settlement agreement and plan of allocation is **APPROVED**.

It is further **ORDERED** that the 70 individuals who submitted to the claims administrator requests for exclusion from the class, *see* R. 191-3, Attachment 5, and objector Terees Williams hereby are deemed excluded from the class and are not bound by, nor may they participate in, the class settlement.

It is further **ORDERED** that Epiq Class Action & Claims Solutions, Inc. is **APPOINTED** as the administrator of the settlement fund. The administrator shall receive, disburse, and account for the settlement proceeds as provided by the formula for distribution of the settlement fund set forth in the settlement agreement. Class counsel shall provide and file with the Court and the defendants a report setting forth the proposed distribution of all funds paid by the defendants as called for in the settlement agreement upon completion of the evaluation of the requests for payment received from class members. After final distribution, class counsel shall file with the

Court a certificate that the settlement fund has been disbursed according to the plan, or that funds remain undistributed for any reason, including uncashed settlement checks, as the case may be.

It is further **ORDERED** that commencing with the date of entry of this order and for five years thereafter, defendant Trott Law P.C. **MUST** do all of the following: (1) Include in the "Trott PC Foreclosure Letter" (comprising all letters sent by the firm included in the definition of that phrase set forth in the settlement agreement) the following text: "An attorney has reviewed information supplied by our client in preparation of this letter." (2) Include in versions of the Trott PC Foreclosure Letter that include reference to reinstatement of a mortgage, the following text: "No timing requirement relating to reinstatement alters your rights to dispute the debt or seek validation within the timelines set forth in this letter." (3) Provide a copy of this order to each member of the Trott Law P.C. Executive Committee, and notify each member of the firm's management with responsibility for formulating or approving the content of the Trott PC Foreclosure Letter of the contents hereof. Trott Law P.C. may, after reasonable notice to class counsel, seek appropriate relief from the Court to modify the language required by this order to reflect changes in the law or a change in Trott Law P.C.'s business practices.

It is further **ORDERED** that incentive awards in the amount of $5,000 each are approved for and may be distributed to the named plaintiffs, Brian J. Martin, Yahmi Nundley, and Kathleen Cadeau. The incentive awards may be designated as expenses of administration and paid according to the appropriate priority as outlined in the settlement agreement.

It is further **ORDERED** that class counsel's motion for attorney's fees and litigation expenses [R. 181, 182] is **GRANTED**, and payments from the settlement fund are approved as follows: Class counsel shall receive $2,499,750 for attorney's fees and $109,014.79 for litigation expenses, and the settlement administrator may be paid up to $406,000.00 (and no more) in actual

expenses incurred in the course of administering the class notice and settlement, which sum includes all payments made to date.

It is further **ORDERED** that this action is **DISMISSED WITH PREJUDICE**; provided, however, that this Court retains jurisdiction over all matters relating to the enforcement of equitable relief, and the administration of the settlement agreement, including allocation and distribution of the settlement fund.

It is further **ORDERED** that Class Counsel and the settlement administrator Epiq Class Action & Claims Solutions, Inc. shall remain responsible for completion of the administration of the claims and distribution of the funds, but they may not invade the settlement fund for further reimbursement or payment of fees absent further order of the Court.

                                                    s/David M. Lawson  
                                                    DAVID M. LAWSON  
                                                    United States District Judge

Date: September 28, 2018

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on September 28, 2018.

                    s/Susan K. Pinkowski  
                    SUSAN K. PINKOWSKI